# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS

## GALVESTON DIVISION

DIVISION 80 LLC,

    *Plaintiff,*

v.

MERRICK GARLAND,
in his official capacity as
Attorney General of the United States,

UNITED STATES DEPARTMENT OF
JUSTICE,

GARY RESTAINO,
in his official capacity as
Acting Director of the Bureau of Alcohol,
Tobacco, Firearms, and Explosives,

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

    *Defendants.*

Case No. 3:22-CV-00148

# PLAINTIFF'S EMERGENCY MOTION
# FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iv

INTRODUCTION ..............................................................................1

STATEMENT OF FACTS ...................................................................3

    I.    ATF Has Long Stated That Unfinished Parts
        of a Firearm Are Not "Firearms" Under the
        Gun Control Act ...............................................................3

    II.   The Biden Administration Announces
        That It "Will Not Wait for Congress to Act
        to Take Its Own Steps" on Gun Control .........................8

    III.  The Final Rule Will Completely Destroy
        Division 80's Business .................................................. 13

ARGUMENT ................................................................................. 15

    I.    Division 80 is Likely to Succeed on the Merits ............................ 15

        A.   The Final Rule Exceeds Defendants' Statutory
            Authority and Violates the Separation of Powers
            by Attempting to Rewrite Federal Statutes ...................... 16

            1.   The Final Rule's Purported Definitions of
                the Terms "Frame or Receiver" and "Firearm"
                Are Not Authorized by Statute ............................... 17

                i.   Current Law Already Defines the Terms
                      "Frame or Receiver" and "Firearm" ............... 17

                ii.  The Final Rule Seeks to Drastically
                      Expand ATF's Regulatory Jurisdiction
                      Through Its Purported Definition of a
                      "Frame or Receiver" ......................................... 18

iii. The Final Rule Changes the Definition of a "Firearm," Which Currently Tracks the Four Statutory Categories of "Firearms," by Adding a Fifth Category With No Basis in the Statutory Text ............. 23

2. The Final Rule Imposes Unlawful Regulations on "Privately Made Firearms" .................................. 28

3. Defendants Are Not Entitled to *Chevron* Deference Because the Final Rule Defines the Substantive Scope of Federal Crimes, Triggering the Rule of Lenity ................................... 30

B. The Final Rule is Unconstitutionally Vague and Effectuates an Unconstitutional Delegation of Legislative Authority ....................................... 33

C. The Final Rule is Arbitrary, Capricious, and an Abuse of Discretion ............................................. 37

1. The Final Rule is Internally Self-Contradictory ...... 38

2. ATF Does Not Reasonably Explain its Departure From its Longstanding Prior Legal Position ............ 44

3. ATF's Stated Explanation for the Final Rule is a Pretext for Defendants' True Goal of Unlawfully Expanding ATF's Jurisdiction .............. 49

4. ATF Did Not Adequately Consider Alternative Regulatory Approaches ............................................. 51

D. The Final Rule Was Adopted Without Observance of Procedure Required by Law ............................................. 54

II. Division 80 Will Suffer Irreparable Harm if an Injunction is Not Granted .................................................. 56

A. The Final Rule Will Put Division 80 Out of Business ....... 56

B.   ATF is Attempting to Enforce the Final Rule Prior to its Effective Date Through Cease-and-Desist Letters ....... 58

C.   The Scope of Injunctive Relief Must Be Nationwide to Preserve the Status Quo and Allow Division 80 to Continue Doing Business .................................................. 61

III.   Temporary Relief Would Not Harm Defendants or the Public ................................................. 62

IV.   The Court May Postpone the Final Rule's Effective Date ........................................... 63

CONCLUSION ............................................................. 64

INDEX OF EXHIBITS ..........................................................Appendix

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ...................................................................... 37

*AFL-CIO v. Donovan,*
757 F.2d 330 (D.C. Cir. 1985) ...................................................... 55

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
522 U.S. 359 (1998) ...................................................................... 37

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,*
875 F.2d 1174 (5th Cir. 1989) ...................................................... 57

*BST Holdings, LLC v. OSHA,*
17 F.4th 604 (5th Cir. 2021) ......................................................... 63

*Business Roundtable v. SEC,*
647 F.3d 1144 (D.C. Cir. 2011) .................................................... 54

*Carter v. Welles-Bowen Realty, Inc.,*
736 F.3d 722 (6th Cir. 2013) ........................................................ 31

*Chamber of Commerce of U.S.A. v. U.S. Dep't of Labor,*
885 F.3d 360 (5th Cir. 2018) ................................................. 22, 46

*City of Arlington v. FCC,*
668 F.3d 229 (5th Cir. 2012) ........................................................ 35

*City of Dallas v. Delta Air Lines, Inc.,*
847 F.3d 279 (5th Cir. 2017) ........................................................ 15

*Corrosion Proof Fittings v. EPA,*
947 F.2d 1201 (5th Cir. 1991) ................................................ 51, 53

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.,*
600 F.2d 1184 (5th Cir. 1979)....................................................... 16

*Del. Dep't of Natural Res. & Envtl. Control v. EPA,*
785 F.3d 1 (D.C. Cir. 2015) .................................................... 44, 54

iv

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ................................................................ 49

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ................................................................ 46

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .................................................................... 22

*Family Rehab., Inc. v. Azar*,
  3:17-CV-3008, 2018 WL 3155911 (N.D. Tex. June 28, 2018) ....................... 16

*Farmers Union Cent. Exch., Inc. v. FERC*,
  734 F.2d 1486 (D.C. Cir. 1984) ............................................... 44, 54

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) .................................................................... 33

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021) ................................................................ 38

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ............................................................... 21, 27

*Green Valley Special Utility Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) ........................................................ 62

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
  968 F.3d 454 (5th Cir. 2020) ........................................................ 27

*IHG Healthcare, Inc. v. Sebelius*,
  CV H-09-3233, 2010 WL 11680368 (S.D. Tex. Apr. 1, 2010) ..................... 64

*Jarkesy v. SEC*,
  --- F.4th ----, No. 20-61007, 2022 WL 1563613 (5th Cir. 2022) .................. 37

*Jiao v. Xu*,
  28 F.4th 591 (5th Cir. 2022) ......................................................... 57

*Leggett & Platt, Inc. v. NLRB*,
  988 F.3d 487 (D.C. Cir. 2021) ............................................... 47, 52

*Leocal v. Ashcroft*,
　543 U.S. 1 (2004) ...................................................................... 30

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
　760 F.2d 618 (5th Cir. 1985) ................................................... 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
　*State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ............................................................... 38, 51

*N.Y. Progress & Prot. PAC v. Walsh*,
　733 F.3d 483 (2d Cir. 2013) .................................................... 63

*Nat'l Ass'n of Home Builders v. EPA*,
　682 F.3d 1032 (D.C. Cir. 2012) ............................................... 54

*Safety Nat'l Cas. Corp. v. DHS*,
　CV H-05-2159, 2005 WL 8168878 (S.D. Tex. Dec. 9, 2005) ......... 64

*Sessions v. Dimaya*,
　138 S. Ct. 1204 (2018) ....................................................... 33, 36

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
　989 F.3d 368 (5th Cir. 2021) ................................................ 55, 56

*Tex. Pipeline Ass'n v. FERC*,
　661 F.3d 258 (5th Cir. 2011) ................................................ 20, 35

*Texas v. Biden*,
　10 F.4th 538 (5th Cir. 2021) .................................................... 51

*Texas v. EPA*,
　829 F.3d 405 (5th Cir. 2016) ................................................... 64

*Texas v. Seatrain Int'l, S.A.*,
　518 F.2d 175 (5th Cir. 1975) ................................................... 16

*Texas v. United States*,
　809 F.3d 134 (5th Cir. 2015) ............................................. 62, 63

*Texas v. United States*,
　95 F. Supp. 3d 965 (N.D. Tex. 2015) ........................................ 64

*United States v. Jimenez,*
    191 F. Supp. 3d 1038 (N.D. Cal. 2016) ........................................ 52

*United States v. Thompson / Center Arms Co.,*
    504 U.S. 505 (1992) ................................................................. 31

*Util. Air Regulatory Grp. v. EPA (UARG),*
    573 U.S. 302 (2014) ......................................................... 21, 30

*Wages & White Lion Investments, LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ................................................ 38

**Statutes**

18 U.S.C. § 921 .......................................................................... 17

18 U.S.C. § 921(a)(3) ..........................................................*passim*

18 U.S.C. § 921(a)(3)(B) ............................................................ 1

18 U.S.C. § 922(g) ..................................................................... 32

18 U.S.C. § 923(a) ..................................................................... 31

18 U.S.C. § 923(i) ...................................................................... 31

18 U.S.C. § 924(a)(1) ................................................................ 32

18 U.S.C. § 930(a) ..................................................................... 32

5 U.S.C. § 553(b)(3) .................................................................. 54

5 U.S.C. § 705 ...................................................................... 63, 64

5 U.S.C. § 706(2)(A) .................................................................. 38

5 U.S.C. § 706(2)(A)–(C) ........................................................... 16

5 U.S.C. § 706(2)(B) .................................................................. 34

5 U.S.C. § 706(2)(D) .................................................................. 38

## Rules

27 C.F.R. § 478.11 ................................................................................. 17, 18, 23

27 C.F.R. § 479.11 ................................................................................. 18

Definition of "Frame or Receiver" and
  Identification of Firearms,
  86 Fed. Reg. 27,720 (May 21, 2021)............................................ 10, 25, 26, 29

Definition of "Frame or Receiver" and
  Identification of Firearms,
  87 Fed. Reg. 24,652 (Apr. 26, 2022)........................................................*passim*

## Other Authorities

*AR-00: 0% Receiver*, GHOST GUNNER,
  https://ghostgunner.net/zero-percent/ ......................................................... 48

*Attorney General Garland's Full Remarks on Gun Violence Prevention
  at the White House Rose Garden*, U.S. DEP'T OF JUSTICE
  (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-
  general-garland-s-full-remarks-gun-violence-prevention-
  white-house-rose-garden ................................................................................. 10

*FACT SHEET: Biden-Harris Administration Announces Initial
  Actions to Address the Gun Violence Public Health Epidemic*,
  WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/
  briefing-room/statements-releases/2021/04/07/fact-sheet-
  biden-harris-administration-announces-initial-actions-to-
  address-the-gun-violence-public-health-epidemic/ ......................................... 9

Fed. Defs.' Mot. Dismiss, *California v. ATF*,
  No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020),
  ECF No. 29, 2020 WL 9849685......................................................................... 7

Fed. Defs.' Mot. for Summ. J., *City of Syracuse v. ATF*,
  1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021), ECF No. 98................................... 7

J.D. Tuccille, *ATF's New "Ghost Gun" Rules Are as Clear as Mud*,
  REASON (Apr. 11, 2022), https://reason.com/2022/04/11/
  atfs-new-ghost-gun-rules-are-as-clear-as-mud/ ....................................... 43, 56

*JSD Supply Legal Relief T-Shirt*, JSD SUPPLY,
   https://jsdsupply.com/shop/jsd-supply-legal-relief-t-shirt/
   (last visited May 17, 2022) ............................................................ 60

Laura Barron-Lopez, *Democrats Exasperated With Biden on
   Gun Control*, POLITICO (Apr. 8, 2022), https://www.politico.com/
   news/2022/04/08/democrats-biden-gun-control-00024097 .......................... 12

