Exhibit 3



# Definition of "Frame or Receiver" and Identification of Firearms

**27 CFR Parts 447, 478, and 479**

**Docket No. 2021R-05; AG Order No. 5374-2022**
**RIN 1140-AA54**
**Final Rule**

***Regulatory Impact Analysis and Final Regulatory Flexibility Analysis***

**April 2022**

Prepared by:
Office of Regulatory Affairs
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Washington, D.C.

# Table of Contents

Executive Summary                                        8
1.      Introduction                                     10
    1.1. Statutory Authority ............................................................................................11
    1.2. Need for Federal Regulatory Action ............................................................11
    1.3. Regulatory Changes from the NPRM to the Final Rule .................................14
2.      Definition of Frame or Receiver        17
    2.1. Need for a Definition of Frame or Receiver ...................................................17
    2.2. Population for Definition of Frame or Receiver .............................................18
    2.3. Costs for Definition of Frame or Receiver.....................................................19
    2.4. Definition of Frame or Receiver Benefits......................................................21
3.      Silencers   22
    3.1. Need for Change in Markings on Silencers ....................................................22
    3.2. Comments Received on Silencers ...................................................................23
    3.3. Population of Silencers..................................................................................24
        3.3.1. Population of FFL Manufacturers of Silencers     24
        3.3.2. Population of Individual Owners of Silencers     24
    3.4. Costs Related to Silencers .............................................................................25
        3.4.1.   Costs for Silencer Manufacturers       25
        3.4.2.   Costs for Individual Silencer Owners   25
    3.5. Benefits Related to Silencers ........................................................................26
4.      FFL and Non-FFL Manufacturers of Firearm Kits.............................................27
    4.1. Need to Include Firearms Kits in the Definition of Firearm ...........................27
    4.2. Comments Received on Manufacturers ...........................................................28
    4.3. Population for Firearm Parts Kits ...................................................................29
        4.3.1.   Population of Manufacturers of Firearm Parts Kits     29
        4.3.2.   Population of Dealers and Individuals with Firearm Parts Kits       30
    4.4. Costs to Manufacturers of Firearm Parts Kits.................................................30
        4.4.1.   Scenario 1: 1 Non-FFL Manufacturer Becomes Licensed as an FFL  33
        4.4.2.   Scenario 2: FFL Manufacturers to Serialize Firearm Parts Kits       41
        4.4.3.   Scenario 3: Non-FFL Manufacturers That Cease Business   42
        4.4.4.   Summary of Costs for Manufacturers of Firearm Parts Kits   43
    4.5. Benefits of Regulating Firearm Parts Kits ......................................................45
5.      Privately Made Firearms and FFL and non-FFL Dealers of Firearm Kits .......................50
    5.1. Need for Markings on PMFs ..........................................................................50
    5.2. Comments Received on FFL and non-FFL Dealers .........................................51
    5.3. Population of Markings on Firearms Kits and PMFs........................................57
        5.3.1.   Population of FFL and Non-FFL Manufacturers of Firearm Parts Kits with a
        Partially Complete "Frame or Receiver"57
        5.3.2.   Population of FFL and non-FFL Dealers       57
        5.3.3.   Population of Type 03 FFL Collectors 59
        5.3.4.   Population of Individuals        60

5.4. Cost of Markings on Weapon Parts Kits and PMFs for FFL and non-FFL Dealers ..........61
    5.4.1.    Costs for Non-FFL Manufacturers    62
    5.4.2.    Costs for FFL and non-FFL Dealers    62
    5.4.3.    Costs for Individuals to Mark PMFs    75
5.5. Benefits of Marking PMFs .................................................................78
6.       Gunsmithing          79
6.1. Need for Change in Definition of Gunsmithing...................................................80
6.2. Comments Received on Gunsmithing .......................................................80
6.3. Gunsmithing Population ..........................................................81
6.4. Gunsmithing Costs ..................................................................82
6.5. Benefits for Changing the Definition of Gunsmithing ...........................................88
7.       Record Retention          89
7.1. Comments Received on Indefinite Records Retention......................................89
7.2. Need for Record Retention ...........................................................93
7.3. Population for Record Retention.......................................................94
7.4. Costs for Record Retention ...........................................................96
7.5. Benefits of Record Retention ........................................................106
7.6. Record Retention Collection of Information .................................................110
8.       Government Costs          111
9.       Summary of the Overall Cost of the Rule................................................112
9.1. Industry Costs......................................................................112
9.2. Total Cost of the Rule ..............................................................114
10.      Analysis of Alternatives Considered ...............................................115
10.1. The Final Rule—Definition of Receiver and New Recordkeeping Requirements.........117
10.2. Alternative 1—No Change ........................................................117
10.3.   Alternative 2— Everytown Petition.................................................118
10.4.   Alternative 3—Grandfather All Existing Firearms and Receivers ............................118
10.5.   Alternative 4—Require Serialization of All Partially Complete Firearms or Split Receivers and Frames and Modular Silencers ......................................119
10.6.   Alternative 5—Implement Corrective Taxes ............................................120
10.7.   Alternative 6—Record Retention Longer than 20 Years, but Less than Indefinite ......120
10.8.   Alternative 7—Requiring Unlicensed Individuals to Mark their Firearms..................121
10.9.   Alternative 8—Allowing the Manufacturer to Designate a Component as the "Receiver" of the Firearm ..................................................................121
10.10.  Alternative 9—Non-Regulatory Alternatives .........................................122
10.11.  Alternative 10—Have Multiple Serial Numbers on a Firearm .........................122
11.      Final Regulatory Flexibility Analysis ..............................................124
11.1. Summary of Findings ..............................................................124
11.2. Final Regulatory Flexibility Analysis ...............................................125
11.3. A Statement of the Need for, and Objectives of, the Rule................................126
11.4. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such

Comments...............................................................................................................127

11.5.  The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Changes Made to the Proposed Rule in the Final Rule as a Result of the Comments. ...........................................................................................................127

11.6.  A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate is Available. ...................................128

11.7.   A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record. ......................................................................................................129

11.8.  A Description of the Steps the Agency has Taken to Minimize the Significant Economic Impact on Small Entities Consistent with the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected...........129

12.       Collection of Information            131

13.       Appendix: Retail Prices of Firearm Parts Kits with Partially Complete "Frames or Receivers"            136

# Tables and Graphs

Table ES.1.  Summary of Affected Population, Costs, and Benefits 8

Table 4.1.  Cost for a Form 7 Application to Become a Type 07 FFL          35

Table 4.2.  Cost to Purchase a Laser Engraver          36

Table 4.3.  Cost to Purchase an Air Handler  36

Table 4.4.  Wage Categories for Metal and Plastic Workers  39

Table 4.5.  Hourly and Wage Burden to Update and Maintain Production and Disposition Records          40

Table 4.6.  Per FFL and Total First-Year Cost to Become a Type 07 Manufacturer FFL     40

Table 4.7.  Cost Per Manufacturer of Firearm Parts Kits          43

Table 4.8.  Industry Cost for Manufacturers of Firearm Parts Kits     44

Table 4.9.  10-Year Cost for FFL and Non-FFL Manufacturers of Firearm Parts Kits          44

Table 4.10.  Number of Traces of Suspected PMFs from 2016 Through 2021          47

Graph 4.1.  Total Suspected PMFs by Year   48

Table 5.1.  Number of PMFs in Circulation   61

Table 5.2.  Range of Individuals Who Currently Own PMFs          61

Table 5.3.  Wage Categories Used for Gunsmithing Activities          64

Table 5.4.  Per FFL Dealer Cost to Engrave Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"          65

Table 5.5.  Annually Recurring Cost to Engrave PMFs Held Overnight in Inventory          66

Table 5.6.  Summary of Costs for FFL Dealers with Gunsmithing Capabilities          67

Table 5.7.  Wage Rate for a Non-Specialized Employee          69

Table 5.8.  Hourly Burden and Cost to Dispose of Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"          70

Table 5.9.  Retail Price of Firearm Parts Kits with a Partially Complete "Frame or Receiver"          70

Table 5.10.  Application Cost to be a Type 01 or 02 FFL          73

Table 5.12.  One-time Cost for Non-FFL Dealers to Engrave Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver" 74

Table 5.13.  Summary of Costs for a Non-FFL Dealer to Become Licensed as an FFL Dealer
        75

Table 5.14.  Cost for Milage to an FFL        76

Table 5.15.  Leisure Wage Rate for Individuals        77

Table 5.16.  Individual Cost to Go to an FFL (Roundtrip)        77

Table 6.1.  Wage Categories Used for Gunsmithing Activities        83

Table 6.2.  Hourly Burden Due to Additional A&D Entries  84

Table 6.3.  Cost to Mark Firearms        85

Table 6.4.  Annually Recurring Cost to Engrave PMFs Held in Inventory   87

Table 7.1.  Summary Comparing Total Type 01 and 02 FFLs to Affected Type 01 and 02 FFLs
        95

Table 7.2.  Number of FFLs, Boxes, and Number of Records over 20 Years Sent to ATF   96

Table 7.3.  Application and Renewal Cost for a Form 7 Application for Type 01 and Type 02
FFLs   97

Table 7.4.  10-year Cost of FFLs Applying for a New License        99

Table 7.5.  Average Monthly Price of Electronic Storage        100

Table 7.6.  Historical and Projected NICS and NFA Transactions        102

Graph 7.1.  Historical and Projected Growth of NICS and NFA Transactions        103

Table 7.7.  Projected Number of Pages for NICS and NFA Transactions, Paper Cost, Per-FFL
Savings from Reduced Paper Printing, and Per-FFL Net Cost        105

Table 7.8.  Industry Cost for Records Retention        106

Table 7.9.  Numbers and Percentages of Traces of Firearms Over 20 Years Old and Successful
Prosecution Rates.        109

Table 9.1.  Industry Cost by Action   112

Table 9.2.  Total 10-year Cost of the Rule        114

Table 10.1.  Summary of Cost and Benefits of the Alternatives        115

Abbreviations

ATF    Bureau of Alcohol, Tobacco, Firearms, and Explosives
BLS    Bureau of Labor Statistics
CFR    Code of Federal Regulations
FATD  Firearms Ammunitions Technology Division
FFL    Federal Firearms Licensee
IRFA   Initial Regulatory Flexibility Analysis
NAICS          North American Industry Classification System
NPRM Notice of Proposed Rulemaking
OMB   Office of Management and Budget
PMF    Privately Made Firearm
RFA    Regulatory Flexibility Act
§        Section symbol
SBA    Small Business Administration
SME    Subject Matter Experts
U.S.    United States
U.S.C. United States Code

# Executive Summary

Executive Order 12866 (Regulatory Planning and Review) directs agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic benefits, environmental benefits, public health and safety effects, distributive impacts, and equity). Executive Order 13563 (Improving Regulation and Regulatory Review) emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

The Attorney General has determined that while the final rule is not economically significant, it is a "significant regulatory action" under section 3(f)(4) of Executive Order 12866 because the final rule raises novel legal or policy issues arising out of legal mandates. Accordingly, the final rule has been reviewed by the Office of Management and Budget ("OMB").

This Regulatory Impact Analysis ("RIA") provides supporting documentation for the regulatory evaluation in the preamble of the final rule for the Definition of Frame or Receiver and Identification of Firearms [2021R-05F].

Table ES.1.  Summary of Affected Population, Costs, and Benefits

| Category | Final Rule |
|---|---|
| Applicability | • Definition of Frame or Receiver<br>• Updates Marking Requirements<br>• Gunsmithing Definition<br>• Updates Record Retention |
| Affected Population | • 113,204 FFLs |

|  | <ul><li>19,449 FFL Type 07 Manufacturers</li><li>43 Non-FFL Manufacturers</li><li>114,001 FFL Dealers, Pawnbrokers, and Collectors</li><li>24 Non-FFL Dealers</li><li>Approximately 1 Million Individual Owners</li></ul> |
|---|---|
| Total Costs to Industry, Public, and Government (7 percent Discount Rate) | $14.3 Million Annualized |
| Benefits (7 percent Discount Rate) | Not Estimated |
| Benefits (Qualitative) | <ul><li>Provides clarity to courts on what constitutes a firearm frame or receiver</li><li>Adapts to new technology/terminology</li><li>Makes consistent markingrequirements</li><li>Eases certain marking requirements</li><li>Increase tracing of crime scenefirearms to prosecute criminals</li><li>Restricts felons and other prohibited persons from acquiring PMFs</li></ul> |

# 1. Introduction

This analysis provides an assessment of the impacts to industry, the public, and government from the changes that are detailed in the final rule titled Definition of "Frame or Receiver" and Identification of Firearms.  This RIA does not attempt to precisely replicate the regulatory language of the final rule; the regulatory text of the published rule, not the text of this analysis, is legally binding.  Furthermore, in the calculations presented throughout the RIA, the various totals do not add up precisely due to rounding in the calculation process.  Additionally, the prices for items that are cited and relied on throughout the RIA are the prices that were found at the time ATF conducted the analysis and therefore may differ from the prices listed at or after the time of publication.  ATF cannot account for inevitable fluctuations in market prices over time.

The final rule does the following:

- Provides definitions of "frame or receiver" and "privately made firearms" ("PMFs") that would encompass and adapt to technological advances in the industry, as well as changes in firearms terminology;

- Requires consistent marking requirements for firearms, including mufflers and silencers;

- Adds weapon parts kits and frame or receiver parts kits containing partially complete frames or receivers that may readily be converted to function to the definitions of "firearm" and "frame or receiver";

- Extends recordkeeping retention requirements from 20 years to indefinitely;

- Allows for greater electronic storage of transaction records in lieu of paper records; and

- Clarifies the definition of gunsmithing to include marking by licensed dealer-gunsmiths.

## 1.1. Statutory Authority

The Attorney General is responsible for enforcing the Gun Control Act of 1968 ("GCA"), as amended, and the National Firearms Act of 1934 ("NFA"), as amended.  This responsibility includes the authority to promulgate regulations necessary to enforce the provisions of the GCA and NFA.  *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a).  Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") of the Department of Justice ("Department"), subject to the direction of the Attorney General and the Deputy Attorney General.  *See* 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); T.D. Order No. 221(2)(a), (d), 37 FR 11696–97 (June 10, 1972).  Accordingly, the Department and ATF have promulgated regulations implementing both the GCA and the NFA.  *See* 27 CFR parts 478, 479.

The final rule provides regulatory definitions to replace "firearm frame or receiver" and "frame or receiver" because they are outdated.  The final rule also amends ATF's definitions of "firearm" and "gunsmith" to clarify the meaning of those terms and to add regulatory terms such as "complete weapon," "complete muffler or silencer device," "multi-piece frame or receiver," "privately made firearm," and "readily" to improve clarity and to account for advancements in firearms technology.  Further, the final rule amends ATF's regulations on marking and recordkeeping to implement these definitions.

## 1.2. Need for Federal Regulatory Action

In the notice of proposed rulemaking ("NPRM"), *see* Definition of "Frame or Receiver"

and Identification of Firearms, 86 FR 27720 (May 21, 2021), ATF stated that the rule would address externalities. Commenters stated that externalities involve inefficiencies resulting from market transactions. ATF concurs that the rule would not address externalities due to market inefficiencies; therefore, ATF has removed language that suggested the rule would address a market inefficiency. Regardless, the publication of the final rule remains necessary to enforce the GCA and NFA.

Agencies take regulatory action for various reasons. One of the reasons is to carry out Congress's policy decisions, as expressed in statutes. Here, this rulemaking aims to apply Congress's policy decision to require licensing, marking, recordkeeping, and background checks so that firearms can be traced if used in crimes and to prevent felons and other prohibited persons from acquiring them.

The final rule is necessary to address recent court cases that have narrowly construed ATF's current regulatory definition of "frame or receiver." Such a narrow construction of the regulatory term creates the possibility that future courts may hold that the overwhelming majority of regulated firearm frames or receivers do not meet the existing definition. Furthermore, administrative inspections, criminal investigations, and prosecutions are hindered when PMFs are accepted into and disposed of from a licensee's inventory, and when firearms records are destroyed after 20 years despite the need of these records to combat criminal activities.

The final rule removes and replaces the existing definitions of "frame or receiver" to account for technological advances in the industry and to ensure that these firearms continue to remain under the regulatory regime as intended by the enactment of the GCA. Among other

things, these changes address the manufacturing of firearms using multiple manufacturers and the making of PMFs.  The narrow interpretation of what constitutes a "frame or receiver" by some courts may potentially allow persons to avoid: (a) having to obtain a license to engage in the business of manufacturing or importing frames or receivers; (b) identifying frames or receivers with a serial number and other traceable markings; (c) maintaining records of produced or imported frames or receivers that are necessary for tracing the frames or receivers; and (d) running National Instant Criminal Background Check System ("NICS") checks on potential transferees to determine if they are legally prohibited from receiving or possessing firearms when they acquire frames or receivers.  These consequences could, in turn, allow otherwise prohibited persons to acquire frames or receivers that can quickly be assembled into semiautomatic weapons easily and without a background check.[1]

If no portion of split or multi-piece frames or receivers were subject to any existing regulations—such as marking, recordkeeping, or background checks—law enforcement's ability to trace firearms used in the commission of a crime would be severely impeded.  The final rule makes marking requirements consistent to facilitate tracing in the event a firearm is used in the commission of a crime.  In order to accommodate additional marking requirements, the final rule expands the definition of "gunsmithing" to expressly allow licensed dealer-gunsmiths to mark firearms without a manufacturer's license.  In addition, the final rule requires Federal firearms licensees ("FFLs") to retain all firearms records, either in hard copy or electronically, until the

---

[1] *See* Ake Bleiberg & Stefanie Dazio, *Design of AR-15 could derail charges tied to popular rifle*, Associated Press (Jan. 13, 2020), *available at* https://apnews.com/article/396bbedbf4963a28bda99e7793ee6366 (last visited Mar. 24, 2022).

-13-

Federally licensed firearms business or licensed activity is discontinued.  For more specific details regarding the need for regulation, please refer to the specific chapters pertaining to each provision of the final rule.

1.3.  Regulatory Changes from the NPRM to the Final Rule

Section V of the final rule's preamble describes the regulatory text of the final rule and changes from the proposed rule.  The following is a list of substantive changes from the NPRM to the final rule:

(1) Definition of frame or receiver

- The final rule describes one part of a projectile weapon that will be either the "frame" or "receiver" with examples and pictures.

- The final rule defines "variant" and more clearly grandfathers existing classifications (*e.g.*, AR-15/M-16 variants).

- The final rule clarifies the one part of a firearm muffler or silencer device that is the frame or receiver and addresses how modular silencers are marked.

- The final rule defines "multi-piece frame or receiver" and specifically addresses how such items should be marked.

- The final rule clarifies the supplement titled "partially complete, disassembled, or nonfunctional frame or receiver" and provides examples.

- The final rule clarifies the items and materials that need to be submitted when voluntarily seeking a firearm or armor piercing ammunition classification from ATF.

(2) PMFs

- The final rule requires FFLs to mark and record PMFs only when they are received or

-14-

otherwise acquired into inventory, but allows PMFs to be adjusted or repaired and returned by licensed dealer-gunsmiths on the same day without marking.

- The final rule allows FFLs to directly supervise a nonlicensee that may mark the PMF for the licensee in accordance with the regulations.

- The final rule clarifies who is required to be licensed as a gunsmith eligible to mark PMFs without a manufacturer's license.

(3) Marking

- The final rule defines "new design" to inform manufacturers as to when they are required to mark firearms they manufacture in accordance with the new marking requirements (*i.e.*, either FFL name, city, and State, or FFL name and abbreviated FFL number placed on the frame or receiver).

- The final rule expands the adoption of marking allowances and addresses three additional circumstances where markings can be adopted. This expansion includes newly manufactured firearms, manufacturers performing gunsmithing services, and PMFs marked by nonlicensees.

- The final rule provides that an acceptable way for PMFs to be marked is by placing the serial number on a metal plate that is permanently embedded into a polymer frame or receiver, or other method approved by the Director of ATF ("Director").

(4) Recordkeeping

- The final rule clarifies that manufacturers have seven days to enter non-NFA firearms into their records, and by close of the next business day for manufactured NFA firearms.

-15-

- The final rule clarifies that licensed dealers (including gunsmiths), manufacturers, and importers may conduct adjustments or repairs of all firearms without recording them as acquisitions or dispositions provided they are returned to the person from whom they were received on the same day.

- The final rule clarifies that PMFs must be recorded as an acquisition when a licensee places marks of identification and as a disposition upon return (unless the licensee is marking under the direct supervision of another licensee that recorded the acquisition).

(5) Record retention

- The final rule clarifies that FFLs are required to maintain their records until the business or licensed activity is discontinued.

# 2.  Definition of Frame or Receiver

The final rule provides definitions to replace "firearm frame or receiver."  It updates how frames or receivers are defined, incorporating various configurations, such as split or multi-piece receivers, as well as firearm parts kits with partially complete "frames or receivers."[2]  The final definition of this term will maintain current classifications and current marking requirements of frames or receivers, except that the name, city, and State (or, alternatively, the name and abbreviated license number) of the manufacturer or importer must be marked on the frame or receiver along with the serial number.  In contravention of ATF's interpretation of its own regulation, some courts have narrowly construed the regulatory definition of frame or receiver.  This narrow construction of ATF's regulatory definition of "frame or receiver" as not applying to split receivers like the AR-15 would mean that a large percentage of all firearms now in existence do not have an identifiable frame or receiver.

All new or unclassified frames or receivers will be required to be marked according to the final rule.  Markings must be placed within seven days of completion of a GCA weapon (or "frame or receiver," if not being sold as a complete weapon), or by close of the next business day for NFA firearms.

## 2.1.  Need for a Definition of Frame or Receiver

---

[2] As explained in chapter 4 of this RIA, the final rule clarifies that weapon parts kits that are "designed to or may readily be assembled, completed, converted, or restored to expel a projectile by the action of an explosive" are included under the definition of "firearm."  Furthermore, the final rule clarifies that "frame or receiver parts kits" are included in the definition titled, "partially complete, disassembled, or nonfunctional frame or receiver" that supplements the definition of "frame or receiver."  Because both "weapon parts kits" and "frame or receiver parts kits" are "firearms" under the definition, this analysis uses the term "firearm parts kits" to refer to both.

Currently, the definition of "firearm frame or receiver" is outdated and does not account for advances in technology or terminology. As it exists, the current definition of "firearm frame or receiver" does not capture the vast majority of firearms that are commercially available. Although numerous firearms manufacturers have asked for and received a classification from ATF as to which component or part of a new firearm design constitutes the frame or receiver, some courts have determined the current regulatory definition of "firearm frame or receiver" does not capture the portion of the firearm that ATF had determined to be a "frame or receiver."

ATF's regulatory definition of "frame or receiver" has not been updated since it was first published, and thus it does not reflect innovations made by the industry. Although the majority of FFLs that manufacture or import firearms (Type 07 and Type 08 FFLs) request determinations from ATF's Firearms Ammunitions Technology Division ("FATD") as to which part of their firearm is the frame or receiver, these determinations have largely relied on ATF policy that interprets the existing regulatory definitions.

## 2.2. Population for Definition of Frame or Receiver

The definition of "frame or receiver" affects Type 07 FFLs that manufacture or sell firearms with split or multi-piece receivers. Based on ATF's licensing database, there are 19,449 Type 07 FFLs that could potentially be affected by the final rule. The rule will also affect non-FFLs that may request a determination (or "classification") letter for multi-piece frame or receiver designs for the purpose of establishing that they are not producing a frame or receiver that falls under the regulatory definition. This definition will not affect FFLs that import firearms (Type 08) because they already need a determination in order to be able to import firearms.

-18-

This chapter does not address manufacturers or retailers of firearm parts kits with partially complete "frames or receivers."  For information regarding manufacturers of firearm kits with a partially a complete frame or receiver, please refer to chapter 4 of this analysis.  For retailers of firearm parts kits with partially complete "frames or receivers," please refer to chapter 5 of this analysis.

