# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| DIVISION 80 LLC, | Case No. 3:22-cv-00148 |
| Plaintiff, | District Judge Jeffrey V. Brown |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States *et al.*, | |
| Defendants. | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

I.      Statutory Background.............................................................................................2

II.     Regulatory Background..........................................................................................3

III.    The Rule.................................................................................................................4

        A.      Definition of "Firearm"..............................................................................4

        B.      Definition of "Frame or Receiver"..............................................................5

        C.      Definition of "Privately Made Firearm" .....................................................8

LEGAL STANDARDS ....................................................................................................8

ARGUMENT ..................................................................................................................9

I.      Plaintiff Has Failed to Show a Likelihood of Success on the Merits..............................9

        A.      The Rule Is Consistent With ATF's Regulatory Authority. ................................9

                1.      The Rule's Amended Definition of "Firearm" Is Appropriate
                        and in Accordance With the Statute.............................................10

                2.      ATF's Amendment of the Definition of "Frame or Receiver" Is
                        Proper and in Accordance with the Statute................................16

                3.      ATF's Definition of "Privately Made Firearm" Is Proper and in
                        Accordance With the Statute.......................................................22

                4.      ATF's Amendment of the Definitions of "Firearm" and "Frame
                        or Receiver" and Inclusion of a Definition for "Privately Made
                        Firearm" Does Not Violate the Separation of Powers............................26

        B.      Although the Rule of Lenity Does Not Apply Here, There Is Also No
                Need to Determine Whether *Chevron* Deference Is Applicable. .......................26

        C.      The Rule Is Not Void for Vagueness. .................................................................31

        D.      The Rule Does Not Violate the Non-Delegation Doctrine. .............................36

        E.      The Rule Is Reasonable. .....................................................................................37

                1.      The Rule Is Internally Consistent.............................................................38

|   |   | 2. | The Rule Adequately Explained ATF's Reasons for Its Policy Change. | 41 |
|---|---|---|---|---|

2.      The Rule Adequately Explained ATF's Reasons for Its Policy Change. ........................................................41

3.      Plaintiff Is Not Likely to Succeed on Its Remaining APA Arguments ..............................................................44

II.     Plaintiff Has Not Shown That It Will Incur Irreparable Harm Absent a Preliminary Injunction ...............................................................50

A.      Plaintiff Fails to Substantiate Any Imminent Threat of Irreparable Injury. .....................................................50

B.      A Cease-and-Desist Letter that ATF Issued to An Entity Other Than Plaintiff Does Not Support Plaintiff's Allegations of Irreparable Harm. .........55

C.      Because Plaintiff Took Voluntary Action in the Face of a Clearly Foreseeable Risk, It Cannot Show Irreparable Harm. ........................................57

III.    The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate. .......................................................59

IV.     Any Relief Ordered Should Be Appropriately Limited. ...................................................62

CONCLUSION ........................................................64

## INTRODUCTION

Congress has vested in the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) the authority to promulgate regulations necessary to enforce federal firearms laws, including advising the firearms industry and the public of the agency's understanding of those laws.  To explain the application of certain statutory terms to advances in firearms technology, ATF undertook the rulemaking at issue here.  As relevant here, the statutory definition of "firearm" includes the "frame or receiver" of a firearm, which is a firearm's primary structural component.  Since ATF first promulgated a regulatory definition of that term in 1968, technological advances have led to an increasing variety of frames and receivers. Technological advances have also made it easier for companies to create firearm parts kits, standalone frame and receiver parts, and easy-to-complete frames or receivers, and companies under the mistaken impression that these items do not qualify as "firearms" have sold these items without conducting background checks or maintaining records of such sales.  As a result, persons prohibited from possessing firearms were able to buy these kits and easy-to-complete frames and receivers without undergoing background checks and could easily make their own firearms at home.  When such firearms are used in crime, they cannot typically be traced because they lack serial numbers.

To provide clarity to the public and the firearms industry on the proper application of federal law, ATF promulgated a rule updating its definition of "frame or receiver" and other statutory and regulatory terms.  Notwithstanding the clear statutory authority underlying ATF's rule and the critical law enforcement need for updated regulations, Plaintiff brought this pre-enforcement facial challenge that seeks to enjoin the rule, claiming that ATF lacks the

1

statutory authority to update its regulations.  Plaintiff is unlikely to succeed on the merits of this claim, or its claims that the rule is vague or arbitrary and capricious.  Plaintiff—which only began operations in November 2021, months after ATF issued the proposed rule—also fails to show that it is likely to suffer imminent irreparable harm absent emergency injunctive relief, or that the balance of the equities supports such relief here.  The Court should therefore deny Plaintiff's motion.

## I.    Statutory Background

Congress enacted the Gun Control Act of 1968, *as amended*, 18 U.S.C. §§ 921 *et seq.* (GCA), after finding that "existing Federal controls over [widespread traffic in firearms moving in interstate commerce] do not adequately enable the States to control this traffic within their own borders."  Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. 197, 225 (1968).  Congress specifically determined that "only through adequate Federal control . . . over *all* persons engaging in the businesses of importing, manufacturing, or dealing in [these weapons], can this grave problem be properly dealt with."  *Id.* § 901(a)(3), 82 Stat. at 225 (emphasis added).  Accordingly, Congress enacted requirements for persons engaging in the business of importing, manufacturing, or dealing in "firearms."  *See generally* 18 U.S.C. §§ 922-923.

Congress defined "firearm" to include "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon."  *Id.* § 921(a)(3).  However, it did not define the terms "frame" or "receiver."  *See id.* § 921.  Congress requires individuals and entities that import, manufacture, or deal in firearms to receive a federal firearms license, *id.* § 923(a), to maintain records of firearm acquisition and transfer as prescribed by regulation, *id.* § 923(g)(1)(A), and

to conduct background checks before transferring firearms to a non-licensee, *id.* § 922(t).  It also requires licensed importers and manufacturers to identify each firearm they import or manufacture by means of a serial number on the receiver or frame of the weapon.  *Id.* § 923(i). Congress has also vested in ATF the authority to prescribe regulations "necessary to carry out the provisions of" the GCA.  *Id.* § 926(a).

## II.    Regulatory Background

ATF has promulgated regulations implementing the GCA.  *See* 27 C.F.R. parts 478-479.  Over fifty years ago, ATF defined the statutory term "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion."  Final Rule, Commerce in Firearms and Ammunition, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968), *codified at* 27 C.F.R. § 478.11.  This definition was meant to provide direction as to which portion of a weapon is the frame or receiver for purposes of licensing, serialization, and recordkeeping, thereby ensuring that a component necessary for the weapon's functioning could be traced if the weapon was used in a crime.  Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,652 (Apr. 26, 2022) (Rule).

However, a restrictive application of this definition—as some courts have recently used—would not describe the frame or receiver of most current firearms, and would allow for circumvention of federal firearms laws.  *Id.*  Most modern weapon designs have a split or multi-piece receiver where the relevant fire control components either are housed by more than one part of the weapon (*e.g.*, the upper and lower receiver of an AR-15 rifle) or incorporate a striker rather than a hammer to fire the weapon.  *Id.*  If the restrictive definition

3

were broadly followed, as many as 90% of all firearms would not have *any* frame or receiver subject to regulation.  *Id.*

Furthermore, technological advances in the decades since the "frame or receiver" definition was adopted have made it easier for companies to create firearm parts kits, standalone frame or receiver parts, and easy-to-complete frames or receivers, and some have sold these items to unlicensed persons without being licensed themselves, maintaining any records or conducting background checks.  *Id.*  These parts kits, standalone frame and receiver parts, and partially complete frames and receivers allow unlicensed persons to make firearms quickly and easily.  *Id.*  Because such privately made firearms typically lack serial numbers, it is extremely difficult for law enforcement to trace them when used in a crime.  *Id.* at 24,652, 24,659.

## III.    The Rule

To update its decades-old definition of "frame and receiver," ATF published a notice of proposed rulemaking in 2021.  Proposed Rule, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021) (Notice).  ATF promulgated the final rule on April 26, 2022.  87 Fed. Reg. 24,652.  Upon consideration of over 290,000 public comments, ATF explained its responses to the comments, its reasoned basis for the provisions of the Rule, and its rationale for updating its regulations.  *Id.* at 24,652-734.  As relevant here, the Rule contains the following key provisions:

### A.    Definition of "Firearm"

Under the GCA and implementing regulations, a "firearm" includes "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a

projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A); 27 C.F.R. § 478.11. This definition thus includes inoperable weapons even though they will not expel a projectile by the action of an explosive at the time of sale or transfer if they are "designed to" or "may readily be converted" to do so. *See* 87 Fed. Reg. at 24,661 nn.42-43 (citing case law). In recent years, weapon parts kits, or aggregations of weapon parts—some of which contain all components necessary to complete a functional weapon within a short time period—have increasingly been sold to individuals either directly from kit manufacturers or from retailers, without background checks or recordkeeping. *Id.* at 24,662. Some of these firearm kits include jigs, templates, and tools that allow the purchaser to complete the weapon fairly or reasonably efficiently, quickly, and easily to a functional state. *Id.* As courts have recognized, such weapon parts kits or aggregations of weapon parts that are *designed to* or *may readily be converted to* expel a projectile by the action of an explosive are "firearms" under the GCA and its regulations. *Id.* at 24,662 n.44 (citing case law).

To reflect existing case law, the Rule adds a sentence to ATF's regulatory definition of "firearm" providing that "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *See id.* at 24,662, 24,727, 24,735.

## B. Definition of "Frame or Receiver"

The Rule accepts the recommendations of numerous commenters and provides an updated definition of the term "frame or receiver."[1] *See id.* at 24,652, 24,727. The Rule further

---

[1] Previously, ATF regulations included definitions for both "firearm frame or receiver" and "frame or receiver." *Id.* at 24,727.

defines "frame" for handguns and "receiver" for rifles, shotguns, and other weapons that expel a projectile. *See id.* at 24,727, 24,735. Unlike the 1968 definition, these updated definitions now describe only a *single* housing or structural component for a *specific* fire control component of a given weapon—including "variants thereof," a term that is also defined. *Id.* For handguns (or variants thereof), the frame is the housing or structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component before initiating the firing sequence. *Id.* For long guns (or variants thereof), the receiver is the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence. *Id.*

The definition of "frame or receiver" includes a frame or receiver that is partially complete, disassembled, or nonfunctional—including a frame or receiver parts kit—that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver. *Id.* at 24,739; *see also id.* at 24,663, 24,727-28. However, the definitions of "frame" and "receiver" specifically exclude forgings, castings, printings, unmachined bodies, or similar articles that have not yet reached a stage of manufacture where they are clearly identifiable as unfinished component parts of weapons—*e.g.*, unformed blocks of metal, liquid polymers, and other raw materials. *Id.* at 24,663, 24,728, 24,739.

To provide notice to the firearms industry and the public as to how ATF evaluates firearm parts kits when making firearm classifications,[2] the Rule states that when issuing

---

[2] Exercising its delegated authority to administer federal firearms laws, 28 C.F.R. § 0.130, ATF has provided both formal guidance (regulations) and informal guidance (classification determinations) as to what constitute "firearms." Although a manufacturer or dealer is not legally required to seek an agency determination whether its product constitutes a "firearm"

classifications, ATF may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold or otherwise made available with the item or kit. 87 Fed. Reg. at 24,724-25, 24,739. To provide additional clarity, the Rule includes five non-exclusive examples illustrating the application of the "frame or receiver" definition to a "partially complete, disassembled, or nonfunctional frame or receiver." *Id.* at 24,739.

The Rule also defines "[r]eadily" to mean a process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. *Id.* at 24,735. With respect to ATF's classification of firearms, relevant factors to making this determination include: (1) time (how long it takes to finish the process), (2) ease (how difficult it is to do so), (3) expertise (what knowledge and skills are required), (4) equipment (what tools are required), (5) parts availability (whether additional parts are required and how easily they can be obtained), (6) expense (how much it costs), (7) scope (the extent to which the subject of the process must be changed to finish it), and (8) feasibility (whether the process would damage the subject of the process, or cause it to malfunction). *Id.* This definition, including relevant factors, is based on case law interpreting the terms "may readily be converted to expel a projectile" in the GCA and "can be readily restored to shoot" in the National Firearms Act (NFA). 86 Fed. Reg. at 27,730 & n.58 (citations omitted).

---

prior to the product's manufacture or sale, ATF provides such determinations to manufacturers or dealers who submit requests for classification. *See Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599 (1st Cir. 2016) (citing ATF, Nat'l Firearms Act Handbook § 7.2.4 (2009)).

### C.      Definition of "Privately Made Firearm"

To account for recent technological advances, the Rule clarifies that the GCA's definition of "firearm" includes a "privately made firearm."  87 Fed. Reg. at 24,735.  A "privately made firearm" is a firearm (including a frame or receiver) that is assembled or otherwise produced by a person other than a licensed manufacturer, and that does not contain a serial number placed by a licensed manufacturer at the time of production.  *Id.*  The Rule does not restrict the private making of firearms by non-licensees who are not otherwise prohibited by law from possessing them, and requires only that such firearms that are taken into inventory by licensees be serialized and recorded so that they may be traced by law enforcement if they are later involved in crime.  *Id.* at 24,653, 24,742, 24,744.

