UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS,
GALVESTON DIVISION

------------------------------------------------- X
DIVISION 80 LLC,                                 :
                                                 :     No. 3:22-CV-00148
                 Plaintiff,                      :
                                                 :     Hon. Jeffrey V. Brown
            v.                                    :
                                                 :
MERRICK GARLAND, in his official                 :
capacity as Attorney General of the              :
United States, *et al.*,                         :
                                                 :
                 Defendants.                     :
------------------------------------------------- X

## BRIEF OF *AMICI CURIAE* GUN VIOLENCE PREVENTION GROUPS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

ADAM M. KATZ
RACHEL H. ALPERT
COOLEY LLP
500 Boylston Street
Boston, MA 02116
Telephone: (617) 937-2351
akatz@cooley.com
ralpert@cooley.com

DANIEL GROOMS
COOLEY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  (202) 776-2042
dgrooms@cooley.com

*Counsel for Amici Curiae*

July 8, 2022

# TABLE OF CONTENTS

Disclosure Statement...........................................................................vi

Statement of Interest.........................................................................vii

Introduction.........................................................................................1

Argument..............................................................................................5

    I.    The Rule Faithfully Implements the Gun Control Act and
        Prevents its Subversion..............................................................5

    II.   The Rule Appropriately Considers the Practical Reality
        that Ghost Guns Can be Quickly and Easily Assembled by
        Nonexperts..............................................................................16

    III.  The Rule Comports with ATF's Longstanding View that
        Unfinished Frames and Receivers Can Be Firearms.................20

Conclusion..........................................................................................24

Certificate of Service.........................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States,*
573 U.S. 169 (2014) ................................................................. 1, 10, 13

*Barrett v. United States,*
423 U.S. 212 (1976) ................................................................. 10

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ................................................................. 10

*Huddleston v. United States,*
415 U.S. 814 (1974) ................................................................. 8, 9

*Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pellella,*
350 F.3d 73 (2d Cir. 2003) ................................................................. 5

*Nat'l Shooting Sports Found., Inc. v. Jones,*
716 F.3d 200 (D.C. Cir. 2013) ................................................................. 14, 15

*New York State Rifle & Pistol Assoc., Inc. v. Bruen,*
2022 WL 2251305 (U.S. June 23, 2022) ................................................................. 10

*Shawano Gun & Loan, LLC v. Hughes,*
650 F.3d 1070 (7th Cir. 2011) ................................................................. 13

*United States v. Cooper,*
714 F.3d 873 (5th Cir. 2013) ................................................................. 16

*United States v. Fuller-Ragland,*
931 F.3d 456 (6th Cir. 2019) ................................................................. 14

*United States v. Hardin,*
889 F.3d 945 (8th Cir. 2018) ................................................................. 16

*United States v. Harris,*
720 F.3d 499 (4th Cir. 2013) ................................................................. 14

*United States v. Marzzarella,*
614 F.3d 85 (3d Cir. 2010) ................................................................. 14, 15

*United States v. Mobley,*
956 F.2d 450 (3d Cir. 1992) ................................................................. 15

## TABLE OF AUTHORITIES
### CONTINUED

Page(s)

*United States v. Mullins*,
446 F.3d 750 (8th Cir. 2006)........................................................ 17

*United States v. Rivera*,
415 F.3d 284 (2d Cir. 2005) ........................................................ 16

*United States v. Smith*,
477 F.2d 399 (8th Cir. 1973)........................................................ 17

*United States v. St. Hilaire*,
960 F.3d 61 (2d Cir. 2020) .......................................................... 14

**Statutes and Regulations**

18 U.S.C.
§ 921..................................................................................*passim*
§ 922..................................................................................*passim*
§ 923..................................................................................*passim*
§ 924...................................................................................... 10

27 C.F.R.
§ 478.73..................................................................................8
§ 478.92................................................................................ 14
§ 478.99..................................................................................8
§ 478.101................................................................................8
§ 478.102................................................................................9

87 Fed. Reg.
24652 ............................................................................... 2, 4
24656 ..................................................................................2
24676 ..................................................................................4

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213...................*passim*

U.S.S.G. § 2K2.1(b)(4)(B) ........................................................ 14

U.S. Const.
amend. II ............................................................................ 10
amend. XIV.......................................................................... 10

## TABLE OF AUTHORITIES
### CONTINUED

Page(s)

**Other Authorities**

Administrative Record, *City of Syracuse, et al. v. Bur. of Alcohol,*
 *Tobacco, Firearms & Explosives*,
 1:20-CV-6885, ECF No. 60 (S.D.N.Y. Dec. 8, 2020) .............................. 21, 22

*About,* R&B Tactical Tooling
 (last visited Nov. 19, 2021), https://bit.ly/3oNKmZU.................................. 12

*Buying Guns Online Without an FFL,* 80% Arms Blog
 (Dec. 3, 2019), https://bit.ly/3HClkFU ......................................................... 12

Complaint, *People v. Blackhawk Mfg. Grp., Inc., et al.*,
 CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) ........................................ 19

Decl. of Justin McFarlan, *City of Syracuse, et al. v. Bur. of*
 *Alcohol, Tobacco, Firearms & Explosives*,
 1:20-CV-6885, ECF No. 64-34 (S.D.N.Y. Dec. 9, 2020) .................. 19, 21, 23

*Ghost Gunner*, Ghost Guns
 (last visited Dec. 14, 2021), https://bit.ly/3pUjDvj ...................................... 12

