# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

**GALVESTON DIVISION**

| | |
|---|---|
| DIVISION 80 LLC,<br><br>    *Plaintiff*,<br><br>v.<br><br>MERRICK GARLAND, in his official capacity as<br>Attorney General of the United States, *et al.*,<br><br>    *Defendants*. | Case No. 3:22-cv-00148 |

**AMICUS CURIAE BRIEF OF GUN OWNERS FOR SAFETY IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR
A PRELIMINARY INJUNCTION**

## CORPORATE DISCLOSURE STATEMENT

Gun Owners for Safety is a voluntary coalition of gun owners that does not have any corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock.  Gun Owners for Safety is supported by Giffords—the gun safety organization co-founded and led by former Congresswoman Gabrielle Giffords—and the employees of Giffords.  Giffords also has no corporate parent and does not issue stock, so no publicly held corporation holds 10% or more of its stock.

No counsel for a party authored any part of this brief.  No one other than amicus curiae, its members, or its counsel financed the preparation or submission of this brief.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................................ i

TABLE OF AUTHORITIES ........................................................................................ iii

INTEREST OF AMICUS CURIAE ............................................................................. 1

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 4

I.     REGULATORY HISTORY ................................................................................ 4

II.    SCRATCH BUILDS ARE NOT AFFECTED BY THE RULE ........................ 6

    A.    Background on Scratch Builds ............................................................. 6

    B.    The Rule Has No Impact on Scratch Builds ....................................... 9

III.   KIT BUILDS ARE ONLY MINIMALLY AFFECTED BY THE RULE ........ 11

    A.    Background on Kit Builds .................................................................. 12

    B.    The Rule Has No Effect on Kit Builds With Fully
        Manufactured, Serialized Frames or Receivers and
        Will Minimally Affect 80% Kits ....................................................... 15

        1.    *The Rule does not affect kit builds with fully machined,*
              *serialized frames or receivers* ................................................ 15

        2.    *The Rule merely requires that kits with 80% frames or*
              *receivers comply with the same federal firearms regulations*
              *as kits utilizing fully machined frames or receivers* ............... 16

CONCLUSION .......................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

STATUTES

18 U.S.C. § 921 ..................................................................................... *passim*

18 U.S.C. § 923 ............................................................................................ 9, 10

OTHER AUTHORITIES

*80 Percent Lower Unfinished Receiver Jig*, 80% LOWERS ............................... 14

*About the Guild*, AMERICAN CUSTOM GUNMAKERS GUILD ............................. 10

ATF Firearms Tracing Guide, ATF Publication 3312.13,
   BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES .................... 2

27 C.F.R. § 478.11 .......................................................................................... 4

Definition of "Frame or Receiver" and Identification of Firearms,
   87 Fed. Reg. 24,652 (published April 26, 2022) .................................. *passim*

Glossary, SPORTING ARMS AND AMMUNITION
   MANUFACTURERS' INSTITUTE, INC. .................................................... 4, 7, 12

*Gunsmithing a Custom Rifle Stock from Scratch: the Step by Step Guide*,
   RICHARD'S MICROFIT STOCKS (Feb. 8, 2021) ........................................ 7, 8

*Gunsmithing a Custom Rifle Stock, with Handgun Parts*, 80% LOWERS ..................... 8, 12

How to Build an AR-15 Rifle, MIDWAYUSA .................................................. 14

Juggernaut Technical, *JT-15 80 Percent Lower Finishing Guide*
   (April 25, 2013) .................................................................................. 15

*Making Guns*, SPRINGFIELD ARMORY, NATIONAL PARK SERVICE ...................... 8

Polymer80 PF940C 80% Compact Pistol Frame and Jig Kit, 80% LOWERS ........... 14

*Understanding Headspace in an AR-15*, AT3 TACTICAL .................................. 9