Press Release, Everytown for Gun Safety, Breaking: ATF Issues
   First Reported Cease and Desist Order to an Online Ghost Gun
   Kits Seller (May 13, 2022), https://www.everytown.org/press/
   breaking-atf-issues-first-reported-cease-and-desist-order-to-an-
   online-ghost-gun-kits-seller/ ........................................................ 60

*Remarks by President Biden Announcing Actions to Fight Gun Crime
   and His Nominee for ATF Director, Steve Dettelbach*, WHITE HOUSE
   (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-
   remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-
   11-2022/ .............................................................................. 12

*Remarks by President Biden at a Gun Violence Prevention Task Force
   Meeting*, WHITE HOUSE (Feb. 3, 2022),https://www.whitehouse.gov/
   briefing-room/speeches-remarks/2022/02/03/remarks-by-president-
   biden-at-a-gun-violence-prevention-task-force-meeting/ ............................ 11

*Remarks by President Biden on Gun Violence Prevention*,
   WHITE HOUSE (Apr. 8, 2021), https://www.whitehouse.gov/
   briefing-room/speeches-remarks/2021/04/08/
   remarks-by-president-biden-on-gun-violence-prevention/ ............................ 9

S. REP. No. 89-1866 (1966)............................................................ 27

*See* Glenn Thrush, *Dueling Messages Muddle Biden's Agenda on Guns*,
   N.Y. TIMES (Mar. 4, 2022), https://www.nytimes.com/2022/03/04/
   us/politics/atf-biden-gun-reform.html ............................................... 11

*Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the
   Constitution, of the S. Comm. On the Judiciary*, 117th Cong. 5
   (statement of Sen. Blumenthal), https://www.judiciary.senate.gov/
   meetings/stop-gun-violence-ghost-guns ............................................. 10

*Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. on the Judiciary*, 117th Cong. 5 (testimony of Ashley Hlebinsky), *available at* https://www.judiciary.senate.gov/imo/media/doc/ Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf......................1

*The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/ ........................8

x

## INTRODUCTION

The United States of America has a long tradition of individuals privately making their own firearms, which dates back to the American Revolution. "[G]un-making at home was essential to the Continental Army, and typically, it was more practical and efficient to assemble [a firearm from parts] rather than completely start from scratch."[1] Law-abiding individuals in this country have always been allowed to make their own firearms, even after the passage of the Gun Control Act of 1968.

The "frame or receiver" of a firearm is the component of the firearm that is subject to federal firearms regulations. *See* 18 U.S.C. § 921(a)(3)(B) (defining a "firearm" as including "the frame or receiver of any such weapon"). Today, many Americans who choose to make their own firearms do so using frame and receiver blanks, also known as "unfinished" or "incomplete" frames and receivers, which are raw materials that have undergone some, but not all, of the stages of manufacturing necessary to produce a complete, functioning firearm frame or receiver.

---

[1] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. on the Judiciary*, 117th Cong. 5 (testimony of Ashley Hlebinsky), *available at* https://www.judiciary.senate.gov/imo/media/doc/Ashley%20Hlebinsky%20Written%20Testimony%20Final.pdf (Exhibit 1).

ATF has long held that frame and receiver blanks do not meet the definition of a "frame or receiver" or "firearm" under federal law. In reliance on ATF's longstanding position, an industry has emerged in the United States selling frame and receiver blanks. Plaintiff Division 80's principal business is the distribution of frame and receiver blanks to lawful businesses that sell these products to consumers.

President Biden campaigned on a promise to pass legislation to "crack down" on the sale of frame and receiver blanks. Though members of Congress have introduced such legislation, those attempts have been unsuccessful. Frustrated by the constitutional process of bicameralism and presentment, the Biden Administration now seeks to accomplish its legislative agenda unilaterally through an unlawful rulemaking. Exhibit 2.

ATF's own analysis admits that the Final Rule will cause companies like Division 80 to "dissolv[e]." Exhibit 3 at 33.[2] A nationwide preliminary injunction is necessary to preserve the status quo, protect individuals' right to make a firearm for personal use, and prevent the destruction of Division 80, its suppliers, and its customers while this Court considers the Final Rule's lawfulness. **In light of the Final Rule's effective date of August 24, 2022, Division 80 requests a preliminary injunction as soon as practicable.**

---

[2] Pincites for exhibits are to the page number of the PDF in ECF and not the document's internal pagination.

## STATEMENT OF FACTS

**I.    ATF Has Long Stated That Unfinished Parts of a Firearm Are Not "Firearms" Under the Gun Control Act**

ATF has long held, and told the public, that unfinished parts of a firearm do not fall within its regulatory jurisdiction over "firearms." Its website states:

**Are "80%" or "unfinished" receivers illegal?**

Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.

**Are there restrictions on who can purchase receiver blanks?**

The Gun Control Act (GCA) does not impose restrictions on receiver blanks that do not meet the definition of a "firearm." . . . .

**What is ATF doing in regards to people making their own firearms?**

An individual may generally make a firearm for personal use. . . . .

**Does an individual need a license to make a firearm for personal use?**

No, a license is not required to make a firearm solely for personal use. . . . .

Exhibits 4, 5, 6, and 7.

ATF's website includes photographs of receiver blanks that ATF has determined not to be firearms:



Exhibit 4.

For the last several decades, ATF has issued written classification determinations to businesses stating that their frame and receiver blank

4

products are not firearms after its Firearms and Ammunition Technology Division reviewed product samples from industry. Manufacturers, distributors, and retailers invested capital, created American jobs, and sold lawful products to customers based on their good-faith reliance on ATF's written classification determinations.

Division 80 has compiled as Exhibit 8 a selection of thirty-six classification determinations for frame and receiver blanks from the administrative records submitted by ATF in *California Rifle & Pistol Association Inc. v. ATF*, No. 1:14-CV-01211 (E.D. Cal.), and *City of Syracuse v. ATF*, 1:20-CV-06885 (S.D.N.Y.). Some examples are reproduced below for illustrative purposes:

**Submitted forging**





Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch.   Any changes to its characteristics would require re-evaluation.

Submitted forging, first view



Submitted forging, second view



Based on our examination, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

Accordingly, FTB finds that the submitted item is not a "firearm" as defined in the GCA. Please note that this classification is based on the item received and examined by our Branch. Any changes to its characteristics would require re-evaluation by FTB.

**Submitted forging**



6

As recently as November 2020 and January 2021, the Department of Justice and ATF defended these classification determinations in litigation against gun-control proponents:

> Plaintiffs' challenges to ATF's classifications also seek to undercut the process under which, for decades, ATF has reviewed numerous items to determine if they should be classified as "firearms" under the GCA, bringing to bear the agency's technical, scientific, mechanical, and legal expertise. Receivers for the AR-15, the most common rifle in America, have a space within them called the fire-control cavity, which accommodates the firing components. The longstanding position of ATF is that, where a block of metal (or other material) that may someday be manufactured into a receiver bears no markings that delineate where the fire-control cavity is to be formed and has not yet been even partially formed, that item is not yet a receiver . . . .

Fed. Defs.' Mot. Dismiss at 2, *California v. ATF*, No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020), ECF No. 29 at 11, 2020 WL 9849685 (Exhibit 9).

> The Record contains classification letters dating back to the 1970s. These classification letters make plain that ATF has consistently adopted a standard whereby the degree of machining to the frame or receiver determined whether the device constituted a firearm. . . .
>
>        . . . . Not one of the above-noted classification letters made reference to the amount of time that would be required to transform the given device into a fully functional frame or receiver. Further, these letters are only a few of the examples contained in the Record of ATF making determinations based on the degree of machining performed on the unfinished frame or receiver with no reference whatsoever to the time required to transform the device into a fully functional frame or receiver.

Fed. Defs.' Mot. for Summ. J. at 30–32, *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021), ECF No. 98 at 40–42 (Exhibit 10).

Other documents from the Department of Justice and ATF that reinforce ATF's longstanding legal position—taken from ATF's administrative record in *City of Syracuse*—are attached as exhibits. *See* Exhibit 11 (ATF Public Affairs Division talking points dated April 9, 2014); Exhibit 12 (ATF technical bulletins dated October 28, 2013, and November 1, 2013); Exhibit 13 (ATF Type Firearm Visual Reference Guide, undated); Exhibit 14 (article by Assistant United States Attorney Shawn Nelson dated November 2015).

## II.   The Biden Administration Announces That It "Will Not Wait for Congress to Act to Take Its Own Steps" on Gun Control

President Biden campaigned on a promise to "[s]top 'ghost guns,'" referring to firearms "assembl[ed] . . . on [one's] own . . . by buying a kit of disassembled gun parts."[3] Specifically, he promised to "pass[] legislation" to "stop the proliferation of these so-called 'ghost guns.'"

After President Biden took office, members of Congress proposed bills changing the way ATF classifies frame and receiver blanks not currently defined as firearms. None of those bills have become law. S. 1558, 117th Cong. (2021) (Untraceable Firearms Act of 2021, Exhibit 16); H.R. 1454, 117th Cong. (2021) (Ghost Guns Are Guns Act, Exhibit 17).

---

[3] *The Biden Plan to End Our Gun Violence Epidemic*, BIDEN-HARRIS DEMOCRATS, https://joebiden.com/gunsafety/ (excerpt at Exhibit 15).

Because the Biden Administration has not accomplished its legislative goal through the constitutional process of bicameralism and presentment, it now unlawfully seeks to accomplish its goal through unilateral executive action.

On April 7, 2021, the Biden Administration announced that President Biden was "reiterating his call for Congress to pass legislation."[4] The announcement also stated that "this Administration will not wait for Congress to act to take its own steps" on gun control. The announcement instructed the United States Department of Justice to "within 30 days . . . issue a proposed rule to help stop the proliferation" of so-called "ghost guns."

On April 8, 2021, President Biden, Vice President Harris, and Attorney General Garland held a press conference at White House Rose Garden. President Biden stated that he "asked the Attorney General and his team to identify for me immediate, concrete actions I could take now without having to go through the Congress."[5] Attorney General Garland stated in his remarks that "the proliferation of the so-called ghost guns" was caused by a "regulatory

---

[4] *FACT SHEET: Biden-Harris Administration Announces Initial Actions to Address the Gun Violence Public Health Epidemic*, WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/ (Exhibit 18).

[5] *Remarks by President Biden on Gun Violence Prevention*, WHITE HOUSE (Apr. 8, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/ (Exhibit 19).

loophole" or "gap,"[6] even though the proliferation of such products was actually the direct result of ATF's proper legal determination and carefully considered decision to issue classification determinations approving the unregulated sale of such products.

On May 7, 2021, Attorney General Garland published ATF proposed rule 2021R–05. Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021) (Exhibit 21).

On May 11, 2021, the U.S. Senate Committee on the Judiciary's Subcommittee on the Constitution held a hearing on proposed legislation addressing so-called "ghost guns." At the hearing, Senator Richard Blumenthal admitted that one reason he proposed the legislation was that "under federal law" frame and receiver blanks are not classified as firearms.[7]

During the ninety-day comment period for the proposed rule, the public submitted approximately 290,000 comments on the proposed rule.