## 2.3.  Costs for Definition of Frame or Receiver

Under the proposed rule, licensed manufacturers of firearms would have been required to serialize multiple parts of a "frame" or "receiver" if the firearm was a new split frame or receiver design unless they had asked for and received a determination letter from ATF.  Existing designs would have been grandfathered in, and would have been serialized in accordance with the existing marking requirements.  Public comments stated that serializing multiple parts of a firearm would be cost prohibitive.  Manufacturers opined that they would need to submit a request to ATF for a determination or classification letter for every modification or design change to existing firearms, significantly increasing the time to receive a determination or classification letter from FATD, which they stated currently takes about one year.  Based on the comments received, ATF concurs that serializing multiple parts of a firearm would be cost prohibitive and therefore has changed the definition of "frame or receiver" in the final rule to identify only one part of a firearm as the "frame or receiver."  Furthermore, all existing classifications and their variants will be grandfathered in and may continue to be identified under the existing marking requirements.

There may be some minor costs to manufacturers under the new marking requirements when they produce a completely new firearm design.  However, because ATF is revising the

definition of "frame or receiver" so that it can be applied to identify only one part of the firearm that needs to be marked even when there are new technological designs, ATF anticipates an unknown amount of savings for new designs.  These savings arise from reduced application and wait times for manufacturers because they will not need to make a request for a classification letter from ATF to determine which part of the firearm is the frame or receiver.  ATF is also revising the definition to account for multi-piece frame or receiver designs.  Because these definitions would better clarify which part is the frame or receiver on a split or multi-piece design, Type 07 FFLs will know where to mark the firearm without submitting new requests for determination or classification letters.

However, there is an unknown cost for non-FFL manufacturers that intended to manufacture multi-piece frames or receivers that do not meet the definition of "frame or receiver" in the final rule.  These costs could not be accurately measured because currently there are no known non-FFLs that manufacture multi-piece firearms or receivers that would fall outside the final rule's definition of frame or receiver.  When the final rule is in effect, any such non-FFL manufacturers that do exist will cease submitting applications for a determination or classification letter as a means to ensure that their new designs will fall outside the regulatory regime.  This is because such non-FFL manufacturers will either dissolve their business or become FFLs selling products that fall within the scope of the regulatory regime.

This chapter does not account for partially complete frames or receivers or firearm kits with a partially complete frame or receiver.  Costs incurred by the manufacturers of partially complete frames or receivers or firearm kits with a partially complete frame or receiver are described under chapter 4 of this RIA.

2.4. Definition of Frame or Receiver Benefits

The definition of "frame or receiver" in this rule would account for many of the innovations made by the industry.  Furthermore, it would clarify to the industry what part of a firearm constitutes a frame or receiver.  Currently, the definition of "firearm frame or receiver" is outdated.  The final rule defines "frame" and "receiver" in a way that consistently identifies one part of the projectile weapon or muffler or silencer device that would need to be marked.  In addition, it would provide clarity to the courts on how the definition of frame or receiver is to be applied to all firearm configurations and variants.

One benefit of the new marking provisions is that they relax the marking burden in other ways.  Currently, FFL manufacturers and importers that mark their frames or receivers need to mark the name of their company (or an accepted abbreviation of their name) in addition to identifying information such as the city and State in which they operate.  The current requirement may be onerous due to the amount of space available for marking.  The rule would allow FFLs to continue to mark their existing frames or receivers that have already been the subject of an ATF determination or classification letter in the same way they do now.  These FFLs may also switch to the new marking requirements that would apply when they produce a new design.  The new marking requirements require the frame or receiver to be marked with either the FFL's name, city and State, and serial number, or the FFL's name and the serial number beginning with the abbreviated licensee number as a prefix to a unique identification number in the size and depth prescribed by existing marking requirements.

-21-

# 3. Silencers

The final rule clarifies and makes consistent the marking requirements for silencers (sometimes referred to as "sound suppressors").[3]  Under the final rule, a supplement is provided for "firearm muffler or silencer frame or receiver."  The definition clarifies that manufacturers and makers of complete muffler or silencer devices need only mark the one part of the device defined as the frame or receiver under the rule.  The final rule also describes the part of the silencer device that would need to be marked in the case of a modular design.  By focusing on a single principal part attached to the weapon to be marked, this change decreases the number of parts that might need to be marked for modular silencers while eliminating the need to mark each small internal nonstructural part of a complete muffler or silencer device.  However, individual muffler or silencer parts will need to be individually marked if they are disposed of separately from a complete device unless transferred by qualified manufacturers to other qualified licensees for the manufacture or repair of complete devices.  Thus, in response to comments received, the final rule will require silencers to be marked on the part that provides housing or a structure for the primary internal component designed to reduce the sound of a projectile or, in the case of a modular silencer with more than one such part, the principal housing attached to the weapon that expels a projectile.

## 3.1.  Need for Change in Markings on Silencers

Currently, manufacturers can mark the housing unit or the end caps of a silencer.

---

[3] For purposes of this RIA, the term "silencer" will be used to refer to both firearm mufflers and firearm silencers as defined in 18 U.S.C. 921(a)(24).

However, end caps of silencers wear out more readily than the housing unit, leaving the muffler or silencer without any traceable markings of identification. The final rule makes clear that the frame or receiver of a silencer does not include the removable end cap of an outer tube. Further, the final rule clarifies for the industry the one part of a silencer that may be identified as the frame or receiver of the device and the marking requirements applicable to silencers.

3.2. Comments Received on Silencers

One commenter asserted that ATF underestimated the cost to serialize all parts of a silencer, and another commenter argued that the benefits of requiring additional silencer parts to be serialized does not outweigh the costs. Also, a commenter asked if ATF would pay for replacement of serialized parts if that part of the silencer is damaged during a repair.

The rule as proposed and finalized requires only the "frame" or "receiver" of a firearm muffler or silencer device to be marked, and the final rule also makes clear which part is the frame or receiver of a modular silencer device. Based on comments received in response to the NPRM and in response to an earlier advance notice of proposed rulemaking ("ANPRM"), *see* Identification Markings Placed on Firearm Silencers and Firearm Mufflers, 81 FR 26764 (May 4, 2016), the final rule will not significantly change the way the industry currently marks silencers. In most cases, the "frame" or "receiver" would be the outer tube.

Under Federal law, 26 U.S.C. 5842(a), and 27 CFR 479.102, each person manufacturing or making each "firearm"—including a "muffler or silencer," *see* 26 U.S.C 5845(a)—is required to mark the firearm in accordance with the regulations and register it in the National Firearms Registration and Transaction Record ("NFRTR"). The rule as proposed and finalized eliminates the substantial cost of marking each and every individual internal part defined as a muffler or

silencer, including a removable end cap of an outer tube.  Additionally, under the rule, individual internal muffler or silencer parts may be transferred by qualified manufacturers to other qualified licensees for further manufacture or repair of complete devices without paying transfer tax or registration, and complete registered devices may be temporarily conveyed for replacement of these internal parts.  However, the term "repair" does not include replacement of the outer tube. The outer tube is the largest single part of the silencer, the main structural component of the silencer, and the part to which all other component parts are attached.  The replacement of the outer tube is so significant an event that it amounts to the "making" of a new silencer.  Hence, new silencer outer tubes must be marked, registered, recorded, and transferred after payment of transfer tax in accordance with the NFA and GCA.  By law, this transfer tax is owed by the transferor, not the government.  *See* 26 U.S.C. 5811(b).

### 3.3.  Population of Silencers

The population of people and entities affected by the portion of the final rule addressing silencers includes manufacturers of silencers (a subset of Type 07 FFLs with a Special Occupational Tax ("SOT")) and individuals who purchase NFA weapons.

### 3.3.1.  Population of FFL Manufacturers of Silencers

There are 7,012 Type 07 FFLs with an SOT that manufacture silencers.  Of these manufacturers, approximately one percent, or five companies, might be marking on the endcap rather than on the housing (*e.g.*, outer tube).  The final rule will not affect manufacturers that already mark the outer tube because that tube would be the "frame" or "receiver" in most cases.

### 3.3.2.  Population of Individual Owners of Silencers

Based on the NFRTR, ATF estimates that there are 101,873 individuals who have

purchased silencers.  Because of changes made to the proposed rule after the receipt of comments, these individuals will not be affected by the final rule.

## 3.4.  Costs Related to Silencers

There are a few silencer manufacturers that mark their silencers solely on the end cap, rather than the outer tube; these manufacturers would be affected only if they mark only the end cap where ammunition exits the silencer.  Because of expected minimal costs for manufacturers to change the location of marking in order to comply with the final rule, ATF does not anticipate the cost of silencers to increase and be passed onto individuals purchasing silencers.  Please refer to the section below for manufacturing costs.

### 3.4.1.  Costs for Silencer Manufacturers

Markings on silencers under the final rule will be required on those parts that provide housing or a structure for the primary internal component designed to reduce the sound of a projectile or, in the case of a modular silencer with more than one such part, the principal housing attached to the weapon that expels a projectile.  Based on comments received in response to the ANPRM, most manufacturers mark either the outer tube or the end cap attached to the firearm.  There may be some manufacturers that mark on the end cap where ammunition exits the silencer; however, these manufacturers typically also mark the outer tube.  Furthermore, based on comments received in response to the ANPRM, moving marking locations has minimal costs associated with it so long as the new location can meet the identification, size, and depth requirements under the marking regulations.  Therefore, ATF anticipates only minimal costs associated with moving the serial number or other identifying information to the outer tube.

### 3.4.2.  Costs for Individual Silencer Owners

ATF does not anticipate that individuals will be affected by the rule's definition of "frame or receiver," as applied to silencers.  In the NPRM, ATF estimated that this provision of the rule would not have affected individual owners of silencers because the cost to modify the markings on silencers would be minimal and not passed on to individuals.

3.5.  Benefits Related to Silencers

The final rule clarifies the definition of frame or receiver as applied to silencers and makes consistent the marking requirements for silencers.  Currently, manufacturers can mark the serial number anywhere on the silencer, including the end cap of a silencer device.  However, end caps of silencers wear out more readily than the housing unit, leaving the muffler or silencer without any traceable markings of identification.  The final rule makes clear that the frame or receiver of a silencer does not include a removable end cap of an outer tube.  The rule provides a definition of frame or receiver as applied to silencers that standardizes marking requirements, allows for increased traceability, and eliminates the cost and confusion of marking each and every individual internal part defined as a muffler or silencer.

# 4.  FFL and Non-FFL Manufacturers of Firearm Kits

This section addresses FFL and non-FFL manufacturers that produce partially complete, disassembled, or nonfunctional frames or receivers that are often sold within firearm parts kits. The final rule's definitions of "firearm" and "partially complete, disassembled, or nonfunctional frame or receiver" under the definition of "frame or receiver" capture both firearm parts kits that are designed to, or may readily be converted to, expel a projectile (*i.e.*, a weapon parts kit) and firearm parts kits with partially complete frames or receivers (*i.e.*, a frame or receiver parts kit). This analysis therefore uses the term "firearm parts kit" to refer to both weapon parts kit and frame or receiver parts kits because both the weapons and frames or receivers produced from the parts within these kits are subject to regulation as "firearms" under the rule and must be marked with a serial number.

## 4.1.  Need to Include Firearms Kits in the Definition of Firearm

Currently, ATF's definitions of "firearm frame or receiver" and "frame or receiver" are outdated and do not account for advances in firearms technology or terminology.  The reason for ensuring that firearm parts kits are included in the definition of "firearm" and "frame or receiver" is that is that these parts kits, or aggregations of weapon parts, some of which contain all of the components necessary to complete a functional weapon or frame or receiver within a short period of time, have been increasingly sold to individuals either directly from manufacturers of the kits or retailers, without background checks or recordkeeping.  When PMFs are made for personal use, they are not required by the GCA to have a serial number placed on the frame or receiver.  However, when PMFs are relinquished by their makers and enter commerce, the

absence of markings on PMFs makes it extremely difficult for law enforcement to determine where, by whom, or when they were manufactured and to whom they were sold or otherwise transferred if they are recovered and submitted for tracing.

4.2.  Comments Received on Manufacturers

ATF received various comments regarding the methodology used to determine affected populations and costs for non-FFL manufacturers of partially complete frames or receivers and firearms kits.  Several commenters treated manufacturers and retailers of these kits as one group and stated that the population estimated by ATF was too low.  ATF partially concurs that the population was underestimated.  After conducting further internet searches, ATF found more manufacturers and retailers of firearm kits with partially complete frames or receivers, but because the requirements for manufacturers and retailers are different, ATF accounts for them separately in different chapters of the RIA, which makes the numbers per chapter lower than the estimates submitted by some of the commenters.

Many commenters stated that ATF did not know how much of an effect on commerce the rule will have on manufacturers.  Some commenters stated that ATF did not account for the cost of non-FFL manufacturers to become licensed.  Some commenters stated that non-FFLs would be unable to become licensed either due to the costs associated with becoming licensed or because of zoning restrictions, and that ATF did not account for companies going out of business.  One commenter reiterated the opinion that non-FFL manufacturers are not likely to become licensed and that, because most of these companies are small, the final rule will force these companies to go out of business.  Commenters also asserted that ATF did not estimate the impact on revenue the rule will have on the public and that ATF's assumptions were

-28-

unsupported.  One commenter worried that the rule will have a significantly bigger impact than the cost stated in the NPRM.  Several commenters claimed that the rule will cause unemployment.

ATF concurs that the costs were underestimated in the analysis accompanying the proposed rule.  This RIA has revised the methodology and costs associated with the final rule to incorporate the costs and cost scenarios that the commenters suggested might arise.  In response to commenters who stated ATF's assumptions were lacking or unsupported, ATF reiterates that the agency does not maintain consolidated or aggregated records on companies' inventory regardless of whether the items in the inventory are regulated, nor can ATF interview all firearm part manufacturers to determine their intended future actions upon publication of the final rule. ATF can make estimates based on the best available information it can acquire through comments received, willing participants on informational surveys, and ATF subject matter experts, but it cannot determine with complete specificity the actual outcomes of the final rule.

### 4.3.  Population for Firearm Parts Kits

This chapter describes how the rule's definition of "frame or receiver" affects FFL and non-FFL manufacturers of firearm parts kits.

### 4.3.1.   Population of Manufacturers of Firearm Parts Kits

The final rule would affect certain FFL and non-FFL manufacturers that manufacture firearm parts kits with partially complete frames or receivers.  As stated previously, ATF does not maintain consolidated or aggregated records of companies' inventory regardless of whether the items the companies produce are regulated.  Therefore, ATF performed a search on the internet to estimate the number of manufacturers that would be affected by inclusion of firearm

parts kit in the definitions of "firearm" and "frame or receiver." In the NPRM, ATF estimated that the rule may affect up to 35 non-FFL manufacturers. 86 FR at 27735. Commenters asserted that the population of non-FFL manufacturers was too low. ATF performed another search on the internet to determine the number of affected companies and found 84 companies that manufacture firearm parts kits with partially complete frames or receivers. The search also identified 45 retailers that sell such kits, but retailers are discussed in chapter 5 of this RIA, below.

ATF reviewed FFL licensing information to determine if the 84 manufacturers were FFLs or non-FFLs. Of the 84 manufacturers identified, ATF verified that 41 of them were FFLs and 43 were not FFLs. One of these FFLs was found to have become an FFL after the publication of the NPRM, while the other FFLs were licensed prior to the publication of the NPRM. For purposes of this analysis, ATF estimates that 43 non-FFL and 41 FFL manufacturers will be affected by the final rule.

4.3.2.  Population of Dealers and Individuals with Firearm Parts Kits

For populations and costs pertaining to firearm parts kits in the inventory of Type 01 and 02 FFLs, non-FFL retailers, and individuals, please refer to chapter 5.

4.4.  Costs to Manufacturers of Firearm Parts Kits

Currently, manufacturers of firearm parts kits produce and sell kits that require additional drilling of the frame or receiver in order to make them into a functional weapon or frame or

receiver.  A lower receiver parts kit can range in cost from \$59.99 to \$474.99.[4,5,6,7]  A handgun

kit could range from \$360 to \$800.[8,9,10]  A rifle kit could range from \$670 to \$750.[11,12,13]  How

the final rule will affect manufacturers of such kits depends on whether they are FFLs and on

how they respond to these requirements.  Some non-FFL manufacturers may choose to apply to

become an FFL.  Commenters suggested that some may opt to become FFLs despite a market

strategy that attempts to avoid regulation by ATF.  One commenter provided some information

on the price to serialize the "frame or receiver" within a firearm parts kit.  This commenter

---

[4] \$350: *See* 80% Lowers, *LR-308 Lower Assembly | Lower Parts Kit | Butt Stock | Buffer Tube | FIRE/SAFE Billet 80% Lower*, *available at* https://www.80-lower.com/products/lr-308-lower-assembly-lower-parts-kit-fire-safe-billet-80-lower/ (visited Apr. 28, 2021).  The prices for items cited and listed throughout the RIA are the prices that were found at the time ATF conducted its analysis and therefore may differ from the prices listed at or after the time of publication.  ATF cannot account for inevitable fluctuations in market prices over time.

[5] \$475: *See* 80% Lowers, *9mm AR-9 Lower Assembly | Lower Parts Kit | Tactical Brace | Buffer Tube | FIRE/SAFE Billet 80% Lower*, *available at* https://www.80-lower.com/products/ar-9-lower-assembly-lower-parts-kit-fire-safe-billet-80-lower/ (visited Apr. 28, 2021).

[6] \$560–\$70: JSDSupply, *80% Glock Compatible Lower Parts Kit – LPK*, *available at* https://jsdsupply.com/shop/80-glock-compatible-lower-parts-kit-lpk/ (visited Apr. 28, 2021).

[7] \$470: *See* 80% Arms, *Easy-Jig® Gen 3 Starter Kit - AR15*, *available at* https://www.80percentarms.com/products/easy-jig-gen-3-starter-kit-ar15/ (visited Apr. 28, 2021).

[8] \$800: *See* 80% Arms, *GST-9: 80% Pistol Build Kit*, *available at* https://www.80percentarms.com/products/gst-9-80-pistol-build-kit/ (visited Apr. 28, 2021).

[9] \$636: *See* 80% Arms, *Complete 10.5″ 5.56/300BLK AR-15 Pistol 80% Build Kit*, *available at* https://www.80percentarms.com/products/complete-10-5-5-56-300blk-ar-15-pistol-80-build-kit/ (visited Apr. 28, 2021).

[10] \$360: *See* MDX Arms, *MDX Arms G23 LF23 .40SW with RMR Cut Build Kit - No Frame*, *available at* https://mdxarms.com/mdx-arms-g23-lf23-40sw-with-rmr-cut-build-kit-no-frame/ (visited Apr. 28, 2021).

[11] \$670: *See* 80% Lowers, *.223 Wylde AR 15 Rifle Kit - 16″ Parkerized Barrel, 1:7 Twist Rate with 12″ M-Lok Handguard*, *available at* https://www.80-lower.com/products/223-wylde-ar-15-rifle-kit-16-parkerized-barrel-12-m-lok-handguard-w-80-lower-1-7-twist/ (visited Apr. 28, 2021).

[12] \$750: *See* 80% Lowers, *.223 Wylde AR 15 Rifle Kit - 16″ Parkerized Barrel, 1:8 Twist Rate with 15″ M-Lok Handguard*, *available at* https://www.80-lower.com/products/new-223-wylde-ar-15-rifle-kit-16-parkerized-barrel-15-m-lok-handguard-w-80-lower-1-8-twist/ (visited Apr. 28, 2021).

[13] \$996: *See* 80% Arms, *Complete 18″ AR .308 80% Build Kit*, *available at* https://www.80percentarms.com/products/complete-18-ar-308-80-build-kit/ (visited Apr. 28, 2021).

suggested that it would cost an estimated $10,000 to buy an appropriate laser engraver and associated equipment, plus labor costs to train an employee to use the laser engraver.

As previously stated, there are 41 FFL and 43 non-FFL manufacturers that will be affected by the rule. Because ATF does not know what future actions they may take, ATF envisions two scenarios in how the non-FFLs may respond to the final rule: become an FFL or end their business. Based on the comments received and the fact that only one manufacturer became an FFL after publication of the NPRM, ATF estimates it will be unlikely that a significant number of non-FFLs will opt to become FFLs. Hence, ATF estimates that 1 non-FFL will become a licensee, continue to sell firearm parts kits, and serialize the "frame or receiver," while the remaining 42 non-FFLs will end up dissolving their businesses. Based on the known revenue of non-FFL manufacturers of firearm parts kits, these non-FFL manufacturers are small businesses, and the loss in business transactions will be $583,500 for each non-FFL manufacturer that ends up dissolving its business. ATF notes that, because these firearm parts kits will now need to be serialized, this will reduce the overall supply and demand for such items.

In summary, ATF estimates three possible approaches which FFL and non-FFL manufacturers could take in order to comply with the final rule:

- Scenario 1: 1 Non-FFL manufacturer becomes an FFL and serializes the frames or receivers within the firearm parts kits it manufactures;

- Scenario 2: The 41 existing FFL manufacturers serialize their firearm parts kits; and

- Scenario 3: 42 Non-FFL manufacturers dissolve their business.

-32-

4.4.1.  Scenario 1: 1 Non-FFL Manufacturer Becomes Licensed as an FFL

Based on comments received, some commenters contend that there may be non-FFLs that opt to become licensed, and that ATF should cost it out.  Other comments suggested that it would be difficult or unlikely for non-FFLs to become licensed.  Although it might be unlikely that non-FFLs will opt to become licensed, for the purposes of this analysis, ATF assumes that 1 non-FFL manufacturer would become licensed, and the other remaining 42 non-FFL manufacturers will dissolve their businesses.

In order to become licensed, non-FFL manufacturers must complete an Application for Federal firearms license, ATF Form 7/7CR ("Form 7"), and include fingerprints, a passport photo, and postage to mail the package.  The application fee for a Type 07 FFL manufacturer is $150; the cost to get fingerprinted is $19; the cost to obtain a passport photo is approximately $16; and the cost for postage is approximately $1 for a large envelope.[14],[15],[16],[17]

Because it takes time to complete the actions needed to complete a Form 7, ATF accounts for the hourly burden to perform activities such as filling out the form and obtaining fingerprints and passport photos.  ATF used the hourly burden as reported on Form 7 as the time needed to

---

[14] ATF, *Form 7/ 7 CR - Application for Federal Firearms License (ATF Form 5310.12/5310.16)*, *available at* , https://www.atf.gov/firearms/docs/form/form-7-7-cr-application-federal-firearms-license-atf-form-531012531016 ("Form 7").

[15] Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or legal Entity with Respect to Making or Transferring a Firearm, 81 FR 2658, 2715 (Jan 15, 2016) (stating the average cost to get fingerprints is $18.66).

[16] $16 = ($17 + 15) / 2.  Passport photo prices from CVS, *Passport Photos*, *available at* https://www.cvs.com/photo/passport-photos (last visited Mar. 24, 2022).

[17] *See* USPS, *Mailing & Shipping Prices*, *available at* https://www.usps.com/business/prices.htm (last visited Mar. 24, 2022).

complete a Form 7.[18]  The hourly burdens to obtain fingerprints and passport photos were

obtained from comments received on a rule previously published by ATF.[19]

Because ATF does not know the salary or hourly wage rate of the person applying for the

Form 7, ATF uses the wage rate for General and Operations Managers from the Bureau of Labor

Statistics ("BLS") at the average hourly wage rate of approximately $60.[20]  In the NPRM, ATF

used the 2019 wage rates as reported by BLS.  At the time of the publication of the NPRM, 2019

wage rates were the latest reported wages.  However, one commenter suggested that 2019 wage

rates as reported in BLS are not recent enough to compensate for changes in wages in 2021.

This commenter suggested using BLS's Employee Cost Index to account for wage increases.

ATF concurs and updates the RIA to reflect the most recent BLS wage rate data (for 2020) and

uses Employee Cost Index of 1.035 to account for wage increases in 2021.[21]  Finally, ATF adds

a load rate[22] to the hourly wage to account for fringe benefits like health insurance to derive a

loaded wage rate of $89.[23]

To simplify the total application cost discussed above, ATF presents Table 4.1, which

---

[18] Form 7 at 4.

[19] *See* Implementation of the Safe Explosives Act, Title XI, Subtitle C of Public Law 107-296, 68 FR 13768, 13777 (Mar. 20, 2003).

[20] BLS, *Occupational Employment and Wage* (May 2020), *available at* https://www.bls.gov/oes/2020/may/oes111021.htm (last visited Mar. 24, 2022).

[21] BLS, *Employment Cost Index—June 2021* (July 30, 2021), *available at* https://www.bls.gov/news.release/archives/eci_07302021.pdf (last visited Mar. 24, 2022).