### LEGAL STANDARDS

Plaintiff moves for a preliminary injunction under Federal Rule of Civil Procedure 65.  "A preliminary injunction is an 'extraordinary and drastic remedy,'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted), that "should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest," *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 219 (5th Cir. 2010).  The last two factors merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Because Plaintiff "bring[s] a facial challenge" prior to the Rule's enforcement, Plaintiff "must establish that no set of circumstances exists under which the [Rule] would be valid." *Associated Builders & Contractors v. NLRB*, 826 F.3d 215, 220 (5th Cir. 2016) (citation omitted).

8

## ARGUMENT

### I.      Plaintiff Has Failed to Show a Likelihood of Success on the Merits.

#### A.      The Rule Is Consistent With ATF's Regulatory Authority.

Plaintiff first asserts that it is likely to succeed on the merits of its claims because ATF exceeded its statutory authority in the Rule's changes to the definitions of "firearm" and "frame or receiver."  Mot. for Prelim. Inj. at 16, ECF No. 11 (Mot.); Compl. ¶¶ 105-107 (citing 5 U.S.C. § 706(2)(A), (C)), ECF No. 1.  However, both of these amendments are within the scope of ATF's statutory authority and consistent with how those terms are used in the statute. Plaintiff therefore has failed to show any likelihood of success on the merits of such claims.

The Attorney General (AG) is responsible for enforcing the GCA and the NFA, and Congress and the AG have expressly delegated the responsibility for administering and enforcing the GCA and the NFA to the Director of ATF.  *See* 26 U.S.C. § 7801(a)(2); 18 U.S.C. § 926(a); 28 U.S.C. § 599A(c)(1); 28 C.F.R. § 0.130(a)(1)-(2).  Plaintiff does not dispute that ATF has the statutory authority to provide regulatory definitions of terms used in the GCA and the NFA.  Indeed, as Plaintiff acknowledges, ATF had previously provided regulatory definitions of the terms "firearm," Mot. at 17 (citing 27 C.F.R. § 478.11), and "frame" and "receiver," Mot. at 18 (citing 27 C.F.R. § 479.11).  As at least one court has recognized, "[b]ecause § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'"  *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990). Nor does the fact that that ATF previously promulgated one definition prevent ATF from amending or updating the definition.  As the Supreme Court has cautioned, courts should not

view prior or existing regulations as permanent, inflexible rules to last indefinitely; instead, agencies "are neither required nor supposed to regulate the present and future within the inflexible limits of yesterday." *Am. Trucking Ass'n v. Atchison, Topeka, and Santa Fe Ry. Co.*, 387 U.S. 397, 416 (1967). The only question, then, is whether the challenged definitions comport with the language of the statute. They do, for the reasons set forth below.

### 1. The Rule's Amended Definition of "Firearm" Is Appropriate and in Accordance with the Statute.

Plaintiff argues that ATF impermissibly broadened the term "firearm" by "add[ing] a brand new . . . category that has no basis in the statutory text." Mot. at 24. However, the term "firearm" has long been understood to encompass disassembled collections of parts that may be combined to form a working firearm, and the amended language to the definition of "firearm" is consistent with the statutory definition, purpose, and legislative history.

The GCA defines the term "firearm" as follows:

> The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. 921(a)(3). The 1968 regulatory definition of the term "firearm" states:

> Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm. In the case of a licensed collector, the term shall mean only curios and relics.

27 C.F.R. § 478.11. The Rule adds the following language to the end of the regulatory definition in 478.11:

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive.  The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition of "frame or receiver."

87 Fed. Reg. at 24,735.

As an initial matter, the idea that the GCA definition of "firearm" encompasses something other than a completely assembled and functional weapon is not a novel idea set forth for the first time in the Rule, but rather a longstanding and widely held interpretation of the statute.  Federal courts that have addressed the issue have uniformly held that disassembled collections of weapon parts and parts kits that may readily be converted to expel a projective are "firearms" under 18 U.S.C. § 921(a)(3)(A).  *See, e.g.*, *United States v. Wick*, 697 F. App'x 507, 508 (9th Cir. 2017); *United States v. Stewart*, 451 F.3d 1071, 1073 n.2 (9th Cir. 2006): *United States v. Annis*, 446 F.3d 852, 857 (8th Cir. 2006); *United States v. Ryles*, 988 F.2d 13, 16 (5th Cir. 1993); *United States v. Theodoropoulous*, 866 F.2d 587, 595 n.3d (3d Cir. 1989).

Plaintiff's contention that the word "weapon" in the statutory definition of "firearm" somehow precludes the amendment to the definition in the Rule is unavailing.  Plaintiff seems to argue that because a "parts kit" is not a "weapon," it therefore cannot be a "firearm" under the statutory definition.  Mot. at 24.  However, a parts kit is merely a weapon in an unfinished or unassembled form or configuration.  To the extent that Plaintiff is positing that only something currently assembled and functional as a weapon can be considered a "weapon" (and, consequently, a "firearm") under the GCA, that argument is entirely circular and would contradict the "may readily be converted" language of the statute.  So long as the collection of parts is clearly identifiable as a collection that may be completed or assembled as an instrument

to expel live ammunition, that is sufficient to constitute a "weapon," and therefore a "firearm," within the meaning of the GCA.

The legislative history also demonstrates that in passing the GCA, Congress intended that the definition of "firearm" would encompass devices that could not immediately expel a projectile but could readily be converted to do so. This is most apparent by the inclusion of the example of the "starter gun" (*i.e.*, a gun designed for use with "blank" ammunition) in the statutory definition. 18 U.S.C. § 921(a)(3). Although a "starter gun" may not currently be able to expel a projectile, Congress was clearly concerned at the ease with which such a device could be converted to do, and cited in the GCA's legislative history the case of an individual who made bulk purchases of starter guns out of state and "would then, at his residence, disassemble them, and . . . bore out the plugged barrel and enlarge the cylinder chambers to accommodate .22-caliber cartridges." *See* S. Rep. No. 88-1340, at 14 (1967). There is no meaningful legal distinction between a starter pistol, which could be modified and converted to expel a projectile, and disassembled guns and gun kits, which could similarly be converted. *See* S. Rep. No. 89-1866, at 73 (1966) ("firearm" includes starter pistols because they "may be converted to fire a projectile by boring a hole through an obstruction in the barrel, substitution of a barrel which will permit the firing of a projectile, or otherwise converted to fire a projectile"). Because Congress intended such collection of components to be considered a "firearm" under the GCA, ATF properly included language explicitly acknowledging as much in the Rule.

Plaintiff identifies two features of the language the Rule will add to the definition of "firearm" under 27 C.F.R. § 478.11 that it believes to be "particularly problematic." Mot. at

12

24.  First, Plaintiff objects not to anything in the new regulatory language itself, but to a statement in the preamble to the Rule in which ATF notes that it "disagrees with the comment that weapon parts kits must contain *all* component parts of the weapon to be 'readily' converted to expel a projective."  87 Fed. Reg. at 24,685.

Nothing in the statute requires that a set of functional parts must be fully complete to qualify as a "firearm" under the GCA.  Tellingly, Plaintiff cites no authority in support of its request that this Court essentially insert a "completeness" requirement into the statutory and regulatory definitions of "firearm."  On the contrary, several courts of appeals interpreting the existing statutory and regulatory language have held that even if a weapon is missing one or more essential pieces such that it cannot expel a projectile in its present form, it can be considered a "firearm" for the purposes of the GCA.  *See, e.g.*, *United States v. Hardin*, 889 F.3d 945, 946-47, 949 (8th Cir. 2018) (holding that a pistol with a broken trigger and some missing internal component parts was still a "firearm"); *United States v. Dotson*, 712 F.3d 369, 370-71 (7th Cir. 2013) (holding that a pistol that was inoperable due to multiple corroded, missing, and broken parts was still a "firearm"); *United States v. Rivera*, 415 F.3d 284, 285-87 (2d Cir. 2005) (holding that a pistol with a broken firing pin and flattened firing-pin channel was a "firearm").

Under Plaintiff's interpretation, a partially disassembled handgun that is missing one minor part (for example, a screw or a firing pin) cannot and should not be considered a "firearm" under the GCA and therefore may freely be sold commercially with none of the licensure, background-check, marking, or record-keeping requirements that would attach to the repetitive sale of "firearms."  Nothing in the statute would require such an absurd result.

13

As ATF acknowledges in the Rule, if "certain essential parts are removed from the kit," this could very well "make it difficult to determine whether such a kit or aggregation of parts may readily be converted to fire."  87 Fed. Reg. at 24,692.  However, the Rule is clear that in order to be "readily" convertible to expel a projectile, the conversion of a kit or collection of components "must be fairly or reasonably efficient, quick, and easy . . . after examining the enumerated factors" in the definition of "readily."  *Id.*  That is consistent with the plain language of the statute and the interpretation of the statutory definition by numerous federal courts of appeals.  It is therefore an appropriate interpretation of the regulatory definition.

The second aspect of the definition of "firearm" that Plaintiff argues is "particularly problematic" is similarly not part of the regulatory definition itself, but a comment in the preamble to the Notice in which ATF notes that the definition of "firearm," as it pertains to kits, would still apply even if the kits were broken up into multiple shipments.  Mot. at 25 (citing 86 Fed. Reg. at 27,726).  Essentially, Plaintiff is trying to create an exception that would swallow the entire rule.   Under Plaintiff's proposed interpretation, if an entity that commercially sells a gun kit that contains all components necessary to assemble into a firearm, it would not be a "firearm," and would thus not subject the entity to licensure, background-check, marking, and recordkeeping requirements, as long as the seller packed the components into different boxes.  Congress defined "firearm" broadly to avoid such circumvention.  *See* 111 Cong. Rec. 5527 (explaining that "extend[ing]" the definition of firearm "to include any weapon by whatsoever name known which will, or which may be readily converted to, expel a projectile or projectiles by the action of an explosive" "represents a much needed

clarification and strengthening of existing law *designed to prevent circumvention* of the purposes of the" GCA) (emphasis added) (attached as Ex. 1).

ATF's statements that Plaintiff argues are "particularly problematic" are nothing more than a straightforward statement of the principle that intentionally structuring a transaction to circumvent the requirements of the GCA, including § 922(a)(1)(A)'s prohibition on selling firearms without a federal firearms license, could result in criminal liability.  Just as the non-licensee owner of a retail establishment may not evade the GCA requirements that attach to the sale of a "firearm" by disassembling a weapon designed to expel a projectile and placing the component parts into two separate paper bags, or by charging the customer for the component parts in two separate back-to-back transactions, an online or mail order establishment may not employ such measures to circumvent the requirements of the law. Plaintiff cites no authority for the argument that a non-licensee may sell a "firearm" as long as it is disassembled and placed into separate packages, and Defendants are aware of no such authority.  Instead, Plaintiff creates a straw man, arguing that this is tantamount to a new requirement that sellers of components must engage in extensive new recordkeeping and analysis and that unlicensed sellers of component parts must now keep complete records of all transactions and are required to analyze all prior transactions with a given customer to determine "whether the totality of the parts sold or distributed to a particular customer, in a particular timeframe, constitute a firearm."  Mot. at 25.  But none of these supposed recordkeeping and analysis requirements appear anywhere in the Rule, and this brief discussion that Plaintiff describes as "particularly problematic" is nothing more than a restatement of basic criminal law principles.

Accordingly, the Rule's amendment of the term "firearm" is consistent with the statutory definition of that term and the purpose and intent of the GCA.

### 2. ATF's Amendment of the Definition of "Frame or Receiver" Is Proper and in Accordance with the Statute.

Plaintiff also challenges as a "dramatic overreach" the amended regulatory definitions of "firearm frame or receiver" in 27 C.F.R. § 478.11 and "frame or receiver" in 27 C.F.R. § 479.11. In fact, the Rule's definition of "frame or receiver" to encompass "partially complete, disassembled, or inoperable" frames or receivers is consistent with the statute and is reasonable.

Under the pre-existing regulatory definitions, "frame or receiver" is defined as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11 (defining "firearm frame or receiver"); 27 C.F.R. § 479.11 (defining "frame or receiver"). The Rule contains an amended definition for "frame or receiver" that contains definitions for the terms "frame," "receiver," and "variant," 87 Fed. Reg. at 24,735, and provides ten nonexclusive examples (with photo illustrations) of "frames or receivers" under the regulatory definitions of those terms, *id.* at 24,735-38. The Rule's definition of "frame or receiver" also includes the following subparagraph, specifically challenged by Plaintiff:

> (c) *Partially complete, disassembled, or nonfunctional frame or receiver.* The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, *i.e.*, to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may

be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distribution of the item or kit to the purchaser or recipient of the item or kit.