*Ghost Guns Recoveries and Shootings*, Everytown Research
 (Apr. 8, 2022), https://bit.ly/3bSCcwt............................................................2

Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel*
 *Epidemic of Violence*, N.Y. Times (Nov. 14, 2021) ..................................... 18

*GST-9: 80% Pistol Build Kit*, 80% Arms
 (last visited Nov. 19, 2021), https://bit.ly/3x6n0T7 ..................................... 18

H. Rep. No. 116-88 (2019)................................................................................. 15

H. Rep. No. 90-1577 (1968)................................................................................7

*How-To Manuals,* Polymer80
 (last visited Dec. 17, 2021), https://bit.ly/3qUwobt ..................................... 18

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked*
 *'Ghost Guns,' Authorities Say, and Then Killed His Sister with*
 *One*, Wash. Post. (Dec. 3, 2021), https://wapo.st/3Ggarb9.......................... 18

## TABLE OF AUTHORITIES
## CONTINUED

**Page(s)**

*JSD 80% Lower Receivers, Jigs, and Gun Parts Kits*, JSD Supply
(last visited Feb. 12, 2022), https://bit.ly/3rKrgqj ...................................... 12

*Lower Receiver*, SS-Arms
(last visited Dec. 14, 2021), https://bit.ly/3GAVvVo .................................... 12

Mem. in Support of Prelim. Inj., *City of New York v. Arm or Ally
LLC, et al.,*
22-CV-5525, ECF No. 9 (S.D.N.Y. June 29, 2022) ...................................... 19

S. Rep. No. 89-1866 (1966) ................................................................. 11

S. Rep. No. 90-1501 (1968) .................................................................7

*The Router Jig Pro Multiplatform – AR-15 / AR-9/AR
45/.308/AR-10*, 5D Tactical
(last visited Nov. 19, 2021), https://bit.ly/3x72bqx .................................... 18

*Trafficking & Straw Purchasing*, Giffords Law Center
(last visited Dec. 14, 2021), https://bit.ly/3FBTtnv .................................... 13

*Untraceable: The Rising Specter of Ghost Guns,* Everytown
Research (May 14, 2020), https://bit.ly/3DTrIWj ........................................ 18

U.S. Dept. of the Treasury,*Following the Gun: Enforcing Federal
Laws Against Firearms Traffickers*, (June 2000)
https://bit.ly/3HClkFU .................................................................... 12

*Webster's Third New International Dictionary* 1889 (1965) ............................ 22

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, *amici curiae* respectfully submit the following disclosures:

Brady United Against Gun Violence ("Brady") is a nonprofit corporation and has no parent corporation. Brady has no stock, therefore no publicly held company owns 10% or more of its stock.

Everytown for Gun Safety Action Fund ("Everytown") is a nonprofit corporation and has no parent corporation. Everytown has no stock, therefore no publicly held company owns 10% or more of its stock.

March For Our Lives ("MFOL") is a nonprofit corporation and has no parent corporation. MFOL has no stock, therefore no publicly held company owns 10% or more of its stock.

## STATEMENT OF INTEREST

*Amici curiae* Brady, Everytown, and MFOL (together, the "Gun Violence Prevention Groups") submit this brief in support of Defendants' opposition to Plaintiff's motion for a preliminary injunction.[1]

Brady is the nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has researched the prevalence of ghost guns, created resources to demonstrate the alarming ease with which ghost guns can be obtained and assembled, and advocated on behalf of commonsense measures to stop the spread of ghost guns.

Everytown is the nation's largest gun-violence-prevention organization. Everytown has advocated for measures to limit the proliferation of unserialized firearms and studied the detrimental effects of these firearms on public safety and federal and state laws.

MFOL is a nonprofit organization of young people from across the country who are fighting for sensible gun-violence-prevention policies. MFOL has fought for measures to curtail the proliferation of ghost guns and has focused in particular on the deadly effects of ghost guns on teenagers.

---

[1] No party's counsel authored this brief in whole or in part and no one other than *amici* and their counsel made any contribution toward the preparation or submission. The parties confirmed in writing that they do not oppose this brief's filing.

## INTRODUCTION

To advance public safety, the Gun Control Act of 1968 (the "Act"), Pub. L. No. 90-618, 82 Stat. 1213, as amended, subjects "firearms" to critical requirements: background checks to prevent sales to persons who have committed felonies, who are fugitives, and who are not of legal age, among others; licensing for manufacturers, importers, and dealers to ensure that firearms are built and sold responsibly; and serialization to allow law enforcement to trace guns to their first retail sale.  18 U.S.C. §§ 921–931. Congress enacted these requirements to "prevent guns from falling into the wrong hands" and to "assist law enforcement . . . in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 172, 180 (2014).

The recent and rapid proliferation of "ghost guns" has undermined the Act and Congress's law-and-order objectives.  A ghost gun is a fully functional, unserialized, and untraceable weapon that can be finished and assembled in an hour or less from components freely available for purchase online or at gun shows (including as part of ghost gun "kits") with no background check and no questions asked.  Ghost guns thwart the Act by allowing criminals and other prohibited individuals to acquire, use, and traffic deadly weapons, all while remaining undetectable to law enforcement.