## INTEREST OF AMICUS CURIAE

Amicus curiae Gun Owners for Safety is a united coalition of gun owners from all backgrounds and political affiliations who believe lives can be saved through commonsense gun laws that do not infringe upon the civil rights of law-abiding gun owners.  With chapters in Texas and across the country, including Colorado, Florida, Michigan, Minnesota, Pennsylvania, and Virginia, we work to prevent gun violence while supporting and protecting Second Amendment rights.  Gun Owners for Safety has over 16,000 members, who include experienced gun owners of all trades and hobbies, including law enforcement, military, hunting, sport shooting, collecting, and building guns.  In Texas alone, Gun Owners for Safety has 1,200 gun owner members, including 60 volunteer ambassadors who have educated the public and lawmakers through such activities as hosting seminars and testifying before the State Legislature.  Affiliated with Giffords, the gun safety organization co-founded and led by Congresswoman Gabrielle Giffords, who is a gun owner herself, we fully respect the Second Amendment and are simultaneously devoted to encouraging safe and responsible gun ownership practices and promoting a shift in culture to inform Americans about ways to improve safe gun ownership, including commonsense gun laws.

## INTRODUCTION

This amicus brief is intended to help the Court understand how the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Final Rule 2021R-05F, entitled Definition of "Frame or Receiver" and Identification of Firearms (the "Rule"), will impact law-abiding gun owners who build their own firearms at home.

ATF promulgated the Rule in part to address the rapidly growing threat posed by untraceable firearms, often referred to as "ghost guns." Traditionally, firearms offered for sale in the United States are marked with a serial number by a manufacturer or importer that holds a federal firearms license ("FFL"). These FFLs are also required to maintain records of their transactions, which together with the serial number enable a law enforcement process called "tracing." Tracing provides a critical investigatory tool that connects crime guns back to their first retail purchaser. *See generally* ATF Firearms Tracing Guide, ATF Publication 3312.13, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/firearms/docs/guide/atf-firearms-tracing-guide-atf-p-331213 (last visited July 8, 2022).

Ghost guns disrupt this traditional process: rather than selling a completed gun, companies such as Plaintiff Division 80 sell guns as kits in partially completed form, and take the position that these kits are not "firearms" under federal law and therefore not subject to background check, serialization, and record-keeping requirements. The guns made from these kits therefore lack serial numbers, and cannot be traced by law enforcement. Since 2016, there has been a stunning increase in the number of these untraceable ghost guns used in crime.[1]

---

[1] ATF records show that, from January 1, 2016, through December 31, 2021, over 45,000 privately made, un-serialized firearms were "reported to ATF as having been recovered by law enforcement from potential crime scenes, including 692 homicides or attempted homicides (not including suicides)," and that this total number reflects an annual increase each year. Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,656 (published April 26, 2022) (to be codified at 27 C.F.R. pts. 447, 478, 479) (noting that 1,758 such firearms were recorded in 2016; 2,552 in 2017; 3,960 in 2018; 7,517 in 2019; 10,109 in 2020; and 19,344 in 2021).

Faced with the Rule, which clarifies that Plaintiff's practice of selling these kits is not exempt from federal gun laws that other gun manufacturers and owners comply with, Plaintiff has filed an emergency motion for a preliminary injunction, claiming that law-abiding gun owners will be prevented from completing at-home builds under the Rule. These claims are baseless, as the Rule will have only a minimal impact on those activities. We know this because we have built our own firearms, and we understand the different processes one can use to make a gun at home.  From the perspective of builders who respect and seek to comply with federal gun laws, Gun Owners for Safety respectfully submits that the Rule will have only a minor impact on law-abiding individuals making a gun at home.

Most methods of at-home builds—such as building a gun from scratch, building a historical replica, or assembling a gun with components that are already fully manufactured—are completely unaffected by the Rule.  The ***sole*** at-home build that is affected by the Rule is an "80%" kit build:  the process of completing a firearm from partially manufactured components, as further described in Section III.A, below.  Such kit builds previously have been sold as if federal law on the sale of guns did not apply to them. The Rule aligns these kit builds with kit builds already subject to federal firearms laws.

In short, Plaintiff's concern about individuals being foreclosed from privately making guns, or prevented from crafting guns as the Founders did, and Plaintiff's claims underlying its emergency motion for a preliminary injunction, are unfounded.  Its motion should be denied.