In February 2022, President Biden and Attorney General Garland traveled to New York City for a meeting of the Gun Violence Prevention Task

---

[6] *Attorney General Garland's Full Remarks on Gun Violence Prevention at the White House Rose Garden*, U.S. DEP'T OF JUSTICE (Apr. 8, 2021), http://www.justice.gov/opa/speech/attorney-general-garland-s-full-remarks-gun-violence-prevention-white-house-rose-garden (Exhibit 20).

[7] *Stop Gun Violence: Ghost Guns: Hearing Before the Subcomm. on the Constitution, of the S. Comm. On the Judiciary*, 117th Cong. 5 (statement of Sen. Blumenthal), https://www.judiciary.senate.gov/meetings/stop-gun-violence-ghost-guns (stating at 22:19 that "they are guns, except under federal law").

Force. At that meeting, President Biden stated that "this spring, the Justice Department will issue a final rule to regulate these so-called 'ghost guns.'"[8]

As the one-year anniversary of the Biden Administration's press conference at the White House Rose Garden drew near, political pressure mounted on the Biden Administration to issue a final rule as soon as possible.

In March 2022, the *New York Times* reported that then-Acting ATF Director Marvin Richardson stated at an industry gathering that ATF was expected to announce its Final Rule by June 2022. A Department of Justice spokesperson said he "was simply reading from a White House budget office document," but two White House officials told the *New York Times* that "Mr. Richardson had misspoken and that the rule would, in fact, be finished by early April."[9] Shortly thereafter, Mr. Richardson was removed from his position as Acting Director and replaced with the current Acting Director Gary Restaino.

On April 8, 2022, exactly one year after the President's press conference at the White House Rose Garden, *Politico* reported that Senator Chris Murphy and more than 100 Democrat legislators sent a letter to President Biden on

---

[8] *Remarks by President Biden at a Gun Violence Prevention Task Force Meeting*, WHITE HOUSE (Feb. 3, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/02/03/remarks-by-president-biden-at-a-gun-violence-prevention-task-force-meeting/ (Exhibit 22).

[9] *See* Glenn Thrush, *Dueling Messages Muddle Biden's Agenda on Guns*, N.Y. TIMES (Mar. 4, 2022), https://www.nytimes.com/2022/03/04/us/politics/atf-biden-gun-reform.html (Exhibit 23).

March 25, 2022, "pressing Biden to take unilateral action on guns," including "[f]inaliz[ing] a regulation to crack down on so-called ghost guns before Democrats potentially lose control of Congress."[10] The article noted that Democrats were "exasperated" at how much time it was taking for the Biden Administration to issue a final rule.

On April 11, 2022, President Biden announced at the White House Rose Garden that the Final Rule was complete. President Biden stated that a "year ago this week . . . I instructed the Attorney General to write a regulation that would rein in the proliferation of ghost guns because I was having trouble getting anything passed in the Congress."[11] He explained that the Final Rule's purpose was to make it "illegal to manufacture" weapon parts kits and "[i]llegal for a licensed dealer to sell them" without complying with the same regulatory requirements governing the manufacture and sale of complete firearms.

The Final Rule was published on April 26, 2022. Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (Exhibit 2). It takes effect on August 24, 2022.

---

[10] Laura Barron-Lopez, *Democrats Exasperated With Biden on Gun Control*, POLITICO (Apr. 8, 2022), https://www.politico.com/news/2022/04/08/democrats-biden-gun-control-00024097 (Exhibit 24).

[11] *Remarks by President Biden Announcing Actions to Fight Gun Crime and His Nominee for ATF Director, Steve Dettelbach*, WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/ (Exhibit 25).

### III.  The Final Rule Will Completely Destroy Division 80's Business

Division 80 is a Texas limited liability company with its headquarters in Galveston County, Texas. Exhibit 26 at ¶ 3. Its principal business is the distribution of frame and receiver blanks, jigs, and tools to build frames and receivers to businesses across the country that lawfully market the products to retail consumers who wish to exercise their Second Amendment rights by making their own firearms. *Id.* at ¶¶ 3, 5.

Division 80's products are shipped from out of state to its headquarters. *Id.* at ¶¶ 3–4. Division 80 then ships them to customers that place orders. *Id.* at ¶ 5. Most of Division 80's customers are out of state. *Id.* at ¶ 6. Division 80 operates without an ATF license because ATF's longstanding position has been that frame and receiver blanks are unregulated materials. *Id.* at ¶ 7. Consistent with longstanding ATF policy, Division 80 is not required to have a federal firearms license to distribute its products, as they are not firearms.

By rewriting the definitions of "firearm" and "frame or receiver," the Final Rule reverses ATF's longstanding legal position and subjects currently unregulated frame and receiver blanks to the same regulatory requirements as fully functional firearms. The Final Rule also imposes extensive identification and recordkeeping requirements on privately made firearms and adds substantial burdens on citizens who exercise their right to make their own firearms.

13

If the Final Rule takes effect, it will destroy Division 80's business. *Id.* at ¶¶ 9–14. ATF's own Regulatory Impact Analysis and Final Regulatory Flexibility Analysis acknowledges that it is "unlikely that a significant number of non-FFLs [*i.e.*, Federal Firearms Licensees]" will continue to do business and non-FFLs will "end up dissolving their businesses." Exhibit 3 at 33. "[E]mployees will lose their jobs" as a result of these businesses dissolving, causing "unemployment." *Id.* at 43. In its cost-benefit analysis, ATF states that "[m]ost costs are attributed to non-FFL manufacturers and dealers dissolving because of the final rule." *Id.* at 115.

Under the Final Rule, it would be illegal for Division 80 to continue with its business of distributing frame and receiver blanks through mail shipment across state lines without an FFL. Exhibit 26 at ¶ 12. Furthermore, the increased regulatory costs, bureaucratic red tape, and extensive recordkeeping requirements that the Final Rule imposes on frame and receiver blanks and privately made firearms would wipe out consumer demand for frame and receiver blanks. *Id.* at ¶ 9–10. Finally, with the decrease in consumer demand, Division 80's suppliers would be forced out of business, meaning that Division 80 would no longer have products to sell. *Id.* at ¶ 11.

The Biden Administration's political rhetoric makes it clear that it seeks to wipe out the industry for frame and receiver blanks and thereby significantly limit the ability of citizens to make their own firearms. The Final Rule is certain

14

to accomplish that goal. Division 80 therefore asks for preliminary injunctive relief on a nationwide basis prior to the Final Rule's effective date of August 24, 2022, to preserve the status quo, which will allow it to continue engaging in the lawful, interstate purchase and sale of frame and receiver blanks while the Court adjudicates the Final Rule's lawfulness.

## ARGUMENT

Because the Final Rule is unlawful and would destroy Division 80's business, Division 80 seeks a preliminary injunction to "preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). Courts look to four factors in deciding whether to grant preliminary injunctive relief: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) the threatened injury to the movant outweighs the threatened harm to the party sought to be enjoined; and (4) granting the injunctive relief will not disserve the public interest." *Id.* The decision on whether to grant preliminary relief is left to the district court's sound discretion. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## I.   Division 80 is Likely to Succeed on the Merits

A movant "appealing to the conscience of the chancellor to maintain the status quo . . . is not required to prove to a moral certainty that his is the only

15

correct position." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

"As long as the court cannot say there is no likelihood of prevailing on the merits

but finds the factor of substantial likelihood of success present to some degree,

then the party seeking the injunction has met its burden." *Family Rehab., Inc.*

*v. Azar*, 3:17-CV-3008, 2018 WL 3155911, at \*3 (N.D. Tex. June 28, 2018) (citing

*Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d

683, 686 (5th Cir. 1980)). "A preliminary injunction may issue . . . despite the

existence of a plausible defense, as long as the movant demonstrates a

substantial likelihood of success." *Dallas Cowboys Cheerleaders, Inc. v.*

*Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979).

### A. The Final Rule Exceeds Defendants' Statutory Authority and Violates the Separation of Powers by Attempting to Rewrite Federal Statutes

The Final Rule's purported definitions of "frame or receiver" and

"firearm" are not authorized by statute. Nor are the Final Rule's regulations of

"privately made firearms." For these reasons, the Court should "hold unlawful

and set aside" the Final Rule on the ground that it attempts to rewrite federal

statutes without congressional approval in violation of the separation of

powers. 5 U.S.C. § 706(2)(A)–(C).

16

1. **The Final Rule's Purported Definitions of the Terms "Frame or Receiver" and "Firearm" Are Not Authorized by Statute**

    i. **Current Law Already Defines the Terms "Frame or Receiver" and "Firearm"**

The texts of several key statutory and regulatory provisions are reproduced below for the Court's reference.

18 U.S.C. § 921(a)(3) defines a "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

27 C.F.R. § 478.11 defines a "firearm" in a manner that tracks the statutory definition almost verbatim: "Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics."

18 U.S.C. § 921 does not define "frame or receiver."

27 C.F.R. § 478.11 provides a one-sentence definition of a "firearm frame or receiver" as: "That part of a firearm which provides housing for the hammer,

17

bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 479.11 use identical language to define a "frame or receiver."

> ### ii. The Final Rule Seeks to Drastically Expand ATF's Regulatory Jurisdiction Through Its Purported Definition of a "Frame or Receiver"

The Final Rule deletes the current one-sentence definition of a "firearm frame or receiver" in the federal regulations and replaces it with a new, unlawful definition that states in part:

> *Partially complete, disassembled, or nonfunctional frame or receiver.* The terms "frame" or "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, *i.e.*, to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projective weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

87 Fed. Reg. at 24,739.

This definition has no basis in the statutory text. Recall that 18 U.S.C. § 921(a)(3) defines a "firearm" as including "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "(B) the frame or receiver of any such weapon." The Final Rule takes a Frankenstein approach to the law and stitches together the word "readily" from subsection (A) with the words "frame or receiver" in subsection (B) to create the totally new concept of a "partially complete" frame or receiver, which encompasses items that may "readily" be completed into a frame or receiver.

The Final Rule's new definition of a "partially complete" frame or receiver is patently unlawful, as an item that has the *potentiality* of becoming a "frame or receiver" is *by definition* not an actual "frame or receiver." By using vague weasel words such as "partially complete," "readily be completed, assembled, restored, or otherwise converted," and "clearly identifiable," this definition of a "frame or receiver" unlawfully expands ATF's regulatory jurisdiction to encompass raw materials that are not actually frames or receivers. Such items include frame and receiver blanks, forgings, castings, printings, extrusions, unmachined bodies, and other items that ATF has historically treated as unregulated materials, once they are "clearly identifiable" as an "unfinished component part of a weapon."

The absurd logic of the Final Rule's abuse of the English language is that two-by-fours are a "house," a potato is a "chip," and a seed is an "apple." That an item can "readily" be converted into another item or is "clearly identifiable as an unfinished component part" of another item does not make it the equivalent of that item whose existence is only a potentiality and not an actuality. 18 U.S.C. § 921(a)(3) speaks of only a "frame or receiver," and the Final Rule's new definition of a "partially complete" frame or receiver is an unlawful attempt to increase ATF's regulatory authority. *See Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011) ("[A]gencies cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border.").