[22] The load rate is based on the average total compensation $36.29 (CMU2010000000000D) for years 2020 and 2021 divided by the average wages and salaries $25.54 (CMU2020000000000D) for years 2020 and 2021.  *See* BLS, *Employer Cost for Employee Compensation*, *available at* https://data.bls.gov/cgi-bin/surveymost?cm (last visited Mar. 24, 2022).

[23] A loaded wage rate is the wage rate adjusted to include fringe benefits such as insurance.  Hourly wage rate of $60.45 * 1.035 Employee Cost Index * load rate of 1.4209 = $89.

outlines the hourly burden, wage rate, and cost items required for a Form 7 application.

Table 4.1.  Cost for a Form 7 Application to Become a Type 07 FFL

| Cost Item | Hourly Burden | Hourly Wage Rate | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | Wage Burden | Cost Item | |
|---|---|---|---|---|---|---|---|
| Form 7 | 1 | $60 | $63 | $89 | $89 | $150 | |
| Fingerprints | 1 | $60 | $63 | $89 | $89 | $19 | |
| Passport Photo | 0.5 | $60 | $63 | $89 | $44 | $16 | |
| Postage | | | | | | $1 | |
| Application Cost | | | | | $222 | $186 | **$408** |
| Form 8 Renewal Cost | 0.5 | $60 | $63 | $89 | $44 | $150 | **$194** |

Overall, the per company cost to apply to become a Type 07 FFL is $408 with a renewal fee of $194 every 3 years.

### 4.4.1.1.  Non-FFL Manufacturers to Serialize Firearm Parts Kits

In addition to licensing, Federal law, 18 U.S.C. 923(i), requires licensed manufacturers to mark firearms with an identifying serial number.  One commenter estimated that it would cost

-35-

$10,000 for a laser engraver, air handler, and safety equipment.  ATF used this comment to base prices on the necessary equipment to serialize firearm parts kits with partially complete "frames or receivers."  Table 4.2 provides a range of costs to purchase a laser engraver.

Table 4.2.  Cost to Purchase a Laser Engraver

|  | Laser Engraving Cost | Vendor | Website |
|---|---|---|---|
|  | $16,997 | Boss Laser | https://www.bosslaser.com/laser-machines/hp-2440 |
|  | $18,997 | Boss Laser | https://www.bosslaser.com/laser-machines/boss-hp-3655 |
|  | $18,497 | Boss Laser | https://www.bosslaser.com/laser-machines/boss-hp-5598 |
|  | $4,098 | Toolots | https://www.toolots.com/30w-handheld-fiber-laser-marking-machine.html |
|  | $3,050 | Toolots | https://www.toolots.com/flmm-b01-30.html |
| Average Cost | **$12,328** |  |  |

Overall, ATF estimates that the average cost for a laser engraver is $12,328.  Based on the comment received about the cost of engraving, ATF also estimated the cost to purchase an air handler.  Table 4.3 shows the range of costs of air handlers.

Table 4.3.  Cost to Purchase an Air Handler

| Air Handler Cost | Vendor | Website |
|---|---|---|
| $1,193 | Grainger | https://www.grainger.com/product/44ZA50?ef_id=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYBiABEgIGlPD_BwE:G:s&s_kwcid=AL!2966!3!496359975784!!!g!437513351199!&gucid=N:N:PS:Paid:GGL:CSM-2295:4P7A1P:20501231&gclid=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYBiABEgIGlPD_BwE&gclsrc=aw.ds |
| $3,719 | AC | https://www.acwholesalers.com/Daikin-Light-Commercial- |

| | Wholesalers | DAT12043/p83645.html?gclid=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYBCABEgLNK_D_BwE |
|---|---|---|
| $1,696 | Comfort.com | https://www.ecomfort.com/LG-LVN241HV4/p102697.html?gclid=EAIaIQobChMIuceD4rqq9QIVu-y1Ch3q6gpzEAQYEiABEgL-KfD_BwE |
| **$2,203** | Average Cost | |

Overall, ATF estimates that the average cost for an air handler is $2,203.  The commenter suggested an FFL would need to also train an employee to do engraving of serial numbers.  ATF estimates that an FFL manufacturer may need a full-time engraver.  ATF uses the annual wage rate for 51-9194 Etchers and Engravers ($35,230) as reported by BLS.[24]  In addition to the base, annual wage rate, ATF used the Employee Cost Index of 1.035 and the load rate of 1.4209 as described in the paragraphs above to determine a loaded annual wage of $51,810.[25]  Although the commenter suggested including the cost of safety equipment, ATF believes that safety equipment is likely to be already included in normal manufacturing operations of non-FFL manufacturers.  Therefore, ATF did not individually assess the cost of safety items for this analysis.

### 4.4.1.2.  Non-FFL Manufacturers to Maintain Production and Disposition Records

In addition to acquiring marking equipment, non-FFL manufacturers that become licensees would need to maintain manufacturers' records in accordance with the regulations.  These records show the manufacture or production of firearms and their disposition (in this case, firearm parts kits with partially complete frames or receivers).  Based on the Paperwork

---

[24] BLS, *Occupational Employment and Wages: 51-9194 Etchers and Engravers* (May 2020), *available at* https://www.bls.gov/oes/2020/may/oes519194.htm (last visited Mar. 24, 2022).

[25] $35,230 * 1.035 Employee Cost Index * 1.4209 load rate = $51,810.

Reduction Act ("PRA") collection of information 1140-0067, it takes approximately one minute (0.01667 hours) to record this required information.[26]  In order to estimate the annual number of transactions, ATF reviewed publicly available information for revenue and compared it to the average retail price of a firearm parts kit with a partially complete frame or receiver.

Based on publicly available information from *Dun & Bradstreet*, ATF was able to obtain revenue data for certain relevant companies.[27]  Based on a review of affected non-FFL manufacturers, ATF was able to obtain the revenue of 24 out of 43 non-FFL manufacturers.  Of these non-FFL manufacturers, one was deemed not small under the Small Business Administration's ("SBA") size standards.[28]  ATF was unable to determine the size standards or revenue for 19 non-FFL manufacturers, as such information was not publicly available.  Of the 24 non-FFL manufacturers for which information was available, the average revenue was $2.6 million.  This $2.6 million average, however, was skewed by the revenue of one non-FFL manufacturer.  To account for this outlier and more accurately represent the revenue of the population of non-FFL manufacturers, ATF instead used the median revenue of $280,000.

ATF then reviewed retail costs of firearm parts kits with partially complete frames or receivers as a means of estimating the number of items produced annually.  For a list of prices used, please refer to the Appendix at the end of this analysis.  Using the average price of $116 for firearm kits with partially complete frames or receivers and the median revenue of $280,000,

---

[26] ATF, *Licensed Firearms Manufacturers Records of Production, Disposition, and Supporting Data*, *available at* https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202109-1140-005 (last visited Mar. 24, 2022).

[27] Dun & Bradstreet, *Data Cloud*, *available at* https://www.dnb.com/ (last visited Mar. 24, 2022).

[28] SBA, *Table of Size Standards* (Aug. 2019), *available at* https://www.sba.gov/document/support--table-size-standards (last visited Mar. 24, 2022).

ATF estimates that the average number of those parts kits produced annually by non-FFL manufacturers is 2,408.[29]  Assuming that these firearm parts kits are manufactured and sold within the same year, ATF assumes two record entries (one for production and one for disposition) per kit, for an annual number of 4,816 record entries per non-FFL manufacturer.[30]

As stated above, ATF estimates that the time burden per record entry is one minute (0.01667 hours).[31]  In order to determine the cost associated with the time burden for the number of record entries calculated above, ATF estimates that recording the entries will be performed by an employee with a background in metal and plastic works.  For the purposes of this analysis, ATF uses three different wage categories from BLS.  ATF incorporated the Employee Cost Index to account for inflation and used a load rate to account additional costs such as benefits and insurance.[32]  Table 4.4 provides the hourly wage rates for the wage categories used for this scenario.

Table 4.4.  Wage Categories for Metal and Plastic Workers

| Hourly Wage | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|
| | | | | |

---

[29] $280,000 annual revenue / $116 average retail price of a partially complete firearm kit = 2,408 items.

[30] 4,816 entries = 2,408 annual production * 2 entries.

[31] *See* footnote 26, *supra*.

[32] *See* BLS, *Series Report*, *available at* https://data.bls.gov/cgi-bin/srgate (last visited Mar. 24, 2022).  ATF used series CMU1010000000000D and series CMU1020000000000D.  Average total compensation: $36.29. Average cost per hour worked: $25.54.  Loaded wage rate: 1.4209 = $36.29 / $25.54.

| | | | | |
|---|---|---|---|---|
| $21 | $22 | $31 | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514022.htm |
| $19 | $20 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | https://www.bls.gov/oes/2020/may/oes514199.htm |
| $19 | $19 | $27 | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514031.htm |
| Average Wage | | **$29** | | |

Based on these calculations, ATF used a loaded hourly wage rate of $29 for recording entries in production and disposition records.  In order to demonstrate the calculation of the hourly burden for PRA collection of information 1140-0067, ATF presents the per manufacturer hourly and wage burden in Table 4.5.

Table 4.5.  Hourly and Wage Burden to Update and Maintain Production and Disposition Records

| Population Type | Hourly Burden | Loaded Wage Rate | Estimated Entries Annually | Per Manufacturer Cost |
|---|---|---|---|---|
| Non-FFL Manufacturer | 0.01667 | $29 | 4,816 | **$2,300** |

4.4.1.3.  Summary Cost for Scenario 1: Non-FFL Manufacturer Becoming FFL

To simplify the presentation of the cost to become an FFL, Table 4.6 illustrates the first-year cost for a non-FFL manufacturer to become a Type 07 Manufacturer FFL.

Table 4.6.  Per FFL and Total First-Year Cost to Become a Type 07 Manufacturer FFL

| Population Description | Population | One-time Cost | Annual Recurring Cost | Cost for Renewal | Per Company First Year Cost | Total First |
|---|---|---|---|---|---|---|

| | | | | Every Three Years | | Year Cost |
|---|---|---|---|---|---|---|
| Population to Become FFL | 1 | $14,939 | $54,111 | $194 | $69,049 | **$69,049** |

Although there may be other expenses beyond the cost described above, ATF is not required to consider these costs because they are too speculative to include in the cost estimates.

### 4.4.2.  Scenario 2: FFL Manufacturers to Serialize Firearm Parts Kits

Because the manufacturers considered in this section are currently licensed, they will not need to incur the same expenses as non-FFL manufacturers becoming FFLs.  Also, because they are already licensed, they will have an engraving machine and trained staff.  Based on public comments, however, manufacturers tend to have different machines to engrave serial numbers for different product lines, and their existing equipment accordingly may not be sufficient to engrave a serial number on firearm parts kits with partially complete frames or receivers.  Thus, FFLs may still need to acquire an appropriate laser engraving machine to comply with this rule and serialize firearm parts kits.  For the purposes of this analysis, ATF uses the average cost of a laser engraver and an air handler as stated in section 4.4.1 above as the one-time additional cost for FFL manufacturers to serialize firearm parts kits.  As stated above, the average price for a laser engraver is $12,328 and the average price of an air handler is $2,203, making the one-time cost per FFL manufacturer $14,530.

As stated above, FFL manufacturers will incur an additional record burden in updating and maintaining their records to reflect the production and disposition of firearm parts kits.  As discussed in section 4.4.1 above, the hourly burden is 1 minute (0.01667 hours) for each record

-41-

entry.  The estimated loaded wage rate is $29.  The estimated annual number of entries is

4,816.[33]  The annual per FFL cost is $2,300.  Because there are an estimated 41 FFL

manufacturers of firearm parts kits, the total first year cost for scenario 2 is $690,068.[34]

### 4.4.3.   Scenario 3: Non-FFL Manufacturers That Cease Business

For some non-FFLs, continuing operations may be cost prohibitive to comply with the

new rule or due to different regulatory requirements, such as local zoning laws.  Other non-FFLs

may choose to stay unregulated and therefore cease operations.

As stated above, ATF reviewed revenue data of all known non-FFL manufacturers of

firearm parts kits using publicly available information from *Dun & Bradstreet*.  Based on the

known revenue, the median revenue was $280,000.  As stated in section 4.4.1 above, the average

revenue ($2.6 million) was not used because one non-FFL manufacturer was an outlier.  For

purposes of this analysis, and as stated in above, ATF estimates that all non-FFL manufacturers

except 1 (*i.e.*, 42 non-FFL manufacturers) will dissolve their businesses.  Based on the median

revenue of non-FFL manufacturers, ATF estimates that the cost of the decision to cease

operations will be $11.7 million annually.[35]

Commenters also stated that companies going out of business will cause unemployment.

ATF partially concurs.  Although employees will lose their jobs, it is not clear whether they will

---

[33] 4,816 total entries = 2,408 firearm parts kits with a partially complete "frame or receiver" produced annually * 2 entries per item.

[34] $690,068 industry cost = 41 companies * ($14,530 one-time cost + $2,300 recurring cost).  Both here and elsewhere, ATF used unrounded results from previous calculations when carrying out new calculations.  As a consequence, the results obtained from the new calculations do not always precisely match the results that would be obtained had the rounded figures been used.  Here, for example, ATF used the unrounded figures for the one-time and recurring costs to calculate the total industry cost.

[35] 42 non-FFL manufacturers * $280,000 median revenue = $11,760,000.

be unable to find other employment.  However, because ATF expects that not all employees will in fact be able to find alternative employees, ATF also estimates the number of job losses due to non-FFL manufacturers going out of business.  Based on publicly available information on *Dun & Bradstreet*, ATF was able to determine the employee sizes of 24 non-FFL manufacturers. Based on these companies, the average number of employees was 20.  However, as stated in the paragraphs above, one non-FFL manufacturer was not small and is considered an outlier. Therefore, ATF used the median number of employees to calculate total job loss.  The median number of employees at these non-FFL manufacturers was six, and therefore, ATF estimates that the final rule will negatively affect an estimated total of 252 jobs.[36]  Because ATF accounts for overall revenue lost, ATF does not account for loss of wages from these jobs due to double counting of costs from revenue.

### 4.4.4.  Summary of Costs for Manufacturers of Firearm Parts Kits

To summarize the cost results discussed above, ATF presents Table 4.7, which shows the cost per manufacturer for the first year.

Table 4.7.  Cost Per Manufacturer of Firearm Parts Kits

| Type of Cost Result | One-time Cost | Application Renewal Cost | Annual Recurring Cost | First Year Cost per Company |
|---|---|---|---|---|
| Scenario 1: Non-FFL Becomes FFL and Serializes | $14,939 | $194 | $54,111 | $69,049 |
| Scenario 3: Non-FFLs Dissolve Businesses | $0 | $0 | $280,000 | $280,000 |
| Scenario 2: FFLs Serialize | $14,530 | $0 | $2,300 | $16,830 |

*Note: Calculation of these numbers may not be exact due to rounding.

---

[36] 252 jobs = 6 jobs * 42 companies.

For the purposes of this analysis, ATF estimates that one non-FFL manufacturer will become licensed as an FFL and serialize firearm parts kits, 41 FFL manufacturers will serialize firearm parts kits, and 42 non-FFL manufacturers will dissolve their businesses.  Table 4.8 illustrates the industry cost for manufacturers of firearm parts kits.

Table 4.8.  Industry Cost for Manufacturers of Firearm Parts Kits

| Total Manufacturing Cost | Population | One-time Cost | Application Renewal Cost | Annual Recurring Cost | Total First Year Cost |
|---|---|---|---|---|---|
| Scenario 1: Non-FFL Becomes an FFL and Serializes | 1 | $14,939 | $194 | $54,111 | $69,049 |
| Scenario 3: Non-FFLs Dissolve Businesses | 42 | $0 | $0 | $11,760,000 | $11,760,000 |
| Scenario 2: FFLs Serialize | 41 | $595,750 | $0 | $94,318 | $690,068 |
| Sum of Total First Year Cost | | | | | $12,519,118 |

*Note: The sum of these numbers may not be exact due to rounding.

To further understand the costs that FFL and non-FFL manufacturers could incur to comply with the final rule, Table 4.9 provides the 10-year undiscounted and discounted costs for this scenario.

Table 4.9.  10-Year Cost for FFL and Non-FFL Manufacturers of Firearm Parts Kits

| Year | Undiscounted | Discount Rate | |
|---|---|---|---|
| | | 3% | 7% |
| 2022 | $12,519,118 | $12,154,483 | $11,700,110 |
| 2023 | $11,908,429 | $11,224,836 | $10,401,283 |
| 2024 | $11,908,429 | $10,897,899 | $9,720,825 |

| | | | |
|---|---|---|---|
| 2025 | $11,908,623 | $10,580,658 | $9,085,032 |
| 2026 | $11,908,429 | $10,272,315 | $8,490,545 |
| 2027 | $11,908,429 | $9,973,122 | $7,935,089 |
| 2028 | $11,908,623 | $9,682,800 | $7,416,092 |
| 2029 | $11,908,429 | $9,400,624 | $6,930,814 |
| 2030 | $11,908,429 | $9,126,819 | $6,477,396 |
| 2031 | $11,908,623 | $8,861,134 | $6,053,740 |
| Total | $119,695,560 | $102,174,690 | $84,210,926 |
| Annualized | | $11,977,991 | $11,989,741 |

*Note: Calculations using these estimates may not be exact due to rounding.

As shown in Table 4.9, the total 10-year cost is $119.7 million undiscounted, or $12.0 million annualized at 3 percent and $12.0 million annualized at 7 percent.

4.5.  Benefits of Regulating Firearm Parts Kits

Unlike firearms manufactured by FFLs, which must meet certain marking requirements, firearm parts kits with partially complete frames or receivers are not currently being serialized by their manufacturers, nor are the manufacturers requiring purchasers to undergo a NICS background check prior to purchase.  This is because these manufacturers do not consider such kits as falling within the current regulatory definition of "firearm," or otherwise subject to the current regulatory regime.  Because these manufacturers are not serializing the frames or receivers in these kits, and are not requiring background checks when selling them, the kits can be obtained with relative ease on the internet by persons who are prohibited from possessing firearms.  In other words, prohibited persons do not have to go in person to a local FFL to purchase this product.  Furthermore, certain manufacturers also offer the option to remove purchaser information in their sales records to prevent the government from tracing the purchasers of the sale.  This is another aspect of the current regulatory regime and existing industry practice that likely makes these firearm parts kits an attractive option to persons

prohibited from possessing firearms.

In addition, a survey performed by *Small Arms Survey* suggested that purchases of firearms for illegal purposes are often made outside the traditional regulatory regime. Specifically, on firearms trafficking, the *Small Arms Survey* states that "[m]any of the traffickers studied did not apply for arms export licenses or attempt to exploit licensing exemptions; they simply bypassed the licensing system entirely."[37]  Of the 159 cases that *Small Arms Survey* reviewed, over half of the cases involved selling firearm parts and accessories; an unknown number of these firearm kits were purchased, assembled into functional weapons, and then shipped illegally.[38]

Purchasing these firearm parts kits is easier than purchasing complete weapons not only because an individual can purchase them on the internet without undergoing a background check, but also because their sales do not trigger multiple sales reports that are reviewed by law enforcement for criminal activity.  Because such transactions are not currently viewed as regulated, and because it is easy to assemble a complete weapon from these kits, they are an attractive option for those with intent to illegally use firearms.

As discussed in the NPRM, tracing is an integral tool for Federal, State, local, and international law enforcement agencies to utilize in their criminal investigations, and the proliferation of untraceable firearms severely undermines this process.  86 FR at 27723–24. ATF traces firearms found by law enforcement at a crime scene by first contacting the licensed

---

[37] Matt Schroeder, *The Mechanics of Small Arms Trafficking from the United States*, Small Arms Survey 1 (Mar. 2016), available at https://www.files.ethz.ch/isn/196408/SAS-IB17-Mechanics-of-trafficking.pdf (last visited Mar. 24, 2022).

[38] *Id.* at 4.

manufacturer or importer marked on the frame or receiver.  That manufacturer or importer must maintain permanent records of their manufacture or importation.  Using the information obtained from those required records, ATF then contacts each licensed dealer and any other licensees that recorded their receipt and disposition to locate the first unlicensed purchaser and thus help find the perpetrator or otherwise solve the crime.[39]  However, because PMFs do not bear a serial number or other markings of a licensed manufacturer or importer, ATF has found it extremely difficult to complete such traces on behalf of law enforcement.  To demonstrate their increasing popularity in criminal activities, ATF filtered trace requests for suspected PMFs, which are typically assembled from firearm kits with partially complete frames or receivers.  Table 4.10 shows the approximate number of attempted traces of suspected PMFs from 2016 through 2021.

Table 4.10.  Number of Traces of Suspected PMFs from 2016 Through 2021

| Year | Published NPRM | Final Rule Update (as of 01/21/2022) | Difference Between NPRM and Final Rule[40] |
|---|---|---|---|
| 2016 | 1,750 | 1,758 | 8 |
| 2017 | 2,507 | 2,552 | 45 |
| 2018 | 3,776 | 3,960 | 184 |
| 2019 | 7,161 | 7,517 | 356 |
| 2020 | 8,712 | 10,109 | 1,397 |
| 2021 | 0 | 19,344 | 19,344 |
| **Total** | **23,906** | **45,240** | **21,334** |

---

[39] Licensees must respond to ATF trace requests within 24 hours.  18 U.S.C. 923(g)(7); *see also J&G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1045–46 (9th Cir. 2007) (describing the tracing process).

[40] The total number of suspected PMFs is greater than the 23,906 originally reported as of March 4, 2021, in the NPRM, 86 FR at 27772–23 because of (1) the addition of 2021 data; (2) updates to traces to add more specificity regarding the firearm; and (3) inclusion of all suspected PMFs recovered within this time frame regardless of when the trace was entered.

| | | | |
|---|---|---|---|
| Homicides 2016 Through 2021 | 325 | 692 | 367 |

Based on suspected PMF traces from 2016 through 2021, there were approximately 692 homicides or attempted homicides carried out with a PMF.  There were also approximately 4,288 felons in possession of a suspected PMF.  To demonstrate the increasing popularity of these PMFs in criminal activities, Graph 4.1 illustrates this growth trend.

Graph 4.1.  Total Suspected PMFs by Year



Furthermore, if firearm parts kits or resulting PMFs are stolen, owners can report the theft to police and insurance companies and provide them with a full description of the firearm. Because these kits (which are likely to become complete and assembled PMFs) will be serialized

under the final rule, the firearm kits or PMFs would now be traceable in the event they were stolen, lost by licensees or individuals, or used in criminal activities.  Law enforcement would then be able to return any recovered stolen or lost firearm kits or PMFs to their rightful owners and use the trace to prosecute criminals who may have used those weapons.

# 5.  Privately Made Firearms and FFL and non-FFL Dealers of Firearm Kits

A firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced is defined as a PMF in the final rule.  This definition does not include a firearm identified and registered in the NFRTR pursuant to chapter 53, title 26, United States Code, or any firearm manufactured or made before October 22, 1968 (unless remanufactured after that date).

Under the final rule, each FFL must mark PMFs within seven days of the firearm being received into inventory by the FFL or before disposition, whichever first occurs.  Licensees have from the date of the final rule's publication until 60 days after the date the final rule becomes effective to mark PMFs already in inventory.  FFLs that are manufacturers, importers, or dealers may mark PMFs for nonlicensees, and FFLs may directly supervise marking by another licensee or a nonlicensee that may mark a PMF in accordance with the regulations.

## 5.1.  Need for Markings on PMFs

Requiring the marking of PMFs that are taken into inventory allows FFLs to track and reconcile their inventories, respond to trace requests, process warranty claims, and report lost or stolen PMFs to police and insurance companies.  Furthermore, requiring markings on firearm kits with a partially complete frame or receiver is also necessary because these kits are likely to become PMFs.  Because these firearms will now be serialized, these PMFs will be traceable in the event that they are stolen from any licensee or are used in criminal activities.  Law

enforcement will be able to return any recovered stolen or lost PMFs to their rightful owners, and they will be able to use the trace information to combat firearms trafficking and other criminal activity.

5.2. Comments Received on FFL and non-FFL Dealers

Several commenters stated that the proposed rule would affect companies that retail only in firearm parts due to their concern that the proposed rule would have required multiple parts to become serialized.  In response to these concerns, ATF has changed the definition of "frame or receiver" to require only one part of a firearm to be serialized.  Because of this change, retailers of firearm parts other than the frame or receiver will be unaffected and can continue to sell unmarked, unregulated parts of a firearm.