*Id.* at 24,739. The Rule then provides five non-exclusive examples of what does and does not constitute a "frame or receiver" under subparagraph (c). *Id.*

There are no statutory definitions for the term "frame or receiver" in the GCA. Therefore, the crucial question is at what point a mere component or foundation of a component, such as a piece of metal or plastic—which is unregulated under federal firearms law—becomes a "frame or receiver" that is so regulated. For many years, ATF has determined that a component becomes a "frame or receiver" when it reaches a "critical stage of manufacture," which is the point at which it is "brought to a stage of completeness that will allow it to accept the firearm components [that] it is designed for, using basic tools in a reasonable amount of time." *See, e.g.*, ATF Letter to Private Counsel #303304, at 3-4 (Mar. 20, 2015) (attached as Ex. 2).

At the time the prior regulatory definitions were promulgated, single-framed firearms such as revolvers and break-open shotguns were far more prevalent for civilian use than split-receiver weapons. However, due to developments in firearms technology, a restrictive application of those definitions would lead to the absurd result that the regulatory definition of "frame or receiver" would not describe the frame or receiver of the vast majority of firearms currently in circulation in the United States. Most firearms now in circulation use a split or

multi-part receiver in which the relevant fire control components are housed by more than just a single part of the weapon. Moreover, the prior definitions were never intended or understood to be exhaustive, and ATF has long applied a multi-factor test in analyzing which component was intended to be the "frame or receiver" even in situations in which no single component of a weapon would satisfy a restrictive reading of the regulatory definition. *See* 86 Fed. Reg. at 27,721-22.

The clear Congressional intent, as indicated by the plain language and the statutory scheme of the GCA, was to regulate—as a "firearm"—the frame or receiver of a firearm. By updating the definition of "frame or receiver," ATF has acted to ensure that the statutory term will cover more than just a small fraction of the firearms currently in circulation—a result Congress would not have intended. The portion of the definition challenged by Plaintiff is a reasonable approach that incorporates well known and oft-interpreted concepts such as the "may readily be completed, assembled, restored, or otherwise converted" language into the definition. Plaintiff's argument that ATF's use of the "readily" concept is an unlawful "Frankenstein approach" to defining the term, Mot. at 19, has no merit. There is no dispute that the GCA did not define "frame or receiver," so Congress did not specifically prescribe what "frame or receiver" should encompass. ATF's use of the term "readily" simply incorporates a term that Congress used repeatedly in federal firearms laws—not only the GCA, but also elsewhere, *see, e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" as "any weapon that shoots, is designed to shoot, or can *readily* be restored to shoot, automatically…")—so that the regulatory definition of "frame or receiver" actually accomplishes what Congress intended it to do. Any other approach would result in persons being able to easily circumvent the

18

requirements of the GCA and NFA by producing or purchasing almost-complete frames or receivers that could quickly and easily be altered to produce a functional frame or receiver of a weapon.  This would thwart Congress's purpose in enacting the GCA and NFA.  *See New York v. Burger*, 482 U.S. 691, 713 (1987) ("[T]he regulatory goals of the Gun Control Act . . . ensure[] that weapons [are] distributed through regular channels and in a traceable manner," thus making "possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms.") (internal punctuation omitted).

ATF has acted consistently with its statutory authority by importing a term and concept used elsewhere in federal firearms laws.  *See, e.g.*, *United States v. TRW Rifle 7.62x51mm Caliber*, 447 F.3d 686, 692 (9th Cir. 2006) (holding that an inoperable rifle that could be rendered functional with ordinary tools and roughly two hours of welding fit within the meaning of "readily restored" for purposes of 26 U.S.C. § 5845); *United States v. Mullins*, 446 F.3d 750, 756 (8th Cir. 2006) (holding that a starter gun that could be modified in less than an hour by an ordinary person to fire a projectile would be considered "readily convertible" under the GCA); *United States v. Woods*, 560 F.2d 660, 664 (5th Cir. 1977) (holding that a weapon qualified as a shotgun within the meaning of 26 U.S.C. § 5845(d) even though the weapon was in two pieces when it was found because an ordinary person could have quickly reassembled it).

That is particularly true here, where ATF has not only explicitly incorporated these well-established concepts into the definition of "frame or receiver," but has done so by adopting a regulatory definition of the term "readily" that summarizes and relies upon the principles used by federal courts in interpreting the term "readily" in the context of federal

firearms laws.  The Rule incorporates the following definition of "readily" into 27 C.F.R.

§ 478.11:

> *Readily*.  A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state.  With respect to the classification of firearms, factors relevant in making this determination include the following:
>
> (1) Time, *i.e.*, how long it takes to finish the process;
> (2) Ease, *i.e.*, how difficult it is to do so;
> (3) Expertise, *i.e.*, what knowledge and skills are required;
> (4) Equipment, *i.e.*, what tools are required;
> (5) Parts availability, *i.e.*, whether additional parts are required, and how easily they can be obtained;
> (6) Expense, *i.e.*, how much it costs;
> (7) Scope, *i.e.*, the extent to which the subject of the process must be changed to finish it; and
> (8) Feasibility, *i.e.*, whether the process would damage or destroy the subject of the process, or cause it to malfunction.

87 Fed. Reg. at 24,735.  The Rule provides five specific, non-exclusive examples of how

collections of components may be determined to be a "frame or receiver" or not depending

upon all the circumstances.  *Id.* at 24,739.

Given the context and guidance that the Rule provides in the form of specific

illustrative examples and the Rule's definition of "readily," Plaintiff's labored analogies—"that

two-by-fours are a 'house,' a potato is a 'chip,' and a seed is an 'apple,'" Mot. at 20—

mischaracterize the Rule's definition of "frame or receiver."  None of these examples are

things that could "readily" be converted or restored to a final product under the specifically

enumerated factors informing that term.  This is particularly true given that the Rule's

definition explicitly provides that a "frame or receiver" "shall *not* include a forging, casting,

printing, extrusion, unmachined body, or similar article that has not yet reached a stage of

manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*,

20

unformed block of metal, liquid polymer, or other raw material)."  87 Fed. Reg. at 24,739.

This language did not appear in the Notice's proposed definition, *see* 86 Fed. Reg. at 27,746,

but was included in the Rule specifically in response to comments to address concerns that

there could be some confusion over whether raw materials could be considered a "frame or

receiver," *see* 87 Fed. Reg. at 24,698.  In the event that a non-licensee seller might still be

uncertain as to whether a component would be considered a "frame or receiver" under the

Rule's definition, it can submit the component to ATF and obtain a classification decision.

   None of the authorities cited by Plaintiff supports its argument that ATF's definition

of "frame or receiver" exceeds the agency's statutory authority.  *Texas Pipeline Association v.*

*FERC* involved an agency interpretation of a term that was explicitly contrary to language

elsewhere in the statute.  661 F.3d 258, 262-64 (5th Cir. 2011).  Here, by contrast, "frame or

receiver" is not defined in the GCA and the statute does not mandate that only a complete,

assembled frame or receiver be considered a "frame or receiver."  In *Utility Air Regulatory Group*

*v. EPA*, 573 U.S. 302, 325-26 (2014), the Supreme Court held that the EPA could not

unilaterally change a greenhouse gas threshold that would trigger permitting requirements to

100,000 tons per year when the statute expressly stated that permits were required for any

facility emitting more than 250 tons per year.  Similarly, in *FDA v. Brown & Williamson Tobacco*

*Corp.*, the Supreme Court held that an agency could not interpret a statutory term to

dramatically expand the reach of its regulatory powers where "Congress ha[d] directly spoken

to the question at issue and precluded" the agency from doing so.  529 U.S. 120, 160-61 (2000).

But those authorities are inapposite to this case, where ATF has long been responsible for

defining the statutory term "frame or receiver," and where the GCA contains no such express

definition or criteria for "frame or receiver" that is being altered by the Rule's updated
definition of the term.

Accordingly, the Rule's amendment to the definition of "frame or receiver" is
consistent with ATF's statutory authority.

### 3.       ATF's Definition of "Privately Made Firearm" Is Proper and in Accordance With the Statute.

Contrary to Plaintiff's assertion, Mot. at 28-30, the Rule's definition of "privately made
firearm" falls within the scope of ATF's statutory authority.  The Rule adds the following
definition to 27 C.F.R. § 478.11:

> *Privately made firearm (PMF)*.  A firearm, including a frame or receiver, completed,
> assembled, or otherwise produced by a person other than a licensed
> manufacturer, and without a serial number placed by a licensed manufacturer at
> the time the firearm was produced.  The term shall not include a firearm
> identified and registered in the National Firearms Registration and Transfer
> Record pursuant to chapter 53, title 26, United States Code, or any firearm
> manufactured or made before October 22, 1968 (unless remanufactured after
> that date).

87 Fed. Reg. at 24,735.  The Rule also: (i) requires federal firearms licensees to "legibly and
conspicuously identify each" PMF with a serial number on the frame or receiver within seven
days of receipt or acquisition, *id.* at 24,742; (ii) requires licensed manufacturers to create and
retain certain records within seven days of taking a PMF into inventory, *id.* at 24,744; (iii)
requires licensees to complete Form 4473 for PMFs, just as they would any other firearm, *id.*
at 24,746; and (iv) requires licensees to record receipt or any other acquisition of a PMF unless
it is for a same-day repair.  *Id.*

As an initial matter, Plaintiff does not appear to have standing to challenge any of the
Rule's provisions concerning PMFs.  The Rule is clear that it imposes no requirements on any

owner of a PMF who assembles or makes the PMF for personal use. *See id.* at 24,686-87 ("This rule does not restrict law-abiding citizens' ability to make their own firearms from parts for self-defense or other lawful purposes.  Under this rule, non-prohibited persons may continue to lawfully complete, assemble, and transfer unmarked firearms without a license as long as they are not engaged in the business of . . . [selling] firearms in a manner requiring a license.").  The only requirements imposed by the Rule concerning PMFs apply to licensed manufacturers and other licensees, and Plaintiff makes no allegation that it has a license.  To have standing to challenge an agency action, a plaintiff must allege the existence of an injury, and "the injury must affect the plaintiff in a personal and individual way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 n.1 (1997).  In determining standing, the Fifth Circuit instructs courts to ascertain "whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999).  Here, because Plaintiff is not a licensee, the Rule's definition of "privately made firearm" and associated provisions impose no obligations at all on Plaintiff, and therefore Plaintiff has no injury of its own on which to base this challenge.

Even if the Court were to determine that Plaintiff has standing to challenge the Rule's definition of the term "privately made firearm," Plaintiff fails to show any likelihood of success on the merits of its claim that this definition exceeds ATF's statutory authority.  "Privately made firearms" are just a subset of the larger definitional category of "firearm." *See* 87 Fed. Reg. at 24,735.  As described in more detail in Section I.A.1, it is clearly within ATF's statutory authority to regulate all "firearms" within the purview of the GCA, and ATF has provided a

regulatory definition of this term for many years.  There is no exception for those that are privately made.

Plaintiff argues that the Rule constitutes a "breathtaking . . . expansion" of ATF's authority because it imposes "onerous new regulations on transactions" involving PMFs.  Mot. at 28, 29.  However, these regulations are all organized around a common principle and goal—to treat PMFs the same as any other type of firearm under the GCA.  While the marking requirement that the Rule adds to 27 C.F.R. § 478.92 is unique to PMFs introduced into a dealer's inventory, this is simply because the lack of a serial number is the primary factor differentiating PMFs from any other type of firearm.  Although marking requirements generally apply to licensed manufacturers and importers, *see, e.g.*, 18 U.S.C. § 923(i), nothing in the statute limits such requirements to those entities.  In fact, in enacting the GCA, which amended the NFA, Congress clearly understood that in some circumstances persons other than licensed manufacturers and importers may need to mark firearms with a serial number. *See* 26 U.S.C. § 5842(a)-(b) (requiring unlicensed makers and possessors to mark certain types of firearms with serial numbers as may be prescribed by regulations).  The GCA expressly requires licensees to record certain information for any firearms taken into their inventory for purposes of tracing firearms and assistance to law enforcement.  However, this statutory requirement would be completely frustrated with regard to PMFs if PMFs taken into licensees' inventory were not marked with a licensee's serial number like other types of firearms. Accordingly, the Rule's marking requirements for licensees accepting PMFs into their inventory is well within the scope of ATF's authority under the GCA and the only reasonable way to effectuate an important purpose of the GCA.  *See Brady*, 914 F.2d at 479 ("Because

24

§ 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'"); *see also Burger*, 482 U.S. at 713 (describing the goals of the GCA as being to "ensure[] that weapons [are] distributed *through regular channels* and *in a traceable manner*" and "prevention of sales to undesirable customers and the detection of the origin of particular firearms.") (emphasis added).