Recoveries of ghost guns in connection with crimes have increased at an alarming rate in recent years, as statistics compiled by the Bureau of Alcohol,

Tobacco, Firearms, and Explosives ("ATF") demonstrate.  From 2016 through 2021, law enforcement agencies reported 45,240 recoveries of ghost guns to ATF, with 19,344 recoveries in 2021 compared to 1,758 recoveries in 2016.[2]  Of these recoveries, 692 ghost guns were recovered in connection with a homicide or attempted homicide.[3]  The acute public safety threat posed by ghost guns shows no signs of abating on its own.  In April, a 17-year-old shot and killed a 16-year-old with a ghost gun outside a high school.[4]  In March, a high school student used a ghost gun to shoot a school administrator.[5]  In February, a man subject to a domestic violence restraining order killed his three daughters and himself with a ghost gun.[6]

ATF acted prudently and well within its authority in promulgating the rule at issue here, *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652 (Apr. 26, 2022) (the "Rule"), which confirms that the core building blocks of ghost guns—unserialized, unfinished frames (the core component of pistols) and unfinished receivers (the core component of long

---

[2] 87 Fed. Reg. 24652, 24656.

[3] *Id.*

[4] *Ghost Guns Recoveries and Shootings*, Everytown Research (Apr. 8, 2022), https://bit.ly/3bSCcwt.

[5] *Id.*

[6] *Id.*

guns) and the kits enabling quick and easy conversion of these frames and receivers into operable ghost guns—are "firearms" under the plain language of the Act.  The Act defines "firearm" to include not only fully complete firearms, but also "frame[s]" or "receiver[s]" that are "designed to" be or that "may readily be converted" into operable weapons.  18 U.S.C. § 921(a)(3).  That definition unambiguously encompasses ghost gun kits and the unfinished frames and receivers they contain, which are designed to be and readily can be converted into operable and unserialized weapons in an hour or less.  Indeed, that is their *only* purpose.  The Rule is sound and *amici* write to underscore three of the many reasons why it should be upheld.

**First**, the Rule faithfully implements the Act's language and prevents the subversion of its law-and-order purpose.  The Act provides that "firearms" may be sold commercially only *by* licensed dealers and *to* law-abiding and responsible persons who pass a background check.  Ghost gun kits and unfinished frames and receivers are "designed to" be and "may readily be converted" into operable firearms, and thus are, by definition, firearms. 18 U.S.C. § 921(a)(3).  Were they not regulated as such, they could continue to be sold *by* anyone (licensed or otherwise) on a commercial scale and *to* anyone (criminal or otherwise)—the opposite of what Congress intended.  The Act also requires imported and domestically manufactured firearms to possess a serial

3

number and criminalizes obliterating that number[7]—all in order to help law enforcement fight crime.  Ghost gun kits and unfinished frames and receivers lack serial numbers and, as such, are largely invisible to law enforcement.

**Second**, beyond remaining faithful to the Act's language, the Rule recognizes practical reality in accounting for the ease and speed with which ghost gun kits and unfinished frames and receivers can be completed into deadly firearms.  As ghost gun companies' advertising and marketing materials make clear, ghost gun kits and unfinished frames and receivers are designed with the sole purpose of being converted into fully functioning firearms.  True to that purpose, such kits and unfinished frames and receivers in fact *do* allow sophisticated and novice purchasers alike to convert these items into operable firearms swiftly and easily.

**Third**, the Rule continues ATF's longstanding view that unfinished frames and receivers can be "firearms."  Shortly after the Act's passage, ATF recognized that unfinished frames or receivers that could readily be converted into operable firearms were indeed "firearms," judging by the ease and speed with which they could be rendered functional.  That the ghost gun industry has flouted ATF's oversight by affirmatively *hiding* the ease and speed with which

---

[7] References to background checks and serialization are limited to firearms that are distributed commercially, as the Rule does not require background checks on private firearm sales or restrict persons not otherwise prohibited from possessing firearms from making unserialized firearms for personal use.  87 Fed. Reg. 24652, 24676.

4

ghost gun kits and parts can be assembled confirms that the industry knows what the Act has said all along:  unfinished frames and receivers "designed" to be or that may "readily be" converted into firearms are "firearms."  Thus, while Plaintiff contends that the Rule betrays the industry's "good-faith reliance," this case involves neither the industry's good faith nor its reliance.

## ARGUMENT

## I.   THE RULE FAITHFULLY IMPLEMENTS THE GUN CONTROL ACT AND PREVENTS ITS SUBVERSION

The Gun Control Act defines "firearm" as follows:

> (A) any weapon (including a starter gun) which will or *is designed to or may readily be converted* to expel a projectile by the action of an explosive; (B) *the frame or receiver of any such weapon*; (C) any firearm muffler or firearm silencer; or (D) any destructive device.

18 U.S.C. § 921(a)(3) (emphases added).

Taken together, (A) and (B) classify as "firearms" unfinished frames and receivers and ghost gun kits that are "designed to" be or may "readily be converted" into operable firearms.  That is because "firearm" is defined as the "frame or receiver of any *such weapon*," with "*such weapon*" in (B) referring back to "weapon" in (A), which in turn encompasses "any weapon" that is "designed to or may readily be converted to expel a projectile by the action of an explosive."  In other words, when (B) refers to "the frame or receiver of any such *weapon*," it incorporates the description of "*weapon*" in (A), which encompasses items presently configured to fire *and* items that are "designed to

5

[be] or may readily be converted" into operable firearms.  *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pellella*, 350 F.3d 73, 81 (2d Cir. 2003) ("any such action" "refers back to" the phrase providing a right to "*institute* an *action*") (citation omitted).  Because (A) includes not-yet-operable and not-yet-finished weapons, it follows that the "frame or receiver of any *such weapon*" under (B) includes unfinished frames or receivers as well (so long as they are "designed to" be or may "readily be converted" into operable firearms).[8]

Under a straightforward application of that definition, unfinished frames and receivers, and the ghost gun kits used to assemble such frames and receivers into operable weapons, are "firearms" whenever they are "designed to" be or may "readily be converted" into operable firearms.  The sole purpose for which these frames, receivers, and kits are made, marketed, and sold, is to be converted into firearms, and the actual conversion can be done without difficulty or expertise.  Failing to regulate these items as "firearms" would ignore the Act's plain language.