**ARGUMENT**

**I.     REGULATORY HISTORY**

Under the Gun Control Act of 1968 ("the Act"), a "frame" or "receiver" is the only component of a gun (in addition to the gun itself) that qualifies as a "firearm."[2]  This is because the Act defines a "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) *the frame or receiver of any such weapon*; (C) any firearm muffler or firearm silencer; or (D) any destructive device."  18 U.S.C. § 921(a)(3) (emphasis added).

In 1968 ATF promulgated regulations regarding the Act.  As relevant here, ATF adopted regulations to implement the Act.  The 1968 regulation defined a "firearm" as: "Any weapon, including a starter gun, which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device; but the term shall not include an antique firearm.  In the case of a licensed collector, the term shall mean only curios and relics."  27 C.F.R. § 478.11.  And it defined a "frame or receiver" as: "That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel."  *Id.*

---

[2] As explained more fully below in Section III.A, the frame or receiver is "[t]he basic unit of a firearm" that houses firing control components—*i.e.*, the component that houses the mechanisms necessary for a firearm to actually fire.  The "receiver" is the component used in the case of long guns and the "frame" is used in the case of handguns.  *See* Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC., https://saami.org/saami-glossary (last visited July 8, 2022).

The Rule that is at issue in this case, adopted April 26, 2022, and effective on August 24, 2022, adds the following language to the definition of a "firearm":

> The term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive. The term shall not include a weapon, including a weapon parts kit, in which the frame or receiver of such weapon is destroyed as described in the definition of "frame or receiver."

Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, at 24,735 (published April 26, 2022) (to be codified at 27 C.F.R. pts. 447, 478, 479). Further, the definition of "frame or receiver" has been updated in the Rule. In relevant part, the Rule provides that "frame or receiver":

> [S]hall include a ***partially complete***, disassembled, or nonfunctional frame or receiver, ***including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver***, *i.e.*, to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.*, unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

*Id.* at 24,739 (emphases added). To clarify what is meant by "readily," the Rule includes eight factors that will help ATF to determine whether something is "readily" converted or assembled, including the time, ease, expertise, equipment, availability of parts, expense, scope of the project, and feasibility of the process. *Id.* at 24,663.

The Rule also adds and defines a new term: "privately made firearm" ("PMF"). A PMF is "a firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced." *Id.* at 24,664. If a PMF maker, however, seeks to have the PMF enter the marketplace, it must meet the Act's other licensing and serial number requirements. *Id.*

## II.    SCRATCH BUILDS ARE NOT AFFECTED BY THE RULE

As law-abiding gun owners, one of our biggest concerns is that, in its motion, Plaintiff conflates the raw materials used by gun artisans with 80% frames or receivers, which are by definition ***partially finished*** frames or receivers for a gun, as discussed further in Section II, below. *See* Compl. ¶ 27, ECF No. 1. Plaintiff also discounts the continuing practice of building guns from scratch, by focusing instead on gun owners who assemble guns from parts. *Id.* at ¶¶ 24, 26, 28. The confusion caused by Plaintiff's allegations suggests an unfamiliarity with the craft of gun building. We would like to clarify for the Court the rich traditions of guns built from scratch. When evaluated with a full understanding of the different ways guns can be made and the limited impact the Rule will have, Plaintiff's concern about individuals being foreclosed from privately making guns as the Founders did at the time of the American Revolution is alleviated, as such at-home scratch builds remain unaffected by the Rule.

### A.    Background on Scratch Builds

Crafting a gun from scratch with raw materials is called a "scratch build." This process—often utilized by artisans—begins with "raw stock." Raw stock consists of

blocks of wood, metal, or other raw materials that have no pre-shaping, milling, or manufacturing.  The particular material is carefully selected by the gun maker depending on the type and style of gun being built.