Particularly absurd is the Final Rule's contention that the availability of "templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials" can change an item that is not a "frame or receiver" into a "frame or receiver." Under the Final Rule's tortured logic, a wooden log on its own might not be a "baseball bat," but that could change if someone uploaded a YouTube video explaining how to make a baseball bat from a log, especially if that YouTuber began to sell logs along with the tools needed to make a baseball bat. To reiterate: If item *A* can readily be made into item *B*, it is by definition not yet item *B*. The availability of instructions and tools for making item *A* into item *B* has no bearing on whether item *A* is in fact item *B*.

20

The Final Rule is not a good-faith attempt to "clarify" what constitutes a "frame or receiver," as the government claims, 87 Fed. Reg. at 24,652, but is instead an unlawful attempt by the Biden Administration to bring about a sweeping expansion of ATF's regulatory jurisdiction over receiver blanks without congressional authorization. *See Util. Air Regulatory Grp. v. EPA (UARG)*, 573 U.S. 302, 324 (2014) ("EPA's interpretation is also unreasonable because it would bring about an enormous and transformative expansion of EPA's regulatory authority without clear congressional authorization."); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.").

ATF has long agreed with Division 80's position that receiver blanks do not meet the definition of a "frame or receiver." According to ATF's website: "ATF has long held that items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of manufacture' which would result in the classification of a firearm according to the GCA." Exhibit 4. ATF has affirmed this position in classification determinations issued to manufacturers after reviewing product samples, in litigation against gun-control proponents, and in its various publications. *See supra*, at 3–8; Exhibits 8–14.

ATF admits that the Final Rule constitutes a repudiation of its longstanding legal position. As the Final Rule states:

> Prior determinations by the Director that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to [the date of the Final Rule's publication], shall not continue to be valid or authoritative after that date. Such determinations shall include those in which the Director determined that the item or parts kit had not yet reached a stage of manufacture to be, or include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to [the date of the Final Rule's publication].

87 Fed. Reg. at 24,741.

The law has not changed since ATF issued its classification determinations on receiver blanks—only the Administration—and ATF's repudiation of its prior legal position to drastically expand its regulatory jurisdiction exceeds Defendants' statutory authority in violation of the separation of powers. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)) (holding that an "'[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice'"); *Chamber of Commerce of U.S.A. v. U.S. Dep't of Labor*, 885 F.3d 360, 380 (5th Cir. 2018) ("Moreover, that it took DOL forty years to 'discovery' its novel interpretation further highlights the

22

Rule's unreasonableness. . . . DOL's turnaround from its previous regulation . . . alone gives us reason to withhold approval or at least deference for the Rule.").

### iii. The Final Rule Changes the Definition of a "Firearm," Which Currently Tracks the Four Statutory Categories of "Firearms," by Adding a Fifth Category With No Basis in the Statutory Text

Recall that 18 U.S.C. § 921(a)(3) defines a "firearm" as including four categories of items: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

27 C.F.R. § 478.11 defines a "firearm" in a manner that tracks the statutory definition almost verbatim: "Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics."

The Final Rule amends 27 C.F.R. § 478.11 by adding the following new language to the definition of a "firearm":

23

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive. The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition of "frame or receiver."

87 Fed. Reg. at 24,735. This amendment takes an existing definition of a "firearm" that tracks almost verbatim the four statutory categories of "firearms" set forth by Congress in 18 U.S.C. § 921(a)(3) and adds a brand new fifth category that has no basis in the statutory text: parts kits. The change is not a mere clarification but is instead an aggressive attempt by ATF to expand its regulatory jurisdiction beyond what Congress authorized. The statute states that "any *weapon* . . . which . . . may readily be *converted* to expel a projectile by the action of an explosive" is a " firearm." The Final Rule goes beyond regulating "weapons" and states that a "*parts kit*" that "may readily be *completed, assembled,* [or] *restored*, . . . to expel a projectile by the action of an explosive" is a "firearm."

Two features of this provision are particularly problematic.

First, the provision is not limited to kits containing all the parts of a firearm. The Final Rule states that the "Department disagrees . . . that weapon parts kits must contain all component parts of the weapon to be 'readily' converted to expel a projectile." 87 Fed. Reg. at 24,685. ATF believes that if it is possible to obtain an "essential part missing from the

kit . . . efficiently, quickly, and easily," the parts in the kit may still be a "firearm," depending on ATF's "case-by-case evaluation of each kit." *Id.* Thus, the Final Rule covers more than disassembled firearms or complete parts kits. It unlawfully expands ATF's jurisdiction to cover previously unregulated parts by defining as a "firearm" any combination of parts that (in ATF's discretionary determination) may "readily" be made into a firearm by obtaining other parts.

Second, ATF reserves for itself not only the discretion to determine which combinations of parts short of a complete parts kit constitute a "firearm," but also the discretion to aggregate numerous transactions over an undefined period of time. In footnote 45 of the Notice of Proposed Rulemaking, ATF states that "persons who engage in the business of selling or distributing such weapon parts kits cannot avoid licensing, marking, recordkeeping, or excise taxation by selling or shipping the parts in more than one box or shipment to the same person, or by conspiring with another person to do so." 86 Fed. Reg. 27,726 n.45. ATF's position is that companies selling or distributing individual parts which could be used to assemble a firearm must keep records of which parts have been sold or distributed to each customer. The companies would then be required to analyze the amorphous (and ultimately impossible to answer) question of whether the totality of the parts sold or distributed to a particular customer, in a particular timeframe, collectively constitute a firearm (keeping in mind that the term "firearm" is not limited to complete collections of all

parts needed to make a firearm). This attempt to introduce a vague and incomprehensible temporal dimension to the definition of a "firearm" only compounds the legal absurdity of the Final Rule. Even after commenters raised these concerns in response to the Notice of Proposed Rulemaking, ATF doubled down on its position in the Final Rule. 87 Fed. Reg. at 24,713.

The plain, unambiguous text of 18 U.S.C. § 921(a)(3) shows that Congress recognized only four categories of firearms. By adding a fifth category with no basis in the statutory text—weapon parts kits, including those that lack a complete (or even incomplete) frame or receiver—the Final Rule goes beyond Congress's statute and effectively rewrites federal law.

The legislative history cited in the Notice of Proposed Rulemaking shows that Congress specifically intended to *exclude* firearm parts from regulation and sought to regulate only the "frame or receiver" of a firearm. Prior to the Gun Control Act of 1968, a firearm was defined as including "any part or parts" of a firearm. 86 Fed. Reg. at 27,720 (Exhibit 21). "During debate on the GCA and related bills introduced to address firearms trafficking, Congress recognized that regulation of all firearm parts was impractical." *Id.* As Senator Dodd explained: "The present definition of this term includes 'any part or parts' of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words 'frame or receiver' for the words 'any part or parts.'" *Id.* (citing 111 Cong. Rec. 5527 (Mar.

26

22, 1965)). The Senate Committee Report for the Act similarly states:

> Also excluded from the present definition of the term "firearm" is "any part or parts" of a firearm. Experience in the administration of the Federal Firearms Act has indicated that it is impractical to treat each small part as if it were a firearm. The revised definition substitutes the words "frame or receiver" for the words "any part or parts."

S. REP. NO. 89-1866, at 14 (1966) (excerpt at Exhibit 27).

ATF's website recognizes this history in its interpretation of the Gun Control Act, stating:

> **Does the GCA control the sale of firearm parts?**
>
> No, except that frames or receivers are "firearms" as defined in the law and are subject to the same controls as complete firearms. . . . .

Exhibit 28.

As the foregoing confirms, the Final Rule unlawfully attempts to regulate firearm parts that Congress intentionally exempted from regulation by deleting the words "any part or parts." *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 143 (holding unlawful a rule that "would contradict Congress' clear intent" to exempt a class of products from an agency's jurisdiction); *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 466 (5th Cir. 2020) (quoting *UARG*, 573 U.S. at 321) ("We will not defer to an agency interpretation that is 'inconsistent with the design and structure of the statute as a whole.'"). The Final Rule's definition of a "firearm" is not authorized by statute and violates the separation of powers.

27

### 2. The Final Rule Imposes Unlawful Regulations on "Privately Made Firearms"

The Final Rule creates a new term, "privately made firearm," which it defines as a "firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced." 87 Fed. Reg. at 24,735.

The Final Rule then imposes onerous new regulations on transactions involving privately made firearms. It states that "licensees must legibly and conspicuously identify each privately made firearm or 'PMF' received or otherwise acquired (including from a personal collection) not later than the seventh day following the date of receipt or other acquisition, or before the date of disposition (including to a personal collection), whichever is sooner." 87 Fed. Reg. at 24,742. It further states that "PMFs must be identified by placing, or causing to be placed . . . an individual serial number on the frame or receiver, which must not duplicate any serial number placed by the licensee on any other firearm." *Id.* And it requires licensees to "identify . . . or cause another person to so identify, each privately made firearm received or otherwise acquired (including from a personal collection) by the licensee" before the effective date of the Final Rule "within sixty (60) days from that date, or prior to the date of final disposition (including to a personal collection), whichever is sooner." 87

28

Fed. Reg. at 24,743. The Supplementary Information in the Notice of Proposed Rulemaking notes that "PMFs currently in inventory that a licensee chooses not to mark may also be destroyed or voluntarily turned in to law enforcement within the 60-day period." 86 Fed. Reg. at 27,732 (Exhibit 21).

These "identify, destroy, or surrender" requirements for privately made firearms exceed ATF's statutory authority. Although the ordinary speaker of the English language would understand the phrase "privately made firearm" to refer to a functioning firearm that an individual personally assembled, the Final Rule's definition of the term, when combined with its expansive new definition of a "frame or receiver," classifies raw, unfinished receiver blanks as "privately made firearms." This is because, under the Final Rule's definition of a "frame or receiver," receiver blanks are "frame[s] or receiver[s] . . . produced by a person other than a licensed manufacturer." 87 Fed. Reg. at 24,735. The Final Rule therefore subjects unfinished receiver blanks to the same "identify, destroy, or surrender" requirements as fully assembled privately made firearms. Such a convoluted scheme that abuses the English language is plainly unlawful.

The breathtaking nature of the Final Rule's expansion of ATF's jurisdiction bears repeating: Under the Final Rule, a receiver blank that is neither "privately made" nor a "firearm" will be transformed from its present classification as a piece of unregulated raw material into a "privately made firearm." The consequence of this reclassification is that upstream and

downstream businesses in the supply chain for firearm parts, such as manufacturers and distributors of receiver blanks, will suddenly be transformed into the legal equivalent of firearms dealers. The chaos and disruption to the entire firearms industry will be incalculable. Such a drastic expansion of ATF's jurisdiction exceeds ATF's statutory authority. *See UARG*, 573 U.S. at 324 ("EPA's interpretation is also unreasonable because it would bring about an enormous and transformative expansion of EPA's regulatory authority without clear congressional authorization.").

> **3. Defendants Are Not Entitled to *Chevron* Deference Because the Final Rule Defines the Substantive Scope of Federal Crimes, Triggering the Rule of Lenity**

A legal definition that affects the scope of criminal liability triggers the rule of lenity. In *Leocal v. Ashcroft*, the Supreme Court unanimously held that the rule of lenity applied in a civil case that turned on the definition of a "crime of violence" because that term has both civil and criminal applications. 543 U.S. 1, 11 n.8 (2004) ("Although here we deal with § 16 in the deportation context, § 16 is a criminal statute, and it has both criminal and noncriminal applications. Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies.").