One commenter asserted that the population of affected dealers of firearm kits with partially complete frames or receivers was underestimated in the NPRM, specifically stating that there were more than 75 dealers.  ATF partially concurs.  During the analysis described in the NPRM, ATF found 71 companies selling these firearm kits.  Although all 71 companies sell firearm kits with a partially complete frame or receiver, ATF separated the number of companies between manufacturers and dealers of kits.  However, ATF performed a second internet search of companies and found an additional 58 companies.  ATF then separated the total number of companies into four groups: (1) FFL manufacturers; (2) non-FFL manufacturers: (3) FFL dealers; and (4) non-FFL dealers.  By categorizing the companies this way, the population numbers appear to be lower than suggested by the commenter in each chapter of the RIA, but the overall number of companies affected is similar to the estimated total number suggested by the commenter.

Many commenters estimated a total number of PMFs already in circulation and estimated that the cost of marking those PMFs currently in circulation would be in the millions of dollars. Some commenters stated that the NPRM should have included an estimate of the number of PMFs and unfinished receivers that would be reclassified as firearms. ATF disagrees that it did not properly estimate the number of firearms affected. Neither the proposed nor final rule requires the serialization of all PMFs in circulation. The rule affects only firearm parts kits with a partially complete "frame or receiver" held by FFLs and PMFs that are transferred through an FFL; therefore, only the ones held by FFLs or that may go through FFLs, as the case may be, were accounted for. However, in this analysis, ATF provides an estimate of the total number of PMFs in circulation, along with potential costs to individuals who go through an FFL for services associated with their PMFs.

A couple of commenters stated that ATF did not provide evidence for its assumption that 10 percent of Type 01 and Type 02 FFLs currently deal in firearm parts kits with a partially complete frame or receiver, and that all dealers would have only two such items in inventory. The commenters noted that ATF cited only unknown subject matter experts ("SMEs"). In the NPRM, ATF relied on SMEs from its Firearms Industry Programs Branch ("FIPB") to provide an estimated population and number of firearm parts kits with a partially complete frame or receiver in inventory. However, many such kits are not currently viewed by their manufacturers as regulated, and because ATF does not have the inventory data that FFLs maintain, ATF is unable to obtain estimates at the level of accuracy requested by the commenters. To improve these estimates for the final rule, ATF relied on general observations from its field divisions to estimate population and inventory. This information was deemed to be the best available

information for the analysis.

One commenter stated that ATF did not account for the lost revenue and increased expenses for gunsmiths, companies selling firearm parts kits, and individuals. ATF concurs that lost revenue was not accounted for in the proposed rule, and this RIA now incorporates the loss in revenue for companies and additional expenses for individuals.

Several commenters suggested that the populations, cost assumptions, and descriptions for in-house engraving were inaccurate. One commenter stated that engraving equipment is not common at FFLs. One commenter suggested that the only viable means of acquiring equipment for engraving is a laser engraver, associated equipment and safety supplies, and a specialized worker. Several suggested the labor and equipment needed to engrave existing inventory is significantly higher than the stamping method discussed in the NPRM. One commenter stated that ATF did not account for expenses associated with serializing PMFs made from polymer materials. The same commenter pointed out that the cost for non-FFL dealers were omitted from the analysis. One commenter stated that the assumption that individuals will not be charged for serialization is inaccurate.

Comments and anecdotal commentary from various offices and divisions throughout ATF suggest that most FFLs do not have gunsmiths on staff; therefore, it is unlikely that they will purchase engraving equipment if the staff and equipment are not already part of their normal operations. FFLs that deal in PMFs can either contract the serialization to another FFL or may be able to perform the serialization as part of their current gunsmithing services. Another possibility that ATF is including for this analysis is that FFLs can dispose of their PMF inventory.

Many commenters stated that the cost of serializing a PMF can range between $35 and $405 based on whether the serialization includes only serializing or also includes related services such as cleaning, oiling, bluing, and polishing. ATF infers from these comments that the high-end cost should be included because ATF should include the cost to return the PMF to its original state in the event the PMF is serialized due the PMF being taken into inventory by an FFL for repair or customization services that are performed on the PMF after implementation of the final rule.

ATF concurs that the description of in-house engraving methods outlined in the NPRM was inaccurate and therefore is no longer considering only FFLs that currently have gunsmiths on staff. As for purchasing a laser engraver, associated equipment and safety supplies, and labor, ATF used this information to illustrate engraving expenses for manufacturers. ATF disagrees that a dealer will need to purchase such labor and equipment because future firearm parts kits with a partially complete frame or receiver will be serialized by the manufacturer and not the dealer. Dealers will not be required to provide additional serialization. ATF concurs that it did not account for costs of serializing firearm parts kits with a partially complete frame or receiver made from polymer materials. In order to account for those costs, ATF has now included the costs for disposing of such items if they cannot be serialized. ATF also concurs that the cost for non-FFL dealers was omitted from the analysis, and ATF now incorporates such costs into this analysis.

Furthermore, ATF reiterates that PMFs for personal use are not required by this rule to be serialized (unless required by State or local law) and marking is limited to those that are taken into inventory, though the final rule exempts same day adjustment or repair and return to the

-54-

person from whom it was received.  Because repairs are performed by gunsmiths, ATF assumes that only FFLs who are gunsmiths or hire gunsmiths will be performing repairs or customizations of PMFs, so ATF incorporated the annual costs for these FFLs in this analysis.  In the NPRM, ATF assumed that individuals with PMFs would choose not to undertake repairs or customization of their PMFs so as to avoid marking requirements; therefore, ATF did not anticipate costs to individuals.  This final analysis illustrates situations in which an individual might experience costs related to the final rule because of repairs and customization.  ATF estimated the cost of serialization to individuals in these situations only as potential costs to illustrate and respond to comments.  Based on gunsmithing experience from an SME from ATF's FATD, most individuals seeking repairs or customization typically do not seek bluing or other services at the same time they are seeking services such as engraving designs on firearms. ATF concurs that the analysis in the NPRM regarding engraving was inaccurate.  ATF agrees that a more likely scenario is that there may be some FFLs that sell firearm parts kit with a partially complete frame or receiver that also offer gunsmithing services.  These FFLs will not need to purchase engraving equipment; rather, they can use their existing staff and equipment to serialize their existing inventory of firearm parts kits.  For FFLs that do not employ gunsmiths or do not have existing gunsmithing equipment, ATF estimates that these FFLs will contract out engraving services to another FFL or dispose of their inventory.

One commenter asserted that ATF's estimate of a one-time cost for contracting out gunsmithing services in order to mark inventory that would need to be serialized lacked any supporting evidence or data as to why this cost would not be on-going.  In the final analysis, ATF estimated a one-time contracting cost for gunsmithing services to account for FFLs that

have the affected firearm parts kits currently in inventory, but do not have gunsmithing capabilities. ATF made the assumption that most FFLs do not have gunsmiths on staff based on anecdotal commentary from various SMEs at ATF. This assumption was further substantiated by the comments received on the NPRM. Because it is unlikely that only FFLs with gunsmithing capabilities will carry firearm parts kits with a partially complete frame or receiver, ATF assumed that this portion of the population, *i.e.*, FFLs without gunsmithing capabilities, will therefore need to hire gunsmiths.

Because this subset of FFLs would not have gunsmithing capabilities, they logically would not provide repairs to PMFs currently in circulation. Furthermore, future firearm parts kits with a partially complete frame or receiver will already be serialized by the manufacturer. Given these circumstances, this subset of FFLs would not have ongoing serialization costs, nor would they incur expenses to buy serializing equipment; rather, they would incur a one-time expense in order to comply with the final rule.

One commenter stated that ATF did not account for the costs associated with entering PMFs into firearm acquisition and disposition records ("A&D records"). ATF concurs that A&D records were not accounted for in the PMF analysis. Currently, FFLs are required by regulation to enter all firearms, including PMFs, that they receive into their A&D records. Because this requirement already exists, ATF did not attribute additional costs for A&D recordkeeping. Again, ATF is not requiring all PMFs in circulation to be serialized; therefore, the only entries in A&D records are those already required by current regulations.

Some commenters suggested that, because of the proposed rule's definitions, it would cost more to purchase individual firearm parts because individuals would now have to go

through FFLs to purchase their firearms kits and pay a transfer fee for each frame or receiver

they purchase.  This concern is substantially mitigated because, based on the comments, the final

rule changes the proposed definition of "frame or receiver" to identify only one part of a firearm

that will need a serial number.

5.3.  Population of Markings on Firearms Kits and PMFs

FFLs that deal in PMFs are affected by the final rule in that they now have to mark their

existing inventory of firearm parts kits with a partially complete frame or receiver as well as

PMFs.  The affected FFLs are primarily anticipated to be Type 01 dealers, Type 02 dealers, and

non-FFL sellers who will either need to become licensed or dissolve their businesses.

Individuals may also be affected and incur the additional cost of serializing their PMFs if they

bring their PMF to an FFL for sale or repair and the FFL needs to take the PMF into inventory

(or overnight in the case of a repaired firearm).

5.3.1.  Population of FFL and Non-FFL Manufacturers of Firearm Parts Kits with a Partially

Complete "Frame or Receiver"

The final rule will affect certain FFL and non-FFL manufacturers that produce firearm

parts kits with a partially complete frame or receiver.  However, the discussion regarding this

population was addressed in chapter 4 above.

5.3.2.  Population of FFL and non-FFL Dealers

Due to the replacement definition of "frame or receiver," ATF anticipates that there will

be a one-time cost associated with serializing PMFs or firearm parts kits with a partially

complete frame or receiver that are currently in the inventory of dealers, as well as an annual cost

to serialize individually owned PMFs that are taken into inventory.  The potentially affected FFL

dealers are Type 01 and Type 02 FFLs that may sell online or locally at a storefront, along with sellers that are nonlicensees (or non-FFL dealers). Based on ATF's Federal Firearms Licensing Center databases, there are 53,816 Type 01 FFLs and 6,974 Type 02 FFLs.

However, the majority of these FFL dealers do not sell firearm kits with partially complete frames or receivers, and therefore the majority of FFL dealers will not be affected by this provision of the final rule. In the NPRM, ATF relied on SMEs in FIPB to estimate the affected population and existing inventory. This was the best available information. Because ATF does not maintain consolidated or aggregated records on companies' inventory regardless of whether the items in the inventory are regulated, ATF does not have specific or direct information on how many FFL and non-FFL dealers will be affected or what aspect of their inventory might be affected. ATF informally requested information from 10 FFL dealers, located throughout the country, in an effort to obtain relevant information.[41] Of those 10 FFL dealers, 1 did not provide any information and 1 did not deal in firearm parts kits with a partially complete frame or receiver. The remaining eight FFLs did not respond to the informal information request. Given the lack of information from the industry, ATF sent out an internal survey to its field divisions asking for their best estimates of the percentage or number of FFL dealers that deal in firearm parts kits with a partially complete frame or receiver and their best estimates of the parts kits that dealers may have in their inventory. Although Industry Operations Investigators ("IOIs") do not report such items as part of their inspections, ATF determined that their collective recollection represented the best available information regarding

---

[41] For the purposes of complying with the Paperwork Reduction Act, only 2 of the 10 FFL dealers were provided the actual list of questions.

the population and inventory because IOIs inspect a sample of FFLs every year.  Based on

informal observations from ATF IOIs and field divisions, ATF estimated that the final rule will

affect 124 Type 01 FFLs and 66 Type 02 FFLs, for a combined total of 190 FFL dealers.

  Based on comments received regarding the affected population of non-FFL dealers, ATF

performed a second internet search of all sellers of firearm parts kits with a partially complete

frame or receiver.  As ATF discussed in chapter 4 of this analysis, there are 84 manufacturers

(both FFL and non-FFL) of these types of firearm kits.  For information and costs regarding

these 84 manufacturers of firearm parts kits with a partially complete frame or receiver, please

refer to chapter 4.  Of the remaining websites found regarding the retail sales of these firearm

parts kits, ATF found 21 FFL dealers with an online presence and 24 non-FFL dealers.  In total,

ATF found 214 FFL and non-FFL companies that sell firearm parts kits with a partially complete

frame or receiver.

## 5.3.3.  Population of Type 03 FFL Collectors

  The final rule will affect Type 03 FFL collectors who wish to add PMFs defined as curios

or relics into their collections of firearms.  This subset of PMFs will have to be serialized under

the final rule.  However, there is no requirement that Type 03 FFL collectors add their entire

collection of personal firearms into their required records.  They can keep and maintain a

personal collection similar to that of an unlicensed individual.  Because the final rule does

impose a requirement on Type 03 collectors to mark PMFs that are not curios or relics, PMFs are

unlikely to be curios or relics (*i.e.*, more than 50 years of age), and the rule does not require

retroactive serialization of all PMFs in their personal collections, Type 03 FFL collectors are not

likely to be affected by the rule as a licensee for many years.  For this reason, the relevant

population, costs, and requirements for Type 03 FFLs are included in the same group as unlicensed individuals listed below.

### 5.3.4.  Population of Individuals

Individuals who own PMFs may be affected by this provision, but only when the PMF is transferred to an FFL and the FFL voluntarily accepts the PMF into its inventory.  In the case of PMFs being adjusted or repaired by a dealer-gunsmith, the PMFs would need to be accepted overnight to be affected by this provision.  Assuming that individuals would choose not to go through an FFL so as to avoid serializing their PMFs, no individuals will be affected by the rule.  However, ATF attempts to estimate the total number of individuals that may own PMFs.  As stated in chapter 4, ATF estimates there are 84 manufacturers of firearm parts kits with a partially complete frame or receiver.  The median revenue of all manufacturers (both FFL and non-FFL) of firearm parts kits with a partially complete frame or receiver is $478,000.  Because ATF does not know when these FFL and non-FFL manufacturers started manufacturing firearm parts kits with a partially complete frame or receiver, ATF used the years 2016 to 2020 as reported in PMF traces as a reference point.  At an average retail price of $116 for firearm parts kits with a partially complete frame or receiver, ATF estimates the annual production of PMFs by all 84 manufacturers to be 345,258.  Using a high estimate that all 84 manufacturers have been in the business from 2016 through 2021 (*i.e.*, for six years), ATF estimates that the total number of PMFs currently in circulation is less than 2.1 million.  *See* Table 5.1 below.  ATF reiterates that the final rule does not require the retroactive serialization of all PMFs in circulation, just those that are in an FFL's inventory.

Table 5.1 provides the outlines estimated number of PMFs currently in circulation.

-60-

Table 5.1.  Number of PMFs in Circulation

| | |
|---|---:|
| All Kit Manufacturers | 84 |
| Years in Production | 6 |
| Median Revenue of All Manufacturers | $478,000 |
| Average Retail Price of Kits/Receivers | $116.30 |
| Annual Production | 345,245 |
| Total in Circulation | 2,071,470 |

Based on bump stock turn-ins after the final rule on "Bump-Stock-Type Devices" went into effect,[42] individuals turned in an average of two bump stocks.  One commenter suggested that individuals may own several PMF handguns and one PMF rifle.  For purposes of this analysis, ATF assumes three handguns and one rifle as the number of PMFs owned by individuals.  Using these data points, ATF estimates a range of individuals in Table 5.2.

Table 5.2.  Range of Individuals Who Currently Own PMFs

| Low | Midrange | High |
|---|---:|---:|
| 517,868 | 1,035,735 | 2,071,470 |

5.4.  Cost of Markings on Weapon Parts Kits and PMFs for FFL and non-FFL Dealers

As stated above, this chapter primarily deals with Type 01 and Type 02 FFLs dealers and non-dealers that will now need to mark their existing inventories of PMFs and firearm parts kits with a partially complete frame or receiver.  ATF assumes the cost associated with this marking

---

[42] Bump-Stock-Type Devices, 83 FR 66514 (Dec. 26, 2018).

is primarily a one-time cost because manufacturers will be marking future firearm parts kits with a partially complete frame or receiver.  There may be annual costs for FFL dealers if they take PMFs into their inventory due to repairs or customization.

### 5.4.1.  Costs for Non-FFL Manufacturers

For non-FFL manufacturers that will be affected by this provision and their associated costs, please refer to chapter 4 above.

### 5.4.2.  Costs for FFL and non-FFL Dealers

Based on comments received regarding the NPRM, ATF revised some of the cost estimates of this chapter.  Depending on their staff, equipment, and FFL status, FFL dealers and non-FFL dealers have several ways to respond to the final rule.  ATF envisions five different scenarios resulting from the final rule that could cause costs for FFL and non-FFL dealers:

- Scenario 1: 42 FFL dealers with gunsmithing capabilities will engrave their own inventory;

- Scenario 2: 74 FFL dealers without gunsmithing capabilities will hire or outsource the engraving of their inventory to another FFL;

- Scenario 3: 74 FFL dealers and 12 non-FFL dealers will dispose of their inventory;

- Scenario 4: 12 non-FFL dealers will dissolve their businesses; and

- Scenario 5: 0 non-FFL dealers will become licensed as an FFL dealer.

For information regarding the numbers of affected populations, please read the different scenarios below.

-62-

5.4.2.1.  Scenario 1: In-house Engraving

Based on informal observations from its field divisions, ATF estimates that FFL dealers maintain, on average, 10 firearm parts kits with a partially complete frame or receiver in inventory.  As discussed above, ATF also contacted 10 FFL dealers to inquire whether they would be interested in participating in an information request.  Of those 10, only 2 responded.  Of the two that responded, one did not provide any information and the other did not deal in firearm parts kits with a partially complete frame or receiver.  Because there is no way to obtain accurate numbers or information on these types of firearm kits, observations from field division inspections were deemed to be the best available source of information.

As discussed above in section 5.3.2, ATF estimates that there are 124 Type 01 and 66 Type 02 FFL dealers that deal in firearm parts kits with a partially complete frame or receiver.  Using the same methodology of averaging the estimated percentages from the different field divisions, ATF estimates that 28.7 percent of Type 01 FFLs and 9.66 percent of Type 02 FFLs have gunsmithing capabilities.  Using this information, ATF estimates that 36 Type 01 FFLs and 6 Type 02 FFLs (or 42 Type 01 and 02 FFLs combined) will use existing staff and equipment to perform in-house engraving.[43],[44]

Because these FFL dealers already have gunsmithing capabilities, ATF assumes for purposes of this analysis that these FFL dealers will have in-house capabilities for engraving their existing inventory.  ATF used information reported by BLS to obtain an average wage rate

---

[43] 124 Affected Type 1 FFLs * 28.7 percent = 36 Type 1 FFLs with gunsmithing services.

[44] 66 affected Type 2 FFLs * 9.66 percent = 6 Type 2 FFLs with gunsmithing services.

for gunsmiths.  In the NPRM, ATF used the most recent wage rates by the publication of the NPRM, which was 2019 data.  Comments suggested that wage rates changed drastically between 2019 and 2021, and that an inflation adjustment should be included.  Therefore, ATF updated the wage rates to 2020, which is the latest information available at the time of analysis, and multiplied the 2020 base wage rate by the Employee Cost Index of 1.035 to account for the inflation of wages to 2021.[45]  In addition to the Employee Cost Index, ATF also used a load rate of 1.4209 to account for additional costs like fringe benefits.[46]  Table 5.3 illustrates the wage categories used for gunsmiths.

Table 5.3.  Wage Categories Used for Gunsmithing Activities

| Hourly Wage | Hourly Wage Adjusted with Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|
| $21 | $22 | $31 | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514022.htm |
| $19 | $10 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | https://www.bls.gov/oes/2020/may/oes514199.htm |

---

[45] BLS, *Employment Cost Index—June 2021* (July 30, 2021), *available at* https://www.bls.gov/news.release/archives/eci_07302021.pdf (last visited Mar. 24, 2022).

[46] A loaded wage rate is hourly wage rate adjusted to include costs of fringe benefits such as insurance.  The load rate is based on theaverage total compensation of $36.29 (CMU2010000000000D) for the years 2020 and 2021 divided by the average wages and salaries of $25.54 (CMU2020000000000D) for the years 2020 and 2021.  BLS, *Employer Cost for Employee Compensation*, *available at* https://data.bls.gov/cgi-bin/surveymost?cm (last visited Mar. 24, 2022).

-64-

| | | | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514031.htm |
|---|---|---|---|---|
| $19 | $19 | $27 | | |
| Average Loaded Wage | | **$29** | | |

ATF used the average loaded wage ($29) of the three job categories referenced in Table 5.3 for the loaded wage of a gunsmith.  Engraving firearm parts kits with a partially complete frame or receiver requires two collections of information ("COIs").  ATF utilized the hourly burden for making firearms from prior relevant PRA COI determinations.[47]  Based on the hourly burdens as reported in these COIs, the hourly burden to mark a firearm is 0.01667 hours and the hourly burden for entries into A&D records is 0.05 hours.  Table 5.4 outlines the per FFL dealer cost to engrave existing inventory of firearm parts kits with a partially complete frame or receiver.

Table 5.4.  Per FFL Dealer Cost to Engrave Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| Activity Type | COI Number | Hourly Burden | Loaded Wage Rate | Existing Inventory | Entries per Kit | One-time Cost per FFL |
|---|---|---|---|---|---|---|
| Entries into A&D Records | COI: 1140-0032 | 0.05 | $29 | 10 | 2 | $29 |
| Mark Firearms | COI: 1140-0050 | 0.01667 | $29 | 10 | 1 | $5 |
| Total | | | | | | **$33** |

---

[47] ATF, *Identification Markings Placed on Firearms*, available at https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=201807-1140-003 (last visited Mar. 24, 2022); and ATF, *Records of Acquisition and Disposition, Collection of Firearms*, available at https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202005-1140-002 (last visited Mar. 24, 2022).

Because these FFL dealers retail in firearm parts kits with a partially complete frame or receiver, and because they have gunsmithing capabilities, for the purposes of this analysis, ATF assumes that there may be recurring costs to engrave individually owned PMFs currently in circulation when these PMFs enter an FFL's inventory.  An SME in FATD with prior gunsmithing experience estimated that a gunsmith would work on several hundred PMFs a year. For the purposes of this analysis, ATF used an overestimate of 500 repairs per year.  Due to the inherently busy nature of gunsmithing, the SME also specified that on-the-spot repairs are unlikely, and that most PMFs are held overnight and thus already included in A&D records as a PMF (though generally recorded without a serial number).  Therefore, ATF has attempted to estimate an annual recurring cost for PMFs that enter inventory due to repairs or customization that result in the PMF being held overnight.  However, based on the number of comments received regarding the serialization of PMFs, ATF estimates that seeking the services of FFLs for repairs or customization is less likely to occur, so the costs are overestimated.

Because PMFs are already entered into A&D records, ATF did not estimate an additional cost for A&D records; instead, ATF estimated only the cost for serializing PMFs.  The additional cost to individuals for serializing their PMF are accounted for under the costs to individuals below.  The hourly wage burden to mark a firearm is estimated to cost $0.48.[48]  Table 5.5 shows annually recurring costs per FFL dealer to serialize PMFs held overnight in inventory.

Table 5.5.  Annually Recurring Cost to Engrave PMFs Held Overnight in Inventory

---

[48] $0.48 cost to mark a PMF = $28.66 hourly wage * 0.01667 hours.

| Number of Repairs per Year | 500 |
|---|---|
| Cost to Mark per PMF | $0.48 |
| Annual Cost per FFL | $240 |

Table 5.6 provides a summary of the per FFL and industry costs outlined above.

Table 5.6.  Summary of Costs for FFL Dealers with Gunsmithing Capabilities

| Affected Population | Existing Inventory Cost | Annual Repair Costs | Per FFL First Year Cost | First Year Cost |
|---|---|---|---|---|
| 42 | $33 | $240 | $273 | $11,484 |

### 5.4.2.2.  Scenario 2: Contract out Gunsmithing Services

Of the remaining Type 01 and 02 FFL dealers, ATF assumes that a portion may contract out engraving services to a separate FFL or a licensed gunsmith.  Those FFL dealers that do not do so may instead opt to dispose of their inventory of firearm parts kits with a partially complete frame or receiver.  Because there is no way to determine which FFL dealers will chose to contract out engraving services or dispose of their inventory, ATF assumes 50 percent of the dealers will choose each option.  The 50 percent of dealers that choose to dispose of their inventory are discussed further in section 5.4.2.3, below.