In other respects as well, the Rule requires licensees to essentially treat PMFs just as they would other types of firearms they take into inventory for purposes of recordkeeping. This is clearly an appropriate exercise of ATF's statutory authority, given that 18 U.S.C. § 923(g)(1) and (g)(2) specifically authorize regulation of licensed importers, manufacturers, and dealers of firearms. What Plaintiff is actually arguing—but does not state explicitly—is that it believes that privately made weapons, and all components comprising them, should be able to be sold by anyone, to anyone, in any quantities, without any of the background check, marking, or recordkeeping requirements of the GCA. This would lead to the absurd result that of two essentially identical weapons—one made and assembled by a commercial manufacturer and one purchased and assembled by an individual and entered into commerce—only one would be subject to GCA regulation as a "firearm" while the sale of the other would not be subject to any regulation throughout its lifetime no matter how many times it changed hands. Plaintiff can point to nothing in the statute or the legislative history indicating that Congress intended such an absurd result.

Accordingly, the Rule's definition of "privately made firearm," and the amendments to regulations regarding how licensees, manufacturers, and importers must mark and keep records of privately made firearms, are a proper exercise of ATF's statutory authority.

4.    **ATF's Amendment of the Definitions of "Firearm" and "Frame or Receiver" and Inclusion of a Definition for "Privately Made Firearm" Does Not Violate the Separation of Powers.**

Plaintiff makes several vague statements implying that ATF's amendment of the definitions of "firearm" and "frame or receiver" somehow violates the constitutional principle of separation of powers.  According to Plaintiff, these definitions are an "attempt[] to rewrite federal statutes without congressional approval in violation of the separation of powers."  Mot. at 16; *see also* Compl. ¶¶ 108-111.

Plaintiff does not seem to dispute that ATF has the statutory authority to provide regulatory definitions of terms used in the GCA and the NFA, and in fact has done so for many years.  *See* 26 U.S.C. § 7801(a)(2); 18 U.S.C. § 926(a); 28 U.S.C. § 599A(c)(1); 28 C.F.R. § 0.130(a)(1)-(2).  Here, for the reasons set forth in more detail above, ATF has simply amended and updated these regulatory definitions to better effectuate Congress's intent and the purpose of these statutes.  These interpretations are reasonable and in accordance with ATF's statutory authority, and therefore do not violate any principles of separation of powers.

B.    **Although the Rule of Lenity Does Not Apply Here, There Is Also No Need to Determine Whether *Chevron* Deference Is Applicable.**

Plaintiff invokes the rule of lenity to argue that deference under *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), does not apply here.  Mot. at 30-33. However, "[t]he rule of lenity only applies if, after considering the text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the court

must simply guess as to what Congress intended." *United States v. Suchowolski*, 838 F.3d 530, 534 (5th Cir. 2016) (citation omitted).  That is not this case.  Plaintiff has established no "grievous ambiguity or uncertainty" here, and the rule of lenity therefore does not apply.  *See also Muscarello v. United State*s, 524 U.S. 125, 138-39 (1998) ("The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree.").[3]

However, there is no need to decide whether the Rule is entitled to *Chevron* deference because it reflects the best statutory interpretation.  The Supreme Court has explained that it is unnecessary to consider deference when an agency rule adopts "not only a reasonable [position], but the position that [the Court] would adopt even if there were no formal rule and [the Court] were interpreting the statute from scratch."  *Edelman v. Lynchburg College*, 535 U.S. 106, 114 (2002); *see also Becerra v. Empire Health Found.*, No. 20-1312, 2022 WL 2276810, at *6 (U.S. June 24, 2022) (agency's "regulation correctly construes the statutory language at issue" because, *inter alia*, "[t]he provisions are technical" and "[t]he text and context support the agency's reading").  Alternatively, if a rule does not reflect this position, the Court should "consider the agency's interpretation to the extent it is persuasive."  *United States v. Garcia*, 707 F. App'x 231, 234 n.5 (5th Cir. 2017) (citing *Baylor Cnty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017)).  Relevant factors under this alternative standard include "how persuasively

---

[3] Moreover, the Supreme Court recently declined to resolve whether the rule of lenity must apply when agencies interpret statutes with potential criminal applications.  *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562, 1572 (2017).  In doing so, the Court impliedly rejected Plaintiff's contention that earlier cases such as *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992), or *Leocal v. Ashcroft*, 543 U.S. 1 (2004), require the result it proposes.  *See* Mot. at 30-31.

[ATF] interpreted the statute," which in turn "depends on the thoroughness evident in the agency's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Baylor Cnty. Hosp. Dist.*, 850 F.3d at 261-62 (citation and internal punctuation omitted).

Under either approach, ATF has adopted a valid determination. ATF issued a thorough analysis that sets forth its reasoning. It explained that, although the GCA and its implementing regulations define a "firearm" to include its "frame or receiver," neither delineates when a frame or receiver is created. 86 Fed. Reg. at 27,729. Nor do common dictionary definitions of "frame" or "receiver" answer this question. *See id.* at 27,720 n.4 (quoting dictionary definitions of these terms). ATF must use its technical expertise to draw the line somewhere, and "[c]ourts are generally unwilling to review line-drawing performed by the agency unless a petitioner can demonstrate that lines drawn are patently unreasonable, having no relationship to the underlying regulatory problem." *Texas v. Becerra*, No. 5:21-CV-300, 2021 WL 6198109, at *17 (N.D. Tex. Dec. 31, 2021) (citation and internal punctuation omitted); *accord Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013); *see also Gulf Restoration Ntwk. v. U.S. Dep't of Trans.*, 452 F.3d 362, 370 n.15 (5th Cir. 2006) ("[W]e find the Secretary has wide discretion in determining where to draw the line, that the line must be drawn somewhere, and that he acted within his discretion when he [drew the line as he did.]").

ATF made a reasonable line-drawing determination here. The crucial inquiry is at what point an unregulated piece of metal, plastic, or other material becomes a "frame or receiver" that is a regulated item under federal law. 87 Fed. Reg. at 24,685. To make this determination,

28

ATF's position even before the Rule had been that a piece of metal, plastic, or other material becomes a frame or receiver when it reaches a "critical stage of manufacture:" in other words, when the article is brought to a stage of completeness that will allow it to accept the firearm components it is designed for, using basic tools in a reasonable amount of time. *Id.* (citing ATF Letter to Private Counsel #907010 (Mar. 20, 2015)). At this "critical stage of manufacture," an item becomes sufficiently complete to function as a frame or receiver, or may be readily completed or converted to accept the parts it is intended to house or hold. 86 Fed. Reg. at 27,729. By contrast, unformed blocks of metal, liquid polymers, and other raw materials have not reached this critical stage of manufacture and are not frames or receivers. 87 Fed. Reg. at 24,686. However, a forging, casting, or additive printing for a frame or receiver—*i.e.*, a partially complete frame or receiver—that has reached a stage of manufacture where it can readily be completed or converted into a functional frame or receiver, is a "frame or receiver" under the GCA. *Id.*

This line-drawing determination is consistent with the legislative history of federal firearms laws. *See* S. Rep. No. 90-1501, at 46 (1968) ("Any machinegun frame or receiver *which is readily restorable* would be treated as serviceable.") (emphasis added); S. Rep. No. 89-1866, at 73 (1966) (clarifying that "firearm" includes "starter pistols which may be converted to fire a projectile by boring a hole through an obstruction in the barrel, substitution of a barrel which will permit the firing of a projectile, or otherwise converted to fire a projectile"). It is also informed by ATF's expertise in firearms. *See Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 22 (D.D.C. 2014) ("The Firearms Technology Branch of ATF has expertise in classifying firearms and firearm silencers—much more so than the Court."); *Sig Sauer, Inc. v. Jones*, 133 F.

Supp. 3d 364, 371 (D.N.H. 2015) (explaining that examination of firearms parts and comparison with other items on the market "require[s] expertise that is well within ATF's grasp . . . . [and] entitled to substantial deference").

The logic of ATF's determination is also underscored by its consistency with the principal purpose underlying the GCA, namely, "to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them.'" *Abramski v. United States*, 573 U.S. 169, 181 (2014) (quoting *Huddleston v. United States*, 415 U.S. 814, 824 (1974)).  Clarifying that partially complete frames or receivers can be "firearms" within the meaning of federal law is necessary in light of the widespread availability of unlicensed and unregulated partially complete frames or receivers that are often sold as part of easy-to-complete kits.  87 Fed. Reg. at 24,686.  Otherwise, prohibited persons could easily circumvent the requirements of federal law—including background checks and firearms serialization—simply by buying almost-complete frames or receivers.  *Id.*  Indeed, many prohibited persons have easily obtained such items and made their own firearms at home.  *Id.* at 24,655-56.  Adopting Plaintiff's contrary interpretation of the statute would mean that prohibited persons could easily make or acquire virtually untraceable firearms directly from unlicensed parts manufacturers, which would unreasonably thwart Congress's evident purpose in enacting the GCA.  *Id.* at 24,686; *see Burger*, 482 U.S. at 713 ("[T]he regulatory goals of the [GCA] . . . ensure[] that weapons [are] distributed through regular channels and in a traceable manner and [make] possible the prevention of sales to undesirable customers and the detection of the origin of particular firearms.") (citation omitted).

Finally, the agency's decision reflects a consistently applied policy. As explained above, even before the Rule, ATF has maintained that a piece of metal, plastic, or other material becomes a frame or receiver when it reaches a "critical stage of manufacture." The Rule preserves this policy, while applying it to an updated definition of "frame or receiver" that takes stock of decades of technological advances in firearms manufacture. And to maintain consistency, ATF has grandfathered existing complete frame or receiver designs previously determined by the agency to be the firearm "frame or receiver" of a given weapon. *See infra* I.E.3. Moreover, ATF set out its reasoning for deciding not to grandfather partially complete, disassembled, or nonfunctional frames or receivers (including weapon or frame or receiver parts kits) that it had previously classified as not being "frames or receivers." *See id.* Previously, incomplete frames or receivers had been sent to ATF for classification without the other parts, jigs, templates, or materials that are sold or distributed with the item or kit. *See id.* The agency acknowledged this decision, and explained its reasoning, which is all that APA review requires. *See infra* I.E.2.

In short, ATF's determination reflects the best interpretation of the GCA, and is well-reasoned, substantiated, and logical. Plaintiff is thus unlikely to succeed in its contention that the Rule exceeds ATF's statutory authority.

## C.    The Rule Is Not Void for Vagueness.

Plaintiff also fails to establish a likelihood of success on the merits of its claim that the Rule violates the void-for-vagueness doctrine. *See* Mot. at 33-37. Under the Fifth Amendment's Due Process Clause, a criminal or quasi-criminal law is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or

is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *accord Munn v. City of Ocean Springs*, 763 F.3d 437, 439 (5th Cir. 2014).[4]  "[F]acial vagueness challenges, in particular"—which Plaintiff brings here—"are generally 'disfavored for several reasons,' including but not limited to, the fact that facial invalidity claims often 'rest on speculation.'"  *Magee v. City of S. Padre Island*, 463 F. App'x 377, 380 (5th Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).  "Accordingly, '[i]n determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about "hypothetical" or "imaginary" cases.'"  *Id.* (quoting *Wash. State Grange*, 552 U.S. at 449-50). Instead, to establish that a law is unconstitutionally vague on its face, "the complainant must demonstrate that the law is impermissibly vague in all of its applications," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982), "including its application to the party bringing the vagueness challenge," *United States v. Clark*, 582 F.3d 607, 612-13 (5th Cir. 2009).

Plaintiff fails to make that showing here.  It argues that the amended regulatory definition of "frame or receiver" to include "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" is unconstitutionally vague.  87 Fed. Reg. at 24,739.  As noted, *see supra* page 7, the phrase "may readily be . . . converted" derives from federal statutes.  *See* 18 U.S.C. § 921(a)(3)

---

[4] The challenged portions of the Rule are subject to this standard because certain "Federal felony violations . . . can apply to circumstances involving the final rule's requirements."  87 Fed. Reg. at 24,713.

(GCA); 26 U.S.C. § 5845 (employing similar language in various definitions in the NFA). Several courts have rejected the argument that provisions of the GCA and the NFA addressing products that may be "readily converted" or "readily restored" to function in a particular manner (or materially identical language in state laws) are unconstitutionally vague. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 266 (2d Cir. 2015); *United States v. 16,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns*, 443 F.2d 463, 464 (2d Cir. 1971); *United States v. Quiroz*, 449 F.2d 583, 585 (9th Cir. 1971); *United States v. Wick*, No. CR 15-30-M-DLC, 2016 WL 10612608, at *3-4 (D. Mont. Mar. 11, 2016); *United States v. Catanzaro*, 368 F. Supp. 450, 454 (D. Conn. 1973); *cf. United States v. Wojcikiewicz*, 403 F. App'x 483, 486 (11th Cir. 2010) (holding that plaintiff could not "establish that the district court plainly erred in failing to determine that the term 'readily restored' was unconstitutionally vague as applied" to his case); *Roberts v. United States*, No. 2:04-cr-295-PMD, 2007 WL 9754483, at *7 (D.S.C. Oct. 30, 2007) (on an ineffective assistance of counsel claim, holding that the plaintiff had "made no showing whatsoever that 26 U.S.C. § 5845 is unconstitutionally vague"). As the Second Circuit reasoned persuasively in *New York State Rifle & Pistol Ass'n*, "[t]his statutory language dates at least to the 1994 federal assault-weapons ban," and "there [was] no record evidence that it [had] given rise to confusion at any time" in the decades since. 804 F.3d at 266. Plaintiff here does not allege any such confusion either.