The Act's purpose demands the same interpretation.  The Act has two principal ends and two principal means.  The ends:  promoting public safety by

---

[8] Plaintiff implicitly concedes that at least some unfinished frames and receivers can qualify as firearms.  That is because Plaintiff endorses the so-called "80% rule," Pl. Br. at 3, ECF No. 11, which posits that a frame or receiver that is "80%" complete has not yet reached a stage of manufacture to be a "firearm."  Even that rule—which is divorced from the text  of the Act—assumes that an unfinished frame or receiver can at some point qualify as a firearm (*e.g.*, an "85% complete" frame).

keeping guns out of the hands of persons who have committed felonies, have been convicted of domestic abuse, and are otherwise dangerous, and assisting law enforcement in fighting crime.  S. Rep. No. 90-1501, at 22 (1968) ("Senate Report") ("The principal purposes of this act are to make it possible to keep firearms out of the hands of those not legally entitled to possess them . . . and to assist law enforcement . . . in combating . . . crime."); H. Rep. No. 90-1577, at 4412 (1968) (explaining the "need" to combat "the growing use of firearms in violent crime").  The means:  regulating who may buy or sell firearms and imposing strict rules governing how firearms and firearm transactions are documented and tracked.  *Infra*.  Because unregulated ghost gun kits and unfinished frames and receivers allow dangerous and prohibited individuals to obtain deadly and untraceable firearms, failing to regulate these items as "firearms" undermines the Act's ends.  And because the Act's scrupulous limits on purchase, sale, and distribution apply to frames and receivers designed to be or readily convertible into operable weapons, the Rule's coverage of ghost gun kits and near-complete frames and receivers is faithful to the means enshrined in the Act's language.  Failing to regulate these items as what they are—firearms—would undermine both the Act and other safety regulations that cross-reference or otherwise rely upon the Act's definition of "firearm."

***Federal firearms licensees.***  The Act designates federal firearms licensees ("FFLs")—those who manufacture, sell, or import firearms—the

"principal agent of [law] enforcement" in "restricting . . . access to firearms." *Huddleston v. United States*, 415 U.S. 814, 824 (1974).  If ghost gun kits and unfinished frames and receivers were not treated as firearms, the effect would be to continue to sideline FFLs with respect to the sale and acquisition of a rapidly growing source of crime firearms across the country.

Under the Act, FFLs—and only FFLs—may "engage in the business of importing, manufacturing, or dealing in firearms."  18 U.S.C. § 922(a)(1)(A); *see id.* § 923(a).  In exchange for this right to engage in the firearms business, FFLs must serve as the Act's frontline mechanism for implementation:

- FFLs may not "sell or deliver" firearms to individuals who, *inter alia*, are underage, reside out-of-state (with limited exceptions), or have a criminal history.  18 U.S.C. §§ 922(b), 922(d); *see* 27 C.F.R. § 478.99.

- FFLs must keep extensive inventory and transaction records and must report suspicious purchasing patterns.  27 C.F.R. §§ 478.101 (record-keeping), 478.121–134 (same); 18 U.S.C. § 923(g)(3) (FFLs must report when an individual buys multiple guns within a short timeframe).

- FFLs must make their records accessible to law enforcement officials, who can and often do access these records to monitor, investigate, and combat firearm-related crimes.  *See infra.*

FFLs that fail to meet these or other duties may lose their license, 27 C.F.R. § 478.73, and they also become susceptible to both civil and criminal liability, 18 U.S.C. §§ 922, 924.

The Act and its implementing regulations thus enshrine FFLs as scrutinizing gatekeepers at the point of sale, subject to harsh penalties for noncompliance.[9]  But FFLs' critical functions and accompanying enforcement mechanisms attach only to "firearms."  If ghost gun kits and unfinished frames and receivers are not treated as "firearms," FFLs would continue to be removed entirely from their post as the "principal agent of [law] enforcement" with respect to this rapidly expanding source of weapons being diverted to criminal misuse.  *Huddleston*, 415 U.S. at 824.

***Background checks.***  The Act requires that every individual who purchases a firearm from an FFL submit to a background check.  18 U.S.C. § 922(t)(1); 27 C.F.R. § 478.102(a).  Absent recognizing ghost gun kits and unfinished frames and receivers as firearms—as the Act requires and the Rule confirms—untraceable and fully functional firearms could be acquired by anyone, regardless of background:  criminals, domestic abusers, minors, and persons with severe mental illness, to name a few.