The entirety of the scratch build process takes considerably more time and skill than starting with partially finished components (which is how we build guns with 80% kits, as discussed further in Section III.A, below).  *See, e.g.*, *Gunsmithing a Custom Rifle Stock from Scratch: the Step by Step Guide*, RICHARD'S MICROFIT STOCKS (Feb. 8, 2021), https://richardsmicrofitgunstocks.com/gunsmithing-a-custom-rifle-stock-from-scratch-the-step-by-step-guide ("*Gunsmithing a Custom Rifle Stock*").  By way of example, artisans crafting a rifle from scratch begin with a "hardwood blank," which is a block of hardwood.  *Id.*  The artisan then designs their rifle stock—*i.e.*, the component to which the metal parts of a firearm are attached to enable the shooter to hold the firearm—from scratch.  From there, the first step is to "inlet[] the action," which is when the maker ensures that the stock fits with the combination of the frame and receiver of the gun.  *Id.*; *see also* Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC., https://saami.org/saami-glossary/?search=action (last visited July 8, 2022).  This step requires precision carpentry tools and woodworking skills "that might be a stretch for beginner carpenters. . . . It is [a] high labor, time, and skill-intensive task."  *Gunsmithing a Custom Rifle Stock*.  Even more demanding, however, is the next step—shaping the blank to conform to the preferred rifle stock design.  *Id.*  The blank must be carved into a recognizable stock form, "fine-tuning the rifle to [one's] shooting style."  *Id.*  The third step, finishing the stock, "involves sanding, whiskering, and applying an oil finish."  *Id.*

This step is "the most time-intensive portion of the gunsmithing process." *Id.* One way to sand the stock is to use "80-grit sandpaper, by wrapping the sandpaper around a solid wood block and rubbing back-and-forth in the same direction as the wood grain." *Id.* "Whiskering" the stock involves wiping the stock with a wet rag, then using "a heat gun or hairdryer to rapidly dry the wood" and then "[r]epeat[ing] this process three or four times before using mineral oil to soak the wood." *Id.*

The entirety of the scratch build process typically requires significant hours to achieve the craftsman's desired finish or level of detail. It also involves the sourcing of different materials and parts that are not preselected or curated by a vendor, unlike gun-making that involves the use of fully machined parts, *see* Section III.A, below. *Compare Gunsmithing a Custom Rifle Stock*, *with Handgun Parts*, 80% LOWERS, https://www.80-lower.com/handgun-parts (last visited July 8, 2022).

As another example, the building of a musket from scratch requires highly specialized knowledge and skill. Three metal-shaping processes can be used in crafting a musket: forging, casting, and stamping. *Making Guns*, SPRINGFIELD ARMORY, NATIONAL PARK SERVICE, https://www.nps.gov/spar/learn/historyculture/making-guns.htm (last visited July 8, 2022). "Forging is the process of heating metals and hammering them into a desired shape. It is the technique used by the blacksmith, and indeed the early gunmakers used many of the blacksmith's tools in their trade." *Id.* Smaller parts "that would otherwise involve many machining steps" could be "cast" by pouring molten steel into a plaster cavity. *Id.* The process of "stamping" or "bending" to shape non-critical parts such as the trigger guard was used in lieu of the more expensive option of machining. *Id.*

A scratch build of a more contemporary weapon is an even more difficult and time-consuming process.  As an example, the scratch build of an AR pattern firearm will require that specific tolerances are met to ensure appropriate lockup between the round, chamber, bolt face, bolt carrier, and recoil gas tube interface occurs safely and repeatably.  *See Understanding Headspace in an AR-15*, AT3 TACTICAL, https://www.at3tactical.com/blogs/news/what-is-headspace-in-an-ar-15-and-how-can-you-check-it-read-on (last visited July 8, 2022).  To ensure the hammer strikes the firing pin, when and only when the bolt has securely locked a live round into battery, requires expensive and specialized tools such as mills, files, headspace gauges, and micrometers not often found in the toolboxes of the average gun owner.  *See id.*

As gun owners, including those of us who ourselves are scratch build artisans and craftsmen, we wish to emphasize for the Court that, from our perspective, the scratch build community does not use partially manufactured frames or receivers.  The scratch build community makes its frames and receivers from scratch—from raw materials such as steel billets or stock blanks.  And for this reason, as described below, the Rule has no impact on us.