In *United States v. Thompson/Center Arms Co.*, the Court applied the rule of lenity to a tax statute in a civil setting because the statute had criminal applications and had to be interpreted consistently with its criminal

30

applications. 504 U.S. 505, 517–18 (1992) (plurality opinion); *see also id.* at 519 (Scalia & Thomas, JJ., concurring in the judgment) ("I agree with the plurality that the application of the National Firearms Act (NFA) to Thompson/Center's pistol and conversion kit is sufficiently ambiguous to trigger the rule of lenity, leading to the conclusion that the kit is not covered."). That case specifically involved the question of whether the sale of a pistol with a kit to convert it into a rifle constituted the sale of a rifle, a factual scenario with obvious relevance to this case. *Id.* at 507.

Where the rule of lenity applies, *Chevron* deference is inappropriate. *See Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 729–36 (6th Cir. 2013) (Sutton, J., concurring). The definitions of "firearm" and "frame or receiver" (which is a sub-category of firearms) in the Final Rule have clear consequences for the substantive scope of federal crimes, triggering the rule of lenity and rendering *Chevron* deference inappropriate.

Federal law imposes strict criminal penalties for violating the licensing regime governing the importation and manufacture of "firearms." 18 U.S.C. § 923(a) states that "[n]o person shall engage in the business of importing, manufacturing, or dealing in firearms . . . until he has filed an application with and received a license to do so from the Attorney General." And 18 U.S.C. § 923(i) requires licensed importers and licensed manufacturers to "identify by means of a serial number engraved or cast on the receiver or frame of the

weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer." Under 18 U.S.C. § 924(a)(1), it is a crime to violate "any other provision of this chapter," referring to Title 18, Chapter 44, of the United States Code, which contains section 923.

The definition of a "firearm" also has criminal consequences for individual owners of items fitting within that definition. 18 U.S.C. § 922(g) makes it a crime for various categories of individuals (prohibited possessors) "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." And 18 U.S.C. § 930(a) makes it a crime to knowingly possess "a firearm . . . in a Federal facility."

Prior to the effective date of the Final Rule, the undersigned counsel could carry a receiver blank, jig, and mill into a federal courthouse as if they were any other objects, but after the Final Rule's effective date, counsel could be committing a crime punishable by up to one year in prison, depending on ATF's construction of vague, ambiguous terms. *See infra*, at 33–37 (discussing the void-for-vagueness doctrine). Because the definitions of "frame or receiver" and "firearm" in the Final Rule have obvious criminal consequences, *Chevron*

32

deference is inappropriate, and under *Leocal* and *Thompson/Center Arms Co.*, any ambiguities should be resolved in accordance with the rule of lenity.

**B.    The Final Rule is Unconstitutionally Vague and Effectuates an Unconstitutional Delegation of Legislative Authority**

The Constitution's guarantee of due process requires criminal prohibitions to be expressed in clear enough terms that "ordinary people" have "fair notice" of what conduct is proscribed. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). An agency policy that does not satisfy this requirement is void for vagueness. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) (holding that the FCC's indecency standards were unconstitutionally vague). The void-for-vagueness doctrine "guards against arbitrary or discriminatory law enforcement" by insisting on comprehensible standards to "govern the actions of police officers, prosecutors, juries, and judges." *Dimaya*, 138 S. Ct. at 1212. "In that sense, the doctrine is a corollary of the separation of powers— requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Id*.

Given that the Final Rule affects the substantive scope of federal crimes, the void-for-vagueness doctrine applies. 87 Fed. Reg. at 24,713 ("The Department reiterates that title 18 of the U.S. Code includes Federal felony violations that can apply to circumstances involving the final rule's requirements."). Numerous provisions of the Final Rule are unconstitutionally

void for vagueness, rendering the Final Rule "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

The Final Rule's new definition of a partially complete "frame or receiver" contains three vague provisions: (1) an assessment of whether the item "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver"; (2) an assessment of whether the item has reached a "stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon"; and (3) an open-ended inquiry into "any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." 87 Fed. Reg. at 24,739.

The Final Rule creates a vague definition of "readily" as a "process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." 87 Fed. Reg. at 24,735; *see also id.* at 24,747. It then provides a non-exclusive list of eight unranked, unweighted factors that are "relevant" to defining the term "readily," none of which is dispositive. Those factors are:

(a)     Time, *i.e.*, how long it takes to finish the process;

(b)     Ease, *i.e.*, how difficult it is to do so;

(c)     Expertise, *i.e.*, what knowledge and skills are required;

34

(d)     Equipment, *i.e.*, what tools are required;

(e)     Parts availability, *i.e.*, whether additional parts are required, and how easily they can be obtained;

(f)     Expense, *i.e.*, how much it costs;

(g)     Scope, *i.e.*, the extent to which the subject of the process must be changed to finish it; and

(h)     Feasibility, *i.e.*, whether the process would damage or destroy the subject of the process, or cause it to malfunction.

87 Fed. Reg. at 24,735; *see also id.* at 24,747. None of these eight terms are defined with further specificity. For instance, the Final Rule does not supply any metric for determining what assembly "[t]ime" satisfies the definition of "readily," even though in other contexts, agencies have given specific timeframes to clarify statutory ambiguity. *City of Arlington v. FCC*, 668 F.3d 229, 235–36 (5th Cir. 2012) (FCC rules setting hard deadlines to define "a reasonable period of time"). Rather than clarifying the statute, the Final Rule intentionally introduces vagueness into the law to expand its regulatory jurisdiction, creating confusion and uncertainty for businesses. *See Tex. Pipeline Ass'n*, 661 F.3d at 264 ("[A]gencies cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border.").

The Final Rule's new definition of a "firearm" as including a "weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive" is also

35

unconstitutionally vague due to its reliance on the word "readily." 87 Fed. Reg. at 24,735. And as discussed earlier, the government's position that multiple transactions over an unspecified period of time that cumulatively include the components needed to make a "firearm"—with "firearm" defined as potentially including a parts kit lacking all the parts needed to make a firearm—is vague and capacious. *See supra*, at 24–26; *see also* 87 Fed. Reg. at 24,713 (claiming that it is illegal to be "working with others or structuring transactions" to sell parts that, in the aggregate, are a "firearm"). The confusion and harm caused by this unconstitutionally vague and expansive definition of a "firearm" can already be seen in the cease-and-desist letters that ATF sent to two companies prior to the Final Rule's effective date. *See infra*, at 58–61.

Through a Rube Goldberg process of defining statutory terms ("frame or receiver" and "firearm") using a vague term ("readily") that is itself defined using other vague terms ("fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest") and an eight-factor balancing test ("time," "ease," etc.), the Final Rule effectively confers on the ATF Director unbounded discretion to determine which products currently classified as unregulated raw materials should be reclassified as regulated "frames or receivers" and "firearms." This combination of vague terms and an eight-factor balancing test does not give the public fair notice of what conduct is lawful or unlawful, violating the void-for-vagueness doctrine. *Dimaya*, 138 S. Ct. at 1212.

36

Furthermore, assuming *arguendo* that the Final Rule is authorized by the statutory scheme Congress created, Congress's delegation of open-ended legislative authority to rewrite federal statutory definitions without an intelligible principle violates the nondelegation doctrine. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *Jarkesy v. SEC*, --- F.4th ----, No. 20-61007, 2022 WL 1563613 (5th Cir. 2022). Compounding the constitutional problem, ATF's exercise of its delegated authority to promulgate a vague Final Rule that effectively delegates to the ATF Director unbridled discretion to determine the scope of ATF's jurisdiction constitutes an even more egregiously unconstitutional double delegation.

## C.    The Final Rule is Arbitrary, Capricious, and an Abuse of Discretion

Federal administrative agencies are required to engage in "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998). This means that "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* The "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

If the agency does not engage in reasoned decision making, then a court "shall hold unlawful and set aside" the agency action as "arbitrary, capricious," or "an abuse of discretion," 5 U.S.C. § 706(2)(A); *see also Wages & White Lion Investments, LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (noting arbitrary-and-capricious review "has serious bite"). The Final Rule is arbitrary and capricious for the following reasons.

## 1.   The Final Rule is Internally Self-Contradictory

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Courts must ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*

The Final Rule's definition of a partially complete "frame or receiver" is arbitrary and capricious because it is internally self-contradictory. It claims that a "frame or receiver" includes a partially complete frame or receiver "that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 87 Fed. Reg. at 24,739. It also states that the ATF Director may, but is not required to, consider "associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing

38

materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit." *Id.*

Sensing the legal absurdity of defining a "frame or receiver" as including items that have the *potentiality* of becoming a "frame or receiver," ATF sought to assure the public that it was not taking the unprecedented, lawless measures that it was, in fact, taking. One of the new features of the Final Rule that was not present in the Notice of Proposed Rulemaking is its inclusion of five hypothetical examples, purportedly designed to clarify its confusing definition of a partially complete frame or receiver. Unfortunately, these examples only compound the confusion about what the Final Rule does. Example 1 states that a kit containing a partially complete frame or receiver "that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, as a person with online instructions and common hand tools may readily complete" it. 87 Fed. Reg. at 24,739 (emphasis added). Examples 4 and 5 then state the following:

> Example 4—*Not a receiver*: A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver.
>
> Example 5—*Not a receiver*: A flat blank of an AK variant receiver without laser cuts or indexing that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools is

not a receiver, as a person cannot readily fold the flat to provide
housing or a structure for the primary component designed to block
or seal the breech prior to initiation of the firing sequence.

87 Fed. Reg. at 24,739. The difference between Example 1 and Examples 4 and
5 is the absence of "instructions, jigs, templates, equipment, or tools" in
Examples 4 and 5. The absence of such extrinsic materials is therefore outcome
determinative. This is puzzling. Rather than focusing on the physical
characteristics of the item itself to determine whether it is a "frame or
receiver," Examples 4 and 5 place dispositive weight on the absence of extrinsic
materials, creating a safe harbor for items sold in the absence of such
materials. This means that two identical pieces of metal will be classified
differently depending on what *other items* are available to consumers.

By contrast, the availability of extrinsic materials is not controlling in
the Final Rule's definition of a partially complete frame or receiver, set forth
just paragraphs earlier. That definition looks at whether the item "is designed
to or may readily be completed, assembled, restored, or otherwise converted to
function as a frame or receiver." 87 Fed. Reg. at 24,739. Under that inquiry,
what matters is the overall ease of completion of the receiver blank and not the
presence or absence of "instructions, jigs, templates, equipment, or tools,"
though the availability of such items "may" be considered.

The following hypothetical illustrates how Examples 4 and 5 contradict
the Final Rule's definition of a partially complete frame or receiver. Suppose a

non-FFL company is currently selling receiver blanks to consumers with instructions and tools for completing the blank into a receiver. Its business will no longer be lawful after the Final Rule takes effect. The company asks legal counsel: "Can I keep selling the same receiver blanks to individual consumers if I do not provide instructions and tools for completion?"

Under Examples 4 and 5, the answer is "yes." Examples 4 and 5 state that receiver blanks, without "instructions, jigs, templates, equipment, or tools," are not frames or receivers, establishing a categorical safe harbor. (As a caveat, ATF's response to public comments suggests that Examples 4 and 5 were meant to be cabined to sales to manufacturers that planned to complete the receiver blanks, 87 Fed. Reg. at 24,678, even though Examples 4 and 5 themselves contain no such limitation. Further adding to the confusion is the question of whether the safe harbor's protections would be removed if one parent company created two companies, one providing receiver blanks and another providing instructions and tools. ATF's response to public comments suggests that such conduct could be illegal "structuring" of transactions, 87 Fed. Reg. at 24,713, even though the Final Rule's text makes no reference to such a concept. And query what would happen if the two companies operated independently with no shared ownership or coordination.)