ATF estimates that there are 44 Type 01 and 30 Type 02 FFL dealers that deal in firearm parts kits with a partially complete frame or receiver yet do not have gunsmithing capabilities and that would opt to obtain the services of a separate FFL to engrave these firearm parts kits in their inventory.  ATF estimates that the average price for serialization paid by these 74 dealers

would be $42.[49]

Although comments suggested a range of costs from $35 for serialization to $405 to include cleaning, oiling, bluing, and polishing services, ATF believes that $42 is an appropriate cost to use. Based on information from an SME in FATD with gunsmithing experience, most individuals who engrave firearms do not request additional services such as cleaning or oiling when seeking engraving services. Therefore, ATF did not account for the costs of these extra services.

ATF estimates the existing inventory of each FFL to be 10 firearm parts kit with a partially complete frame or receiver. Based on the information above, ATF estimates that the per FFL cost for engraving inventory is $420, making the total cost for all FFLs for engraving inventory to be $31,080.[50]

### 5.4.2.3.  Scenario 3: Disposal Costs

As stated in the previous section, ATF assumed an even distribution between FFLs that would hire another party to engrave their inventory and FFLs that would dispose of their inventory. Thus, much as ATF assumed 74 FFLs would choose to have their inventory engraved, ATF assumes that 74 FFLs would choose to dispose of their inventory.

In this portion of the analysis, ATF also considered the disposal costs for non-FFL

---

[49] For representative indications of the price of engraving services, see, e.g., Tar Heel State Firearms, *SBR / SBS Laser Engraving*, *available at*
https://tarheelstatefirearms.com/store/index.php?route=product/product&product_id=232 (last visited Mar. 25, 2022); Atomic Engraving, *Serial Number Engraving*, *available at* https://www.atomicengraving.com/product-category/firearms-engraving/serial-number-engraving-ca-compliant/ (last visited Mar. 25, 2022). As noted above, ATF cannot account for fluctuations in market prices over time, and the estimated price of engraving services used in this analysis—$42—may not precisely match the prices quoted by the cited websites or other providers of such services.

[50] $31,080 = 74 FFLs * (10 firearm parts kit with a partially complete frame or receiver * $42 to serialize each kit).

dealers.  Some of these dealers may dissolve their business as a result of the rule, whereas some non-FFL dealers may choose only to dispose of their inventories of affected items.  Because ATF cannot determine which non-FFL dealers will choose which option, ATF assumed that 50 percent of non-FFL dealers would dissolve their business and 50 percent would choose only to dispose of their inventory.  Thus, ATF assumed that 12 non-FFL dealers would dispose of their inventory.  ATF assumed that the remaining 12 non-FFL dealers would dissolve their business, and these dealers are discussed more fully in section 5.4.2.4, below.

Both FFL and non-FFL dealers are also retail stores.  Hence, ATF assumes that a non-specialized retail employee will perform the work of disposing firearm parts kits with a partially complete frame or receiver.  For purposes of this analysis, ATF used the wage category of cashier to dispose of the existing inventory.  Table 5.7 provides the wage rate for a cashier.

Table 5.7.  Wage Rate for a Non-Specialized Employee

| Wage Rate | Wage Rate Adjusted with Employee Cost Index | Loaded Wage Rate After Adjustment for Cost Index | Title | Website |
|---|---|---|---|---|
| $12 | $13 | $18 | 41-2011 Cashier | https://www.bls.gov/oes/2020/may/oes412011.htm |

ATF anticipates that the same or similar methods that are used to destroy bump stock-type devices will be used to destroy a firearm parts kit with a partially complete frame or receiver.  Based on disposal information from ATF's rule regarding bump-stock type devices, ATF used the hourly burden as reported for small businesses as determined by the SBA.  Table 5.8 provides the cost and hourly burden to dispose of existing inventory.

Table 5.8.  Hourly Burden and Cost to Dispose of Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| Hourly Burden | Loaded Wage Rate After Adjustment with Employee Cost Index | Per Dealer Cost | Source |
|---|---|---|---|
| 0.25 | $18 | $5 | Bump-Stock-Type Devices, 83 FR 66514, 66550 (Dec. 26, 2018). |

Because ATF does not know the inventory of non-FFL dealers, for the purposes of this analysis, ATF uses the same estimate of 10 firearm parts kits with a partially complete frame or receiver as was used above for FFL dealers.  ATF notes that this is likely to be an underestimate for non-FFL dealers because most firearm parts kits with a partially complete frame or receiver are available for purchase online.  However, for the purposes of this analysis, ATF assumes that non-FFL dealers that incur the costs described here sell other items and not only firearm parts kits with a partially complete frame or receiver; therefore, the loss of such parts kits due to disposal would only be a part of their total revenue.

In addition to the hourly burden of disposing existing inventory of firearm parts kits with a partially complete frame or receiver, these FFL and non-FFL dealers will incur a loss in inventory.  Table 5.9 lists the retail prices of firearm parts kits with a partially complete "frame or receiver" used for this analysis.  As noted earlier, the prices quoted by vendors such as the ones referenced here may fluctuate over time, but ATF believes the average price reported in Table 5.9 is a reasonable price to use for this RIA.

Table 5.9.  Retail Price of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| Cost | Vendor | Website |
|---|---|---|

-70-

| | | |
|---|---|---|
| $150 | Polymer 80 | https://www.polymer80.com/pistols/80percentpistolkits |
| $170 | Polymer 80 | https://www.polymer80.com/pistols/80percentpistolkits |
| $255 | 5D Tactical | https://www.5dtactical.com/80-build-kits-s/160.htm |
| $912 | 5D Tactical | https://www.5dtactical.com/80-build-kits-s/160.htm |
| $616 | 5D Tactical | https://www.5dtactical.com/80-build-kits-s/160.htm |
| $53 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $191 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $466 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $317 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $224 | Tennessee Arms | https://www.tnarmsco.com/categories/bundle-packs/80-bundles.html |
| $335 | | Average Price |

*Note: Calculations using these estimates may not be exact due to rounding.

At an average price of $335 per kit, the total loss in inventory per dealer is $3,354.

Including the $5 hourly burden cost for disposal, the per FFL and non-FFL dealer cost to dispose

of existing inventory of firearm parts kits with a partially complete frame or receiver is $3,359,

making the industry cost for this scenario $288,835.[51]

### 5.4.2.4.  Scenario 4: Non-FFL Dealer Dissolves Business

Some non-FFL dealers only or primarily sell firearm parts kits with a partially complete

frame or receiver.  Upon publication of the final rule, it is unlikely that these non-FFL dealers

will be able to continue their business.  As described above, however, ATF assumed for the

purposes of this analysis that half of the non-FFL dealers will simply dispose of their inventory

---

[51] $288,835 = 86 FFL and non-FFL dealers * ((10 firearm parts kits with a partially complete frame or receiver * $335) + $5 hourly disposal cost).

of affected items and remain in business; and only the remaining half of non-FFL dealers will dissolve their business.

Based on the information gathered on non-FFL dealers, the average revenue of a non-FFL dealer is $405,667. The median revenue is $117,000. Given the large discrepancy among the known revenues of non-FFL dealers, ATF used the median revenue rather than the average revenue. Assuming 12 non-FFL dealers, with median revenues of $117,000, dissolve their business, ATF estimates this scenario will have an annual cost of $1.4 million.[52]

5.4.2.5. Scenario 5: Non-FFL Dealer Becomes an FFL

Anecdotal evidence from the ATF field divisions indicates that most firearm parts kits with a partially complete frame or receiver are sold online and not through a local storefront. It is unclear whether a non-FFL dealer that primarily sells on the internet will be able to completely change its operations to comply with the regulations that licensed dealers must abide by, including having a physical place of business where they maintain their inventory and records that are subject to ATF inspection. However, to illustrate the potential cost for a non-FFL dealer to become licensed as a Type 01 or Type 02 FFL, ATF estimates the per company cost for a non-FFL dealer to become an FFL dealer.

In order to become licensed as a Type 01 or Type 02 FFL dealer, the non-FFL dealer will need to submit a Form 7 application. Table 5.10 outlines the hourly burden and costs for the first-year application to become licensed as a Type 01 or Type 02 FFL. In calculating these costs, ATF used the same sources as described earlier when discussing the costs associated with

---

[52] 12 non-FFL dealers * $117,000 median revenue = $1,404,000.

Form 7.

Table 5.10.  Application Cost to be a Type 01 or 02 FFL

| Cost Item | Hourly Burden | Hourly Wage Rate | Hourly Wage Adjusted with Employee Cost Index | Loaded Hourly Wage Rate After Adjustment with Cost Index | Wage Burden | Cost Item | |
|---|---|---|---|---|---|---|---|
| Form 7 | 1 | $60 | $63 | $89 | $89 | $200 | |
| Fingerprints | 1 | $60 | $63 | $89 | $89 | $19 | |
| Passport Photo | 0.5 | $6 | $63 | $89 | $44 | $16 | |
| Postage | | | | | | $1 | |
| Application Cost | | | | | $222 | $236 | **$458** |
| Renewal Cost | 0.50 | $60 | $63 | $889 | $44 | $90 | **$134** |

In addition to the application for an FFL license, non-FFL dealers will also need to begin maintaining A&D records.  In order to determine the number of firearm parts kits with a partially complete frame or receiver that will now need to be entered in A&D records, ATF used the median revenue for non-FFL retailers divided by the average retail price for a firearm parts kit to derive an estimated number of 349 firearm parts kits with a partially complete frame or receiver

per year.[53]  Multiplied by 2 entries for acquisitions and dispositions, the total number of entries is estimated to be 698.  Because retailers do not need specialized employees to record serial numbers, ATF used the same BLS category of cashier to enter A&D records at the loaded wage rate of $18.  For more information regarding this wage category, please refer to scenario 4 above.

Table 5.11.  Cost to Maintain A&D Records

| Population Type | Hourly Burden | Loaded Wage Rage | Estimated Entries Annually | Per Dealer Cost |
|---|---|---|---|---|
| Non-FFL Dealers | 0.0167 | $18 | 698 | $211 |

In addition to incurring costs associated with A&D records non-FFL dealers seeking to become FFL dealers will need to procure engraving services for their inventory from an FFL that provides engraving services.  Table 5.12 provides a summary of the one-time cost to engrave existing inventory.

Table 5.12.  One-time Cost for Non-FFL Dealers to Engrave Existing Inventory of Firearm Parts Kits with a Partially Complete "Frame or Receiver"

| | |
|---|---|
| Average Cost to Contract out Existing Inventory for Engraving | $42 |
| Number of Kits | 349 |
| Application Cost | $458 |
| Total First Time Cost | $15,116 |

---

[53] 349 firearm parts kit with a partially complete "frame or receiver" = $117,000 median revenue / $335 retail price of a parts kit.

Table 5.13 provides a summary of the cost for a non-FFL dealer to become a licensed Type 01 or 02 FFL.

Table 5.13.  Summary of Costs for a Non-FFL Dealer to Become Licensed as an FFL Dealer

| Population Description | One-time Cost | Annual Recurring Cost | Every 3 Year FFL Renewal Cost | Per Company First Year Cost |
|---|---|---|---|---|
| Cost | $15,116 | $211 | $134 | $15,328 |

Based on a median annual revenue of $117,000, this scenario is likely to cost 13 percent of the revenue of a non-FFL dealer.

### 5.4.3.  Costs for Individuals to Mark PMFs

As stated previously in various sections, the final rule does not require serialization of all PMFs currently in circulation.  Although there may be State or local requirements for individuals to serialize their PMFs, the Federal requirements do not require serialization for PMFs owned by individuals unless they transfer their PMFs to an FFL.  In the NPRM, ATF did not estimate costs for an individual to do so because ATF assumed that individuals with PMFs would choose to avoid taking their PMF to an FFL to avoid the serialization requirement and hence would not incur any associated costs.  This assumption was reinforced by the many comments that ATF received regarding PMFs.

However, some commenters asserted that the rule disproportionately affects low-income households because it is more arduous and expensive for an individual to go through an FFL to purchase firearms than it is for an individual to purchase an unregulated firearm parts kit online and build a PMF.  ATF disagrees that the final rule disproportionately affects low-income households.  Regardless of the rule, ordering a firearm parts kit online and building a PMF may

take more time and money overall than going to an FFL to purchase a complete firearm.

Scenario 1 illustrates the cost for an individual to go to an FFL to purchase a complete firearm

compared to the cost of building a PMF.   Additionally, because there is at least some possibility

that individuals may choose to take an existing PMF to an FFL for repairs or customization, ATF

estimates the cost for individuals to bring their PMFs to an FFL to be serialized.

5.4.3.1.  Result 1: Individuals Go to an FFL to Purchase a Firearm

Table 5.14 illustrates the cost to travel to an FFL to purchase a firearm.

Table 5.14.  Cost for Milage to an FFL

| Miles Traveled | 35.48 | ATF estimated during a previous rulemaking that this is the average distance traveled by an individual to turn in bump stock-type devices to ATF. |
|---|---|---|
| Per Diem for Miles Traveled | $.59 | General Services Administration, *Privately Owned Vehicle (POV) Mileage Reimbursement Rates* (Jan. 1, 2022), *available at* https://www.gsa.gov/travel/plan-book/transportation-airfare-pov-etc/privately-owned-vehicle-pov-mileage-reimbursement-rates last visited (Mar. 26, 2022). |
| Cost for Miles Traveled | $21 | |

*Note: Calculations using these estimates may not be exact due to rounding.

Based on the Department of Transportation's guidance on the costs for leisure time,

ATF attempted to update the leisure wage based on the methodology outlined in the guidance.[54]

The Department of Transportation uses the median household income as the base for income

---

[54] Dep't of Transportation, *Revised Departmental Guidance on Valuation of Travel Time in Economic Analysis* (Sept. 27, 2016), *available at* https://www.transportation.gov/office-policy/transportation-policy/revised-departmental-guidance-valuation-travel-time-economic last visited (Mar. 26, 2022).

from the Census.  ATF used the latest median income of a household from the Current

Population Survey Annual Social and Economic Supplements, as published by the Census

Bureau in September 2021.[55]  Table 5.15 provides the leisure wage.

Table 5.15.  Leisure Wage Rate for Individuals

| | |
|---|---|
| Median Household Income (2021) | $67,521 |
| DOT Travel Time | 2080 |
| Value of Travel Time Savings | 50% |
| Leisure Wage | $16 |

ATF notes that the value calculated for the time and miles traveled are likely to be

overestimates because the data is based on the time and miles traveled for an individual to go to

an ATF field office rather than an FFL.  There are more FFL locations than there are ATF

locations; therefore, FFL locations may be closer to the individual.  Based on these

assumptions, Table 5.16 outlines the cost for an individual to go to an FFL (roundtrip) to

purchase an affected firearm kit.

Table 5.16.  Individual Cost to Go to an FFL (Roundtrip)

| | |
|---|---|
| Total Cost for Driving Time | $25 |
| Cost for Miles Traveled | $21 |
| FFL Transfer Fee | $35 |
| Cost per Trip (per Individual) | $81 |

---

[55] Census Bureau, *Income and Poverty in the United States: 2020* (Sept. 14, 2021), *available at* https://www.census.gov/library/publications/2021/demo/p60-273.html (last visited Mar. 26, 2022).

The per individual cost to go to an FFL to purchase a firearm is $81.  In contrast, Table 5.17 illustrates an estimated time to build a PMF.

Table 5.17.  Estimated Time (in Hours) to Build a PMF

| Time to Build a PMF (low) | 4 |
|---|---|
| Time to Build a PMF (high) | 8 |
| Average Time | 6 |
| Leisure Wage | $16 |
| Cost to Build a PMF | $97 |

*Note: Calculations using these estimates may not be exact due to rounding some of the values used as inputs for subsequent calculations.

As illustrated, Table 5.17 shows that the cost to build a PMF is $97, which is more than the cost to go to an FFL to purchase firearm, as reported in Table 16 ($81).  Furthermore, various YouTube videos show that personally building a firearm is more expensive than buying a similar type of firearm through an FFL.[56, 57]

5.4.3.2.  Scenario 2: Serialization Cost

Based on the average cost of serialization as described above, ATF estimates that it will cost an additional $42 to serialize a PMF.

5.5.  Benefits of Marking PMFs

ATF anticipates a one-time surge in the markings of firearm parts kits with partially

---

[56] YouTube, *Polymer 80 What Does It Cost To Build* (June 16, 2021), *available at* https://www.youtube.com/watch?v=l4N1k6Hjqqk (last visited Mar. 26, 2022) (explaining at 2:24 that "[b]uilding the polymer 80 was about $50 or so more than buying a Glock 19," with a total price to build of $630.47).

[57] YouTube, *POLYMER 80 BUILD COST BREAKDOWN* (July 8, 2021), *available at* https://www.youtube.com/watch?v=a_prtH4NQ5g (last visited Mar. 26, 2022) (acknowledging at 4:00 that the price to personally build a Glock can be "pretty close to what a Glock costs" at retail, but also noting that costs for personally building a Glock can run higher than retail prices if a person is not knowledgeable about how to construct the weapon, with a cost of up to $1,000).

complete frames or receivers and PMFs, primarily from Type 01 and Type 02 FFL dealers.

Regulating these items will help prevent felons and other prohibited persons from easily

obtaining unmarked firearms without a background check and illegally making PMFs.  Bringing

these kits and PMFs within the regulated market thereby helps prevent violent crime, allows

ATF to locate and prosecute offenders and their straw purchasers, and makes it easier to trace

firearms to criminals who commit crimes with the weapons they build from those kits.  As

reported by commenters, the objective of ATF in issuing the rule is to increase public safety.

For more discussion on the benefits of serializing firearm kits and PMFs, please refer to

chapter 4 on manufacturers of firearm parts kits with a partially complete frame or receiver.

# 6. Gunsmithing

The final rule amends the definition of "gunsmith" under the term "engaged in the

business" to make clear that businesses may be licensed as dealer-gunsmiths rather than as

manufacturers if they, among other things, routinely repair or customize existing firearms not for

sale or distribution, or mark PMFs, which by definition includes unmarked firearm parts kits

with partially complete frames or receivers.  The final rule also makes clear that gunsmiths are

not required to be licensed as manufacturers if they perform gunsmithing services only on

existing firearms for their customers, or for another licensee's customers, because the work is not

being performed to create firearms for sale or distribution.  The change to the definition also

allows greater access to professional marking services so that individuals or gunsmiths can be

licensed as dealer-gunsmiths solely to provide professional PMF marking services.  This

provision includes all FFLs that perform gunsmithing activities; in particular, it may encompass

gunsmiths that perform custom work on firearms.

## 6.1. Need for Change in Definition of Gunsmithing

The final rule allows persons to become licensed as Type 01 and Type 02 FFLs (dealers or pawnbrokers) to accommodate the increase in the number of firearm parts kits with a partially complete frame or receiver and PMFs that must be serialized.

## 6.2. Comments Received on Gunsmithing

One commenter stated that the proposed rule would increase the cost to gunsmith PMFs, particularly for small changes such as on-the-spot repairs and firearm competitions.  ATF concurs and, under the final rule, licensees will need to mark and record only PMFs that are acquired into inventory.  The final rule specifically excludes from this requirement adjustments or repairs of PMFs where the firearm is returned to the person from whom it was received on the same day.

One commenter opposed the definition of gunsmith proposed in the NPRM, stating that one should not need to be licensed in order to gunsmith.  ATF disagrees because the requirement for gunsmiths to be licensed if they are engaged in the business of providing gunsmithing services is an existing statutory requirement.  The final rule clarifies that Type 01 and 02 FFLs can perform gunsmithing and customization services, which include marking services on firearms, rather than requiring them to apply for a Type 07 manufacturer's license.

One commenter suggested that there was a discrepancy in the regulatory analysis regarding contract gunsmithing.  ATF concurred with this and other commenters, as discussed in chapter 5 for dealers of firearm parts kit with a partially complete frame or receiver.  ATF has significantly revised and clarified those costs in both the rule and chapter 5 of this RIA.

One commenter asserted that ATF significantly underestimated the activities for gunsmithing; the commenter did not understand why the number of items needing to be serialized was so low.  ATF reiterates that PMFs for personal use are not required to be serialized (unless required by State or local law); instead, only those PMFs that are taken into inventory by FFLs must be serialized.  Further, as noted above, the final rule exempts same-day adjustments and repairs from this requirement.  Because adjustments and repairs are done by gunsmiths, ATF assumes that FFLs with gunsmithing capabilities will be performing repairs or customizations of PMFs, so ATF incorporated the annual costs for these FFLs.  Also, the additional costs are primarily a one-time cost to FFL dealers that outsource or hire gunsmiths to serialize their existing inventory of firearm parts kit with a partially complete frame or receiver, as discussed in chapter 5.

6.3.  Gunsmithing Population

Although gunsmithing activities can be performed by all licensed manufacturers, the final rule allows persons who are engaged in the business of marking firearms to be licensed as Type 01 and Type 02 dealers specifically to mark firearms.  For the purposes of this RIA, ATF has broken this provision up by population because some of the marking requirements are for Type 01 and Type 02 FFLs whose main operations are not gunsmithing activities, but rather retail sales or pawn brokering.  For purposes of this analysis, ATF is using the term "gunsmith" to indicate that these may be FFLs that perform more custom work or repairs on firearms.

Based on informal observations from ATF field divisions located throughout the country, ATF estimates that 28.7 percent of Type 01 FFLs and 9.66 percent of Type 02 FFLs already have gunsmithing capabilities.  For more information on this subset of FFLs that would do in-

house engraving, please refer to chapter 5, section 5.4.2.1. Additionally, for purposes of this analysis, ATF estimates that 74 FFLs would need to hire or contract with another licensed dealer-gunsmith in order to serialize the PMFs in their inventory that would need to be marked as a result of the final rule. For more information regarding these 74 FFLs, please refer to chapter 5, section 5.4.2. This chapter relates to the FFLs that receive serialization orders from the 74 FFLs that outsource their engraving to a separate FFL. ATF assumes that there will be 74 FFLs that incur one-time serialization costs from fulfilling orders from the 74 FFLs that outsource the serialization of their existing inventory of firearm parts kit with a partially complete frame or receiver.

## 6.4. Gunsmithing Costs

ATF anticipates that there would be a one-time increase in requests from other FFLs to provide custom markings of serial numbers on PMFs and firearm parts kits with a partially complete frame or receiver. Although FFLs can mark the firearms in their inventory themselves, there may be a portion who opt to outsource the marking to another FFL that specializes in engraving services. The costs for serializing these kits from the outsourcing by Type 01 and 02 FFLs to gunsmiths are outlined in chapter 5, above. This chapter outlines the costs for FFLs to receive and fulfill outsourced requests from FFLs that currently have firearm parts kit with a partially complete frame or receiver.

For the FFL dealers that receive these requests to serialize another FFL's existing inventory of firearm parts kit with a partially complete frame or receiver, ATF assumes that these FFLs will have additional costs due to (1) completing A&D records from the one-time increase in serialization, and (2) the time spent making these firearm parts kits. ATF used approximate

job categories from BLS to obtain an average wage rate for gunsmiths.  In the NPRM, ATF used the most recent wage rates at time of the NPRM's publication, which was 2019 data. Commenters suggested that wage rates changed drastically between 2019 and 2021 and that an inflation adjustment should be included.  One commenter specifically referenced the Employee Cost Index as an appropriate inflation rate.  ATF concurs and has updated the wage rates to use data from 2020, which is the latest reported data at the time of this analysis.  ATF has also multiplied the 2020 base wage rate by the Employee Cost Index of 1.035 to account for the inflation of wages to 2021.[58]  In addition to the Employee Cost Index, ATF also used a load rate of 1.4209 to account for additional costs like fringe benefits.[59]  Table 6.1 illustrates the wage categories used for gunsmiths.

Table 6.1.  Wage Categories Used for Gunsmithing Activities

| Hourly Wage | Hourly Wage Adjusted by Employee Cost Index | Loaded Wage Rate | BLS Occupation | Website |
|---|---|---|---|---|
| $21 | $22 | $31 | 51-4022 Forging Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514022.htm |

[58] BLS, *Employment Cost Index—June 2021* (July 30, 2021), *available at* https://www.bls.gov/news.release/archives/eci_07302021.pdf (last visited Mar. 24, 2022).