Moreover, although the Fifth Circuit has not considered this precise question, it has rejected a void-for-vagueness challenge to the closely related statutory term "any combination of parts designed and intended for use in converting a weapon into a machine gun." *United States v. Campbell*, 427 F.2d 892, 893 (5th Cir. 1970) (per curiam). In determining whether a

combination of parts was designed and intended for use in converting a weapon into a machine gun, a court would likely need to consider similar factors as the Rule prescribes for determining whether a non-functioning frame or receiver may be readily converted to function, such as the "time," "ease," "expertise," "equipment," "parts availability," "expense," "scope," and "feasibility" of the conversion.  87 Fed. Reg. at 24,735 (capitalization altered); *cf. Vill of Hoffman Ests.*, 455 U.S. at 500-01 (holding that the statutory term "designed . . . for use" calls for an inquiry into the product's "objective features").

Plaintiff suggests that the eight factors identified in the Rule somehow increase ambiguity as to the meaning of the term "readily," *see* Mot. at 36.  But in fact, the opposite is true; the factors offer guidance with respect to ATF's classification criteria.  To the extent that Plaintiff contends that the Rule is unconstitutionally vague for failing to provide a bright-line rule for determining whether a particular product may be readily converted to function as a frame or receiver, that argument is foreclosed by binding Supreme Court and Fifth Circuit precedent.  The vagueness doctrine does not require "perfect clarity and precise guidance." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1214 (2018) (reaffirming that "[m]any perfectly constitutional statutes use imprecise terms"). Indeed, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).  The Fifth Circuit has explained that "for [an] ordinance to pass constitutional muster" under the void-for-vagueness doctrine, it need not "delineate the exact actions a [regulated party] would have to take to avoid liability." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008). Accordingly, the Supreme Court and the Fifth Circuit have rejected vagueness challenges to

criminal laws imposing standards as open-ended as: "near" a courthouse, *Cox v. Louisiana*, 379 U.S. 559, 568 (1965); "immoral purposes," *Clark*, 582 F.3d at 612; and "unreasonable noise," defined to include noise "which, under the circumstances of time, place, and manner in which it is produced . . . annoys . . . a reasonable person of normal sensitivities," *Munn*, 763 F.3d at 438-39 (emphasis omitted).  The Rule is at least as precise with respect to the conduct that it proscribes as the laws upheld in *Cox*, *Clark*, and *Munn*.

Plaintiff's void-for-vagueness claim is also unlikely to succeed on the merits for an additional reason: the Rule provides for an administrative process through which regulated entities may obtain classifications as to whether their particular products fall within the Rule's scope.  The Supreme Court and Fifth Circuit have held that "licensing . . . requirements," such as the Rule, "are afforded considerable deference in the vagueness analysis," in part "because the regulated party may 'have the ability to clarify the meaning of the regulation[s] . . . by resort to an administrative process.'"  *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th Cir. 1991) (quoting *Vill. of Hoffman Ests.*, 455 U.S. at 498).  Here, the Rule provides just such an opportunity, by inviting requests for voluntary classifications as to whether a particular item, such as a partially complete frame or receiver, is a "firearm" within the meaning of the GCA and its regulations.  *See* 87 Fed. Reg. at 24,743.  Plaintiff therefore cannot be heard to complain that it has no means of ascertaining whether any product that it sells falls within that definition.  For all of these reasons, Plaintiff has not shown a likelihood of success on the merits of its void-for-vagueness claim.

### D.     The Rule Does Not Violate the Non-Delegation Doctrine.

Plaintiff's cursory argument that the Rule violates the non-delegation doctrine is also unlikely to succeed.  *See* Mot. at 37.  The Supreme Court recently reaffirmed—as it has, "time and again"—"that a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle'" to direct the exercise of its delegated authority.  *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (citation omitted).  Indeed, "[o]nly twice in this country's history," both times in 1935, has the Court "found a delegation excessive," and then only "because 'Congress had failed to articulate *any* policy or standard' to confine discretion."  *Id.* at 2129 (citation omitted); *see A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935).  Meanwhile, the Court has rejected challenges to delegations as broad as the authority to set "fair and equitable" prices, *Yakus v. United States,* 321 U.S. 414, 427 (1944); to determine "just and reasonable" rates, *FPC v. Hope Nat. Gas Co.,* 320 U.S. 591, 600 (1944); to regulate broadcast licensing "as public interest, convenience, or necessity" require, *Nat'l Broad. Co. v. United States,* 319 U.S. 190, 225-26 (1943); to allow railroad acquisitions in the "public interest," *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932); and to issue any air quality standards "requisite to protect the public health," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

Here, the statutory term "frame or receiver" itself provides a clear standard, because the Rule interprets what that term means.  In leaving "frame or receiver" undefined in the GCA, Congress thereby delegated that authority to ATF.  *See, e.g.*, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007).  Moreover, Congress expressly delegated to ATF the authority to prescribe "rules and regulations as are necessary to carry out the provisions of"

36

the GCA.  18 U.S.C. § 926; *see* 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(b)(1), (c)(1); 28 C.F.R. § 0.130(a)(1)-(2).  Plaintiff cites no authority, and Defendants are aware of none, holding that a delegation of authority to define statutory terms violates the non-delegation doctrine.

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), on which Plaintiff relies, *see* Mot. at 37, is readily distinguishable.  In that case, the Fifth Circuit held that the Dodd-Frank Act unconstitutionally delegated authority to the SEC "to determine which subjects of its enforcement actions are entitled to Article III proceedings with a jury trial, and which are not," 34 F.4th at 461, while offering "*no guidance* whatsoever" as to that determination, *id.* at 462. Here, by contrast, Plaintiff has identified no unfettered choice that Congress delegated in the GCA.  Accordingly, Plaintiff fails to show a likelihood of success on the merits of its delegation claim.

### D.    The Rule Is Reasonable.

Plaintiff's arbitrary-and-capricious claims fare no better.  The arbitrary and capricious standard is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021).  The "court's task is merely to ask whether the agency considered the relevant facts and articulated a satisfactory explanation for its decision." *Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022).  "[A] court is not to substitute its judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted), and must "uphold an agency's actions if its reasons and policy choices satisfy minimum standards of rationality," *10 Ring Precision v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (citation and internal punctuation omitted).  A reviewing court starts from "a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome

that presumption by showing that the decision was erroneous." *Texas Clinical Labs. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).

Here, ATF considered the relevant factors and articulated a satisfactory explanation for its decision-making. The APA requires no more.

### 1. The Rule Is Internally Consistent.

Although Plaintiff contends that illustrative examples provided in the Rule show that the Rule is not internally consistent, Mot. at 38-44, a look at these examples shows that Plaintiff is mistaken. To help provide clarity, the Rule includes five non-exclusive examples that illustrate the definition of a "partially complete, disassembled, or nonfunctional frame or receiver." 87 Fed. Reg. at 24,739. Example 1 states that a kit containing a partially complete receiver blank that is sold with a compatible jig or template is a receiver, because a person with online instructions and common hand tools may readily assemble the parts into a functioning receiver. *Id.* By contrast, Example 4 provides that a specific type of receiver (an AR-15 variant receiver) "without critical interior areas having been indexed, machined or formed" that is "not sold . . . with instructions, jigs, templates, or equipment or tools such that it may be readily completed" is not a receiver. *Id.* And similarly, Example 5 states that another specific type of receiver (a flat blank of an AK variant receiver) "without laser cuts or indexing" that is not sold with instructions, tools, or equipment is not a receiver because "a person cannot readily fold the flat to provide housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence." *Id.*

Plaintiff is thus mistaken in contending that the only difference between Example 1 on the one hand, and Examples 4 and 5 on the other, is the absence of extrinsic materials such as

tools and equipment.  Mot. at 40.  The determination in Examples 4 and 5 that these specific items are not receivers clearly depends on both the physical state of these specific types of receivers *and* the absence of tools and equipment.  In both examples, the item in question has not reached a particular stage of development—for Example 4, "critical interior areas" have not been "indexed, machined or formed," and for Example 5, the flat blank has not received "laser cuts or indexing."  Thus, contrary to Plaintiff's assertion, these examples do not create "a safe harbor for items sold in the absence of . . . materials" such as tools and equipment.  Mot. at 40.

Furthermore, the Rule clarifies that when suppliers provide manufacturers with unfinished blanks for further manufacture, there is no requirement that the manufacturer be licensed, mark such items, or maintain records of production and disposition.  87 Fed. Reg. at 24,678.  This is because the transaction is only between the supplier and the manufacturer, and the supplier is not providing the end retail customer with any jigs, templates, or other items that allow the unfinished blanks to be readily converted to function as a frame or receiver.  *Id.*  Plaintiff is thus again mistaken in describing this clarification as somehow "cabin[ing]" Examples 4 and 5 "to sales to manufacturers that planned to complete the receiver blanks."  Mot. at 41.

The remainder of Plaintiff's argument under this rubric largely consists of various hypothetical situations imagined by Plaintiff in which, Plaintiff asserts, the application of the Rule might not be entirely clear-cut.  *Id.* at 40-42.  For example, Plaintiff ponders the application of the Rule if an imaginary parent corporation were to create two subsidiary companies, one selling partially complete receivers and one selling tools and equipment to

complete them. *Id.* at 41. But "[s]uch hypothetical examples are not the stuff of ripe APA challenges" because among other things, they are "irrelevant to facial challenges like this one." *Ass'n of Priv. Sector Colleges & Univs. v. Duncan*, 110 F. Supp. 3d 176, 196 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016). Because Plaintiff "bring[s] a facial challenge" before the Rule has been enforced, Plaintiff "must establish that no set of circumstances exists under which the [Rule] would be valid." *Associated Builders & Contractors*, 826 F.3d at 220 (citation and internal punctuation omitted). It is not Defendants' burden to support the Rule's application as applied to hypothetical sets of circumstances. Thus, even if Plaintiff could "point to a hypothetical case in which the rule might lead to an arbitrary result," it would "not render the rule 'arbitrary or capricious'" because "[t]his case is a challenge to the validity of the entire rule in all its applications." *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991). At bottom, Plaintiff claims confusion about how the Rule might apply in certain hypothetical scenarios. While "[v]irtually every legal (or other) rule has imperfect applications in particular circumstances," identifying such applications does not render those rules invalid. *Barnhart v. Thomas*, 540 U.S. 20, 29 (2003). In the event that such "uncommon particular applications" conjured up by Plaintiff were to actually occur, affected entities could seek classification decisions or raise as-applied challenges, but the mere "possibility" of such occurrences "does not warrant judicial condemnation of the rule in its entirety." *EPA v. EME Homer City Generation*, 572 U.S. 489, 524 (2014); *see also Ass'n of Priv. Sector Colleges & Univs. v. Duncan*, 681

F.3d 427, 442 (D.C. Cir. 2012) ("[I]t is not enough for [an APA plaintiff] to show the challenged regulations could be applied unlawfully.") (citation omitted).[5]

Nor, finally, does Plaintiff show that the Rule's substantive content is "self-contradictory." Mot. at 44. In any event, the authority it cites to support this argument is not pertinent. The surrounding discussion of *Delaware Department of Natural Resources v. EPA*, 785 F.3d 1 (D.C. Cir. 2015), from which Plaintiff quotes, does not concern a rule alleged to be internally inconsistent, but instead one in which the agency had not adequately responded to concerns raised in comments. *See id.* at 14-16. And the sentence Plaintiff truncates from *Farmers Union Central Exchange v. FERC*, 734 F.2d 1486 (D.C. Cir. 1984), reads in full: "Such self-contradictory, wandering logic does not constitute an adequate explanation for [an agency's] *rejection of admittedly valuable proposals*." *Id.* at 1520 (emphasis added). The case involved FERC's alleged failure to give appropriate consideration to alternative rate-making methodologies for oil pipelines, a situation far afield from this case.