Allowing unfettered access to dangerous weapons is the opposite of what Congress envisioned.  In tightly regulating who may purchase a firearm under

---

[9] The Act's focus on the point of sale is important.  In monitoring the point of sale, the Act keeps firearms out of dangerous hands in the first place, rather than forcing law enforcement to implement restrictions on possession after the firearms have already entered circulation.  The Rule thus furthers the Act's prophylactic premise: public safety is better served by preventing a violent criminal from purchasing a gun than it is by recovering a gun after a crime has already occurred.

the Act, "Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976).  That approach is consistent with a "longstanding" historical tradition of "prohibitions on the possession of firearms" that further public order, such as limiting possession by "felons and the mentally ill." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008); *see New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 2022 WL 2251305, at *5, *13–14 (U.S. June 23, 2022) ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, *law-abiding* citizen . . . .") (emphasis added). The Act continues that tradition by "establish[ing] a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172.

So important is the identity of the purchaser that it is a crime for an FFL to sell a firearm without running a background check on the transferee, 18 U.S.C. § 922(t); a crime for a buyer to "make any false or fictitious oral or written statement" concerning their identity, *id*. § 922(a)(6); and a crime for FFLs to make any "false" statement in records relating to licensing or a buyer's identity, *id*. §§ 922(m), 924(a)(3).  The Rule faithfully implements Congress's calibration of who may and may not possess a firearm and Congress's overall regulatory scheme for preventing circumvention of those rules.

Although the Act's text is determinative, there also is no reasoned basis upon which to conclude that Congress meant to impose background checks on operable firearms, but not on unfinished frames and receivers that are often marketed jointly with every other part needed to assemble an operable firearm. The only difference between a "complete" firearm and an "unfinished" ghost gun kit or unfinished frame or receiver is an hour or less of easy assembly. *Infra.* Yet Plaintiff suggests that Congress intended this trivial difference to mean that "complete" firearms are only available to lawful persons who undergo a background check, whereas easy-to-assemble kits, frames, and receivers are freely available to anyone—including dangerous individuals.

Plaintiff's position would breathe life into the exact dangers the Act was designed to address. Congress saw "the ease with which any person can anonymously acquire firearms" as "a matter of serious national concern," and responded accordingly. Senate Report at 22. For instance, to curtail anonymous purchases, Congress barred "the commercial mail-order traffic in firearms to unlicensed persons." *Id*. at 23. In fact, Congress *rejected* earlier proposed legislation in part because such legislation failed to "prohibit the mail-order sale" of firearms known for "their susceptibility to crimes." S. Rep. No. 89-1866, at 34, 100 (1966).

Absent regulation as firearms, ghost gun kits and unfinished frames and receivers are the modern incarnation of mail-order guns:  they allow

anonymous buyers (including criminals), to purchase a gun remotely and have that gun shipped across state lines to facilitate violent crime.  Indeed, prior to the Rule's adoption, this has occurred regularly, nationwide.  And ghost gun kit manufacturers, for their part, specifically advertise anonymity and the avoidance of background checks as reasons to purchase their wares.[10]

*Straw purchases.*  Failing to classify ghost gun kits and unfinished frames and receivers as firearms would dilute the Act's ban on "straw purchases," *i.e.*, gun purchases made by someone who can pass a background check on behalf of someone else—often a prohibited buyer.  Purchasers of ghost gun kits or unfinished frames and receivers would not even need to cloak their identities with straw purchases if these items were not recognized as firearms.

The Act aims to prevent the diversion of firearms to the black market through several means, including by prohibiting "straw purchases."  Straw purchases have long fueled illegal gun trafficking.  U.S. Dept. of the Treasury, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers*, U.S.

---

[10] *See*, *e.g.*, *Are Felons Restricted from Owning a Firearm that Was Built from an 80% Receiver?*, Polymer80 Blog (Oct. 21, 2020), *formerly at* https://bit.ly/3DDzXGo ("Convicted felons are not restricted from purchasing and owning 80% frames . . . ."); *Buying Guns Online Without an FFL*, 80% Arms Blog (Dec. 3, 2019), https://bit.ly/3HClkFU (no background check or serial number required); *JSD 80% Lower Receivers, Jigs, and Gun Parts Kits*, JSD Supply (last visited Feb. 12, 2022), https://bit.ly/3rKrgqj (same); *Ghost Gunner*, Ghost Guns (last visited Dec. 14, 2021), https://bit.ly/3pUjDvj (same); *Lower Receiver,* SS-Arms (last visited Dec. 14, 2021), https://bit.ly/3GAVvVo (same); *About,* R&B Tactical Tooling (last visited Nov. 19, 2021), https://bit.ly/3oNKmZU (same).

Department of Justice at 10 ("Nearly 50 percent of the ATF investigations involved firearms being trafficked by straw purchasers.") (June 2000), https://bit.ly/3HClkFU; *Trafficking & Straw Purchasing*, Giffords Law Center (last visited Dec. 14, 2021) https://bit.ly/3FBTtnv (noting "30,000 attempted straw purchases each year").

Through a number of interlocking requirements, the Act forbids straw purchases. Gun buyers must fill out "Form 4473," attesting to their identity as the firearm's "actual transferee/buyer," ATF Form 4473 (5300.9) (revised May 2020), https://bit.ly/3CAv5Rl, and it is a crime to misrepresent—on Form 4473 or elsewhere—"any fact material to the lawfulness of the sale," 18 U.S.C. § 922(a)(6); *see Abramski*, 573 U.S. at 171. Further, any FFL that does not take steps to stop straw purchases at the point of sale can lose its license and face both civil and criminal liability. *See*, *e.g.*, *Shawano Gun & Loan, LLC v. Hughes*, 650 F.3d 1070, 1077–79 (7th Cir. 2011).