**B.      The Rule Has No Impact on Scratch Builds**

As the law currently stands (*i.e.*, prior to the Rule taking effect), gun artisans performing a scratch build are not subject to the same regulations as a firearm purchaser or manufacturer, as they are not required to undergo a background check.  Additionally, those who craft guns from scratch generally are not in the business of selling firearms and thus do not need to obtain an FFL.  *See* 18 U.S.C. § 923(a) ("No person shall engage in the

9

business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Attorney General."); *see also About the Guild*, AMERICAN CUSTOM GUNMAKERS GUILD, https://www.acgg.org/index.php/about-acgg/the-guild.html (last visited July 8, 2022) (explaining that the Guild serves to form a community of artisans interested in "the exchange of ideas concerning their craft").[3]   Moreover, replicas of historical weapons (manufactured before 1898) are considered "antique firearms" and thus do not qualify as "firearms" for the purposes of FFL licensing requirements. *See* 18 U.S.C. § 921(3) (specifying that the term "firearm" does not include an "antique firearm"); *id.* § 921(16) (defining "antique firearm").

In short, before the updates of the Rule, scratch builds fell outside the ambit of regulations governing the manufacturing or purchasing of firearms.   And with the Rule, ***scratch builds remain outside the ambit of regulations governing firearm manufacturers or purchasers***.   The Rule in no way impacts, affects, or regulates scratch builds.   Rather, the Rule now solely (and minimally) affects a "***partially complete, disassembled, or nonfunctional*** frame or receiver, including a frame or receiver parts kit," as discussed further in Section III.B, below.   *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. at  24,739 (emphasis added).   The Rule further clarifies its lack of regulation over scratch builds by stating that the terms "frame or receiver" "shall not

---

[3] Importantly, even under current law (prior to the Rule), if an artisan or craftsman sought to "engage in the business" of "dealing in firearms," he or she would be required to apply and obtain a license to do so.  *See* 18 U.S.C. § 923(a).

include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (***e.g., unformed block of metal, liquid polymer, or other raw material***).” *Id.* (emphasis added); *see also id.* at 24,653 (“[T]he final rule makes clear that articles that have not yet reached a stage of manufacture where they are clearly identifiable as an unfinished component of a frame or receiver (*e.g.*, unformed blocks of metal, liquid polymers, or other raw materials) are not frames or receivers.”).  Thus, those performing scratch builds today—including those creating replicas of weapons once used in the American Revolution—are subject to no more regulation under the Rule than they currently are.  *Compare* Pl.’s Emergency Mot. for Prelim. Inj., ECF No. 11, at 1, *with* Definition of “Frame or Receiver” and Identification of Firearms, 87 Fed. Reg. at 24,739.[4]

In short, a frame or receiver made with raw materials, as we do in scratch builds, through “forging, casting, printing, extrusion,” is unaffected by the Rule.

## III.   KIT BUILDS ARE ONLY MINIMALLY AFFECTED BY THE RULE

Similar to Plaintiff’s misunderstanding of the Rule’s impact on scratch builds, Plaintiff overstates the Rule’s effect on kit builds.  Plaintiff broadly speaks in terms of “weapon parts kits,” suggesting that no such kits have been regulated to date.  Pl.’s Emergency Mot. for Prelim. Inj. at 12.  Kits with fully machined parts, however, have long been regulated.  Yet, Plaintiff ignores these existing requirements.  The Rule merely aligns kits with partially machined parts so that they are subject to the same requirements as kits

---

[4] All citations to ECF documents are to the internal pagination of the document, not the ECF pagination.

with fully machined parts.  Thus, contrary to Plaintiff's assertions, the Rule minimally impacts only one kind of kit build.

### A.    Background on Kit Builds

"Kit builds" refer to building guns from manufactured or partially manufactured components, as opposed to raw materials.  The components can be sold together as part of a kit, or the components can be sold individually.  For either approach, the manufactured or partially manufactured components amount to a "kit" from which the builder can assemble a gun.  "No experience is required to master one of these build projects," and "easy-to-follow instructions" are often provided.  *Handgun Parts*, 80% LOWERS, https://www.80-lower.com/handgun-parts (last visited July 8, 2022).