Under the Final Rule's definition of a partially complete frame or receiver (preceding Examples 1, 4, and 5), the answer to whether the

hypothetical company could sell receiver blanks without instructions and tools is "no." That definition focuses on whether an item can "readily" be made into a frame or receiver. Even if the company did not provide instructions and tools for completing its receiver blanks, it is possible that purchasers of the receiver blanks could figure out on their own how to build a functioning receiver. Because an individual could still "readily" complete the receiver blank without instructions or tools from the company, the receiver blank would fall within ATF's definition of a partially complete frame or receiver. By contrast, Examples 4 and 5 compel the opposite conclusion, creating a categorical safe harbor for receiver blanks that are not combined with instructions and tools. (This raises another perplexing question: Could the same item be "not a receiver" when sold to a person ignorant about firearms and a "receiver" when sold to an experienced machinist who knows how to make a receiver?)

The above-mentioned hypothetical conversation between a company and its legal counsel has been playing out all across the country due to the Final Rule's unclear and self-contradictory statements about how much weight should be given to "instructions, jigs, templates, equipment, or tools." This confusion affects not only direct-to-consumer sales of receiver blanks, but also upstream and downstream businesses in the supply chain for firearm parts that are used to manufacture complete, functioning firearms. As a journalist recently explained:

[I]ndustry experts aren't sure what the rules mean. That uncertainty poses huge challenges for manufacturers, vendors, and anybody trying to establish what is and isn't legal.

"It looks like there is room still to sell 80 percent receivers, especially ones that have had determination letters," [one industry member] told me over the phone. . . . .

. . .

But not everybody is convinced that the ATF rules leave an opening for the existing 80 percent receiver market to continue to operate. That's because the agency dumps its old guidance with regard to unfinished components, creates untested new terminology, and leaves an awful lot to the interpretation of federal bureaucrats.

J.D. Tuccille, *ATF's New "Ghost Gun" Rules Are as Clear as Mud*, REASON (Apr. 11, 2022), https://reason.com/2022/04/11/atfs-new-ghost-gun-rules-are-as-clear-as-mud/ (Exhibit 29).

The self-contradictory nature of the Final Rule is the result of ATF talking out both sides of its mouth. On the one hand, the Final Rule seeks to maximize ATF's regulatory jurisdiction over receiver blanks through the intentional adoption of vague terminology in response to political pressure to regulate so-called "ghost guns." *See supra*, at 8–12. On the other hand, ATF is aware of the chaos and confusion that will result from its displacement of longstanding precedents established over decades and seeks to convince the public that its actions are not as extreme as they really are. Through this doublespeak, ATF is smiling and saying, "nothing to see here, business as usual," while stabbing industry and consumers in the back by repudiating its

longstanding legal position and prior classification determinations.

The result of the Final Rule's internally self-contradictory definition of a "frame or receiver" is that industry has been left unable to determine whether a receiver blank sold without "instructions, jigs, templates, equipment, or tools" meets the definition of a regulated "frame or receiver." Examples 4 and 5 provide a categorical safe harbor exempting such products from regulation, but the language preceding those examples leads to the opposite conclusion. Such an incomprehensible, self-contradictory rule does not satisfy the requirement of reasoned decisionmaking and is arbitrary and capricious. *See Del. Dep't of Natural Res. & Envtl. Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) (holding that a final rule was arbitrary and capricious when EPA's "later statements contradicted earlier responses"); *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1520 (D.C. Cir. 1984) ("Such self-contradictory, wandering logic does not constitute an adequate explanation . . . .").

### 2. ATF Does Not Reasonably Explain its Departure From its Longstanding Prior Legal Position

As discussed in the Statement of Facts, ATF's longstanding legal position has been that receiver blanks do not meet the definition of a "firearm." *See supra*, at 3–8. To quote ATF's website, "ATF has long held that items such as receiver blanks, 'castings' or 'machined bodies' in which the fire-control cavity area is completely solid and un-machined have not reached the 'stage of

44

manufacture' which would result in the classification of a firearm according to the [Gun Control Act]." Exhibit 4.

ATF reaffirmed this position over the course of decades in precedential classification determinations issued to manufacturers after receiving product samples and conducting a rigorous scientific, technological, and legal analysis. Exhibit 8 (containing thirty-six classification determinations by ATF determining that a receiver blank was not a "frame or receiver" or "firearm"). ATF has in litigation against gun-control proponents defended its position that receiver blanks do not fall within its regulatory jurisdiction. *See* Exhibit 9 (motion to dismiss filed in *California v. ATF* dated Nov. 30, 2020); Exhibit 10 (summary-judgment motion filed in *City of Syracuse v. ATF* dated January 29, 2021). And in numerous publications, the U.S. Department of Justice and ATF have reiterated ATF's longstanding principles for determining whether a product is an unregulated receiver blank. *See* Exhibit 11 (ATF Public Affairs Division talking points dated April 9, 2014); Exhibit 12 (ATF technical bulletins dated October 28, 2013, and November 1, 2013); Exhibit 13 (ATF Type Firearm Visual Reference Guide, undated); Exhibit 14 (article by Assistant United States Attorney Shawn Nelson dated November 2015).

In the Final Rule, ATF abandons its longstanding legal position, defining frame and receiver blanks as "frames or receivers," and thus, "firearms," on the ground that they can "readily" be made into frames and receivers. ATF

45

acknowledges that the Final Rule departs from its prior legal position and expressly repudiates its prior classification determinations:

> Prior determinations by the Director that a partially complete, disassembled, or nonfunctional frame or receiver, including a parts kit, was not, or did not include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to [the date of the Final Rule's publication], shall not continue to be valid or authoritative after that date. Such determinations shall include those in which the Director determined that the item or parts kit had not yet reached a stage of manufacture to be, or include, a "firearm frame or receiver" under § 478.11, or "frame or receiver" under § 479.11, as those terms were defined prior to [the date of the Final Rule's publication].

87 Fed. Reg. at 24,741.

An agency's departure from its prior, longstanding legal position is inherently suspect. *See Chamber of Commerce of U.S.A.*, 885 F.3d at 380 ("Moreover, that it took DOL forty years to 'discovery' its novel interpretation further highlights the Rule's unreasonableness. . . . DOL's turnaround from its previous regulation . . . alone gives us reason to withhold approval or at least deference for the Rule."). When an agency changes its position, it must provide a reasoned explanation for its departure from its prior position, especially when its prior position has engendered serious reliance interests. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (holding that the DHS Secretary's failure to address whether there was "legitimate reliance" on the DACA Memorandum was arbitrary and capricious). That explanation must be

46

thorough and reasonable to withstand judicial scrutiny. *See Leggett & Platt, Inc. v. NLRB*, 988 F.3d 487, 495 (D.C. Cir. 2021) (noting the "uncharacteristic brevity" of the NLRB's explanation for its departure from its prior position and holding to "say this was an adequate explanation would gut that standard of all meaning").

The reliance interests in this case are serious and profound. ATF's prior legal position that frame and receiver blanks are not regulated products—as explained on its website, in its precedential classification determinations, in its litigation positions against gun-control proponents, and in various publications—has led to a burgeoning industry for frame and receiver blanks that enable consumers to privately and legally make their own firearms. Manufacturers, distributors, and retailers have invested capital, created American jobs, and lawfully sold products based on their good-faith reliance on ATF's prior legal position. *Cf.* Exhibit 3 at 43 (noting in ATF's regulatory analysis that "employees will lose their jobs" as a result of such businesses shutting down in response to the Final Rule, causing "unemployment").

There have been no changes to the statutes ATF administers that would require ATF to repudiate its prior classification determinations. Indeed, attempts to advance such legislative changes have failed in Congress. *See supra*, at 8. Facing political pressure to deliver on a campaign promise of enacting gun-control measures, but unable to achieve support in Congress, the

Biden Administration has resorted to unlawfully rewriting federal law through rulemaking under the false pretense of "clarifying" the law. 87 Fed. Reg. at 24,652.

In response to comments from the public arguing that the rule is an arbitrary and capricious departure from ATF's prior position, ATF cited "ATF statistics," "media reports," and "studies" about crimes involving guns, as well as the existence of "better and cheaper technologies" that make it easier for individuals to privately make firearms, 87 Fed. Reg. at 24,689. While these may explain some of Defendants' motivations for adopting the Final Rule, they offer no legal explanation for how the definition of a "frame or receiver" could possibly have changed so suddenly to effectuate a massive expansion of ATF's regulatory jurisdiction without any legislation from Congress.

The critical question that ATF fails to address is how an unregulated piece of metal can turn into a regulated "frame or receiver" merely because of the increased availability of tools for turning that piece of metal into a frame or receiver. Under Defendants' legal logic, ATF could one day claim the power to regulate a solid, rectangular prism of raw aluminum as a "frame or receiver" depending on what tools were available. This issue is not merely hypothetical. An Internet search for "0% receiver" reveals that several websites are already marketing such blocks of aluminum. *See, e.g.*, *AR-00: 0% Receiver*, GHOST GUNNER, https://ghostgunner.net/zero-percent/. If the Final Rule is permitted

to stand, there will be no limiting legal principle to stop ATF from regulating solid, rectangular blocks of raw aluminum.

ATF has provided no reasonable explanation for why it is departing from its prior legal position and repudiating its classification determinations. ATF's departure from its longstanding interpretation of federal law, which has engendered serious reliance interests, is arbitrary and capricious.

### 3.   ATF's Stated Explanation for the Final Rule is a Pretext for Defendants' True Goal of Unlawfully Expanding ATF's Jurisdiction

The Final Rule is entitled "Definition of 'Frame or Receiver' and Identification of Firearms." It purports to "capture the full meaning of those terms" and provide "clarity" on the meaning of other terms. 87 Fed. Reg. at 24,652. But as discussed earlier, the Final Rule creates vague and self-contradictory new definitions that exceed ATF's statutory authority, achieving the opposite of what ATF purportedly sought to accomplish. *See supra*, at 33–44. ATF's stated goals of capturing the full meaning of statutory terms and providing clarity to the law are pretexts for Defendants' true goal of expanding ATF's regulatory jurisdiction without congressional authorization.

It is a "settled proposition" that "in order to promote meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–69 (1962)). If "the evidence tells a story

that does not match the explanation" given by the agency for its decision, then the agency's action is arbitrary and capricious. *Id.* at 2575. Stated differently, when "an explanation for agency action" is "incongruent with what the record reveals about the agency's priorities and decisionmaking process," the agency has failed to satisfy the "reasoned explanation requirement of administrative law," which "is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 2575–76.

The evidence in the record, including the public statements of President Biden, shows that the true motivations for the Final Rule are not to capture the full meaning of statutory terms or provide clarity to the law, but to expand ATF's regulatory jurisdiction without congressional approval to achieve President Biden's campaign promise of imposing new regulations on so-called "ghost guns." *See supra*, at 8–12 (noting the failure of legislation and President Biden's statements about resorting to agency rulemaking to get around Congress).