[59] A loaded wage rate is the wage rate adjusted to include fringe benefits such as insurance.  The load rate is based on the average total compensation $36.29 (CMU2010000000000D) for years 2020 and 2021 divided by the average wages and salaries $25.54 (CMU2020000000000D) for years 2020 and 2021.  *See* BLS, *Employer Cost for Employee Compensation*, *available at* https://data.bls.gov/cgi-bin/surveymost?cm (last visited Mar. 24, 2022).

| | | | | https://www.bls.gov/oes/2020/may/oes514199.htm |
|---|---|---|---|---|
| $19 | $20 | $28 | 51-4199 Metal Workers and Plastic Workers, All Other | |
| $19 | $19 | $27 | 51-4031 Cutting, Punching, and Press Machine Setters, Operators, and Tenders, Metal and Plastic | https://www.bls.gov/oes/2020/may/oes514031.htm |
| Average Loaded Wage | | **$29** | | |

ATF used the average loaded wage ($29) of the three job categories referenced in Table 6.1 for the loaded wage of a gunsmith.  Engraving firearm parts kits with a partially complete frame or receiver requires two COIs, one COI for marking firearms, and one COI for maintaining A&D records.  ATF utilized the hourly burden for making firearms from prior relevant PRA COI determinations and then assumed that these firearm parts kits with a partially complete frame or receiver will have two entries, one for acquisition and one for disposition. Based on the hourly burdens as reported in these COIs, the hourly burden to mark a firearm is 0.01667 hours and the hourly burden for entries into A&D records is 0.05.  Table 6.2 outlines the total hourly burden for gunsmiths to complete the records required when they take in firearm parts kits with a partially complete frame or receiver.

Table 6.2.  Hourly Burden Due to Additional A&D Entries

| OMB 1140-0032 A&D Records | |
|---|---|
| FFLs that Receive Outsourcing Requests | 74 |
| | |
| Number of Kits in Inventory | 10 |
| Total Items | 740 |
| | |

| | |
|---|---|
| Number of Entries per Submission | 2 |
| Total Number of Entries | 1480 |
| | |
| Hourly Burden per Entry | 0.05 |
| Hourly Burden due to Rule | 74 |

Table 6.3 outlines the total hourly burden for gunsmiths to mark the firearm parts kits with a partially complete frame or receiver after receiving them by FFLs dealers that have chosen to outsource the work required to comply with the marking requirements.

Table 6.3.  Cost to Mark Firearms

| | |
|---|---|
| OMB 1140-0050 Marking a Firearm | |
| FFLs Outsourcing | 74 |
| | |
| Number of Kits in Inventory | 10 |
| Total Items | 740 |
| | |
| Number of Markings on a Firearm | 1 |
| Total Number of Markings | 740 |
| | |
| Hourly Burden per Marking | 0.01667 |
| Hourly Burden due to Rule | 12 |

The total hourly burden for completing the records and performing the marking is 86 hours.  ATF multiples this hourly burden by the average loaded wage rate of $29 to determine the one-time cost to engrave kits sent out from FFL dealers that deal in firearm parts kits with a partially complete frame or receiver, but do not have gunsmithing capabilities, of $2,474.  For purposes of this analysis, only the one-time cost to serialize an existing inventory of firearm parts

kits with a partially complete "frame or receiver" is considered part of the total cost of the rule. However, as similarly suggested in chapter 5, FFLs with gunsmithing capabilities may currently be repairing or customizing PMFs currently in circulation.  FFLs may continue to adjust or repair unserialized PMFs regardless of the rule; however, they will be required to serialize the PMF if the FFL takes an unserialized PMF into inventory for a purpose other than same-day adjustment or repair.  Because going to an FFL is an optional decision for owners of unserialized PMFs, as reflected in the comments, ATF anticipates that owners of PMFs will be less likely to do so after issuance of the final rule.  Furthermore, ATF does not have access to information that would allow it to calculate a reasonable estimate of the number of non-same-day adjustment or repairs of PMFs that gunsmiths might perform in a given year.  Therefore, the costs discussed below are not included in calculating the overall cost of the final rule; instead, they are discussed only for illustration of costs that might arise.

Based on anecdotal evidence from a SME in FATD with prior gunsmithing experience, a gunsmith would work on several hundred PMFs a year.  Due to the inherently busy nature of gunsmithing, the SME also stated that on-the-spot repairs are unlikely, and that most PMFs are held overnight and already included in A&D records as a PMF (though generally without recording a serial number).  Therefore, ATF estimates an annual recurring cost for repairs, or customizations, of PMFs whether or not they are held overnight.  As mentioned above, ATF estimates that all costs for serializing individually-owned PMFs are an overestimate because it is less likely that individuals with PMFs will undertake repairs or customizations through an FFL after publication of the final rule in order to avoid serializing their PMFs.

Because this analysis assumes FFLs may currently be repairing or customizing PMFs and

that PMFs are already entered into A&D records, ATF did not estimate an additional cost for A&D records; instead, it estimated only the incremental cost for serializing PMFs. The additional cost to the individuals for serializing their PMFs in addition to repair or customization are accounted for under the costs to individuals, below. Table 6.4 shows annually recurring costs per FFL dealer to serialize PMFs held in inventory.

Table 6.4. Annually Recurring Cost to Engrave PMFs Held in Inventory

| Number of Repairs per Year | 500 |
|---|---|
| Cost to Mark per PMF | $0.48 |
| Annual Cost per FFL | $239 |

Despite calculating the annual recurring cost for engraving PMFs taken into inventory, ATF did not use these costs in calculating the total cost of the rule. This is because the best available data from SMEs at ATF regarding the number of repairs performed by gunsmiths resulted in an estimated number of repairs that far exceeds the total number of PMFs currently in circulation, as estimated in chapter 5's analysis (Table 5.1) of FFL dealer costs. In the absence of more accurate data, ATF was unable to estimate the costs of serialization associated with individuals taking their PMFs to FFLs for repairs or other work that cannot be completed on the same day. Thus, for purposes of calculating the costs associated with the final rule, ATF considered only the one-time cost to engrave kits sent out from FFL dealers that deal in firearm parts kits with a partially complete frame or receiver, but do not have gunsmithing capabilities (*i.e.*, $2,474).

-87-

6.5.  Benefits for Changing the Definition of Gunsmithing

The benefit to amending the term "gunsmith" in the final rule is that it allows persons to be licensed as dealer-gunsmiths if they are engaged in the business of only placing markings on PMFs, thus expanding the availability of professional marking services for both: (1) licensees that need their inventory of firearm kits or PMFs serialized, and (2) nonlicensees if they should want their PMFs serialized.  Providing these types of services will no longer be limited to Type 07 manufacturers.  The amended definition also clarifies who is required to be licensed as a gunsmith versus a manufacturer.

# 7.  Record Retention

Currently, Type 01 FFLs (dealers), Type 02 FFLs (pawnbrokers), and Type 03 FFLs (collectors) do not have to store their required records beyond 20 years.  As stated above, the final rule requires all licensees to store their Forms 4473 and A&D records until the business or licensed activity is discontinued, at which point they will need to send their out-of-business records to ATF, as currently prescribed.

Based on tracing data and out-of-business records from the last 10 years, ATF estimates that the majority of FFLs currently retain their records indefinitely or send their out-of-business records to ATF.  For these FFLs, this provision of the final rule would not impose any additional costs.  The final rule will affect only businesses that currently destroy their records or send records older than 20 years to ATF, as these businesses will be required to retain these records either indefinitely or until they discontinue their business or licensed activity.

Finally, the rule allows an FFL to store its records electronically (under an ATF approved method) and its paper records older than 20 years in a separate warehouse.  FFLs that do not currently store transaction records longer than 20 years thus have various means of storing their records indefinitely.  They can: (1) buy additional electronic storage files; (2) purchase or rent additional physical storage space; (3) transfer their forms onto an electronic platform; or (4) voluntarily discontinue their current business or licensed activity, send their send their paper out-of-business records to ATF, and start a new business or activity under a new license with a new electronic recordkeeping system.

7.1.  Comments Received on Indefinite Records Retention

ATF received various comments regarding the population affected and the cost of record retention.  Some commenters stated that the costs of shipping all firearms records were not accounted for, and that, even if they had been, ATF's estimated shipping cost was too low to account for all shipments from all FFLs and that the estimated shipping cost amounted to less than $1 per FFL.  Furthermore, one commenter suggested that, regardless of whether an FFL ships records voluntarily, all FFLs should be accounted for, not only the ones that currently destroy their records that are older than 20 years.

The Department disagrees with commenters who said the agency underestimated the cost per FFL or that it should have taken into account the costs borne by all FFLs.  Federal law, *see* 18 U.S.C. 923(g)(4); 27 CFR 478.127, already requires FFLs to send all of their out-of-business records to ATF.  ATF does not attribute these costs to the final rule because the duty to send out-of-business records to ATF is an existing statutory and regulatory requirement.  In the NPRM, ATF estimated that most FFLs currently store their records for longer than 20 years and will not be affected by the indefinite records retention requirement.  The final rule's requirement will impose costs only on a subset of the total number of FFLs.  Furthermore, the Office of Management and Budget ("OMB") has explained that the baseline for an RIA should be "what the world will be like if the proposed rule is not adopted."[60]  Prior to the publication of the NPRM, the majority of FFLs maintained records until discontinuance of business or licensed activity regardless of whether they remained in the business for 20 years.  Because any alternative, including the requirement in the final rule, would be a comparison against this

---

[60] OMB, *Circular A-4* at 2 (Sept. 17, 2003), *available at* https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/A4/a-4.pdf (last visited Mar. 26, 2022).

baseline, only the incremental cost above this baseline is attributed to the rule.[61]

Some commenters suggested that ATF did not account for the influx of transactions recorded for multiple "frames" or "receivers" or the influx of transaction records from purchases of firearm parts kit with a partially complete frame or receiver that would be disposed of as a "firearm" under the rule. One commenter suggested that ATF use NICS checks and population growth to account for the increased number of transactions and number of records in the future. Several commenters suggested that ATF's assertedly low records retention cost was due to an over-reliance of savings from converting paper records to electronic storage. One commenter suggested that the cost for electronic storage should include a team of employees to create and maintain electronic storage for the FFL.

ATF partially concurs. ATF did not account for the potential increase in the number of records stored due to an increase in transactions recorded for multiple "frames" or "receivers;" however, this cost no longer needs to be accounted for as a result of changes to the definition of "frame or receiver." Nonetheless, ATF concurs that there will be an increase in firearms records because there could be more firearms transactions, which can increase the overall retention cost. However, most FFLs have and will continue to retain records, and the rule will not affect these FFLs. As stated above, this activity for the majority of FFLs is an existing activity prior to the publication of the final rule and is not attributed to the rule. However, for the relatively small subset of FFLs that currently destroy records older than 20 years, the new retention requirement could impose a significant cost. For purposes of this analysis, ATF estimates that, in an effort to

---

[61] *Id.* at 11.

reduce their costs, FFLs may utilize electronic storage.  Furthermore, most FFLs that use electronic formats for A&D records or Forms 4473 already outsource these software applications to third parties rather than hiring employees and building the program in-house; therefore, ATF is not incorporating the cost for an FFL to create and maintain electronic storage of their records.

One commenter suggested that ATF consider an alternative to this requirement with a timeframe between 20 years and indefinite.  Though the alternatives of requiring record retention for 25 or 30 years was considered, ATF determined they were not the best course of action.  Because firearms are durable items that can be in circulation for many decades or even beyond 100 years, a specific retention requirement of 25 years, 30 years, or some other fixed duration will fail to track the shelf life of firearms that last longer than the specific duration.  ATF would thus continue to have unsuccessful traces of these firearms when used in the commission of a crime.

One commenter suggested that ATF relied too heavily on SMEs and did not explain its methodologies.  Furthermore, this commenter questioned the assumption that all FFLs would choose to send their records older than 20 years to ATF.

ATF partially concurs.  Based on SMEs' analyses, most FFLs already retain records indefinitely beyond the existing 20-year requirement until discontinuance of business or licensed activity.  For most FFLs this is already an industry standard.  Furthermore, upon publication of the final rule, FFLs that currently ship records older than 20 years to ATF will no longer be able ship their records to ATF because, under the final rule, FFLs are required to retain them indefinitely until they discontinue business or licensed activity.  However, ATF was able to use tracing data and out-of-business records as a proxy to estimate the number of FFLs that do not

retain records older 20 years and therefore could be affected by the rule.  For the final rule, ATF deemed this to be the best available information.  Also, in this analysis, ATF estimates that, after the final rule becomes effective, FFLs that currently and voluntarily ship records older than 20 years may decide to voluntarily discontinue their license and apply for a new license so they can ship their paper out-of-business records to ATF and start a new business or activity under a new license with a new electronic recordkeeping system.

Some commenters stated that ATF did not quantify or monetize benefits for the record retention requirement.  One commenter suggested that the benefits do not outweigh the costs.  One commenter asserted that ATF did not demonstrate how many crimes would be solved through tracing firearms over 20 years old.  ATF concurs that additional quantification is appropriate, and therefore, has modified the benefits section to illustrate an estimated number of successful prosecutions that increased and successful tracing may achieve.  This analysis does not monetize the reduction in criminal activity.

## 7.2.  Need for Record Retention

Currently, FFLs are not required to maintain transaction records for longer than 20 years.  Although the 20-year requirement would account for the lifespan of most firearms, it does not account for crimes being committed using firearms that outlast this timeframe.  Not only have there been technological advances in the firearms industry, but there have also been technological advances in storage capabilities.  Currently, FFLs are required to maintain Forms 4473 in paper form, except as authorized by ATF Ruling 2016-2.  The majority of FFLs use electronic versions of Form 4473 but are still required to print these same records for storage because they are required to be available for inspection purposes.  The final rule would allow

FFLs to store records electronically without also printing them using an ATF approved method that will be issued separately from the rule.

7.3.  Population for Record Retention

The rule would affect Type 01, Type 02, and Type 03 FFLs because all of them are now required to maintain transaction records until their business or licensed activity is discontinued.[62] Because Type 03 FFLs acquire curio or relic firearms for personal use, ATF anticipates that Type 03 FFLs already store their curio or relic firearm transaction records indefinitely.  Even if not, they would not have a sufficient number of records to need to rent additional storage space for these records.  There are 60,790 Type 01 and Type 02 FFLs that may be affected by this record retention requirement.  Because ATF is only aware of those FFLs that voluntarily reported destroyed records during crime gun traces, ATF does not know how many FFLs overall have destroyed their records that are over 20 years old.  Therefore, to determine an estimated number of FFLs that do not retain records older than 20 years, ATF compared the total number of FFLs (184,460) involved in all traces from January 2012 to December 2021 (10 years) against the number of FFLs (1,260) that were traced but that did not retain records older than 20 years from January 2012 to January 2021 (9 years).  Because the overall total number of FFLs is relatively stable (even as FFLs go in and out of business), ATF used the average among the years to estimate that, on average, there were 140 FFLs every year to which firearms were traced but that did not retain records older than 20 years.  This amounts to 0.76 percent of the

---

[62] Retaining records for more than 20 years will affect a subset of all FFLs—in particular, Type 1 and 2 FFLs, because licensed manufacturers (Types 6, 7, and 10) and importers (Types 8 and 11) generally maintain permanent consolidated production, acquisition, and disposition records in accordance with 27 CFR 478.129(d), and ATF Rulings 2011-1 and 2016-3.

average 18,446 FFLs every year.[63]  Table 7.1 provides a summary of the population analysis.

Table 7.1.  Summary Comparing Total Type 01 and 02 FFLs to Affected Type 01 and 02 FFLs

| | |
|---|---|
| Total FFL Type 01 and 02 Population | 60,790 |
| Population of Type 01 and 02 FFLs Involved in All Traces Over 10 Years | 184,460* |
| Average Number of FFLs with Trace Data | 18,446 |
| Population of Type 01 and 02 FFLs that Destroy Records 20+ Years Old | 1,260** |
| Average Number of FFLs with Trace Data and Destroyed Records Per Year | 140 |
| Proportion of FFLs Destroying Records 20+ Years Old Per Year | 0.76% |
| Population of FFLs Not Storing 20+ Years Old Based on Unsuccessful Traces | 461 |

*Over a 10-year period of analysis
**Over a 9-year period of analysis
*Note: Calculations using these estimates may not be exact due to rounding.

For purposes of this analysis, ATF estimates that less than 0.76 percent of all Type 01 and Type 02 FFLs (or 461 FFLs) do not store their records longer than 20 years and would convert to electronic storage.[64]

Based on National Tracing Center ("NTC") records, from 2016 to 2021, a total of 284 FFLs voluntarily sent their records older than 20 years to ATF as an alternative to destruction. For purposes of this analysis, ATF assumes that all FFLs that have shipped records that are older

---

[63] 0.76 percent= (1,260 FFLs involved in a trace but did not retain records / 9 years) / (184,460 FFLs involved in a trace / 10 years) *100.

[64] 60,790 Type 1 and 2 FFLs * 0.76 percent = 461 FFLs that do not retain records over 20 years old.  As noted elsewhere, ATF used unrounded numbers (rather than the approximate numbers reported in the tables) when performing subsequent calculations.  This may result in apparent discrepancies in some of the calculations.

than 20 years over the last 5 years to ATF are likely to want to continue to operate a firearms business or licensed activity for longer than 20 years.  In total, this provision is estimated to affect a total of 745 FFLs.

7.4.  Costs for Record Retention

ATF estimates that there may be 461 FFLs that currently destroy their records after 20 years.  For purposes of this analysis, ATF assumes that they will convert their records from paper to electronic storage.  For these FFLs, the cost will be the cost to outsource their electronic storage to a third party.  No cost was attributed to convert existing paper into electronic format; any estimate of this cost would be inherently speculative because ATF does not have sufficient information that might allow it to calculate such a cost..

In a September 2013 newsletter, ATF strongly encouraged FFLs to voluntarily send records older than 20 years to ATF rather than destroy them.[65]  Based on information from the NTC, some FFLs currently send their records that are older than 20 years to ATF as an alternative to destroying them.  Table 7.2 shows the number of FFLs that have shipped records older than 20 years, the number of boxes shipped, and the number of records contained in all boxes.

Table 7.2.  Number of FFLs, Boxes, and Number of Records over 20 Years Sent to ATF

| Year | Number of Active FFLs Shipping Records 20+ Years | Number of Boxes | Number of Records | Average Number of Boxes |
|---|---|---|---|---|

---

[65] ATF, *Federal Firearms Licensees Newsletter* (Sept. 2013), *available at* https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-september-2013-volume-1 (last visited Mar. 26, 2022).

| 2016 | 159 | 563 | 1,221,710 | 4 |
| 2017 | 32 | 295 | 640,150 | 9 |
| 2018 | 20 | 267 | 579,390 | 13 |
| 2019 | 29 | 166 | 360,220 | 6 |
| 2020 | 20 | 107 | 232,190 | 5 |
| 2021 | 24 | 242 | 525,140 | 10 |
| Total FFLs | **284** | | Average | **8** |

However, after the publication of the final rule, these FFLs will no longer be able to voluntarily ship their records that are older than 20 years to ATF because the FFLs are required to retain them until they discontinue business or licensed activity.  Once the final rule is effective, FFLs do have the option of voluntarily discontinuing the business or licensed activity for which those records were maintained, sending their paper out-of-business records to ATF, and then applying for a new license with new a recordkeeping system.  Because these companies already ship their records to ATF, no additional shipping cost was attributed to the final rule.

Because FFL licenses have to be renewed every three years, ATF did not account for the full cost of an application; instead, it accounted only for the net cost between a new application and the cost for a renewal.  To estimate the difference in cost between a renewal and a new application, ATF used the data for new applications that was discussed above.  Table 7.3 illustrates the cost of an application and a renewal.

Table 7.3.  Application and Renewal Cost for a Form 7 Application for Type 01 and Type 02 FFLs

| Cost Item | Hourly Burden | Hourly Wage Rate | Employee Cost Index | Loaded Wage Rate | Wage Burden | Cost Item | |
|---|---|---|---|---|---|---|---|
| Form 7 | 1 | $60 | $63 | $89 | $89 | $200 | |

| Fingerprints | 1 | $60 | $63 | $89 | $89 | $19 | |
| Passport Photo | 0.5 | $60 | $63 | $89 | $44 | $16 | |
| Postage | | | | | | $1 | |
| Application Cost | | | | | $222 | $236 | **$458** |
| Renewal Cost | 0.5 | $60 | $63 | $89 | $44 | $90 | **$134** |

\* Note: Calculation of these numbers may not be exact due to rounding.

Because the cost for a new application is $458 and the renewal cost $134, ATF estimates that the difference in cost is $324.  Based on information from NTC, one chain of FFLs with multiple licenses ships its overflow records every five years.  For purposes of this analysis, ATF estimates that it will now ship records every three years.[66]  Because ATF does not know the shipping frequency for the other FFLs, ATF assumed an annual average of 25 FFLs will cancel their license; ship their out-of-business records to ATF; and apply for a new license.

Table 7.4 shows the 10-year undiscounted net cost for an FFL to apply for a new license rather than renew an existing license.  The numbers in the column of active shippers are based on

---

[66] This estimate is based on ATF's assumption that, rather than retain its records indefinitely under the final rule, the chain of FFLs will instead choose to cease its licensed activity at the end of the three-year duration of its license; ship its out-of-business records to ATF; apply for a new license; and repeat the process every three years.

-98-

historical shipping patterns (*see* Table 7.2) and ATF's assumption that one large chain of FFLs will cease operations and ship its out-of-business records to ATF every three years.

Table 7.4.  10-year Cost of FFLs Applying for a New License

| Year | Number of Active FFLs Shipping Records 20+ Years | Industry Cost of FFLs Applying for a New License Instead of Renewing Existing License |
|---|---|---|
| 2016 | 159 | N/A |
| 2017 | 32 | N/A |
| 2018 | 20 | N/A |
| 2019 | 29 | N/A |
| 2020 | 20 | N/A |
| 2021 | 24 | N/A |
| 2022 | 159 | $51,462 |
| 2023 | 25 | $8,092 |
| 2024 | 25 | $8,092 |
| 2025 | 159 | $51,462 |
| 2026 | 25 | $8,092 |
| 2027 | 25 | $8,092 |
| 2028 | 159 | $51,462 |
| 2029 | 25 | $8,092 |
| 2030 | 25 | $8,092 |
| 2031 | 159 | $51,462 |

Note: Calculation of these numbers may not be exact due to rounding

To alleviate costs for storage requirements, the rule would also allow electronic storage of Forms 4473 without also maintaining paper records.  Because this is a new allowance, ATF does not know how much it will cost to convert records electronically.  Currently, ATF allows FFLs to store A&D records electronically and allows Forms 4473 to be completed electronically, so long as the electronically completed Forms 4473 are printed, signed by hand, and also

retained in paper format.  Because fully electronic storage will be a new allowance, ATF does not have the information needed to estimate the cost for electronic storage.  However, because there are existing companies that electronically store A&D transaction records and Forms 4473, ATF uses this information as the closest proxy in terms of cost.  Table 7.5 provides a list of companies that provide electronic storage of A&D records as well as electronic Forms 4473s.

Table 7.5.  Average Monthly Price of Electronic Storage

| E-Storage Company | Cost | Frequency | Website |
|---|---|---|---|
| Gun Store Master | $50 | Month | https://www.gunstoremaster.com/?gclid=EAIaIQo bChMIubyG8ZHS9QIVgo3ICh0ZBwqkEAAYAS AAEgLA3vD_BwE |
| Fast Bound | $34 | Month | https://www.fastbound.com/try/#plans |
| Easy Bound Book | $59 | Month | https://easyboundbook.com/pricing/ |
| Orchid eBound | $37.50 | Month | https://orchidadvisors.com/orchid-ebound-and-e4473-software/ |
| ExpressLogBook.com | $29.99 | Month | http://www.expresslogbook.com/ |
| EZ Arms Keeper | $19 | Month | https://www.ezarmskeeper.com/ |
| Logbooks For Guns | $60 | Month | https://www.logbooksforguns.com/purchase |
| Average | $41 | Month | |
| Annual Cost | $496 | 12 Months in a Year | |

*Note: Calculations using these estimates may not be exact due to rounding some of the values used as inputs for subsequent calculations.

For purposes of this analysis, ATF assumes that companies that currently destroy their records after 20 years may opt to use fully electronic storage rather than retain their paperwork in paper format, making the total cost attributable to the final rule $228,780 a year.[67]  Assuming

---

[67] $228,780 = 461 FFLs that currently destroy records over 20 years * $496 annual cost.

that FFLs convert to electronic storage of Forms 4473, there may be a cost in the first few years, but a savings in later years. In order to account for these savings, ATF used NICS and NFA Form 4 applications as the closest proxy for the amount of pages printed and retained.