### 2. The Rule Adequately Explained ATF's Reasons for Its Policy Change.

"An agency's change in policy is not subjected to a heightened standard or more substantial review than the scrutiny applicable to policy drafted on a blank slate." *Handley v.*

---

[5] Plaintiff does not present any support for its contention that the firearms industry has experienced difficulty in interpreting the Rule, with the sole exception of a single published article. *See* Mot. at 42-43. While that article does make broad assertions concerning the alleged confusion of "industry experts" and "manufacturers and vendors" in interpreting the Rule, *see* ECF No. 11-29, the article (like Plaintiff) fails to substantiate its assertions with concrete evidence. Instead, it cites only two individuals, the first a parts manufacturer who expressed no confusion regarding the Rule, and the second an attorney for a firearms rights organization rather than a producer or seller of items regulated by the Rule. *See id.*

*Chapman*, 587 F.3d 273, 282 (5th Cir. 2009) (citing *FCC v. Fox Television Stations*, 556 U.S. 502, 514-16 (2009)).  "Rather, a policy change must only meet three requirements: The new policy must be permissible under the statute; there must be good reasons for it; and the agency must believe that the new policy is better, which the conscious change of course adequately indicates."  *Id.* (citation omitted); *accord Entergy Mississippi, Inc. v. NLRB*, 810 F.3d 287, 293 (5th Cir. 2015).[6]

Initially, it is not clear that this standard applies because as explained above, ATF has consistently maintained that an unformed block of material becomes a frame or receiver when it reaches a "critical stage of manufacture."  *See supra* I.B.  In any event, to the extent the Rule updates this policy, all three requirements are met here.  As explained above, *see supra* I.A.1-2, the GCA permits ATF's policy regarding partially complete frames and receivers.  The agency has also clearly explained the reasons for its update.  Technological advances have made it easier for companies to sell partially complete frames or receivers to unlicensed persons, posing significant challenges to the regulation of frames and receivers and enabling prohibited persons to easily make firearms at home.  86 Fed. Reg. at 27,722; 87 Fed. Reg. at 24,655.  Many kits that include partially complete frames or receivers have been sold by non-licensed entities that did not run a background check or maintain transaction records; as a result, prohibited

---

[6] *Chamber of Commerce v. U.S. Department of Labor*, 885 F.3d 360 (5th Cir. 2018), cited by Plaintiff, does not suggest otherwise.  *See* Mot. at 46.  In the quotation truncated by Plaintiff, the Court stated that the agency's "turnaround from its previous regulation *that upheld the common law understanding of fiduciary relationships* alone gives us reason to withhold approval or at least deference for the Rule."  885 F.3d at 380 (emphasis added).  By contrast, there is no suggestion here that the Rule departs from any common law understanding of recognized legal concepts, because there is no common law understanding of a firearm "frame or receiver."  Plaintiff does not contend otherwise.

persons have easily obtained them.  86 Fed. Reg. at 27,729.  And because such partially complete frames and receivers are unmarked, these firearms are nearly impossible to trace when used in a crime, leading to illegal trafficking of such weapons.  *Id.*; 87 Fed. Reg. at 24,655-57.  The Department of Justice has brought numerous criminal cases to counter the illegal trafficking of unserialized privately completed and assembled weapons.  87 Fed. Reg. at 24,656-57.  ATF thus showed that it was aware it was updating its policy regarding partially complete frames and receivers, and explained its reasons for doing so.  The APA requires no more.  *See Entergy Miss.*, 810 F.3d at 293; *contra* Mot. at 44-49.

Plaintiff relies on the principle that an agency "sometimes" should provide "a more detailed justification than what would suffice for a new policy created on a blank slate," including "when its prior policy has engendered serious reliance interests that must be taken into account."  *Fox*, 556 U.S. at 515; *see* Mot. at 47.  But Plaintiff has no reliance interest in ATF's prior policy regarding partially complete frames and receivers, because Plaintiff started business six months *after* the Notice announcing ATF's intent to change its policy was issued.  *See* Certification of Formation, Division 80 LLC (showing a formation date of "11/29/2021") (attached as Ex. 3); *Palacios v. DHS*, 434 F. Supp. 3d 500, 507 (S.D. Tex. 2020) (no reliance interest in continued existence of terminated parole program where plaintiffs "have been on notice since August 2017"—before they applied for parole—"that the Program had ended").

In any event, Plaintiff errs in contending that ATF failed to account for any reliance interests of persons or entities already engaged in the production or sales of partially complete frames and receivers.  To the contrary, in its regulatory impact analysis, the agency directly accounted for the costs that such persons or entities might incur under the Rule.  *See* ECF No.

43

11-3 at 27-78.  ATF reasonably concluded, however, that the benefits far outweighed the costs of maintaining a policy regarding partially complete frames and receivers that allowed easy circumvention of the GCA's licensing and serialization requirements, which in turn has promoted illegal weapons trafficking.  Moreover, Plaintiff exaggerates the cost and burden that the Rule imposes: ATF found only 214 companies nationwide that sell firearm parts kits with a partially complete frame or receiver.  *Id.* at 59.  And as noted below, in Plaintiff's case, its costs are limited to applying for a federal firearms license, conducting background checks, and maintaining certain records.  *See infra* II.A.  Moreover, ATF mitigated any burden where feasible by allowing persons to be licensed as dealer-gunsmiths, which will make professional marking services more available to unlicensed individuals, and allow other licensed dealers to receive into inventory and transfer partially complete frames and receivers.  87 Fed. Reg. at 24,664, 24,689, 24,702-04.  ATF has thus complied with the APA.  *See Fox*, 556 U.S. at 515-16.[7]

### 3. Plaintiff Is Not Likely to Succeed on Its Remaining APA Arguments.

Plaintiff also advances three abbreviated APA arguments: (1) ATF's rationale for the Rule is pretextual, Mot. at 49-51, (2) the Rule did not adequately consider regulatory

---

[7] Plaintiff also relies on a "slippery slope" argument, Mot. at 48-49, urging the Court to grant emergency relief not only because the Rule is arbitrary and capricious but because hypothetical future ATF regulations could be arbitrary and capricious.  Plaintiff is not likely to succeed on this claim because it asks the Court to issue an advisory opinion based on hypothetical facts and abstract issues, rather than on the concrete and particularized issue presented here.  *See Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 228 (5th Cir. 2020) (explaining that federal courts "do not render advisory opinions; concrete legal issues, presented in actual cases, not abstractions are requisite") (citation omitted).

alternatives, *id.* at 51-54, and (3) illustrative examples provided in the Rule were not a logical outgrowth of the Notice.  *Id.* at 54-56.  None of these claims are likely to succeed.

1.      Plaintiff argues that the reason given for promulgation of the Rule is pretextual. Relying on *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), Plaintiff contends that the true motivation prompting the Rule was to fulfill a presidential campaign promise.  But "[t]he circumstances in this case do not come close to those in *Department of Commerce.*"  *Biden v. Texas*, No. 21-954, 2022 WL 2347211, at *14 (U.S. June 30, 2022).  That case emphasized that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons," and "may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."  *Dep't of Commerce*, 139 S. Ct. at 2573.  That is all that Plaintiff alleges here.    *See also Guedes v. ATF*, 920 F.3d 1, 34 (D.C. Cir. 2019) ("Presidential administrations are elected to make policy[, a]nd as long as the agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration.") (citation omitted); *Confederacion de Asociaciones Agricolas v. United States*, 32 F.4th 1130, 1141 (Fed. Cir. 2022) (finding no "impropriety" in lawmakers "urging an agency to take action on the merits based on the ineffectiveness of a prior agency action to remedy a particular problem that affects their constituents.").  Unlike in *Department of Commerce*, there is no "significant mismatch between the decision [ATF] made and the rationale [it] provided." 139 S. Ct. at 2575.  ATF determined that the ease with which companies may sell partially complete frames and receivers enables prohibited persons to make their own firearms, and that the lack of serialization on such

firearms makes them nearly impossible to trace when used in crime.  The agency thus decided to require that partially complete frames and receivers have serial numbers, and that manufacturers and sellers of such items be licensed and conduct background checks.  ATF's rationale plainly aligns with its decision.  And to the extent that Plaintiff contends under this rubric that the Rule exceeds ATF's regulatory authority, as explained above, Plaintiff is mistaken.  *See supra* I.A.

2.    ATF also rationally explained why it rejected regulatory alternatives that would not accomplish its policy objectives.  In evaluating an agency's consideration of alternatives, courts do not "ask whether a regulatory decision . . . is better than the alternatives."  *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016).  "Rather, an agency must consider only significant and viable and obvious alternatives," *10 Ring Precision*, 722 F.3d at 724 (citation omitted), and "explain its reasons for rejecting [such] alternatives in sufficient detail to permit judicial review," *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984) (citation omitted); *see also City of Dallas v. Hall*, 562 F.3d 712, 718 (5th Cir. 2009) ("The rejection of even viable and reasonable alternatives, after an appropriate evaluation, is not arbitrary and capricious.").  Here, ATF has appropriately explained its decision to reject the alternatives preferred by Plaintiff.

Plaintiff argues that ATF did not adequately consider two regulatory alternatives: (1) no change at all, and (2) grandfathering prior classification determinations.  As an initial matter, Plaintiff appears to have waived this argument by not presenting it to the agency during rulemaking.  *La. Env't Action Network v. EPA*, 382 F.3d 575, 584 (5th Cir. 2004); *but see City of Seabrook v. EPA*, 659 F.2d 1349, 1360-61 (5th Cir. 1981).  In any event, ATF did address these

alternatives and explained why they were not viable and would not accomplish the agency's policy objectives.  First, ATF explained that it considered the "no change" alternative but opted against it because in enacting the GCA, Congress required the regulation of firearms, and presently, most firearms fall outside the scope of the existing statutory definition of "frame or receiver."  87 Fed. Reg. at 24,724.  This explanation does not stand by itself but is founded on ATF's explanation in the Rule that technological advances have made it easier for prohibited persons to evade the GCA's requirements on firearms possession by making firearms through the purchase of partially complete frames and receivers.  *Id.* at 24,656-57. Plaintiff thus errs in condemning this explanation's "brevity," as if it stood in a vacuum.  Mot. at 52.  Furthermore, Plaintiff does not identify any specific alternative that ATF failed to consider, but instead only expresses its disagreement with the policy ATF adopted.

Second, contrary to Plaintiff's characterization, Mot. at 52, ATF did consider "grandfathering" its prior classification determinations, and partially adopted this alternative. To minimize disruption and cost to the licensed firearms industry as much as possible, and in keeping with ATF's public safety goals, the Rule grandfathers existing complete frame or receiver designs previously determined by ATF to be the firearm "frame or receiver" of a given weapon.  87 Fed. Reg. at 24,652; *see also id.* at 24,683, 24,693.  However, ATF chose not to grandfather partially complete, disassembled, or nonfunctional frames or receivers (including weapon or frame or receiver parts kits) that it had previously classified as *not* being "frames or receivers."  *Id.*; *see also id.* at 24,672.  ATF explained the basis for drawing this distinction.  In the past, incomplete frames or receivers had been sent to ATF for classification without any of the other parts, jigs, templates, or materials that are sold or distributed with the

item or kit. *Id.* at 24,673. Thus, the entire kit may not have been presented to the agency when it made its classification, *id.* at 24,709, despite the fact that these items and materials are necessary for ATF to make a proper firearm classification. *Id.* at 24,725. ATF explained that in addition to not grandfathering these particular classifications, individuals seeking classifications prospectively must submit any associated templates, jigs, molds, equipment, or tools that are made available by the seller or distributor of the item or kit, to the purchaser or recipient of the item or kit, together with any instructions, guides, or marketing materials if they will be made available by the seller or distributor with the item or kit, to ensure that a proper classification decision can be made that considers the entire kit. *Id.* at 24,673. As explained below, the agency did not err in its cost-benefit analysis in making this determination. *See infra* pages 53-54; *contra* Mot. at 53-54.

ATF has thus explained its reasons for deeming the alternatives suggested by Plaintiff inadequate to meet its policy goals. Although Plaintiff disagrees with ATF's decision, "[i]n offering an explanation for rejecting [these] alternative[s], the [agency] was not required to do more." *Am. Radio Relay League v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008) (citation omitted).[8]

3.       Finally, Plaintiff mistakenly contends that the Rule is not a logical outgrowth of the Notice because the Rule contains five "nonexclusive examples that illustrate the definition[]" of a partially complete receiver. 87 Fed. Reg. at 24,739; *see* Mot. at 54-56. Even if Plaintiff has not waived this argument, *see supra* page 46, a notice of proposed rulemaking is

---

[8] Furthermore, even if the Court were to agree with Plaintiff, the "proper course" would not be vacatur but instead "to remand to the agency for additional investigation or explanation." *Knapp v. USDA*, 796 F.3d 445, 459 (5th Cir. 2015) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

"not required to specifically identify every precise proposal which the agency might ultimately adopt" but instead "satisfie[s] the requisite standard by fairly apprising interested persons of the subjects and issues the agency was considering." *Huawei Techs. USA v. FCC*, 2 F.4th 421, 448 (5th Cir. 2021) (citation and alterations omitted); *see also ConocoPhillips Co. v. EPA*, 612 F.3d 822, 834 (5th Cir. 2010) ("[C]ourts must proceed with caution before deeming a Final Rule too attenuated from the Proposed Rule, lest we supplant the agency's role in the nation's regulatory scheme.").