As the Supreme Court has recognized, protections against straw purchases are essential because, "[p]utting true numbskulls to one side, anyone purchasing a gun for criminal purposes would avoid leaving a paper trail by the simple expedient of hiring a straw." *Abramski*, 573 U.S. at 183. And yet, if ghost gun kits and unfinished frames and receivers were wrongly considered not to be firearms, then none of the tools that ATF employs to

combat straw purchases would be available to this segment of the market, leaving criminal purchasers with few roadblocks to obtaining firearms.

**_Serialization, record-keeping, and public safety._**   Ghost guns contravene the Act's serialization and record-keeping provisions, making it more difficult for law enforcement to fight crime.  Gov't Br. at 24–46, ECF No. 16; *see*, *e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) ("[W]e think it plain that [serialization] serves a law enforcement interest."); *United States v. Harris*, 720 F.3d 499, 502 (4th Cir. 2013) (same).  By their very nature, ghost guns—easily assembled from the unfinished frames and receivers that Plaintiff would exempt from the Act—are fully operational, unmarked, and *untraceable* firearms, which impede law enforcement's ability to prevent and prosecute violent crime by tracing illegal weapons to their source.

The Act mandates that every firearm possess a unique serial number and makes it a crime to tamper with a serial number.  *See* 27 C.F.R. § 478.92; 18 U.S.C. § 923(i).  Serialization allows ATF "to link a suspect to a firearm." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 204 (D.C. Cir. 2013). It is a crime to "transport, ship, [] receive," or "possess," a "firearm which has had the . . . serial number removed, obliterated, or altered."  18 U.S.C. § 922(k). Possessing a firearm with an altered serial number also triggers a sentencing enhancement—even if law enforcement can reconstruct the serial number.

U.S.S.G. § 2K2.1(b)(4)(B); *see United States v. St. Hilaire*, 960 F.3d 61, 64 (2d Cir. 2020); *United States v. Fuller-Ragland*, 931 F.3d 456, 467 (6th Cir. 2019).

The Act also assists law enforcement by subjecting FFLs to record-keeping duties to track firearm transactions and inventory. *See* 18 U.S.C. § 922(g)(1)(A); 27 C.F.R. §§ 478.121–134. Law enforcement are empowered to "inspect or examine the inventory and records of [FFLs] . . . without such . . . reasonable cause or warrant," "in the course of a reasonable inquiry during the course of a criminal investigation." 18 U.S.C. § 923(g)(1)(B); *see* 27 C.F.R. § 478.121(b). "FFL records" thus allow ATF to "trace a firearm" and identify its "path through the distribution chain." *Nat'l Shooting Sports*, 716 F.3d at 204 (cleaned up).

Without serialization and record-keeping, these law enforcement mechanisms break down. *United States v. Mobley*, 956 F.2d 450, 454 (3d Cir. 1992) (noting it is "no secret that a chain of custody for a firearm greatly assists in the difficult process of solving crimes," and that, without "serial numbers," reconstructing that chain is "virtually impossible"); *Marzzarella*, 614 F.3d at 98 ("Firearms without serial numbers are of particular value to those engaged in illicit activity."). Indeed, a House Committee report warned that "[g]host guns" pose a "homeland security challenge" because they "hamstring[] law enforcement's ability to investigate crimes," as such crimes are "committed with untraceable weapons." H. Rep. No. 116-88, at 2 (May 8, 2019). That

tracks common sense:  would-be criminals naturally prefer untraceable ghost guns to traceable options if they are available.  In short, absent regulation as firearms, ghost gun kits and unfinished frames and receivers would flout Congress's intent that firearms be serialized, recorded, and traceable.

## II.  THE RULE APPROPRIATELY CONSIDERS THE PRACTICAL REALITY THAT GHOST GUNS CAN BE QUICKLY AND EASILY ASSEMBLED BY NONEXPERTS

The Act defines "firearm" in practical terms, covering not only completed weapons, but also frames and receivers that are (1) designed to be converted into operable firearms, and/or (2) may readily be converted into operable firearms—thus regulating items that almost certainly *will* become operable firearms.  *See* 18 U.S.C. § 921(a)(3).  The Rule is faithful to this statutory definition and Congress's practical approach, recognizing that ghost guns can be assembled from ghost gun kits and unfinished frames and receivers easily and without any technical expertise, in an hour or less.

Courts have widely agreed that, under the Act, a "weapon designed to fire a projectile" that is "temporarily incapable of effecting its purpose," is not "removed from" the definition of a "firearm."  *United States v. Rivera*, 415 F.3d 284, 286 (2d Cir. 2005); *see, e.g., United States v. Hardin*, 889 F.3d 945, 949 (8th Cir. 2018) (rejecting argument that the "disrepair" of a gun, which rendered it inoperable, changed that the gun was "manufactured to be . . . a gun") (quotation marks omitted); *United States v. Cooper*, 714 F.3d 873, 881

(5th Cir. 2013) ("[W]e have consistently held that inoperable firearms can support convictions [under section 921(a)(3).]").  Likewise, an object that must be "modified" to function as a firearm, is no less a firearm in the eyes of the Act.  *See United States v. Mullins*, 446 F.3d 750, 756 (8th Cir. 2006) (finding gun that could be "modified," "without any specialized knowledge, in less than an hour," is "'readily convertible'"); *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (finding gun that required "an 8-hour working day in a properly equipped machine shop" was "readily" convertible into a machine gun).  It is thus wrong to say, as Plaintiff does, that "[i]f item *A* can readily be made into item *B*," it is unequivocally not "item *B*," Pl. Br. 20, when the Act makes clear that if "item *A*" is designed to be or readily capable of being converted into a firearm it is indeed a firearm—whether or not "item *A*" is presently operable as a firearm.  18 U.S.C. § 921(a)(3).