Contemporary firearms are built around a key component generally called the "receiver" in the case of long guns or the "frame" in the case of handguns.  As noted above in Section I, the frame or receiver is "[t]he basic unit of a firearm" which houses firing control components.  Glossary, SPORTING ARMS AND AMMUNITION MANUFACTURERS' INSTITUTE, INC., https://saami.org/saami-glossary/?search=reciever (last visited July 8, 2022).  In other words, the frame or receiver is the component of a firearm that houses the mechanisms necessary for a firearm to actually fire.  Frames and receivers are often made of aluminum or steel, but in more recent times, these components can also be made out of a polymer, akin to a heavy-duty plastic, such as firearms produced by Glock, Bushmaster, and Smith & Wesson.  *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. at 24,688.

The frames or receivers purchased for kit builds can be fully manufactured and operational, or they can be partially manufactured—what is known as a "receiver blank," "unfinished receiver," or "80%" frame or receiver—which requires additional machining, typically a minimal amount, before it can be used as a functional frame or receiver.

When a fully manufactured and functional frame or receiver is purchased, it will be serialized, and it can be used to assemble a firearm without any further machining.  Fully machined frames and receivers have been defined as "firearms" since the Gun Control Act and its accompanying regulations were enacted in 1968, and accordingly all federal laws applicable to firearms have applied to fully manufactured frames and receivers as well.

An 80% frame or receiver, on the other hand, has not been fully machined; it is sold in a nearly complete form, but requires additional machining—usually a minimal amount of drilling and milling—to become a functional frame or receiver.  Historically, ATF has not considered 80% receivers and frames to be within the statutory definition of "firearm," and accordingly those making and selling 80% receivers and frames have not been subject to the federal laws applicable to the sale of firearms, such as licensing, background check, serialization, and record-keeping requirements.

80% kits include not only the 80% frame or receiver, but often the other components necessary to make a functioning firearm:  barrels, trunnions, springs, pins, slides (in pistols), uppers (in long guns), and sights.[5]  Along with these component parts, "80%"

---

[5] For example, a kit available from MDX Arms—an online seller of rifle components and accessories—included:  frame blank, jig, trigger and trigger housing, drill bits, an unfinished slide and parts to complete it, frame rails, magazine release, take-down lever, slide stop, barrel, and recoil spring.  *See* Decl. of Inspector Eric Tejada in Supp. of Pl. People of

retailers also often include a "jig."  The jig is a specialized piece of steel, aluminum, or polymer that assists the builder in the machining process by clamping around the frame or receiver blank and contains holes in specific locations to guide the builder's process.  Jigs make the at-home building process more user-friendly, even foolproof.  Some retailers sell the jig with the 80% frame or receiver; others sell the jig separately.  *E.g.*, *80 Percent Lower Unfinished Receiver Jig*, 80% LOWERS,  https://www.80-lower.com/80-lower-jig (last visited July 8, 2022).

Retailers also often provide detailed information for gun builders about what tools will be required for machining, instructions giving step-by-step guidance on how to complete an 80% frame or receiver, and tutorial videos for how to use their jigs and assemble the kits.  *See, e.g.*, How to Build an AR-15 Rifle, MIDWAYUSA, https://www.midwayusa.com/how-to-guides/how-to-build-ar-15-rifle (last visited July 8, 2022); Polymer80 PF940C 80% Compact Pistol Frame and Jig Kit, 80% LOWERS, https://www.80-lower.com/products/polymer80-pf940c-80-compact-pistol-frame-and-jig-kit/ (last visited July 8, 2022) (providing a link to download a tool list and instructions).

Moreover, videos are now readily available online, providing step-by-step visual instructions on machining an 80% frame or receiver into a completed frame or receiver ready for use.  These online videos are user-friendly and receive substantial foot traffic. They show the various levels of ease and available tools for completing the frames or receivers—from hand-held routers and basic drills to more sophisticated, automated mills.

---

the State of California's Mot. for a Prelim. Inj. at 5, *California v. Blackhawk Manufacturing Group Inc.*, No. CGC-21-594577 (Cal. Super. Ct. Aug. 18, 2021) ("Tejada Decl.").