Defendants seek to bring under ATF's authority products that legally fall outside the regulatory regime Congress created. The Final Rule is thus an unconstitutional attempt by Defendants to rewrite federal law through unilateral executive action in violation of the separation of powers. Because

50

ATF offered pretextual explanations for the Final Rule that masked its true intentions, the Final Rule is arbitrary and capricious.

### 4. ATF Did Not Adequately Consider Alternative Regulatory Approaches

An agency must reasonably consider available regulatory alternatives when engaging in rulemaking. *See State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 51. An agency's "failure to consider . . . regulatory alternatives . . . cannot be substantiated by conclusory statements that the [alternatives] would be insufficient." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1226 (5th Cir. 1991). "Stating that a factor was considered . . . is not a substitute for considering it." *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (quoting *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)).

ATF did not sufficiently consider "[n]o change." Exhibit 3 at 118. In its Regulatory Impact Analysis and Final Regulatory Flexibility Analysis, ATF states that this "alternative was considered and not implemented because the GCA requires that firearms be regulated," and "[c]urrently, the majority of firearms fall outside the scope of the existing definition of receiver." *Id.* at 119. The analysis goes on to claim that "[d]ue to recent court rulings on what constitutes a firearm, it would be difficult to prosecute criminal activity because the vast majority of legal firearms would no longer fit the definition of a firearm." *Id.* The analysis provides no citations to any court rulings, but in

the Final Rule, ATF cites three district court opinions in which courts held that the current regulatory definition of a "firearm frame or receiver" is not sufficiently clear enough to warrant a criminal conviction of a defendant for possessing an AR-15 lower receiver. 87 Fed. Reg. at 24,691. One of the cases, *United States v. Jimenez*, 191 F. Supp. 3d 1038 (N.D. Cal. 2016), held that the statutory and regulatory definitions of a "receiver" were unconstitutionally vague.

It is incomprehensible why ATF would seek to cure an unconstitutionally vague definition of a "frame or receiver" by adding a multitude of new vague terms to the definition, such as "partially complete," "readily," and "clearly identifiable," and allowing an open-ended inquiry into the availability of instructions and tools. If the Final Rule takes effect, there will likely be far more than three district court opinions holding the definition of a "frame or receiver" unconstitutionally vague. The "uncharacteristic brevity" of ATF's single-paragraph analysis of the possibility of no change is arbitrary and capricious, and "[t]o say that this was an adequate explanation would gut that standard of all meaning." *Leggett & Platt, Inc.*, 988 F.3d at 495.

ATF also failed to adequately consider the possibility of grandfathering prior classification determinations. This compromise position would have allowed existing companies such as Division 80 to continue operations while the Final Rule's application to new products was litigated in court. But ATF

rejected this reasonable proposal on the ground that it would be "problematic" to allow manufacturers to "continue to produce non-compliant frames or receivers." Exhibit 3 at 120. That cursory analysis begs the question and assumes the validity of ATF's legally dubious and unconstitutionally vague new definition of what constitutes a "frame or receiver."

Furthermore, ATF's cost-benefit analysis of the possibility of grandfathering prior classification determinations is irrational and contradicts other parts of ATF's regulatory analysis. ATF claimed that grandfathering "has no costs and low benefits." *Id.* Yet that same analysis states that it is "unlikely that a significant number of non-FFLs [such as Division 80]" will continue to do business under the Final Rule and non-FFLs will "end up dissolving their businesses." *Id.* at 33. According to ATF, "employees will lose their jobs" as a result of these businesses dissolving, causing "unemployment." *Id.* at 43. The benefit of grandfathering is the preservation of existing, longstanding reliance interests—interests that ATF itself recognized in quantifying the Final Rule's costs—yet ATF's inadequate analysis dismissed the option of grandfathering as having insignificant benefits.

In performing reasoned decisionmaking, an agency's cost-benefit analysis "cannot" be "unreasonable." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1218 (5th Cir. 1991). "When an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis

can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012); *see also Business Roundtable v. SEC*, 647 F.3d 1144, 1149–56 (D.C. Cir. 2011) (identifying numerous flaws with the SEC's cost-benefit analysis in holding a rule unlawful).

By relying on a cost-benefit analysis that contradicts ATF's own analysis of the Final Rule's impacts on industry, ATF failed to engage in reasoned decisionmaking in its evaluation of the possibility of grandfathering. *See Del. Dep't of Natural Res. & Envtl. Control*, 785 F.3d at 15 (holding that a final rule was arbitrary and capricious when EPA's "later statements contradicted earlier responses"); *Farmers Union Cent. Exch., Inc.*, 734 F.2d at 1520 ("Such self-contradictory, wandering logic does not constitute an adequate explanation . . . .").

ATF's inadequate consideration of regulatory alternatives was arbitrary and capricious.

## D. The Final Rule Was Adopted Without Observance of Procedure Required by Law

In notice-and-comment rulemaking, an agency's notice must contain "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). If notice is inadequate, the "regulation must fall on procedural grounds, and the substantive validity of the change accordingly need not be examined." *AFL-CIO v. Donovan*, 757 F.2d

54

330, 338 (D.C. Cir. 1985). When a "change between the proposed and final rule is important, the question for the court is whether the final rule is a 'logical outgrowth' of the rulemaking proceeding." *Id.* (quoting *United Steelworkers v. Marshall*, 647 F.2d 1189, 1221 (D.C. Cir. 1980)). If "the final rule deviates too sharply from the proposed rule, affected parties will be deprived of notice and an opportunity to respond to the proposal." *Id.* The logical-outgrowth test's "objective is fair notice," and the question is whether interested parties "reasonably should have filed their comments on the subject during the notice-and-comment period." *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381–82 (5th Cir. 2021).

The Final Rule contains important new provisions that were not present in the Notice of Proposed Rulemaking, and which the public did not have an opportunity to comment on. Specifically, the Final Rule now includes a list of five hypothetical examples of what does, and does not, count as a partially complete frame or receiver. As previously discussed, Examples 4 and 5 are at odds with the Final Rule's definition of a partially complete frame or receiver, rendering the Final Rule incomprehensible and self-contradictory. *See supra*, at 38–44. The Final Rule's definition of a partially complete frame or receiver treats the absence of "instructions, jigs, templates, equipment, or tools" as non-dispositive, whereas Examples 4 and 5 create a categorical safe harbor for frame and receiver blanks not combined with such accoutrements. The self-

contradictory nature of the Final Rule has resulted in significant confusion among industry members and consumers about what conduct is allowed and what conduct is prohibited. *See* J.D. Tuccille, *supra* (Exhibit 29).

ATF did not provide the public with notice and an opportunity to comment on the five new hypothetical examples in the Final Rule. If it had done so, the public would have alerted ATF to the confusing, self-contradictory nature of the Final Rule's new definition of a partially complete frame or receiver in the comment period. Faced with such an obviously problematic rule, ATF could have taken additional steps to refine the rule's language.

Instead, ATF rushed the Final Rule based on political pressure to complete it before the midterm elections and before the one-year anniversary of President Biden's press conference at the White House Rose Garden. *See supra*, at 11–12. The public never had a chance to comment on the hypothetical examples, which were added only in the Final Rule. *Tex. Ass'n of Mfrs.*, 989 F.3d at 381–82. Because the Final Rule is not the logical outgrowth of the proposed rule, it must be set aside as unlawful.

## II.   Division 80 Will Suffer Irreparable Harm if an Injunction is Not Granted

### A.   The Final Rule Will Put Division 80 Out of Business

The second factor in the preliminary-injunction analysis, irreparable harm, is met when a "potential economic loss is so great as to threaten the

existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989); *see also Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022) (quoting *Atwood Turnkey Drilling*, 875 F.2d at 1179).

Division 80's principal business is the distribution of frame and receiver blanks, jigs, and tools to law-abiding businesses that market the products to customers who wish to exercise their Second Amendment rights by making firearms. Exhibit 26 at ¶¶ 3, 5. If the Final Rule takes effect, Division 80 will suffer irreparable harm because it will be forced out of business.

The consumers for the products that Division 80 distributes are sensitive to issues of cost and convenience. *Id.* at ¶ 9. If frame and receiver blanks were treated the same as regulated firearms and privately made firearms were subject to the onerous regulations imposed by the Final Rule, the regulatory costs, bureaucratic red tape, and extensive recordkeeping requirements would cause a dramatic reduction in consumer demand for frame and receiver blanks, jigs, and tools. *Id.* The result of the Final Rule would be to largely wipe out consumer demand for Division 80's products. *Id.* at ¶ 10.

That reduction in consumer demand would cause manufacturers of the products that Division 80 distributes to go out of business. *Id.* at ¶ 11. ATF's regulatory analysis admits that "it will be unlikely that a significant number of non-FFLs will opt to become FFLs," and non-FFLs will instead "end up

dissolving their businesses." Exhibit 3 at 33. These "companies going out of business will cause unemployment." *Id.* at 43. As ATF acknowledges in its cost-benefit analysis, "[m]ost costs are attributed to non-FFL manufacturers and dealers dissolving because of the final rule." *Id.* at 115.

It follows logically that without consumer demand, manufacturers will cease operations. Exhibit 26 at ¶ 11. And without products to sell or customers to buy them, Division 80 will go out of business as well. *Id.* at ¶ 13. As ATF itself admits in its analysis, the Final Rule "will reduce the overall supply and demand" for parts kits with frame and receiver blanks. Exhibit 3 at 33.

In addition, because Division 80 is not an FFL, its business of distributing frame and receiver blanks through the mail without a license would become illegal after the Final Rule takes effect. Exhibit 26 at ¶¶ 7–8, 11. In sum, if the Final Rule takes effect, Division 80's business will be completely wiped out, causing irreparable harm.

## B.   ATF is Attempting to Enforce the Final Rule Prior to its Effective Date Through Cease-and-Desist Letters

In a brazen, self-serving attempt to build a paper trail to defend against the argument that the Final Rule repudiates ATF's longstanding legal position, ATF has attempted to enforce the Final Rule *prior to its effective date*. That enforcement began with a cease-and-desist letter sent to JSD Supply, signed May 10, 2022, premised on the Final Rule's legal theory that a weapon

58

parts kit meets the definition of a firearm, even though the Final Rule does not take effect until August 24, 2022. Exhibit 30. Keenly aware that many would perceive ATF as enforcing the Final Rule prior to its effective date, ATF claimed in the letter that its new legal position "is and has been true notwithstanding the recently announced regulations and definitions under Final Rule 2021R-05F." *Id.*

ATF would have the public believe that the Final Rule was an entirely unnecessary exercise in political theater, even though ATF previously took the opposite position in litigation against gun-control proponents, members of Congress and gun-control activists pleaded with President Biden to accelerate the rulemaking process, and President Biden admitted that the Final Rule was his strategy to circumvent Congress in an effort to fulfill his promise to "crack down" on "ghost guns." *See supra*, at 8–12. Again, ATF is duplicitously smiling and saying, "nothing to see here, business as usual," while stabbing industry and consumers in the back by repudiating its longstanding legal position and prior classification determinations.