The Department concurs with one commenter who suggested that there will be an increase in NICS transactions year to year, *i.e.*, there is an upward trend which must be considered as part of this analysis. This increase in NICS transactions, in turn, increases the number of Forms 4473 (and thus the number of pages) that must be retained. However, ATF disagrees with the methodology suggested by the commenter in using population growth of persons in estimating additional NICS transactions. Although ATF agrees that there will be a population growth of potential firearm purchasers, and a general increase in NICS transactions over time, these are not one-to-one comparisons. In other words, ATF disagrees that all individuals purchase firearms; therefore, ATF determined that population data is not appropriate for determining the growth rate of NICS transactions. Instead, ATF projects the increase in transactions based on the historical trend. Because the historical trend already includes population growth, accounting for population growth in addition to the growth of NICS transactions would double count the number of transactions.

In addition to NICS transactions, FFLs will also need to retain records of NFA transactions. ATF forecasted the growth of paperwork based on historical data for the number of NICS and NFA transactions as reported by the Federal Bureau of Investigation ("FBI") and NFA Form 4 Applications as maintained by ATF (background checks are conducted when ATF

receives NFA Form 4 Applications).[68]  Because there is not a one-to-one correlation with the
number of transactions, as suggested by the commenter, ATF multiplied the number of reported
NICS checks by 6 pages (Form 4473) and NFA applications by 13 pages (NFA Form 4
Application).  ATF notes that the number of NICS checks and NFA applications underrepresents
the total number of Form 4473 transactions involving a NICS transaction.  Under varying
circumstances, States may perform a State background check for a person purchasing a firearm;
these checks are included in the data on NICS transactions run by the FBI.  Currently, there are
37 States that are non-point-of-contact States and thus contact NICS for all firearms background
checks, and 13 States that are full point-of-contact States where the state conducts all firearms
background checks.  Additionally, there are 25 States that have qualifying State permits in which
an individual holding a permit does not need to undergo any background checks in order to
purchase a firearm.  However, ATF notes that, although an individual carrying a permit may be
exempt from undergoing background checks, he or she will still need to complete a Form 4473.
Table 7.6 shows the historical and projected number of NICS checks and Form 4 applications
between 2012 and 2031, and the projected number of pages to be retained.

Table 7.6.  Historical and Projected NICS and NFA Transactions

| Year | NICS Checks | NFA Applications | Projected Paperwork Due to NICS and NFA Transactions* |
|---|---|---|---|
| 2012 | 19,592,303 | 65,084 | 118,399,910 |
| 2013 | 21,093,273 | 91,010 | 127,742,768 |
| 2014 | 20,968,547 | 97,925 | 127,084,307 |

[68] As maintained by ATF (background checks are conducted when ATF receives NFA Form 4 Applications).  *See*
FBI, *NICS Firearm Checks: Month/Year*, *available at* https://www.fbi.gov/file-repository/nics_firearm_checks_-
_month_year.pdf/view (last visited Mar. 26, 2022).

| | | | |
|---|---|---|---|
| 2015 | 23,141,970 | 137,222 | 140,635,706 |
| 2016 | 27,538,673 | 237,567 | 168,320,409 |
| 2017 | 25,235,215 | 112,018 | 152,867,524 |
| 2018 | 26,181,936 | 164,402 | 159,228,842 |
| 2019 | 28,369,750 | 179,973 | 172,558,149 |
| 2020 | 39,695,315 | 251,937 | 241,447,071 |
| 2021 | 38,876,673 | 323,536 | 237,466,006 |
| 2022 | N/A | N/A | 239,026,122 |
| 2023 | N/A | N/A | 251,933,237 |
| 2024 | N/A | N/A | 264,840,352 |
| 2025 | N/A | N/A | 277,747,467 |
| 2026 | N/A | N/A | 290,654,582 |
| 2027 | N/A | N/A | 303,561,697 |
| 2028 | N/A | N/A | 316,468,812 |
| 2029 | N/A | N/A | 329,375,927 |
| 2030 | N/A | N/A | 342,283,042 |
| 2031 | N/A | N/A | 355,190,157 |

* Note that this column counts the total number of pages per transactions (6 pages for NICS and 13 pages for NFA)

ATF also graphed the projection for clarification.  Graph 7.1 shows the historical and projected outcomes of NICS and NFA transactions.

Graph 7.1.  Historical and Projected Growth of NICS and NFA Transactions



Although the graph projects an upper bound and a lower bound, ATF did not separately present costs for each bound because the numbers were similar.  Thus, for this RIA, ATF used the main, middle estimate.

As pointed out by one commenter, completion of a Form 4473 could take up to 6 pages per transaction, and, based on the copy requirements for an NFA Form 4 application, FFLs need to retain 13 pages for these types of NFA transactions.  ATF used these page estimates to estimate the projected paperwork that FFLs would need to retain for Form 4473 transactions and NFA transactions.

For purposes of this analysis, ATF uses $0.10 as the cost per page.  ATF divided the total paper cost by the existing population of 60,790 Type 01 and 02 FFLs to obtain the per FFL cost that would normally be incurred from printing paper.  Should these FFLs convert to electronic storage, they would no longer incur the cost of printing paper, which results in an overall savings.  Finally, because electronic storage costs an average $496 per year, ATF used the $496

cost and subtracted the per FFL savings from reduced paper printing, which results in the per FFL net cost. Because the number of NICS and NFA transactions (and hence the corresponding number of pages to store) is expected to increase over time, the total cost to print paper each year would also increase. However, with electronic storage, FFLs enjoy a net savings over time because they no longer need to print and maintain paper records. Table 7.7 shows the projected number of pages by year, the cost to print pages, the savings from reduced paper printing per FFL by year, and the net cost per FFL.

Table 7.7. Projected Number of Pages for NICS and NFA Transactions, Paper Cost, Per-FFL Savings from Reduced Paper Printing, and Per-FFL Net Cost

| Year | Projected Number of Pages for NICS and NFA Transactions | Paper Cost | Per FFL Savings from Reduced Paper Printing | Per FFL Net Cost |
|---|---|---|---|---|
| 2022 | 239,026,122 | $23,902,612 | $393 | $103 |
| 2023 | 251,933,237 | $25,193,324 | $414 | $82 |
| 2024 | 264,840,352 | $26,484,035 | $436 | $61 |
| 2025 | 277,747,467 | $27,774,747 | $457 | $39 |
| 2026 | 290,654,582 | $29,065,458 | $478 | $18 |
| 2027 | 303,561,697 | $30,356,170 | $499 | ($3) |
| 2028 | 316,468,812 | $31,646,881 | $521 | ($24) |
| 2029 | 329,375,927 | $32,937,593 | $542 | ($46) |
| 2030 | 342,283,042 | $34,228,304 | $563 | ($67) |
| 2031 | 355,190,157 | $35,519,016 | $584 | ($88) |

Based on discussions with FIPB, electronic storage is a popular concept. However, because ATF does not know the number of FFLs that will choose the option for electronic

storage, ATF uses the estimated population of FFLs that currently destroy records over 20 years (461 FFLs) as a low estimate of savings.  In other words, ATF used the per FFL net cost from Table 7.7 and multiplied that cost from each year by 461 FFLs in order to obtain the overall net industry cost for electronic storage.  ATF also references the second set of FFLs that have been voluntarily shipping their records to ATF and will now be applying for a new license from Table 7.4.  Combining these 2 sets of industry costs results in the total industry cost for this provision of the final rule.  Table 7.8 shows the industry cost for FFLs to apply for a new license, plus the industry cost of electronic storage, and the overall cost from both sets of FFLs combined.

Table 7.8.  Industry Cost for Records Retention

| Industry Cost for Records Retention | Industry Cost for New Form 7 Application | Industry Cost for Electronic Storage | Net Total Cost for Records Retention |
|---|---|---|---|
| 2022 | $32,543 | $47,515 | $80,057 |
| 2023 | $5,117 | $37,728 | $42,844 |
| 2024 | $5,117 | $27,941 | $33,057 |
| 2025 | $32,543 | $18,149 | $50,691 |
| 2026 | $5,117 | $8,362 | $13,479 |
| 2027 | $5,117 | ($1,425) | $3,692 |
| 2028 | $32,543 | ($11,212) | $21,330 |
| 2029 | $5,117 | ($21,004) | ($15,887) |
| 2030 | $5,117 | ($30,791) | ($25,674) |
| 2031 | $32,543 | ($40,578) | ($8,035) |

*Note: Calculations using these estimates may not be exact due to rounding.

7.5.  Benefits of Record Retention

As acknowledged by commenters, the objective of ATF in issuing the rule is to increase public safety.  Expanding the record retention requirement would have benefits in investigating criminal activities.  Currently, there are a significant number of traces that are unsuccessful due

to the age of the firearm and the fact that records over 20 years of age have been reported to ATF as destroyed.  Furthermore, allowing for electronic storage accommodates advancements in technology and eases the burden of maintaining physical copies of transaction records.  The subsections below describe in further detail these benefits.

7.5.1.  Law Enforcement Tracing

This proposed rule would support tracing requests for crimes committed in the U.S. and abroad.  Currently, Type 01, Type 02, and Type 03 FFLs are required to retain transaction records for only 20 years.  Depending on the usage and care of firearms, firearms could be maintained and used (including use in criminal activity) for much longer than 20 years.

Currently, records older than 20 years can be disposed of by burning or shredding.  The rule would eliminate the need to incur costs to burn or shred old records.  Furthermore, 1,400 to 1,600 traces a year are unsuccessful due to the age of the firearm and the lack of a requirement to retain firearm records longer than 20 years.  Without any transaction records, law enforcement officers are unable to determine who purchased the firearms used in criminal activity.  Because the rule requires indefinite recordkeeping, ATF will be able to increase the number of successful traces of firearms found at crime scenes.

Commenters stated that ATF did not show the number of homicides and violent crimes associated with traces nor, did ATF show the success rates that tracing has on criminal activities. The Department agrees and is providing additional support.  Of these total unsuccessful traces over 12 years (16,324), approximately 182 of the traces were designated as "Urgent," 1,013 were related to a homicide, and 4,237 were related to "Violent Crime."  The Department has also added successful traces of records older than 20 years as a proxy to estimate the success rate of

traces for records that would have otherwise been destroyed.  Between the years 2010 to 2021, ATF successfully traced an average of around 40,000 firearms per year to records older than 20 years.  ATF has been able to successfully prosecute an average of 8,310 cases per year from 2016 to 2020 where the crime involved a firearm over 20 years.  Note that prosecutions might not be resolved within the year they were opened.  These reported cases are only those that were opened and closed between the years 2016 and 2020.  Thus, the success rates reported in this analysis are under-representative of the overall successful prosecution cases overall.  Using this information, ATF is projecting the number of successful prosecutions that could have occurred had records over 20 years old not been destroyed and had the traces associated with those records been successful.  Table 7.9 shows the number of traces involving records over 20 years; the number of unsuccessful traces due to the lack of transaction records beyond 20 years; the number of successful traces to records over 20 years linked an individual; and the projected number of successful prosecutions that could have occurred had the unsuccessful traces been successfully completed.

Table 7.9.  Numbers and Percentages of Traces of Firearms Over 20 Years Old and Successful Prosecution Rates.

| Year | Number of Traces involving 20+ year Records | Traces Not Completed Due to Records 20+ Years and Destroyed | Number of Successful Traces Linked to First Retail Purchaser 20+ Year Record | Percentage of Successful Traces from All Traces 20+ Years | Estimated Number of Additional Successful Traces if 20+ year Records Had Not Been Destroyed | Estimated Number of Successful Prosecution Cases Had Traces of 20+ Years Records Been Successful* |
|---|---|---|---|---|---|---|
| 2010 | 114,042 | 1663 | 33,236 | 29.14% | 485 | 35 |
| 2011 | 121,281 | 1070 | 35,531 | 29.30% | 313 | 21 |
| 2012 | 120,714 | 931 | 35,973 | 29.80% | 277 | 19 |
| 2013 | 139,767 | 1151 | 42,264 | 30.24% | 348 | 21 |
| 2014 | 147,794 | 1176 | 43,826 | 29.65% | 349 | 20 |
| 2015 | 145,940 | 1414 | 42,927 | 29.41% | 416 | 24 |
| 2016 | 140,400 | 1477 | 42,137 | 30.01% | 443 | 26 |
| 2017 | 143,960 | 1608 | 43,452 | 30.18% | 485 | 28 |
| 2018 | 145,522 | 1610 | 45,569 | 31.31% | 504 | 29 |
| 2019 | 131,263 | 1438 | 42,835 | 32.63% | 469 | 30 |
| 2020 | 121,731 | 1461 | 40,267 | 33.08% | 483 | 33 |
| 2021 | 112,642 | 1325 | 38,784 | 34.43% | 456 | 34 |
| Average | **132,088** | **1360** | **40,567** | **30.77%** | **419** | **27** |

*Note: 8,310 average prosecution cases / (number of traces involving 20+ year old records * estimated number of successful traces if 20+ year old records had not been destroyed).

Although the rule does not attempt to monetize the costs of criminal activity, ATF estimates that, on a low range, the Department would be able to successfully prosecute 27 additional cases per year if all FFLs retained records indefinitely.

7.5.2.  Electronic Storage

The rule would allow for electronic storage of Forms 4473 in a manner approved by

ATF.  Currently, FFLs are required to retain Forms 4473 in paper format (even if also stored electronically) and would thus need infrastructure to store that paperwork.  Allowing for full electronic storage reduces the need for infrastructure and provides flexibility in terms of storage. It also modernizes the storage requirements to allow for use of the latest technology.  Finally, electronic storage of records could expedite searches for firearms transactions in trace requests, thereby decreasing the time needed for FFLs to search their records and for law enforcement to investigate criminal activity.

   7.6.  Record Retention Collection of Information

         This provision would not affect any COIs because the number of requestsand the information requested has not changed; instead, only the retention period has been extended.

# 8.  Government Costs

The final rule changes the FFLs' requirement to retain firearms records from 20 years to until the business or licensed activity is discontinued.  For the purposes of this analysis, ATF assumes that the only FFLs that will dissolve their business or licensed activity and apply for a new license with a new recordkeeping system are those that currently voluntarily ship their over 20-year-old records to ATF.  Because this is an existing supply of records, and because it is assumed that fewer paper records will be maintained by FFLs over time, thus reducing the need to send paper records to ATF, ATF did not account for any additional government costs for the final rule.  No other enforcement actions or government activities are anticipated upon the publication of the final rule.

# 9.   Summary of the Overall Cost of the Rule

This chapter summarizes the various costs as estimated by the other chapters in this RIA. In summary, there are six chapters that outline how the final rule will affect various populations and describe the various options that each population has in order to comply with the final rule. The chapters regarding the individual costs and benefits are as follows:

- Chapter 2: Costs for Type 07 manufacturers

- Chapter 3: Costs for silencers

- Chapter 4: Costs for manufacturers of firearm parts kit with a partially complete frame or receiver

- Chapter 5: Costs for dealers of firearm parts kit with a partially complete frame or receiver

- Chapter 6: Cost for gunsmithing activities

- Chapter 7: Cost for records retention

## 9.1.  Industry Costs

Table 9.1 outlines the costs by chapter and action.

Table 9.1.  Industry Cost by Action

| Cost Type | Frequency | First Year Cost | Annually Recurring Cost | Other Cost |
|---|---|---|---|---|
| **Chapter 2: Markings on Existing Firearms** | | | | |
| Marking of Firearms | Annual | $0 | $0 | $0 |
| **Chapter 3: Markings on Silencers** | | | | |

| Markings on Silencers | Annual | $0 | $0 | $0 |
|---|---|---|---|---|
| **Chapter 4: Cost to Manufacturers of Partially Complete Firearm Kits** | | | | |
| Scenario 1: Non-FFL Manufacturers Becoming Licensed | Variable | $69,049 | $54,111 | $0 |
| Scenario 3: Non-FFL Manufacturers Dissolve Business | Annual | $11,760,000 | $11,760,000 | $0 |
| Scenario 2: FFL Manufacturers Adding Serialization | One-time | $690,068 | $2,300 | $0 |
| **Chapter 5: Retail Sales of Partially Complete Firearm Kits** | | | | |
| Scenario 1: Engraving Costs | One-time | $11,484 | $10,080 | $0 |
| Scenario 2: Outsourcing Costs | One-time | $31,080 | $0 | $0 |
| Scenario 3: Disposal to ATF | One-time | $288,835 | $0 | $0 |
| Scenario 4: Non-FFL Dealers Dissolve Business | Annual | $1,404,000 | $1,404,000 | $0 |
| **Chapter 6: Gunsmithing** | | | | |
| Additional A&D Records for Gunsmiths due to Outsourcing | One-time | $2,474 | $0 | $0 |
| **Chapter 7 Records Retention** | | | | |
| Records Retention | Annual | Variable | Variable | |
| Total | | $14,256,992 | $13,230,491 | |

Most costs are attributed to non-FFL manufacturers and dealers dissolving their businesses because of the final rule.

9.2.  Total Cost of the Rule

This RIA describes various costs for manufacturers and dealers of firearm parts kits with a partially complete frame or receiver could encounter as a result of the final rule.  There are no government costs associated with the final rule.  The total cost thus includes only the industry costs.  Table 9.2 provides the 10-year cost for the final rule.

Table 9.2.  Total 10-year Cost of the Rule

| Year | Undiscounted | Discounted | |
|---|---|---|---|
| | | 3% | 7% |
| 2022 | $14,355,968 | $13,937,833 | $13,416,793 |
| 2023 | $14,302,811 | $13,481,771 | $12,492,629 |
| 2024 | $14,293,024 | $13,080,141 | $11,667,365 |
| 2025 | $14,326,602 | $12,729,001 | $10,929,696 |
| 2026 | $14,273,445 | $12,312,399 | $10,176,769 |
| 2027 | $14,263,658 | $11,945,589 | $9,504,478 |
| 2028 | $14,297,241 | $11,624,966 | $8,903,603 |
| 2029 | $14,244,079 | $11,244,408 | $8,290,184 |
| 2030 | $14,234,292 | $10,909,400 | $7,742,512 |
| 2031 | $14,267,876 | $10,616,639 | $7,253,064 |
| Total | $142,858,996 | $121,882,147 | $100,377,093 |
| Annualized | | $14,288,306 | $14,291,440 |

*Note: Calculations using these estimates may not be exact due to rounding.

# 10.  Analysis of Alternatives Considered

This chapter outlines the alternatives considered in the development of the final rule. Table 10.1 provides a summary of the alternatives, along with the benefits and costs of each alternative.

Table 10.1.  Summary of Cost and Benefits of the Alternatives

| Summary | 7% Annualized Costs | Benefits | Comments |
|---|---|---|---|
| Preferred Alternative | $14.3 million | - Updates definition to account for technological advances<br>- Ensures traceability regardless of age of firearm<br>- Makes consistent marking requirements | Grandfather technology that has been compliant with previous regulations |
| Alternative 1: No Change | $0 | $0 | Does not account for the majority of existing firearms. The majority of firearms would not fall under the current definition of frame or receiver, decreasing the overall benefits |
| Alternative 2: Everytown Petition | Less than Final Rule | Less than Final Rule | Does not account for the majority of existing firearms. The majority of firearms would not fall under this proposed definition of frame or receiver, |

| | | | decreasing the overall benefits |
|---|---|---|---|
| Alternative 3: Grandfathering | Less than Final Rule | Less than Final Rule | Enforcement becomes a problem |
| Alternative 4: Serialization of All Items | More than the Final Rule | More than the Final Rule | ATF regulates only Federal firearms licensees |
| Alternative 5: Implement Corrective Taxes | N/A | Would not achieve safety-related benefits of the final rule; any increase in government revenue would amount to a transfer rather than a net benefit | Does not meet the objective to prevent access to firearms by felons |
| Alternative 6: Record Retention for Longer than 20 Years, but Not Until Discontinuation of the Business | Less than the Final Rule | Less than Final Rule | Due to the longevity of firearms, would fails to fully achieve the objective of enhanced traceability for law enforcement purposes |
| Alternative 7: Require All Individuals To Mark Their Firearms. | More than the Final Rule | N/A | ATF is not requiring individuals to mark their firearms.  Also, without a serial number marked and recorded by an FFL that includes the FFL's associated information, law enforcement still would not be able to determine how to trace a PMF with an unlicensed person's newly created |

| | | | |
|---|---|---|---|
| | | | identification number. |
| Alternative 8: Allowing Manufacturer to Designate a Component as the "Receiver" for the Firearm | Less than the Final Rule | N/A | May be more confusing for law enforcement to determine what part has the serial number |
| Alternative 9: Non-Regulatory Alternatives. | N/A | N/A | Out of scope of the rulemaking |
| Alternative 10: Have Multiple Serial Numbers on a Firearm | More Expensive than the Final Rule | Same as the Final Rule | Was deemed too costly to implement. |

A discussion of the costs follows in the sections below.

10.1.   The Final Rule—Definition of Receiver and New Recordkeeping Requirements

This final rule replaces the definition of "frame or receiver," creates a definition for "privately made firearm," updates existing serialization requirements, makes marking requirements consistent, clarifies gunsmithing eligibilities for all Type 01 and Type 02 FFLs, and requires record retention (in electronic storage or otherwise) until business or licensed activity is discontinued.  The rule is estimated to cost $14.3 million annualized at 7 percent, but, where feasible, grandfathering was allowed to minimize costs to industry.  The final rule—rather than an alternative such as those described in Table 10.1—was chosen because the final rule maximizes benefits.

10.2.   Alternative 1—No Change

Some individuals requested that no change be made.  This alternative has no costs or benefits because it maintains the status quo.  This alternative was considered but not implemented, because the GCA requires that firearms be regulated.  Currently, the majority of firearms fall outside the scope of the existing statutory definition of receiver.  Due to recent court rulings on what constitutes a firearm, it would be difficult to prosecute criminal activity because the vast majority of legal firearms would no longer fit the definition of a firearm.

10.3.  Alternative 2— Everytown Petition.

A petition for rulemaking from *Everytown for Gun Safety* was received proposing to define "firearm frame or receiver" in 27 CFR 478.11 to read as follows: "That part of a firearm which provides housing for the trigger group, including such part (1) that is designed, intended, or marketed to be used in an assembled, operable firearm, or (2) that, without expenditure of substantial time and effort, can be converted for use in an assembled, operable firearm."  This proposed definition focuses on the housing for the "trigger group"; however, it does not define "trigger group," and even if it did, it would not address firearms that do not house trigger components within a single housing or which have a remote trigger outside the weapon.  In other words, this alternative would fall short of addressing all technologies or designs of firearms that are currently available or may become available in the future.  It also does not address potential changes in firearms terminology.  Thus, although the alternative requested by this petition would reduce the cost by reducing the number of entities affected, it does not fully address the objectives of the final rule.

10.4.  Alternative 3—Grandfather All Existing Firearms and Receivers

This alternative would grandfather all existing firearms that would not meet the

serialization standard for partially complete firearms and split receiver frames on firearms and silencers. This alternative also has no costs and low benefits. This alternative was considered and incorporated into the proposed alternative where feasible, but a complete grandfathering of all firearms, firearm parts kits with a partially complete "frame or receiver," and PMFs was not adopted. In order to enforce the rule, a complete grandfathering of existing firearms and silencers is problematic in that manufacturers could continue to produce non-compliant frames or receivers and market them as grandfathered frames or receivers.

ATF received comments that the NPRM would not grandfather PMFs. This is not accurate with respect to PMFs already purchased and possessed by nonprohibited, unlicensed individuals. Firearm parts kits with partially complete frames or receivers and PMFs made from those kits that are owned by non-prohibited individuals for lawful purposes are not subject to regulation under either the proposed or final rule. Retroactively serializing all firearm parts kits with a partially complete "frame or receiver" and PMFs owned by individuals was considered and rejected under Alternative 4. However, firearm parts kits with a partially complete frame or receiver and PMFs owned or serviced by FFLs (except for same-day adjustments and repairs) will not be grandfathered. Those PMFs are subject to regulation under the rule and must be marked and recorded by licensees.