The Rule satisfies this standard.  The five hypothetical examples were added to illustrate when a partially complete frame or receiver is considered a "frame or receiver."  The notice of proposed rulemaking announced ATF's intent to define "frame or receiver" as including, "in the case of a frame or receiver that is partially complete, disassembled, or inoperable, a frame or receiver that has reached a stage in manufacture where it may readily be completed, assembled, converted, or restored to a functional state," and noted that in determining this status, ATF "may consider any available instructions, guides, templates, jigs, equipment, tools, or marketing materials."  86 Fed. Reg. at 27,729.  The five examples in the Rule simply reflect sample applications of this definition to show when a particular item is or is not considered a "frame or receiver" in response to comments seeking clarity.  87 Fed. Reg. at 24,693, 24,739.  Because the proposed rule "fairly appris[ed] interested persons of the subjects and issues the agency [was] considering," the Rule—including the five illustrative examples—is a logical outgrowth.  *Huawei Techs. USA*, 2 F.4th at 448 (citation omitted).

Notably, Plaintiff fails to cite any authority suggesting that an agency violates principles of fair notice merely by including illustrative examples in a final regulation.  Unlike in *Texas*

*Association of Manufacturers v. Consumer Product Safety Commission*, 989 F.3d 368 (5th Cir. 2021), cited by Plaintiff, there was no "change [here] in the justification for the Proposed Rule and the justification for the Final Rule." *Id.* at 382. The illustrative examples "changed nothing about the import of the rule [but] merely served to elucidate what the proposed rule had announced." *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 135 (D.D.C. 2016). The public received fair notice of the Rule's content.

*     *     *

Ultimately, Plaintiff merely disagrees with the policy judgments made by ATF in promulgating the Rule. But such disagreement is not a basis for finding the Rule arbitrary and capricious. Plaintiff fails to show it is likely to succeed under the "highly deferential" arbitrary and capricious standard.

## II. Plaintiff Has Not Shown That It Will Incur Irreparable Harm Absent a Preliminary Injunction.

### A. Plaintiff Fails to Substantiate Any Imminent Threat of Irreparable Injury.

"The party seeking a preliminary injunction must show that the threatened irreparable harm is more than mere speculation, . . . and that the injury is imminent." *Rodden v. Fauci*, __ F. Supp. 3d __, 2021 WL 5545234, at *2 (S.D. Tex. Nov. 27, 2021) (citations omitted). "Speculative injury is not sufficient" in making this demonstration. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *accord Sheffield v. Bush*, __ F. Supp. 3d __, 2022 WL 1638205, at *15 (S.D. Tex. May 23, 2022).

Plaintiff has not demonstrated either imminent injury or that the economic harm it alleges threatens its very existence. Instead, Plaintiff warns in general and conclusory language that the consumers of its products are "sensitive issues [sic] of cost and convenience," and

speculates on this basis that if it does not receive preliminary injunctive relief, it will suffer "a dramatic reduction in consumer demand."  Decl. of Brandon Padilla ¶ 9, ECF No. 11-26. However, Plaintiff fails to substantiate its allegation of irreparable economic harm with any actual evidence.  For example, Plaintiff does not provide any evidence quantifying the extent of any alleged reduction in consumer demand, or indeed provide any data to support its conclusory assertions.  Without doing so, it cannot satisfy its burden of establishing irreparable injury.  *See Pizza Inn v. Pizza Inn Advert. Plan Coop.*, No. 4:20-CV-00064-RWS, 2020 WL 6803253, at *5 (E.D. Tex. Apr. 3, 2020) (no emergency injunctive relief where plaintiff "ha[d] not demonstrated that the threat of irreparable harm"—the loss of its business—"is imminent or even likely"); *Morice v. Hosp. Serv. Dist. #3*, No. 18-7945, 2019 WL 1517954, at *8 (E.D. La. Apr. 8, 2019) (plaintiff "fail[ed] to present credible evidence" that its business would likely cease where, "[w]ithout reference to financial statements or other corroborating evidence," it provided only "conclusory and self-serving statements" without "specific or corroborating details").[9]

---

[9] *See also Andritz Sundwig GmbH v. United States*, No. 4:18-2061, 2018 WL 3218006, at *10 (S.D. Tex. July 2, 2018) (where plaintiff "conceded that bankruptcy is only a possibility and is not a definite outcome if the injunction is denied," its "testimony fail[ed] to demonstrate financial harm that would threaten [its] existence and, therefore, fail[ed] to establish irreparable harm"); *AIDS Healthcare Found. v. City of Baton Rouge*, No. 17-00229, 2017 WL 2899689, at *2-3 (M.D. La. July 7, 2017) (no irreparable harm where only 6% of clinic's patients were affected by defendant's allegedly unlawful conduct and thus "any potential financial harm Plaintiff might suffer [wa]s not enough to threaten the existence of" its business); *Camber Energy. v. Discover Growth Fund*, No. CV H-17-1436, 2017 WL 1969682, at *1 (S.D. Tex. May 11, 2017) (mere "conclusory allegation" that stock exchange delisting "would put [plaintiff] out of business" did not establish irreparable harm); *Altairia Corp. v. Woodbolt Distrib.*, No. 14-471, 2014 WL 3121899, at *5 (W.D. Tex. July 7, 2014) (company "failed to demonstrate irreparable harm is likely" where it was "not . . . able to provide any compelling evidence of a decrease in sales as a result of" defendant's activities "or any evidence end-use consumers are purchasing less");

At bottom, Plaintiff's purported future harm boils down to unsubstantiated assertions that (1) complying with the Rule *might* significantly increase its costs, (2) its customers *might* react to this hypothetical cost increase by reducing the quantity of their business with Plaintiff, and (3) those customers that do so *might* do so in such volume that Plaintiff will be put out of business. But "[s]peculation built upon further speculation does not amount to a reasonably certain threat of imminent harm and does not warrant injunctive relief," *Sierra Club v. U.S. Army Corps of Eng'rs*, 482 F. Supp. 3d 543, 559 (W.D. Tex. 2020) (citation omitted), let alone confer standing, *see Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017) ("An injury that is based on a 'speculative chain of possibilities' does not confer Article III standing.") (citation omitted); *Little v. KPMG LLP*, 575 F.3d 533, 540-41 (5th Cir. 2009) (claim of lost business as injury that "depend[ed] on several layers of decisions by third parties" was "too speculative to confer Article III standing").

Moreover, Plaintiff fails to substantiate any of the links in this chain of conjecture. As to (1), the additional cost amounts to the cost of a federal firearms license—$200 for three years—and of conducting background checks and maintaining certain business records.[10] Such costs are consistent with maintaining a company's normal business operations; indeed,

---

*Metal Mgmt. Miss., Inc. v. Barbour*, No. 3:08-CV-00431, 2008 WL 3842979, at *12 (S.D. Miss. Aug. 13, 2008) (no irreparable harm where "[t]he possibility that the plaintiff may go out of business is unsupported by any competent proof and is only alluded to as a mere possibility").

[10] The cost of a three-year license to be a dealer in firearms other than destructive devices is $200. 27 C.F.R. § 478.42(c)(2). The cost of renewal is $90 for three years. *Id.* Licensed dealers must conduct background checks before transferring firearms to non-licensees, 18 U.S.C. § 922(t), and maintain records of firearms acquisition and disposition. 27 C.F.R. § 478.124. Because partially complete frame and receivers will already be serialized by manufacturers, *see* ECF No. 11-3 at 56, Plaintiff will not be responsible for serializing these items.

there are more than 53,000 federally licensed firearms dealers (excluding dealers in destructive devices), and more than 5,000 in Texas alone, all of whom are able to carry such costs.[11]  And as to (2) and (3), as explained above, mere speculation that an entity might go out of business because of an unsubstantiated fear of decreased sales is insufficient to demonstrate irreparable injury.  *See Ascend Geo v. OYO Geospace Corp.*, No. H-09-2886, 2009 WL 3735963, at *3 (S.D. Tex. Nov. 4, 2009) (no irreparable harm where "Plaintiff's assertion that it will suffer lost sales if the injunction does not issue is speculative"); *Peavey Elecs. Corp. v. Pinske*, No. 4:10CV69, 2010 WL 2243562, at *5 (S.D. Miss. June 1, 2010) (no threat of irreparable harm where plaintiff failed to show "it ha[d] lost any clients or [wa]s in serious danger of losing customers" as "[i]t is not enough to show that [plaintiff] could possibly lose business, which [wa]s all it ha[d] done").

Furthermore, Plaintiff misunderstands ATF's anticipation that non-licensed producers and sellers of partially completed frames and receivers will be unlikely to choose to become federal firearms licensees.  *See* Mot. at 53, 57-58.  As explained above, the costs of a license are modest, so there is no reason to believe that becoming a licensed dealer is cost-prohibitive.  Rather, the reason that ATF anticipates that such businesses are not likely to become licensed is because persons prohibited from possessing firearms under federal law tend to prefer to purchase unserialized, easy-to-complete frames and receivers without a background check, which they can readily convert into useable firearms.  *See* ATF Response to FBI Criminal Justice Information Services comment at 2 (attached as Ex. 4) (explaining that firearm parts

---

[11] ATF, *Federal Firearms Listings*, https://www.atf.gov/firearms/listing-federal-firearms-licensees (last accessed June 29, 2022).

kits with partially complete frames or receivers "are currently desired because they are perceived as unregulated, and are not marked with serial numbers"). Indeed, the business model of entities such as Plaintiff is premised on circumvention of the GCA's regulatory scheme, which is intended to ensure that prohibited persons do not acquire firearms, and that firearms involved in crime can be traced. *See id.* (noting that "the market demand for these kits[] largely depends on them being unserialized and untraceable"). In other words, while ATF anticipates that some non-licensed sellers will decide as a matter of personal choice not to obtain licenses and instead to dissolve their businesses, such dissolution does not follow as an inevitable result of the Rule, as Plaintiff contends.

Plaintiff cites two cases to support its claim of irreparable harm, but in both cases, unlike here, the plaintiffs presented factual evidence substantiating their contentions that they faced imminent threats of business stoppage. In *Atwood Turnkey Drilling v. Petroleo Brasileiro*, 875 F.2d 1174 (5th Cir. 1989), an oil company pleaded specific facts demonstrating that it would "be forced into bankruptcy" absent injunctive relief barring the expiration of a letter of credit: namely, that its creditors had only extended the company credit on the basis of the letter, and that because it would lose most, if not all, financing without the letter, it would be forced to cease business operations. *Id.* at 1178-79. And in *Jiao v. Xu*, 28 F.4th 591 (5th Cir. 2022), the district court had determined that a hotel-owning company was "in imminent danger of losing the hotel's IHG franchise and even the hotel itself" based on the "testimony of both fact and expert witnesses." *Id.* at 598. By contrast, Plaintiff presents no specific facts to substantiate its alleged economic losses, much less any suggesting that it is "in imminent danger" of a loss of business operations. Instead, Plaintiff relies on conjecture without

supporting facts.  Consequently, "[a]t this point, it is too speculative to say that [Plaintiff is] in imminent danger of irreparable harm."  *Rodden*, 2021 WL 5545234, at *2.

## B.   A Cease-and-Desist Letter That ATF Issued to An Entity Other Than Plaintiff Does Not Support Plaintiff's Allegations of Irreparable Harm.

Plaintiff also fails to show a certainly impending threat of irreparable harm based on a cease-and-desist letter that ATF issued to another entity and subsequently rescinded.  *See* ECF No. 11-34, at 9.  As an initial matter, a court recently held that the very cease-and-desist letter on which Plaintiff relies "does not determine rights or obligations and otherwise has no direct legal consequences, either civil or criminal."  *Not an LLC v. ATF*, No. 2:22-cv-747, 2022 WL 2073340, at *7 (W.D. Pa. June 9, 2022).  Therefore, even if Plaintiff received a similar letter, it would suffer no cognizable harm.

In any event, however, Plaintiff does not allege that it engages in the conduct that gave rise to the cease-and-desist letter.  The letter addresses the sale of "complete" firearm kits, or "kits which include all components necessary to produce a functional firearm."  ECF No. 11-30 ("C&D Ltr.") at 1.  By contrast, Plaintiff alleges that "[i]ts exclusive business is the distribution of receiver blanks," which are "also commonly known as '*incomplete* receivers.'"  Compl. ¶¶ 6, 26 (emphasis added).  That distinction is critical.  Whereas the Rule amends ATF's prior classification of some receiver blanks (*i.e.*, incomplete receivers, which cannot be converted to functioning firearms without the addition of separate parts), complete weapons parts kits have long been understood to fall within the statutory definition of "firearm," because such kits—standing alone—"may readily be converted to expel a projectile by the action of an explosive."  18 U.S.C. § 921(a)(3)(A); *see* 87 Fed. Reg. at 24,692; 86 Fed. Reg. at 27,726 & nn.39-40 (citing case law).  Thus, with respect to weapon parts kits, the Rule merely

codifies ATF's existing legal interpretation that complete weapon parts kits are "firearms" within the meaning of the GCA, whereas the Rule updates the regulatory definition of "frame or receiver" to include an incomplete frame or receiver "that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 87 Fed. Reg. at 24,739.