Not only is the statutory language dispositive, but a mountain of evidence confirms that ghost gun kits and unfinished frames and receivers ***are*** designed to be and may readily be converted into operable firearms, and thus are "firearms" under the Act.  Manufacturers and distributors have advertised that these kits, frames, and receivers are designed for the sole purpose of being assembled into functional guns.  And—consistent with that purpose—these items can in fact be easily assembled into functional weapons by the most novice gun-builder, even a child.

Specifically, through a single website, one can buy a complete, all-in-one kit that "package[s] the unfinished frame or receiver with all the other parts needed to complete the firearm." *Untraceable: The Rising Specter of Ghost Guns,* Everytown Research (May 14, 2020), https://bit.ly/3DTrIWj ("Ghost Gun Report"). Once the kit is delivered, assembly is simple. As the head of ATF's Los Angeles field office observed:

> If you can go to one of these big-box stores and put that type of furniture together, if you're putting together your kids Christmas toys, you can make a homemade gun. It's that easy.

Jonathan Edwards, *A 13-Year-Old Boy Made and Trafficked 'Ghost Guns,' Authorities Say, and Then Killed His Sister with One*, Wash. Post. (Dec. 3, 2021), https://wapo.st/3Ggarb9.

Ghost gun kits are not only designed to be converted into firearms: they are designed to be converted into firearms **quickly**. Indeed, ghost gun kit manufacturers and distributors tout this speed in marketing materials. *See, e.g.*, *The Router Jig Pro Multiplatform – AR-15 / AR-9/AR-45/.308/AR-10*, 5D Tactical (last visited Nov. 19, 2021), https://bit.ly/3x72bqx (boasting that its receiver can be finished "in **under 15 minutes** with excellent results" (emphasis added)); *GST-9: 80% Pistol Build Kit*, 80% Arms (last visited Nov. 19, 2021), https://bit.ly/3x6n0T7 (same). Manufacturers and distributors also publish how-to guides to walk novices through the fast-and-easy assembly.

18

*See*, *e.g.*, *How-To Manuals,* Polymer80 (last visited Dec. 17, 2021), https://bit.ly/3qUwobt.

In several well-documented examples, amateurs and experts alike have assembled kits in around an hour or less.  *See, e.g.*, Glenn Thrush, *'Ghost Guns':* *Firearm Kits Bought Online Fuel Epidemic of Violence*, N.Y. Times (Nov. 14, 2021), https://nyti.ms/3EYiedv ("[An] amateur can . . . turn [a ghost gun kit] into a working firearm in **less than an hour**." (emphasis added)); Complaint at ¶¶ 74, 115, *People v. Blackhawk Mfg. Grp., Inc., et al.*, CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) (police officer assembled kit in "**less than 25 minutes**" with tools from a hardware store (emphasis added)); *id*. at ¶ 73 (ATF agent finished ghost gun kit "in **less than nineteen minutes**" (emphasis added)); Mem. in Support of Prelim. Inj., *City of New York v. Arm or Ally LLC, et al.*, 22-CV-5525, ECF No. 9, at 11 (S.D.N.Y. June 29, 2022) (local sheriff assembled a "fully functioning ghost gun in **approximately an hour and a half**").  In connection with earlier ghost gun litigation, one individual submitted a declaration explaining he had "never attempted to build a firearm using an unfinished frame or receiver," that he watched "videos on *YouTube* for thirty minutes," then built "a complete pistol from [a] handgun kit in **86 minutes**."  Decl. of Justin McFarlan, *City of Syracuse, et al. v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 1:20-CV-6885 ("*City of Syracuse*"), ECF No. 64-34, at ¶¶ 8, 10, 11 (S.D.N.Y. Dec. 9, 2020) (emphasis added).

The reality is that anyone with an internet connection, an hour or less of free time, and some basic household tools can convert ghost gun kits and unfinished frames and receivers into operable and untraceable firearms. This Rule is not about crafting a unique rifle from scratch or welding firearm parts: it is about rudimentary assembly. *See* Pl. Br. 13–14, 20, 47. There is a categorical difference between hand-carving a tree into a cabinet and attaching legs to a pre-assembled IKEA cabinet—a tree is not designed to be or easily convertible into a cabinet; an IKEA cabinet assembly kit is. Ghost gun kits and unfinished frames and receivers are plainly the latter: they are "designed to be" and can "readily be converted" into operable firearms and, thus, are "firearms" under the Act. Plaintiff analogizes the regulation of ghost gun kits as firearms to treating "two-by-fours [as] a 'house,'" *id.* at 20, but a more apt analogy would be a fully constructed house that just needs an hour or less to screw on doorknobs and install window hardware to be complete (and comes with all the tools needed for this assembly).

## III.   THE RULE COMPORTS WITH ATF'S LONGSTANDING VIEW THAT UNFINISHED FRAMES AND RECEIVERS CAN BE FIREARMS

Plaintiff mistakenly contends that the Rule sharply deviates from ATF's historical practice. Pl. Br. 3–8, 44–49. To the contrary, for years after the Act's passage, ATF understood that Congress defined "firearm" to include some unfinished frames and receivers, and that the operative question is how

quickly and easily—*i.e.*, how "readily"—a frame or receiver can "be converted" into an operable weapon.  18 U.S.C. § 921(a)(3).  That some purveyors of ghost gun kits and parts have tried to *hide* from ATF the ease with which their wares can be assembled into operable weapons makes plain that the industry itself well knows that an unfinished frame or receiver that can quickly and easily be converted into a firearm is indeed a "firearm" under the Act.