*See, e.g.*, Juggernaut Technical, *JT-15 80 Percent Lower Finishing Guide* (April 25, 2013), https://www.youtube.com/watch?v=ZKz2sLJUvGU.  In some cases, after watching online instructions and using a drill, rotary tool, hammer, punch, file, clamp, pliers, and a utility knife, a gun maker starting with a polymer 80% frame can complete the entire process from kit to completed firearm in less than half an hour.  Tejada Decl. at 6-7.

**B.    The Rule Has No Effect on Kit Builds With Fully Manufactured, Serialized Frames or Receivers and Will Minimally Affect 80% Kits**

As previously discussed, frames or receivers are necessary for a gun to be capable of expelling a projectile, and there are two options for purchasing frames or receivers when completing a kit build: (1) a fully manufactured, serialized, and operational frame or receiver or (2) an 80% frame or receiver.  As demonstrated below, with respect to kit builds, the Rule has minimal impact:  fully machined frames or receivers already are regulated, and thus the Rule does not impact kits that include such frames or receivers; and kits that include 80% frames or receivers will simply be treated in the same manner as kits with fully machined, serialized frames or receivers.

**1.    *The Rule does not affect kit builds with fully machined, serialized frames or receivers.***

Currently, individuals purchasing a fully machined frame or receiver for a kit build (or even without a kit) must comply with federal firearms law:  the frame or receiver must be serialized by the manufacturer, purchased through an FFL, and in that sale the purchaser must complete a Form 4473 (ATF Firearm Transaction Record) and undergo a background check—the exact same procedure legal gun owners undertake to purchase a fully operational firearm.  18 U.S.C. § 921(a)(3).  We, as well as other at-home gun makers,

15

have long utilized this process to make guns.  Through FFLs, we purchase kits that include

fully machined frames or receivers, which we receive only after undergoing a background

check (just like we do when we buy a fully functional firearm); and the frame or receiver

is identified by a serial number on it.  Indeed, this process is required for purchase of a

fully machined frame or receiver, regardless of whether it is included in a kit or sold as a

standalone part.  *See id.*  These requirements—that at-home gun makers undergo a

background check and receive a serialized frame or receiver—are precisely those that apply

to the purchase of a completed gun, and are not burdensome.  Plaintiff, however, fails to

acknowledge these existing requirements for at-home builds—requirements that we have

followed for decades without impeding our ability to build guns at home.

> **2.**    ***The Rule merely requires that kits with 80% frames or receivers comply with the same federal firearms regulations as kits utilizing fully machined frames or receivers.***

The only change resulting from the Rule is that guns made from kits with partially

machined frames or receivers will now be covered by the same federal firearm laws that

apply to kits that include fully machined frames or receivers.  This adjusted definition

merely brings the regulation in harmony with the present-day reality of the capabilities of

the firearms industry and individual gun makers.  As ATF has explained, "technological

advances have also made it easier for companies to sell firearm parts kits, standalone frame

or receiver parts, and easy-to-complete frames or receivers to unlicensed persons, without

maintaining any records or conducting a background check."  Definition of "Frame or

Receiver" and Identification of Firearms, 87 Fed. Reg. at 24,652.  And "[t]hese parts kits,

standalone frame or receiver parts, or partially complete frames or receivers enable

individuals to make firearms quickly and easily . . . . Because of the difficulty with tracing illegally sold or distributed PMFs, those firearms are also commonly referred to as 'ghost guns.'" *Id.*

By recognizing that its guidance was out of date with the practices of manufacturers and gun makers, ATF has eliminated a loophole that has been exploited to the disadvantage of law-abiding gun owners, gun makers, and the public.  The utilization of 80% kits has become more prevalent given the ease and little skill required to assemble these guns at home, which means the number of un-serialized guns increases by the day in this country. As the Rule recognizes, the advances in technology in recent years have challenged the regulation of frames, receivers, and firearms parts kits.  *Id.* at 24,652.  These marketplace developments have made it easier for prohibited individuals to make these un-serialized, untraceable ghost guns.  Because of these developments, there has been a "substantial increase" in ghost guns recovered from crime scenes, forcing ATF to reckon with these changes in technology and the gun-building market.  In its 1968 enactment of the Gun Control Act, Congress recognized that the ability to make a gun can change and envisioned the law would stay relevant by choosing to include "readily be converted" in the definition of a "firearm."  18 U.S.C. § 921(a)(3).