The cease-and-desist letter appears to have been the culmination of efforts in coordination with the gun-control group Everytown for Gun Safety, which quickly claimed credit for drawing ATF's attention to JSD Supply in a press release that described the letter as the "First Reported Cease and Desist

Order to an Online Ghost Gun Kits Seller."[12] As a result of the letter, JSD Supply placed a message on its website stating: "For the immediate future . . . we have to suspend sales temporarily. We're working on getting absolute clarification from the ATF . . . ."[13]

After unsuccessful attempts to seek clarification, JSD Supply filed suit against ATF on May 19, 2022, in the Western District of Pennsylvania, seeking a preliminary injunction on the ground that the cease-and-desist letter was an unlawful attempt to enforce the Final Rule prior to its effective date. Exhibit 33. Just three hours after Judge Stickman scheduled an emergency hearing on May 25, 2022, ATF sent JSD Supply a letter that rescinded the cease-and-desist letter, *but simultaneously doubled down on ATF's legal position notwithstanding the rescission*. Exhibit 33 at 3, 9. JSD Supply's reply in support of its preliminary-injunction motion rightly excoriates ATF for opportunistically attempting to moot the case once it feared an unfavorable outcome while nonetheless continuing to threaten JSD Supply with the possibility of a future enforcement action. Exhibit 34. The reply also reveals

---

[12] Press Release, Everytown for Gun Safety, Breaking: ATF Issues First Reported Cease and Desist Order to an Online Ghost Gun Kits Seller (May 13, 2022), https://www.everytown.org/press/breaking-atf-issues-first-reported-cease-and-desist-order-to-an-online-ghost-gun-kits-seller/ (Exhibit 31).

[13] *JSD Supply Legal Relief T-Shirt*, JSD SUPPLY, https://jsdsupply.com/shop/jsd-supply-legal-relief-t-shirt/ (last visited May 17, 2022) (Exhibit 32).

that on May 18, 2022, ATF sent a similar cease-and-desist letter to another business, KM Tactical, demonstrating that the threat of premature enforcement of the Final Rule remains a valid and ongoing concern for industry. *Id.* at 2, 13–15. The issue of mootness is now pending before the court.

As the foregoing demonstrates, the Biden Administration and gun-control groups have succeeded in politicizing ATF, transforming it into an agency dedicated to enacting policies that the Administration could not achieve through legislation. Businesses that hired competent, respected legal counsel who worked hand-in-hand with ATF to ensure compliance are now being accused of committing crimes for selling products that, for decades, were treated by ATF as falling outside of its jurisdiction. Given the volatile and unpredictable nature of ATF's conduct, there is a strong likelihood that ATF will attempt to shut down Division 80, its suppliers, or its customers prior to the effective date of the Final Rule, making it impossible for Division 80 to stay in business.

### C. The Scope of Injunctive Relief Must Be Nationwide to Preserve the Status Quo and Allow Division 80 to Continue Doing Business

An injunction on a nationwide level is necessary because Division 80 receives its inventory from out of state and most of its customers are out of state. Exhibit 26 at ¶¶ 4–6. An injunction applying to only Division 80 would not protect any manufacturers that supply the products that Division 80 sells

or any of Division 80's customers. Without a nationwide injunction to preserve the status quo, Division 80 would have no products and no customers. *Id.* at ¶¶ 9–11. As a result, Division 80 would be unable to continue its operations and would be forced out of business. *See Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020) (en banc) (noting that when "crafting an injunction, district courts are guided by the Supreme Court's instruction that the scope of injunctive relief is dictated by the extent of the violation established"); *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (affirming the grant of a preliminary injunction when there was "a substantial likelihood that a geographically-limited injunction would be ineffective" at remedying the plaintiff's injury).

Because Division 80 cannot continue operations without a nationwide injunction, the issuance of nationwide relief is a necessary and essential remedy to preserve the status quo while this Court performs its Article III duty to decide this case.

## III.   Temporary Relief Would Not Harm Defendants or the Public

The third and fourth factors in deciding whether to grant a preliminary injunction—harm to the opposing party and the public interest—overlap when the government is the opposing party. *Texas v. United States*, 809 F.3d at 187 & n.204 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Defendants face no harm from temporary relief. The "public interest" is properly "served by maintaining our constitutional structure and maintaining the liberty of individuals . . . ." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Government officials have no legitimate interest in implementing an unlawful rule. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law").

Even if Defendants had a legitimate interest in implementing the Final Rule, they, and the public, face no substantial prejudice from a delayed implementation. The government's interest "can be effectively vindicated after a trial on the merits," *Texas v. United States*, 809 F.3d at 187, whereas Division 80's interest cannot be, given that the Final Rule will destroy its business.

## IV.   The Court May Postpone the Final Rule's Effective Date

The Final Rule is scheduled to go into effect on August 24, 2022. If this Court requires additional time to conduct a preliminary-injunction hearing and issue an opinion, it may, in the interim, postpone the Final Rule's effective date.

The Administrative Procedure Act empowers a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. A stay of the effective date should issue

"to the extent necessary to prevent irreparable injury" and "[o]n such conditions as may be required." *Id.*; *see also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (staying an EPA action pending review).

When considering "whether to stay an agency action pending judicial review," district courts apply the same test used for temporary restraining orders and preliminary injunctions. *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015); *see also IHG Healthcare, Inc. v. Sebelius*, CV H-09-3233, 2010 WL 11680368, at *1 (S.D. Tex. Apr. 1, 2010); *Safety Nat'l Cas. Corp. v. DHS*, CV H-05-2159, 2005 WL 8168878, at *2 (S.D. Tex. Dec. 9, 2005).

For the reasons explained herein, Division 80 has made the showing necessary for a stay of the Final Rule. The Administrative Procedure Act empowers the Court to postpone the effective date as long as necessary "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. As a result, the Court may postpone the Final Rule's effective date pending the final resolution of this litigation or pending the resolution of this preliminary-injunction motion.

## CONCLUSION

Division 80 respectfully requests that the Court enter a preliminary injunction preventing Defendants from implementing the Final Rule, or in the alternative, postpone the Final Rule's effective date.

Division 80 also asks that the Court enjoin ATF from taking any enforcement actions, including the sending of cease-and-desist letters, premised on the legal theories in the Final Rule that (1) a weapon parts kit is a "firearm" or that (2) a partially complete, disassembled, or inoperable frame or receiver is a "frame or receiver."

Division 80 requests an in-person hearing as soon as practicable given the Final Rule's effective date of August 24, 2022, and ATF's recent attempts to enforce the Final Rule prior to its effective date. *See* Exhibits 30 and 34.

> Respectfully submitted,
>
> Michael J. Sullivan
> Massachusetts Bar No. 487210
> *Pro Hac Vice Pending*
> ASHCROFT LAW FIRM LLC
> 200 State Street, 7th Floor
> Boston, MA 02109
> Phone: (617) 573-9400
> Fax: (703) 247-5446
> Email: msullivan@ashcroftlawfirm.com
>
> */s/ Cory R. Liu*
> Cory R. Liu
> *Attorney-in-Charge*
> Texas Bar No. 24098003
> S.D. Texas Bar No. 3047640
> ASHCROFT LAW FIRM LLC
> 919 Congress Ave., Ste. 1325
> Austin, TX 78701
> Phone: (512) 370-1800
> Fax: (703) 247-5446
> Email: cliu@ashcroftlawfirm.com
>
> *Counsel for Plaintiff Division 80 LLC*

65

## INDEX OF EXHIBITS

1. **Testimony of Ashley Hlebinsky at the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution (May 11, 2021)**

2. **Final Rule (Apr. 26, 2022)**

3. **Regulatory Impact Analysis and Final Regulatory Flexibility Analysis**

4. **ATF Website – Are "80%" or "unfinished" receivers illegal?**

5. **ATF Website – Are there restrictions on who can purchase receiver blanks?**

6. **ATF Website – What is ATF doing in regards to people making their own firearms?**

7. **ATF Website – Does an individual need a license to make a firearm for personal use?**

8. **Selection of ATF classification determination letters**

9. **ATF's motion to dismiss in *California v. ATF*, No. 3:20-CV-06761 (N.D. Cal. Nov. 30, 2020), ECF No. 29**

10. **ATF's summary-judgment motion in *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y. Jan. 29, 2021), ECF No. 98**

11. **ATF Public Affairs Division talking points (Apr. 9, 2014)**

    Source: *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y.), ECF No. 60-5 at 15–21

12. **ATF Technical Bulletins (Oct. 28, 2013, and Nov. 1, 2013)**

    Source: *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y.), ECF No. 60-3 at 72–83

13. **ATF Type Firearm Visual Reference Guide (undated)**

    Source: *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y.), ECF No. 60-3 at 84–89

14. **Article by AUSA Shawn J. Nelson on "Unfinished Lower Receivers" (Nov. 2015)**

    Source: *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y.), ECF No. 60-4 at 96–100, ECF No. 60-5 at 1–2

15. **Biden-Harris Democrats Website – "The Biden Plan to End Our Gun Violence Epidemic"**

16. **Bill – Untraceable Firearms Act of 2021, S. 1558, 117th Cong. (2021)**

17. **Bill – Ghost Guns Are Guns Act, H.R. 1454, 117th Cong. (2021)**

18. **Biden Administration Statement on Gun Violence (Apr. 7, 2021)**

19. **President Biden's Remarks at the White House Rose Garden (Apr. 8, 2021)**

20. **Attorney General Garland's Remarks at the White House Rose Garden (Apr. 8, 2021)**

21. **Notice of Proposed Rulemaking (May 21, 2021)**

22. **President Biden's Remarks at a Gun Violence Prevention Task Force Meeting (Feb. 3, 2022)**

23. ***New York Times* – "Dueling Messages Muddle Biden's Agenda on Guns" (Mar. 7, 2022)**

24. ***Politico* – "Democrats Exasperated with Biden on Gun Control" (Apr. 8, 2022)**

25. **President Biden's Remarks at the White House Rose Garden (Apr. 11, 2022)**

26. **Declaration of president of Division 80**

27. **Excerpt of Senate Committee Report for the Gun Control Act of 1968**

    Source: *City of Syracuse v. ATF*, No. 1:20-CV-06885 (S.D.N.Y.), ECF No. 60-3 at 60–62

28. **ATF Website – Does the GCA control the sale of firearm parts?**

29. ***Reason* – "ATF's New 'Ghost Gun' Rules Are as Clear as Mud" (Apr. 11, 2022)**

30. **ATF cease-and-desist letter to JSD Supply (May 9–10, 2022)**

31. **Everytown for Gun Safety press release (May 13, 2022)**

32. **JSD Supply website screenshot (visited May 17, 2022)**

33. **JSD Supply complaint in *Not an LLC d/b/a JSD Supply v. ATF*, No. 2:22-CV-747 (W.D. Pa.), ECF No. 1**

34. **JSD Supply reply in support of preliminary injunction and attached exhibits in *Not an LLC d/b/a JSD Supply v. ATF*, No. 2:22-CV-747 (W.D. Pa.), ECF Nos. 19-1, 19-2, 19-3, 19-4, and 19-5**

**Certificate of Service**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 6, 2022. A true and accurate copy of the foregoing document was also sent to the following:

daniel.riess@usdoj.gov

*/s/ Cory R. Liu*
Cory R. Liu

**Certificate of Conference**

I certify that, on June 6, 2022, I conferred with Defendants' counsel, who represented that Defendants oppose this motion.

*/s/ Cory R. Liu*
Cory R. Liu