10.5.  Alternative 4—Require Serialization of All Partially Complete Firearms or Split
        Receivers and Frames and Modular Silencers

This alternative would have required all unmarked firearms currently in circulation, including those purchased by individuals, to be retroactively serialized. This would benefit individuals whose firearms are stolen. It would make it easier for owners to either retrieve stolen

firearms or have them considered lost property for insurance purposes.  However, the GCA

regulates only the production, acquisition, and disposition of firearms by FFLs, not the making

of firearms for personal use by private unlicensed individuals.  Therefore, this alternative was not

chosen.

### 10.6.  Alternative 5—Implement Corrective Taxes

This alternative was suggested by a commenter, presumably to reduce market demand of

certain firearms.  ATF interprets this alternative as placing a higher tax on firearms that are

currently being regulated, thereby making the cost of regulated firearms more expensive to the

public.  The objective of the final rule, however, is not to suppress purchasing of firearms or

otherwise make it more difficult for the public to obtain firearms; instead, it is to regulate

firearms, whether made by licensed manufacturers or private individuals, that enter the market,

as defined by the GCA, in a consistent manner.  The rule intends only to prevent access to

firearms by felons and other prohibited persons, and to help law enforcement solve crime.  It was

not clear how implementing corrective taxes would further these public safety goals, and

therefore, this alternative was rejected.

### 10.7.  Alternative 6—Record Retention Longer than 20 Years, but Less than Indefinite

A commenter suggested that ATF require retention of records for longer than 20 years

but not indefinitely.  Theoretically, this alternative could cost less for FFLs retaining records

until the discontinuation of their business or licensed activity.  Though this alternative was

considered, ATF determined this was not the best course of action.  Considering that firearms

can be in circulation for as long as, or beyond, 100 years, a specific year record retention term

fails to track the shelf life of firearms that may last a significant number of years.  When records

are destroyed, ATF cannot successfully trace these firearms that may have used in the commission of a crime.  This alternative was, therefore, not accepted.

10.8.  Alternative 7—Requiring Unlicensed Individuals to Mark their Firearms.

This alternative would require all persons to mark serial numbers on any firearm.  ATF partially accepts this alternative by allowing FFLs to adopt such a unique identification number placed on a PMF so long as the firearm is marked according to the regulations, and they add their abbreviated FFL number as a serial number prefix.  Individuals always have and will continue to be able to serialize their own personal firearms for their lawful personal use under the GCA and NFA.  States that have laws pertaining to the serialization of PMFs will not be affected by the rule.  The rule will not change an individual's right to mark or not to mark the individual's firearms the way the individual sees fit, consistent with State and local laws.  Further, the rule does not require individuals to serialize their non-NFA firearms.

10.9.  Alternative 8—Allowing the Manufacturer to Designate a Component as the "Receiver" of the Firearm

This alternative proposes that regulatory compliance be accomplished by allowing the manufacturer to designate a component identified as the "firearm" for each model.  One commenter suggested that "[t]hese specific components, regardless of the level of completion, should be the components prohibited from direct-to consumer sales and required to go through an FFL."  ATF partially disagrees.  Although allowing the manufacturer to designate certain components would reduce the need for an ATF determination or classification letter, it would cause more confusion for law enforcement in determining which part is the "frame or receiver."  To provide clarity and standardization, however, ATF is publishing a more comprehensive

-121-

definition of "frame or receiver" to account for varying modularity of frames and receivers. By defining various configurations, it is anticipated that fewer manufacturers will need to request classification letters from ATF to determine what component of the firearm is in fact the "frame" or "receiver." Additionally, a uniform rule applicable to all firearms is a better alternative because it prevents a manufacturer from designating a minor, non-essential, easily removable component as a frame or receiver, which would undermine congressional intent to ensure that firearms are traceable.

## 10.10.  Alternative 9—Non-Regulatory Alternatives

One commenter suggested that ATF consider the following non-regulatory alternatives: subsidies, enlistment of aid from non-governmental organizations, tort law, public service advocacy, and private contracting.

It is not clear how the commenter envisioned using these non-regulatory alternatives as a means of achieving the objective of ensuring that firearms fall under regulation. However, these alternatives are beyond the scope of the rule and regulatory controls of the GCA; therefore, these alternatives were rejected.

## 10.11.  Alternative 10—Have Multiple Serial Numbers on a Firearm

This alternative was partially proposed in the NPRM. All firearms and firearm kits defined under the NPRM as firearms would have been required to be serialized on each housing or holding structure for any fire control component, unless a determination was made by ATF designating the particular part to be marked. This alternative was rejected in the final rule because, based on comments received, it would have been too costly for the industry to implement, and could have resulted in multiple markings that would have been confusing for law

enforcement when tracing firearms.

# 11.  Final Regulatory Flexibility Analysis

In accordance with the Regulatory Flexibility Act ("RFA"), ATF prepared a Final Regulatory Flexibility Analysis ("FRFA") that examines the impacts the final rule will have on small entities (*see* 5 U.S.C. 601 *et seq.*).  The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of fewer than 50,000 people.

Because the final rule affects different populations in different ways, the analysis for the FRFA has been broken up by provision.  Certain provisions may have a significant impact on certain small entities, such as non-FFL manufacturers of firearm parts kits with partially complete frames or receivers.

## 11.1.  Summary of Findings

ATF performed an FRFA of the impacts on small businesses and other entities from the Definition of Frame or Receiver and Identification of Firearms final rule [2021R-05F].  This assessment was performed using the cost information discussed in chapters 2 through 7.

Based on the information from this analysis:

- ATF estimates that the final rule could potentially affect 132,023 entities, including all FFLs and non-FFL manufacturers and retailers of firearm parts kits with partially complete frames or receivers, but anticipates that the majority of entities listed in this analysis will not be directly affected.  Only a small subset will be significantly affected.

- ATF estimates the majority of affected entities are small entities that would experience a range of costs, the largest cost being the dissolution of the entire business.  Therefore,

the rule will have a significant impact on small entities.

11.2.  Final Regulatory Flexibility Analysis

The RFA establishes "as a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes, to fit regulatory and informational requirements to the scale of the businesses, organizations, and governmental jurisdictions subject to regulation.  To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure that such proposals are given serious consideration."  5 U.S.C. 601 note.

Under the RFA, the agency is required to consider what, if any, impact the rule would have on small entities.  Agencies must perform a review to determine whether the rule will have an impact on a substantial number of small entities.  Because ATF has determined that the final rule will, ATF has prepared an FRFA as described in the RFA.

Under section 604(b) of the RFA, the FRFA must contain:

- a statement of the need for, and objectives of, the rule;

- a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made to the proposed rule as a result of such comments;

- the response of the agency to any comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

-125-

- a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

- a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

- a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected;

## 11.3.   A Statement of the Need for, and Objectives of, the Rule

The Attorney General is responsible for enforcing the GCA, as amended, and the NFA, as amended.  This responsibility includes the authority to promulgate regulations necessary to enforce the provisions of the GCA and NFA.  *See* 18 U.S.C. 926(a); 26 U.S.C. 7801(a)(2)(A), 7805(a).  Congress and the Attorney General have delegated the responsibility for administering and enforcing the GCA and NFA to the Director of ATF, subject to the direction of the Attorney General and the Deputy Attorney General.  *See* 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(b)(1), (c)(1); 28 CFR 0.130(a)(1)–(2); T.D. Order No. 221(2)(a), (d), 37 FR 11696–97 (June 10, 1972). Accordingly, the Department and ATF have promulgated regulations implementing both the GCA and the NFA.  *See* 27 CFR parts 478, 479.

The final rule removes and replaces the current regulatory definitions of "firearm frame or receiver" and"frame or receiver" because they are outdated.  The final rule would also amend ATF's definitions of "firearm" and "gunsmith" to clarify the meaning of those terms and to add regulatory terms such as "complete weapon," "complete muffler or silencer device," "multi-piece frame or receiver," "privately made firearm," and "readily" for purposes of clarity in light of advancements in firearms technology.  Further, the proposed rule would amend ATF's regulations on marking andrecordkeeping that are necessary to implement these definitions.

11.4.  A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, a Statement of the Assessment of the Agency of Such Issues, and a Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

Commenters stated that having multiple serial numbers on firearms will significantly affect the entire firearms industry, most of whom are small businesses.  ATF considered these comments and changed the definition of "frame or receiver" to identify one part of the weapon that will need to be marked.  Commenters also suggested that including firearm kits with partially complete frames or receivers will have a significant impact on non-regulated entities. ATF concurred and revised the analysis to include small entities dissolving their business as a worst-case scenario.

11.5.  The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Changes Made to the Proposed Rule in the Final Rule as a Result of the Comments.

There were no comments filed by the Chief Counsel for Advocacy of the SBA in response to the proposed rule. Therefore, no changes were made to the proposed rule in the final rule as a result of comments.

11.6. A Description of and an Estimate of the Number of Small Entities to Which the Rule Will Apply or an Explanation of Why No Such Estimate is Available.

ATF estimates that the rule could potentially affect a maximum number of the following entity types:

- 53,816 Type 01 FFL dealers;

- 6,974 Type 02 FFL pawnbrokers;

- 53,211 Type 03 FFL collectors;

- 17,642 Type 07 FFL manufacturers;

- 1,807 Type 08 FFL importers;

- 43 non-FFL manufacturers;

- 24 non-FFL dealers.

This list of entities is an overestimate of the actual number of entities affected because most FFLs will not be affected by the final rule. Only a small subset of FFLs and non-FFLs that deal in firearm parts kits with a partially complete frame or receiver will be directly affected by the rule.

The final rule will primarily affect the population of non-FFLs, more specifically the 43 manufacturers and 24 dealers. The actual costs incurred will depend on the business choices they make. Some entities may choose to dissolve their businesses, which will result in a complete loss in total revenue and a loss of jobs associated with these businesses.

11.7.   A Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will be Subject to the Requirement and the Type of Professional Skills Necessary for Preparation of the Report or Record.

The final rule will affect four existing COIs: an application to become a licensed FFL, production and disposition records for 41 FFL manufacturers, A&D records for 190 FFL dealers, and identification markings on firearms for FFL manufacturers and FFL dealers.  Although applying for a license and updating and maintaining records do not require specialized skills, marking firearms may require an employee trained in engraving services at a mean, loaded yearly salary of $51,810.

11.8.  A Description of the Steps the Agency has Taken to Minimize the Significant Economic Impact on Small Entities Consistent with the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected.

In the proposed rule, ATF considered a definition of "frame or receiver" that could have resulted in multiple serial numbers on firearms as well as serializing firearm parts kits with a partially complete "frame or receiver."  Commenters suggested that requiring multiple serial numbers on firearms will have a significant impact on the entire firearm industry.  Most entities in the firearm industry are small.  ATF considered these comments and changed the definition of "frame or receiver" to identify one part of a complete weapon or complete muffler or silencer device that will need to be marked.  ATF was unable to find lower cost alternatives to serializing

-129-

firearm kits with partially complete frames or receivers that would have resulted in the same benefits as the final rule.  The GCA requires serialization of firearms and these firearm parts kits with partially complete frames or receivers are firearms.  ATF considered excluding firearm parts kits with a partially complete frame or receiver from falling under regulation, but decided it was in the interest of public safety to regulate them and therefore include them in the definition of "firearm."

# 12.  Collection of Information

This rule calls for COIs under the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.*  As defined in 5 CFR 1320.3(c)(1), a "collection of information" includes reporting, recordkeeping, monitoring, posting, labeling, and other similar actions.  The title and description of the information collection, a description of those who must collect the information, and an estimate of the total annual burden follow.  The estimate covers the time for reviewing instructions, searching existing sources of data, gathering and maintaining the data needed, and completing and reviewing the collection.

Under the provisions of the final rule, there is a one-time increase in paperwork burdens of identification markings placed on firearms as well as additional transaction records.  This requirement would be added to an existing approved collection covered by OMB control numbers 1140-0018, 1140-0032, 1140-0050, and 1140-0067.

TITLE: Application for a Federal Firearms License

OMB Control Number: OMB 1140-0018

PROPOSED USE OF INFORMATION:  This collection of information is necessary to ensure that anyone who wishes to be licensed as required by 18 U.S.C. 923 meets the requirements to obtain the desired license.

DESCRIPTION AND NUMBER OF RESPONDENTS:  Currently there are 13,000 applications for a license.  As explained above, ATF anticipates that one non-FFL will choose to become an FFL as a result of the rule, causing a one-time increase of one respondent.

FREQUENCY OF RESPONSE:  There will be a recurring response for all currently existing

FFLs.  This rule will result in a one-time increase of one response (13,001 respondents * 1 response).

BURDEN OF RESPONSE: The response includes recurring time burden of one hour.  ATF anticipates a one-time hourly burden of one hour per respondent.

ESTIMATE OF TOTAL ANNUAL BURDEN: The current burden listed in this collection of information is 13,000 hours.  The new burden, as a result of this rule, is a one- time hourly burden of 13,001 hours (13,001 respondents * 1 response * 1 hour per respondent).


TITLE:  Records of Acquisition and Disposition, Type 01/02 Dealer of Firearms

OMB Control Number:  OMB 1140-0032

PROPOSED USE OF INFORMATION:  The recordkeeping requirements as contemplated by 18 U.S.C. 923, as amended, are for the primary purpose of facilitating ATF's authority to inquire into the disposition of any firearm in the course of a criminal investigation and to conduct compliance inspections.  Because the regulations require uniform formats for recordkeeping, the records serve a major secondary purpose:  granting ATF officials the ability to examine records for firearms traces or compliance inspections, per 18 U.S.C. 923(g)(1)(B), (C).

DESCRIPTION AND NUMBER OF RESPONDENTS: Currently there are 60,790 respondents. The final rule will not increase the number of respondents, though we anticipate that 116 current respondents will have firearm parts kits and will therefore have an additional burden under the final rule.

FREQUENCY OF RESPONSE:  There will be a recurring response for all currently existing Type 01 and 02 FFLs.  The frequency of response will be dependent on the inventory and sales

of FFLs.

BURDEN OF RESPONSE:  The per response burden is estimated to be 0.5 hours for inspections.  No burden was attributed to entries in records.

ESTIMATE OF TOTAL ANNUAL BURDEN:  The current burden listed in this collection of information is 60,790 hours.  The new, additional burden, as a result of the final rule, is a burden of 116 hours (116 respondents * 10 items * 2 responses * 0.05 hourly burden per entry).


TITLE:  Identification Markings Placed on Firearms

OMB Control Number:  OMB 1140-0050

PROPOSED USE OF INFORMATION:  ATF would use this information in fighting crime by facilitating the tracing of firearms used in criminal activities.  The systematic tracking of firearms from the manufacturer or U.S. importer to the retail purchaser also enables law enforcement agencies to identify suspects involved in criminal violations, determine if a firearm is stolen, and provide other information relevant to a criminal investigation.

DESCRIPTION AND NUMBER OF RESPONDENTS:  Currently there are 12,252 licensed manufacturers of firearms and 1,343 licensed importers.  Of the potential number of licensed dealers and licensed pawnbrokers, ATF estimates that those directly affected would be a one-time increase of 42 licensed dealers and 74 licensed pawnbrokers.  The final rule would thus cause a one-time increase of 116 respondents.

FREQUENCY OF RESPONSE:  There will be a recurring response for all currently existing 13,595 licensed manufacturers and licensed importers.  The final rule would cause a one-time number of 1,160 responses (116 one-time respondents * 10 responses).  There will be an annual

increase in 101,136 responses (42 existing respondents * 2,408 responses).

BURDEN OF RESPONSE:  This includes recurring time burden of one minute.

ESTIMATE OF TOTAL ANNUAL BURDEN:  The current burden listed in this collection of information is 85,630 hours.  The new, additional burden, as a result of the final rule, is a one-time hourly burden of 19 hours (116 one-time respondents * 10 responses * 0.016667 hourly burden per respondent).  The new recurring burden as a result of the final rule is 1,686 hours (42 existing respondents * 2,408 responses * 0.016667 hourly burden per respondent).


TITLE:  Licensed Firearms Manufacturers Records of Production, Disposition, and Supporting Data

OMB Control Number:  OMB 1140-0067

PROPOSED USE OF INFORMATION:  ATF would use this information for criminal investigations and assessments of compliance with the Gun Control Act of 1968 and its implementing regulations.  The Attorney General may inspect or examine the inventory and records of a licensed importer, licensed manufacturer, or licensed dealer, without reasonable cause or warrant, and during the course of a criminal investigation of a person or persons other than the licensee, in order to ensure compliance with the record keeping requirements of 18 U.S.C. 923(g)(1)(A).  The Attorney General may also inspect or examine any records relating to firearms involved in a criminal investigation that are traced to the licensee, or firearms that may have been disposed of during the course of a bona fide criminal investigation.  18 U.S.C. 923(g)(1)(B), (C).

DESCRIPTION AND NUMBER OF RESPONDENTS:  The current number of respondents is

9,056 firearm manufacturers.  The final rule will affect a subset of existing respondents (42 respondents)

FREQUENCY OF RESPONSE:  There will be a recurring response for all 9,056 licensed manufacturers.  The final rule will result in an increase in records of 202,272 responses.

BURDEN OF RESPONSE:  This includes a recurring time burden of 1 minute.  The burden resulting from the final rule is 3,371 hours annually.

ESTIMATE OF TOTAL ANNUAL BURDEN:  The current burden listed in this collection of information is 201,205 hours.  The new, additional burden, as a result of the final rule, is 3,371 hours (42 respondents * 0.016667 hours * 4,816 responses).

# 13.  Appendix: Retail Prices of Firearm Parts Kits with Partially Complete "Frames or Receivers"

The websites and prices for items listed below are the prices that were found at the time ATF conducted the analysis in January and February of 2022 and therefore may differ from the prices listed at or after the time of publication.  It is also possible that some of the websites no longer exist.  ATF cannot account for inevitable fluctuations in market prices over time.

| Cost per Item | Cost per Single Frame/Receiver | Description | Website |
|---|---|---|---|
| $140 | $140 | 1911 Frame | https://www.1776supplyco.com |
| $150 | $150 | | |
| $375 | $375 | Glock | |
| $100 | $100 | AR15 | |
| $210 | $210 | 1911 government frame | www.1911builders.com |
| $200 | $200 | | |
| $50 | $50 | AR15 | https://www.5dtactical.com/ |
| $120 | $120 | | |
| $60 | $60 | | |
| $80 | $80 | | |
| $210 | $70 | AR15 3 pack | |
| $180 | $60 | | |
| $225 | $45 | AR15 5 pack | |
| $175 | $35 | | |
| $330 | $33 | AR15 10 pack | |
| $430 | $43 | | |
| $110 | $110 | 80% lowers - single | https://www.80lowerjig.com/80-glock-frame |
| $130 | $130 | | |

| | | | |
|---|---|---|---|
| $140 | $140 | | |
| $110 | $110 | | |
| $330 | $110 | 80% lowers - 3 -pack | |
| $420 | $140 | | |
| $550 | $110 | 80% lowers - 5 -pack | |
| $650 | $130 | | |
| $700 | $140 | | |
| $1,100 | $110 | 80% lowers - 10 -pack | |
| $1,300 | $130 | | |
| $49 | $49 | AR15 single | http://www.80pctlower.com/ |
| $59 | $59 | | |
| $125 | $125 | AR15 3 pack | |
| $140 | $140 | 1911 Frame | |
| $100 | $100 | 80% lowers | https://www.80percentarms.com/ |
| $150 | $150 | | |
| $130 | $130 | | |
| $129 | $129 | | |
| $99 | $99 | | |
| $160 | $160 | | |
| $180 | $180 | | |
| $110 | $110 | | |
| $80 | $80 | | |
| $100 | $100 | 80% lowers - single | https://www.80-lower.com/collections/80-percent-lower/ |
| $110 | $110 | | |
| $120 | $120 | | |
| $130 | $130 | | |
| $140 | $140 | | |
| $150 | $150 | | |
| $160 | $160 | | |
| $170 | $170 | | |
| $360 | $120 | 80% lowers | |

| | | | |
|---|---|---|---|
| | | - 3 pack | |
| $390 | $130 | | |
| $420 | $140 | | |
| $450 | $150 | | |
| $510 | $170 | | |
| $600 | $120 | 80% lowers - 5 pack | |
| $700 | $140 | | |
| $750 | $150 | | |
| $650 | $130 | | |
| $850 | $170 | | |
| $1,200 | $120 | 80% lowers -10 pack | |
| $1,300 | $130 | | |
| $1,500 | $150 | | |
| $55 | $55 | poly80 pistol frame | |
| $45 | $45 | AR15 AR10 AR9 lowers | https://aaomfg.com/ |
| $90 | $90 | | |
| $80 | $80 | | |
| $110 | $110 | | |
| $120 | $120 | | |
| $65 | $65 | AK blanks | https://ak-builder.com/index.php |
| $35 | $35 | | |
| $75 | $75 | | |
| $80 | $80 | | |
| $70 | $70 | | |
| $40 | $40 | | |
| $70 | $70 | 80% lower - single | https://americanmadetactical.com/product-category/80lowers/80-ar-15-lower-receivers/ |
| $80 | $80 | | |
| $85 | $85 | | |
| $68 | $68 | | |
| $75 | $75 | | |
| $55 | $55 | | |

| | | | |
|---|---|---|---|
| $210 | $70 | 80% lowers - 3 pack | |
| $240 | $80 | | |
| $255 | $85 | | |
| $204 | $68 | | |
| $350 | $70 | 80% lowers - 5 pack | |
| $400 | $80 | | |
| $425 | $85 | | |
| $340 | $68 | | |
| $89 | $89 | ar15 lower | https://www.brokenarmory.com/ |
| $99 | $99 | | |
| $114 | $114 | | |
| $100 | $100 | lower receivers | https://www.durkintactical.com |
| $90 | $90 | | |
| $90 | $90 | AR15 Lower | https://getlowers.com |
| $76 | $76 | | |
| $176 | $88 | AR15 Lower–2 Pack | |
| $261 | $87 | AR15 Lower–3 Pack | |
| $427 | $86 | AR15 Lower–5 Pack | |
| $55 | $55 | AR15 Lower | https://ggd-store.com |
| $140 | $140 | poly80 pistol frame | https://ghostgunner.net/ |
| $90 | $90 | AK lower | |
| $75 | $75 | AR15 | |
| $85 | $85 | AR-308 | |
| $150 | $150 | $1,911.00 | |
| $95 | $95 | .308 lower | http://jamesmadisontactical.com/ |

| | | | |
|---|---|---|---|
| $120 | $120 | AR lowers | https://www.modulusarms.com/ |
| $75 | $75 | | |
| $119 | $119 | | |
| $55 | $55 | | |
| $160 | $160 | | |
| $150 | $150 | | |
| $140 | $140 | | |
| $106 | $106 | | |
| $190 | $190 | Poly80 Glock pistol frame | https://www.omegamanufacturinginc.com/ |
| $150 | $150 | | |
| $120 | $120 | AR lower single | https://ormondarms.com/ |
| $95 | $95 | | |
| $90 | $90 | | |
| $85 | $85 | | |
| $425 | $85 | AR lower 5 pack | |
| $390 | $390 | | |
| $135 | $135 | AR15 lower receivers | https://www.righttobear.com/Contact-Us-a/259.htm |
| $190 | $190 | | |
| $155 | $155 | | |
| $200 | $200 | | |
| $200 | $200 | | |
| $165 | $165 | | |
| $195 | $195 | | |
| $175 | $175 | | |
| $93 | $93 | 9mm Colt lower | https://www.smftactical.com |
| $29 | $29 | receiver flats | www.theflatspot.net |
| $32 | $32 | | |
| $35 | $35 | | |
| $250 | $250 | Remsport | http://www.tr-enabling.com/default.asp |

| | | 1911 frames | |
|---|---|---|---|
| $240 | $240 | | |
| $230 | $230 | | |
| $225 | $225 | | |
| $220 | $220 | | |
| $90 | $90 | AR15 lowers | |
| $105 | $105 | | |
| $125 | $125 | | |
| $66 | $66 | AR15 Billet lower | https://venom-defense.com/ |
| $120 | $120 | AR10 lower | http://web.archive.org/web/20210303233834/https://www.warrdogz.com/category-s/201.htm |
| $90 | $90 | AR15 lower | |
| $110 | $110 | | |
| $119 | $119 | | |
| $135 | $135 | | |
| $150 | $150 | | |
| Average Retail Price Per Item: $225 | Average Cost Per Single Frame or Receiver: $116 | | |