Against this backdrop, Plaintiff is incorrect to assert that the cease-and-desist letter suggests that ATF is "attempt[ing] to enforce the Final Rule prior to its effective date." Mot. at 58 (emphasis omitted). The letter itself is clear that it reflects ATF's longstanding position that complete firearm kits—by contrast to certain incomplete frames and receivers—"have always been firearms pursuant to statute[,] . . . notwithstanding the recently announced regulations and definitions" pursuant to the Rule. C&D Ltr. at 1. It follows that Plaintiff is also incorrect to assert that "there is a strong likelihood that ATF will attempt to shut down Division 80, its suppliers, or its customers prior to the effective date of the Final Rule." Mot. at 61.[12] Indeed, Plaintiff identifies no cease-and-desist letter directed to an entity or individual that sells only incomplete receivers, nor are Defendants aware of any such letter. Plaintiff accordingly has not shown that it faces likely irreparable harm from the Rule's premature enforcement.

---

[12] With respect to Plaintiff's suppliers and customers, Plaintiff does not allege that it either buys complete firearm kits or sells to merchants of complete firearm kits.

### C.   Because Plaintiff Took Voluntary Action in the Face of a Clearly Foreseeable Risk, It Cannot Show Irreparable Harm.

When a party is aware of foreseeable risks of taking voluntary action, the assumed risk cannot form the basis for a claim of irreparable harm.  Plaintiff started business in November 2021, months after ATF announced its plans to issue new regulations subjecting certain frames and receivers to regulatory requirements.  *See* Ex. 3.  Because Plaintiff's alleged harm resulted from its assumption of a clearly foreseeable risk when it decided to start its business, that alleged harm does not constitute irreparable injury.

"In assessing [a party's] irreparable harm, [courts] exclude the burden it voluntarily assumed by proceeding in the face of a known risk."  *Floralife, Inc. v. Floraline Int'l, Inc.*, 633 F. Supp. 108, 114 (N.D. Ill. 1985).  It is a settled equitable principle that a party who voluntarily assumes the risk of foreseeable harm may not contend that such alleged harm is irreparable. *See, e.g.*, *Hardin v. Houston Chron. Pub. Co.*, 434 F. Supp. 54, 57 (S.D. Tex. 1977) (no irreparable harm based on risk that plaintiffs' business operations would be terminated when they negotiated contracts allowing for such terminations, which were thus "a foreseeable risk of doing business") *aff'd*, 572 F.2d 1106 (5th Cir. 1978); *United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004) (enjoined party would not suffer irreparable injury when construction of apartments was halted because the design violated federal law and the party enjoined had been warned of that fact); *Ty v. Jones Grp., Inc.*, 237 F.3d 891, 903-04 (7th Cir. 2001) (defendant's "claim of irreparable harm rings hollow considering when it decided to

produce [a product] it had knowledge of the potential consequences," *viz.*, that it might "face legal challenges to its product and in turn negative financial consequences").[13]

Because Plaintiff "knew the risks it was taking when it" created a company distributing partially complete frames and receivers, such "harm . . . does not constitute irreparable injury." *BMC Software, Inc. v. IBM Corp.*, No. H-17-2254, 2018 WL 4520020, at *3 (S.D. Tex. Sept. 21, 2018); *see also Salt Lake Trib. Publ'g. Co. v. AT & T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (denying preliminary injunction where alleged future business losses stemmed from a management change "result[ing] from the express terms of a contract [plaintiff] negotiated"); *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630, 2012 WL 2576136, at *8 (N.D. Cal. July 3, 2012) (no irreparable harm justifying stay where company "assumed the risk of facing disruptions to [its] business practices by building [its] promotional schemes on a product that has been the subject of a pending preliminary injunction motion"); *Fluor Daniel Argentina, Inc. v. ANZ Bank*, 13 F. Supp. 2d 562, 565 (S.D.N.Y. 1998) (no irreparable harm based on financial losses associated with need to utilize legal processes of foreign country to enforce judgment where such risk was "fully foreseeable" by plaintiff when it contracted with a foreign company "and effectively assumed these risks").  This includes harm allegedly caused by government action.  *See Athenex Inc. v. Azar*, No. 19-cv-603, 2019 WL 4316139, at *1-2 (D.D.C. Sept. 6, 2019) (no irreparable harm justifying stay pending appeal where company produced medical product without any assurance that Food and Drug Administration would recognize clinical

---

[13] *FEC v. Cruz*, 142 S. Ct. 1638 (2022), does not suggest to the contrary.  That case declined to recognize an exception to Article III's traceability requirement for injuries that a party purposely incurs.  *See id.* at 1646-47.  By contrast, the issue here is whether a party may plead irreparable harm on the basis of alleged injuries sustained in the face of known risk.

need for product); *Citizens of the Ebey's Rsrv. v. U.S. Dep't of the Navy,* 122 F. Supp. 3d 1068, 1083 (W.D. Wash. 2015) (no irreparable harm based on alleged adverse health effects where plaintiffs had moved to vicinity of naval base only after it had been zoned for high intensity noises).

Plaintiff assumed the risk of incurring such alleged harm when it decided to start its business six months after the promulgation of the Notice.[14]  It may not now invoke this Court's equitable authority to protect itself "from the consequences of its own fully-informed decisions." *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 263 F. Supp. 3d 144, 151 (D.D.C. 2017).[15]

## III. The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate.

Although the balance of the equities and the public interest typically are considered as separate factors in the preliminary injunction analysis, "[t]hese factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  Here, these combined factors strongly counsel against issuing the requested preliminary injunction.

---

[14] Moreover, Plaintiff may not premise irreparable harm on its contention that its business will be unable to continue unless it obtains a federal firearms license, Padilla Decl. ¶ 12, because such alleged harm is self-inflicted.  *See Second City Music v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("Injury caused by failure to secure a readily available license is self-inflicted, and self-inflicted wounds are not irreparable injury.").

[15] Concurrent with this opposition brief, Defendants have filed a motion for leave to seek jurisdictional discovery.  *See* Mot. for Leave to Conduct Discovery Limited to the Issue of Subject Matter Jurisdiction, ECF No. 17.  As explained in that motion, the Court should not exercise its jurisdiction before further development regarding the basis of Plaintiff's asserted standing to sue.

Congress has determined that certain dangerous persons must not possess firearms; that persons or entities that regularly buy and sell firearms for profit must be licensed; that firearms must bear serial numbers to aid law enforcement in the event that a firearm is used to commit a crime; and that licensed dealers must keep records of their firearm sales for the same reason. *See* 18 U.S.C. § 922(g); *see also supra* Statutory Background. Congress further provided that a "firearm" includes "the frame or receiver of any such weapon" and left it to ATF to define that subsidiary term. 18 U.S.C. § 921(a)(3)(B). ATF has exercised that authority to promulgate the Rule. Under such circumstances, if "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

Moreover, granting Plaintiff's requested preliminary injunction would significantly harm the government's interests in law enforcement and public safety. When it takes effect, the Rule will "increase public safety by, among other things, preventing prohibited persons from acquiring firearms and allowing law enforcement to trace firearms involved in crime." 87 Fed. Reg. at 24,654. It is well established that the government has a "compelling interest[]" in protecting "public safety." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989). Further, in the context of preliminary injunctions, in particular, the Supreme Court has instructed that, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citation omitted). Here, the public consequences of

60

permitting unlicensed merchants to sell firearms without serial numbers, without keeping purchase records, and without confirming would-be gun owners' eligibility to possess firearms weighs heavily against granting Plaintiff's requested preliminary injunction.

On the other side of the balance, Plaintiff's interests are merely pecuniary.  *See* Mot. at 57 (asserting that "[i]f the Final Rule takes effect, Division 80 will suffer irreparable harm because it will be forced out of business").  Such interests do not outweigh the government's interest in preventing violent crime.  *See, e.g.*, *Slocum v. City of Cleveland Heights*, No. 1:14CV532, 2014 WL 1237534, at *5 (N.D. Ohio Mar. 25, 2014) (holding that "the interest in protecting the public from . . . gun violence" outweighed allegedly "substantial damage to [the plaintiffs'] financial condition and loss of goodwill").

In sum, the balance of the equities and the public interest both weigh in favor of denying Plaintiff's motion.  Accordingly, Plaintiff is not entitled to a preliminary injunction, and the Court need not reach the merits of its claims.  *See Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016).[16]

---

[16] For the same reasons that Plaintiff has not established that it is entitled to preliminary relief, there is no basis for the Court to postpone the Rule's effective date as Plaintiff urges.  *See* Mot. at 63-64.  The same factors that govern the issuance of a preliminary injunction govern the issuance of a stay pending judicial review pursuant to Section 705 of the APA, which authorizes "the reviewing court" to stay "the effective date of an agency action" pending judicial review "to prevent irreparable injury."  5 U.S.C. § 705; *see, e.g.*, *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016); *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015); *IHG Healthcare, Inc. v. Sebelius*, No. H-09-3233, 2010 WL 11680368, at *1 (S.D. Tex. Apr. 1, 2010).  Because Plaintiff has not satisfied its burden with respect to those four factors, the Court should deny Plaintiff's request for a stay pursuant to Section 705.

## IV.    Any Relief Ordered Should Be Appropriately Limited.

In the event the Court were to disagree with Defendants, any relief ordered should be no broader than necessary to remedy the demonstrated harms of the specific, identified plaintiff in this case.  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford,* 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994) (citation omitted).  "A district court abuses its discretion if it does not 'narrowly tailor an injunction to remedy the specific action which gives rise to the order.'"  *ODonnell v. Harris Cnty.*, 892 F.3d 147, 163 (5th Cir. 2018) (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)), *overruled on other grounds by Daves v. Dallas Cnty.*, 22 F.4th 522, 534 (5th Cir. 2022).  Accordingly, even if this Court were to grant preliminary injunctive relief, it should refuse Plaintiff's request to issue a nationwide injunction and, instead, limit the application of any injunction to Plaintiff.

Indeed, Plaintiff fails to demonstrate that this case is an appropriate vehicle for "one district court [to] make a binding judgment for the entire country."  *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021); *see id.* at 264 (granting stay pending appeal to all but the plaintiff-states).  The "little justification" that Plaintiff provides "for issuing an injunction outside the [entity] that brought this suit," *id.* at 263, is its bare assertion that the products it distributes are shipped "from out of state" and that "most of its customers are out of state," Mot. at 61.  Which state or states?  How many manufacturers or customers are located in each one?  Plaintiff does not say, or provide any evidence to substantiate its vague assertion.  Nor does this threadbare allegation show that Plaintiff will suffer imminent irreparable harm absent

nationwide relief.  And at a minimum, these vague assertions do nothing to demonstrate why a more narrowly tailored injunction could not be crafted to provide complete relief *to Plaintiff*, which is what Article III and basic principles of equity require.

Nor does the case law Plaintiff cites suggest that nationwide relief is appropriate here. *Green Valley Special Utility District v. City of Schertz*, 969 F.3d 460 (5th Cir. 2020), did not involve nationwide relief, and reiterated the Fifth Circuit's statements in *John Doe #1* and *ODonnell* that injunctive relief must be "vacated" as "overbroad" if not "narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order." *Id.* at 478 n.39 (citations omitted).  And *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), "does not hold that nationwide injunctions are required or even the norm." *Louisiana*, 20 F.4th at 263.  That case relied on "the constitutional command for 'uniform' immigration laws and a concern that 'a geographically-limited injunction would be ineffective because [Deferred Action for Parents of Americans] beneficiaries would be free to move among states.'" *Id.* (citation omitted).  No similar concerns are presented here.

Moreover, nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J., concurring in grant of stay) (stating that nationwide injunctions raise serious separation of powers concerns and hamper orderly judicial resolution of cases).  Consequently, even if the Court were to disagree with Defendants and order emergency injunctive relief, any such relief should apply only to Plaintiff.

Furthermore, even if the Court were to grant emergency relief enjoining ATF's treatment of partially complete "frames or receivers" as applied to Plaintiff, the rest of the Rule should stand because it contains a severability clause.  *See* 87 Fed. Reg. at 24,730. Typically, "[w]hether the offending portion of a regulation is severable depends upon [1] the intent of the agency *and* [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *accord Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only "the portions of the final rule" that the court decided were unlawful).  Here, the Rule's severability clause makes clear ATF's intentions with respect to severability.  *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).  And a review of the remainder of the Rule makes clear that it could easily function in the absence of the partially complete "frame or receiver" portion of the Rule.  Thus, because Plaintiff marshals no "strong evidence" to the contrary, any "objectionable provision[s]" should be "excised" from the rest of the Rule.  *Id.*

## CONCLUSION

For the reasons stated above, the Court should deny Plaintiff's emergency motion for a preliminary injunction.

DATED: July 1, 2022                          Respectfully submitted,

BRIAN M. BOYNTON
Principal   Deputy   Assistant   Attorney
General

ALEXANDER K. HAAS
Director, Federal Programs Branch

LESLEY FARBY
Assistant   Director,   Federal   Programs
Branch

/s/ Daniel Riess
DANIEL RIESS
MARTIN M. TOMLINSON
TAISA GOODNATURE
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone:          (202) 353-3098
Email: Daniel.Riess@usdoj.gov

*Attorneys for Defendants*

65