The Act was signed into law in 1968.  In 1976, ATF's Assistant Chief Counsel issued an opinion setting out a framework for evaluating whether an "unfinished" frame or receiver is a "firearm" under the Act.  Administrative Record, *City of Syracuse*, ECF No. 60 (S.D.N.Y. Dec. 8, 2020), at ATF0265.  The opinion explained that if "unfinished frames" or "castings" *"may readily be converted"* into firearms, "they are firearms."  *Id*. at ATF0266 (emphasis added).  The opinion concluded that unfinished frames and receivers must be assessed "case-by-case" to gauge if they are "readily convertible" into firearms:

> We view the current Bureau procedure in classifying "firearms" on a case-by-case basis as consistent with the letter and spirit of the [] Act.  It is obvious that what constitutes "readily convertible" depends upon the nature of each firearm.  That there may be cases where it is difficult to determine the side on which a particular "firearm" falls is not a sufficient reason to establish a rigid criterion for … "readily convertible."

*Id*. at ATF0267.

For decades, ATF followed the framework set forth in the 1976 opinion in classification letters that turned on whether an unfinished frame or receiver

could "readily be converted" into an operable firearm.  *See id.* at ATF0001, ATF0014, AATF0020, ATF0023, ATF0050, AATF0051, AATF0053, ATF0065. Consistent with the definition of "readily" meaning "without much difficulty" or "with fairly quick efficiency,"[11] several of these letters referenced the ease and speed with which unfinished frames and receivers could be assembled into operable firearms.  *See id.* at ATF0020 (receiver was a "firearm" because it required "75 minutes" to be made "functional"); *id.* at ATF0023 (frame was a "firearm" because it required "20 minutes" to be made functional).

Notwithstanding this historical interpretation, Plaintiff complains that the Rule's focus on how quickly and easily a firearm can be assembled offends the "good-faith reliance" of the industry.[12]  Pl. Br. 5.  To the contrary, there is evidence that the industry has attempted to hide from ATF the extent to which ghost gun kits and parts could "readily" be converted into firearms—evidence that belies both "reliance" and "good faith."  For example, in an affidavit submitted in support of a warrant to search a facility operated by Polymer80 (the nation's largest public seller of ghost gun kits and parts), an ATF agent stated that Polymer80 tried in 2017 to obtain an ATF determination that an

---

[11] *Webster's Third New International Dictionary* 1889 (1965) (defining "readily").

[12] Plaintiff—Division 80 LLC—seems to be a shell company with no commercial operations at all.  In fact, Plaintiff appears to have been created for and solely in the business of bringing this lawsuit.  So it is doubtful that Plaintiff could have "reliance" on any commercial status quo, much less reliance that is in "good faith."

unfinished pistol frame is not a firearm, by misleadingly submitting for review just the unfinished frame, and not the remainder of the kit that was sold with the frame—the kit included additional parts and tools to facilitate completing a ghost gun. Aff. of T. Hart, *In the Matter of the Search of the Business and Federal Firearms Licensee known as Polymer80*, 3:20-mj-123, ¶¶ 42–43 (D. Nev. Dec, 9, 2020) (https://on.wsj.com/3yzljP1).

ATF responded to Polymer80 in a letter noting that, "the submitted sample is simply a component of a larger product," and further directing Polymer80 to "submit the complete . . . [k]it." *Id*. at ¶¶ 43–44. As of December 2020, Polymer80 had not "resubmitted the complete . . . kit." *Id*. at ¶ 45. ATF ultimately obtained the Polymer80 kit through an ATF informant who purchased a "Buy Build Shoot" kit—advertised as having "all the necessary components" for a gun—with no background check, and assembled it into an operable firearm in just 21 minutes. *Id*. at ¶ 69.

This case thus involves the opposite of "good-faith reliance." ATF has long recognized that unfinished frames and receivers that can quickly and easily be assembled into operable firearms—*i.e.,* that can "readily" be "converted" into firearms—are, per common sense and the Act's statutory text, "firearms." That the ghost gun industry appears to have intentionally hidden the nature of its products from ATF further confirms that the industry itself has long known that it was operating on borrowed time.

23

## **CONCLUSION**

This Court should deny Plaintiff's motion for a preliminary injunction.


July 8, 2022                                    Respectfully Submitted,

                                               By:   */s/ Daniel Grooms*


ADAM M. KATZ*                                  DANIEL GROOMS*
RACHEL ALPERT*                                 COOLEY LLP
COOLEY LLP                                     1299 Pennsylvania Avenue, NW
500 Boylston Street                            Washington, DC 20004
Boston, MA 02116                               Telephone:  (202) 776-2042
Telephone: (617) 937-2351                      dgrooms@cooley.com
akatz@cooley.com
ralpert@cooley.com


                        *pro hac vice pending


                *Counsel for Amici Curiae*


24

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of July, 2022, a true and accurate copy of the foregoing brief was electronically filed with the Court using the CM/ECF system.   Service on counsel for all parties will be accomplished through the Court's electronic filing system.

July 8, 2022

Respectfully Submitted,

By:  *  /s/ Daniel Grooms*