By requiring compliance with the minimal measures that all legal gun owners already undertake when purchasing fully manufactured firearms or fully machined frames or receivers—a background check and purchasing a serialized gun through an FFL—ATF has simply exercised its rulemaking power to address the evolving marketplace of firearms.

The Rule's clarification considering these developments makes sense to us, and its imposition of minimal regulation to achieve that end is a result we have supported for years.

As gun owners who value and support the rights in the Second Amendment, it is important to us that the Rule does not impact the availability of 80% kits to law-abiding Americans, ***and it does not***.  Under the Rule, the purchase and utilization of 80% kits will still be readily available to law-abiding citizens.  The only individuals impacted are those who would not qualify to legally purchase a completed firearm, frame, or receiver, or those traffickers who seek to illegally resell these weapons.  In other words, any individual who can pass a background check will still be permitted to utilize an 80% kit.

* * * * * * * *

We regularly purchase firearms through FFLs and pass background checks in the process.  As we stated, we have previously built guns at home with the purchase of a fully machined, serialized frame or receiver, rather than an 80% kit, in compliance with federal background check, serialization, and record-keeping requirements.  These requirements are not burdensome, and did not significantly impact our at-home builds.  What is more, they are critical, commonsense requirements that reduce gun violence by keeping guns out of the hands of people who should not have them.

Plaintiff inflates the stakes of the Rule, and the impact it will have on at-home gun makers, in large part through an inaccurate conflating of scratch builds with kit builds.  *See* Compl. ¶¶ 90, 91; Pl.'s Emergency Mot. for Prelim. Inj. at 13.  But as our brief has shown, scratch and kit builds are different.  The Rule recognizes these distinctions and leaves unregulated the scratch build gun-maker.  Plaintiff also overstates the impact of the Rule

18

on kit builds, failing to fairly acknowledge the existence of requirements already in place for kits made from fully machined frames or receivers, and that the Rule simply aligns the regulations with changes in the gun industry that have made it easy to build guns from partially manufactured parts.

Taking into account these different processes for building guns, the lack of any changes to the treatment of scratch builds, and preexisting requirements for kit builds made from fully machined frames and receivers, the Rule simply does not impose new restrictions or regulations not already applicable to gun makers and purchasers in similar contexts.  It merely aligns gun-making from 80% frames and receivers with gun-making from fully machined frames and receivers.

Accordingly, the Rule will prevent the dangerous proliferation of untraceable ghost guns, particularly by those who could not otherwise legally own a firearm, without unduly impeding our ability to make our own guns.

## CONCLUSION

For the foregoing reasons and the reasons stated in Defendants' Opposition, Plaintiff's Emergency Motion for a Preliminary Injunction should be denied.


Respectfully submitted, on July 8, 2022.

/s/ *Mason C. Malone*
Mason C. Malone
Texas Bar No. 24125149
SDTX Fed. ID No. 3711341
Email:   masonmalone@jonesday.com
JONES DAY
717 Texas, Suite 3300

Houston, TX  77002
Telephone: (832) 239-3939
Facsimile:  (832) 239-3600

Barbara Mack Harding
      Attorney-in-Charge
      D.C. Bar No. 419250
      (*pro hac vice* pending)
Jennifer L. Swize
      D.C. Bar No. 490988
      (*pro hac vice* pending)
Megan E. Ball
      D.C. Bar No. 1708286
      (*pro hac vice* pending)
Joseph J. Kiessling
      D.C. Bar No. 1630477
      (*pro hac vice* pending)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Angela A. Korge
      Florida Bar No. 125419
      (*pro hac vice* pending)
JONES DAY
600 Brickell Ave
Suite 3300
Miami, FL 33131
Telephone: (305) 714-9700
Facsimile: (305) 714-9799

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and distribution to all registered participants of the CM/ECF System.

/s/ *Mason C. Malone*

Mason C. Malone