**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

**GALVESTON DIVISION**

DIVISION 80 LLC,

*Plaintiff,*

v.

MERRICK GARLAND,
in his official capacity as
Attorney General of the United States,

UNITED STATES DEPARTMENT OF JUSTICE,

STEVEN DETTELBACH,
in his official capacity as
Director of the Bureau of Alcohol,
Tobacco, Firearms, and Explosives,

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

*Defendants.*

Case No. 3:22-CV-00148

**PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION**

## I. Division 80 is Likely to Succeed on the Merits

### A. The Principles Articulated in *West Virginia v. EPA* Support Division 80's Argument that the Final Rule Exceeds ATF's Statutory Authority and Violates the Separation of Powers

In *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), the Supreme Court emphasized that in reviewing whether agency action is authorized by statute, a court's inquiry must be guided by the question of "whether Congress in fact meant to confer the power the agency has asserted." *Id.* at 2608. When the "history and the breadth of the authority that [the agency] has asserted" and the "economic and political significance of that assertion" provide a "reason to hesitate before concluding that Congress meant to confer such authority," the court must take care to ensure that the agency does not exceed the authority Congress conferred by statute. *Id.* Both "separation of powers principles and a practical understanding of legislative intent" counsel that a "sweeping," "unprecedented" assertion of regulatory authority by an agency must be rooted in "clear congressional authorization." *Id.* at 2608–09.

A review of the history of gun-part regulations reveals that the Final Rule effectuates a sweeping and unprecedented expansion of ATF's regulatory authority that exceeds the statutory authority conferred by Congress.

Since the dawn of this country, Americans have privately made their own firearms. Before the Industrial Revolution, production of firearm components was the province of skilled tradesmen, and assembling firearms was rarely a

centralized or integrated process. *See* WILL FOWLER ET AL., THE ILLUSTRATED WORLD ENCYCLOPEDIA OF GUNS 42 (2011). Colonial American gunsmithing typically consisted of purchasing parts separately, often importing them from abroad, and then assembling them. *Id.* at 43. The American Revolution was won with muskets that were "assembled from the salvaged metal components of British land pattern muskets" and were "usually very simple, if somewhat crudely, assembled." GEORGE D. MOLLER, AMERICAN MILITARY SHOULDER ARMS VOL. I: COLONIAL AND REVOLUTIONARY WAR ARMS 58–59 (2011).

The development of modern firearms in the early 1900s led to the first national gun-control laws in the 1930s. Congress passed the National Firearms Act of 1934 (NFA) and the Federal Firearms Act of 1938 (FFA). The FFA imposed licensing requirements on those who manufacture, import, or sell firearms, and it defined a firearm as including "any part or parts" of a firearm. Federal Firearms Act of 1938, Pub. L. No. 75-785, 52 Stat. 1250. That standard proved to be unworkable and was changed in the next major federal firearms legislation, the Gun Control Act of 1968 (GCA).

The GCA was the product of sustained negotiations over multiple sessions of Congress. In 1965 and 1966, the 89th Congress considered S. 1592 and S. 3767, neither of which became law. S. 1592 was introduced by Senator Thomas Dodd of Connecticut, who stated: "It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes

the words 'frame or receiver' for the words 'any part or parts.'"[1] Using almost identical language, the Senate Committee Report for S. 3767 stated: "Experience in the administration of the Federal Firearms Act has indicated that it is impractical to treat each small part as if it were a firearm. The revised definition substitutes the words 'frame or receiver' for the words 'any part or parts.'" When the GCA was passed in 1968, it followed S. 1592 and S. 3767 in replacing the words "any part or parts" with "frame or receiver." Both the Senate and House Committee Reports for the GCA state:

> Under the present definition of "firearm," any part or parts of such a weapon are included. It has been found that it is impractical to have controls over each small part of a firearm. Thus, the revised definition substitutes only the major parts of the firearm; that is, frame or receiver for the words "any part or parts."

S. REP. 90-1097, at 2200; H.R. REP. 90-1577, at 4416.

Since Congress enacted the GCA, businesses have produced and sold firearm parts without being classified as manufacturers of "firearms." Such parts include frame and receiver blanks like those sold by Division 80, which ATF has for decades held are not firearms. ECF No. 11-8.

Now, more than fifty years after Congress enacted the relevant statutory framework, ATF is proposing a sweeping and unprecedented expansion of its

[1] The discussion of legislative history here corrects inaccuracies in Plaintiff's preliminary-injunction motion. Senator Dodd's statement (quoted in the Notice of Proposed Rulemaking) was about S. 1592, not the GCA, and Exhibit 27 of the motion is the Senate Committee Report for S. 3767, not the GCA.

regulatory authority to circumvent Congress's deliberate choice to regulate only the "frame or receiver" of a firearm. This unilateral rewrite of federal law exceeds ATF's statutory authority to make rules "necessary to carry out" Congress's statutes. Defs.' Opp'n 9 (citing 18 U.S.C. § 926(a) as the source of the government's authority for the Final Rule).

Congress defined a "firearm" as including the "frame or receiver" of a firearm and a "weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). Its use of the word "readily" with respect to the "conver[sion]" of "weapon[s]" was not intended to confer on Defendants the authority to (1) treat incomplete parts as "frames or receivers" or (2) treat a collection of parts without a "frame or receiver" as a "firearm" under the theory that they are a "weapon parts kit." The Final Rule's expansion of ATF's jurisdiction into these domains—on the historically significant issue of Second Amendment rights—exceeds Defendants' statutory authority. *Cf. N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022) (recognizing "this Nation's historical tradition" of Second Amendment rights and holding that "the government may not simply posit that the regulation promotes an important interest").

The Second Amendment right to keep and bear arms is most certainly an issue of "economic and political significance" that is routinely debated by

Congress. Congress recently passed the Bipartisan Safer Communities Act, on which Senator John Cornyn "expended two decades of political capital . . . in what was an almost unthinkable move for a Republican representing [Texas]." Abby Livingston, *U.S. Senate Approves First Major Gun Legislation Since 1994, One Month After Uvalde Shooting*, TEX. TRIB. (June 23, 2022), https://www.texastribune.org/2022/06/23/senate-john-cornyn-bipartisan-gun-deal/. As a result of the bipartisan deal struck between Senate Republicans and Democrats, a House bill that addressed the issue of incomplete frames and receivers did not become law. H.R. 7910, 117th Cong. (2022) (Protecting Our Kids Act). Congress once again specifically declined to bring incomplete frames and receivers within ATF's jurisdiction, and Defendants are seeking to circumvent Congress by unilaterally claiming that authority.

Given the "history and the breadth of the authority that [ATF] has asserted" and the "economic and political significance of that assertion," this Court has "reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. at 2608. Defendants' "sweeping" and "unprecedented" assertion of regulatory authority has no basis in "clear congressional authorization" and is unlawful. *Id.* at 2608–09; *see also id.* at 2622 (noting that agencies may not "seek to hide 'elephants in mouseholes'"). Division 80 is likely to succeed in showing that the Final Rule exceeds Defendants' statutory authority and violates the separation of powers.

### B. The Government's Response Provides No Clarity on the Final Rule's Vague, Arbitrary, and Self-Contradictory Provisions

Despite the government's repeated insistence that the Final Rule "clarifies" the definition of a "frame or receiver," its response provides no greater clarity on the basic issues that are puzzling industry members across the country. Those issues can be summarized as follows:

*First*, do receiver blanks like the ones below, when sold on their own, constitute regulated receivers under the Final Rule? Under the classification letters previously issued by ATF, the answer is "no," because the fire-control cavity is completely solid. Under the Final Rule, the answer is unclear. Example 4 in the Final Rule suggests that the answer is "no" because the "critical interior areas" are not "indexed, machined, or formed" and they are not sold with "instructions, jigs, templates, equipment, or tools." 86 Fed. Reg. at 24,739. But the Final Rule's definition of a "partially complete" frame or receiver suggests that the answer may be "yes" due to ATF's use of the vague terms "readily" and "clearly identifiable." *Id.*




ATF Website



www.80percentarms.com

*Second*, if the answer to the first question is "no," how can the same piece of metal be transformed from "not a receiver" to a regulated "receiver" merely by the addition of "templates, jig, molds, equipment, tools, instructions, guides, or marketing materials"? 87 Fed. Reg. at 24,739. What statutory language supports ATF's reliance on extrinsic materials as potentially dispositive of whether an object is a frame or receiver (recall that the statutory text of 18 U.S.C. § 921(a)(3) merely states that a "firearm" includes "the frame or receiver of any such weapon")? What exact combinations of extrinsic materials are sufficient to transform a piece of metal that is "not a receiver" into a "receiver"?

*Third*, if the answer to the first question is "yes," then at what stage of manufacture does a product no longer constitute a "frame or receiver"? Do the meanings of the terms "readily" and "clearly identifiable" evolve over time, based on what information is available to the public and what tools are available for sale? In today's Internet age, is it even practicable for businesses and consumers to constantly monitor the totality of all information and products available? How could such vague terms provide sufficient clarity to satisfy the due-process requirement that laws be clear enough for the public to know what conduct is unlawful?

*Fourth*, under the Final Rule's new definition of a "firearm," what assortment of parts counts as a "weapon parts kit"? Can a collection of parts be a "firearm" even if it lacks a frame or receiver? How does ATF expect businesses

to keep track of whether a customer has ordered too many parts in a certain timeframe such that they might be liable for "structuring" a firearm sale?

The true purpose of the Final Rule is not to "clarify" the law, but rather to delegate to ATF unbridled discretion to determine the boundaries of its own regulatory jurisdiction—and to even change those boundaries in the future without additional rulemakings based on its evolving interpretations of the vague terms "readily" and "clearly identifiable." If the Final Rule takes effect, ATF could potentially invoke the doctrine of *Auer* (a.k.a. *Kisor*) deference to obtain judicial deference to ATF's interpretation of its own purposely ambiguous rules. *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). Justice Scalia's worst fears when he criticized *Auer* deference have come true: "It seems contrary to fundamental principles of separation of powers to permit the person who promulgates a law to interpret it as well. . . . [D]eferring to an agency's interpretation of its own rule encourages the agency to enact vague rules which give it the power, in future adjudications, to do what it pleases." *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 68–69 (2011) (Scalia, J., concurring). This Court can and should hold that ATF's delegation of discretion to itself to determine the boundaries of its own jurisdiction through the adoption of vague, ambiguous terms is unlawful. Division 80 has shown a likelihood of success on its arguments that the Final Rule is unconstitutionally vague, violates the non-delegation doctrine, and is arbitrary and capricious.

### C. The Vast Number of *Amici* Who Weighed in Shows That the Final Rule is Motivated by Politics

Division 80 has argued that Defendants adopted the Final Rule to fulfill President Biden's promise to "crack down" on so-called "ghost guns" without having to go through Congress. *See* ECF No. 11-25 (President Biden stating that he used the Final Rule to "keep" his "promise" after "having trouble getting anything passed in the Congress"). The vast number of *amici* who filed briefs in this case include almost every Democratic state attorney general and city and county leaders aligned with the Democratic Party, confirming that the Biden Administration acted under immense political pressure. That pressure led Defendants to adopt a Final Rule rife with legal problems instead of taking a more incremental and administrable (but less splashy) approach that could have earned industry's buy-in.

Though the policy arguments in the *amicus* briefs are not relevant to most of the legal issues in this case, Division 80 makes the following observations in response to those arguments.

*First*, the cities' *amicus* brief talks about the *rate* of increase year-to-year in the number of unserialized firearms seized by law enforcement (with a very limited data set going back to only 2019), but there is no dispute that the vast majority of guns seized by law enforcement are not unserialized privately made firearms. ECF No. 25-4 at ¶ 6 (stating that "ghost guns are a small percentage

of all gun seizures"). Thus, the broad concerns about "gun violence" raised by *amici* are a generalized critique of gun ownership in the United States rather than a critique of unserialized privately made firearms specifically.

*Second*, federal law already makes it illegal for a prohibited possessor to possess a firearm, for someone to be engaged in the business of manufacturing firearms without a license, and for someone to sell a firearm to a prohibited possessor. There are many ways to violate these laws, including through private sales and 3D printing. Yet the potential for private sales and 3D printing to be criminal does not render all private sales and 3D printing *per se* unlawful. Similarly, it is not *per se* unlawful to privately make an unserialized firearm for personal use—as the Final Rule acknowledges—and such lawful conduct should not be described as a "circumvention" of the Gun Control Act.

*Third*, as the District of Columbia and states' *amicus* brief demonstrates, in the absence of federal action on incomplete frames and receivers, states have enacted their own laws on the matter. If this Court holds that the Final Rule is unlawful—as it should—that would not spell the end of efforts to change how incomplete frames and receivers are regulated. It would simply mean that federal law does not place these products under ATF's jurisdiction, leaving states free to enact their own laws subject to constitutional limits. *See* U.S. CONST. amend. X; *Thompson v. Dallas City Atty's Office*, 913 F.3d 464, 471 (5th Cir. 2019) (describing states as the "laboratories of democracy").

## II. Division 80 Will Suffer Irreparable Harm

The textbook definition of irreparable harm is an injury for which "there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Where a "meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction." *Id.* In a request for a preliminary injunction, the plaintiff need only show a "substantial threat" of irreparable harm in the absence of an injunction. *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015).

Irreparable harm warranting preliminary relief has been shown.

*First*, Division 80 will likely be unable to receive full compensation in the form of monetary damages. If the Final Rule wipes out the market for frame and receiver blanks while this case is pending, only to be held unlawful, it will be difficult from an evidentiary perspective to estimate what Division 80's profits would have been during the time period in which the Final Rule was effective. *See Allied Marketing Grp., Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989) (finding irreparable harm when damages "might be incapable of calculation"). Furthermore, the government would likely assert sovereign immunity to stop Division 80 from receiving full monetary compensation for the harm it suffered. *Wages & White Lion Investments LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (finding irreparable harm because "federal agencies

generally enjoy sovereign immunity"); *see also Texas v. Becerra*, --- F. Supp. 3d ----, 2021 WL 6198109, at *20 (N.D. Tex. Dec. 31, 2021). As the Fifth Circuit has observed, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016).

*Second*, a "meaningful decision on the merits would be impossible without an injunction." *Janvey*, 647 F.3d at 600. If this Court does not enter a preliminary injunction, Division 80 will be forced to go out of business. As this Court knows all too well, civil litigation is a long and protracted process. It would likely require millions of dollars of attorney's fees and years of time to complete discovery, summary-judgment motions, a trial, and appellate review. The government could bleed the budget for this litigation dry and force Division 80's owner to find another way to earn a living while this case is pending—and then argue that the case is moot. If the Court does not issue a preliminary injunction, the Court will most likely never have an opportunity to issue a decision on the merits. Scenarios like this are exactly the reason why a preliminary injunction is necessary when the "potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989).

The government claims that the harms shown by Division 80 are "speculation." Defs.' Opp'n 50–52. But it goes on to acknowledge that ATF

stated in its own regulatory analysis that businesses such as Division 80, its manufacturers, and its retailers will be forced "to dissolve their businesses." Defs.' Opp'n 54. The government does not deny that these businesses will "dissolve." Rather, it argues that this Court should ignore their destruction because "the market demand" for frame and receiver blanks "largely depends on them being unserialized and untraceable." *Id.* Of course, as the Final Rule itself acknowledges, there is nothing unlawful about individuals choosing to privately make unserialized firearms. *See* 87 Fed. Reg. at 24,652 ("Such privately made firearms ('PMFs'), when made for personal use, are not required by the GCA to have a serial number placed on the frame or receiver . . . ."); *id.* at 24,653 ("[T]he final rule does not mandate unlicensed persons to mark their own PMFs for personal use . . . ."); *id.* at 24,719 ("ATF reiterates that PMFs for personal use are not required by the GCA or this rule to be serialized . . . ."). The government's admission that the "market demand" for unserialized frame and receiver blanks will be wiped out by the Final Rule's criminal prohibition of such products removes all doubt that Division 80 would be forced to "dissolve" if the Final Rule takes effect.

The government also suggests that Division 80 cannot show irreparable harm because its sales began after the Noticed of Proposed Rulemaking was published but cites no binding authority for that proposition. Defs.' Opp'n 57. The government's smattering of inapposite cases involving private contract

disputes,[2] alleged trademark infringement,[3] and an untimely motion for a preliminary injunction[4] do not come close to establishing that a company suffering harm at the hands of an unlawful agency rule must nonetheless be denied injunctive relief solely because a proposed rule (which by definition is still tentative and can be withdrawn or changed) was published in the Federal Register. The only thing "clearly foreseeable" was that ATF was acting far outside its regulatory authority and should have withdrawn the proposed rule. It was certainly not foreseeable that ATF would take the unprecedented step of adding brand new language in the Final Rule expressly repudiating decades worth of classification determinations, which ATF had defended in court as recently as January 29, 2021, in *City of Syracuse v. ATF.* ECF No. 11-10. Division 80 had nothing to do with ATF's decision to publish the Final Rule. The idea that Division 80's harm was self-inflicted has no basis in law or fact.

The Fifth Circuit has said that "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable

---

[2] *Salt Lake Trib. Publ'g Co. v. AT&T Corp.*, 320 F.3d 1081 (10th Cir. 2003); *Hardin v. Houston Chronicle Publ'g Co.*, 434 F. Supp. 54 (S.D. Tex. 1977); *BMC Software, Inc. v. IBM Corp.*, No. H-17-2254, 2018 WL 4520020 (S.D. Tex. Sept. 21, 2018).

[3] *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891 (7th Cir. 2001); *Floralife, Inc. v. Floraline Int'l, Inc.*, 633 F. Supp. 108 (N.D. Ill. 1985).

[4] *Citizens of the Ebey's Reserve for a Healthy, Safe & Peaceful Env't v. U.S. Dep't of the Navy*, 122 F. Supp. 3d 1068 (W.D. Wash. 2015).

compliance costs." *Texas v. EPA*, 829 F.3d at 433. This case is not the rare exception to that rule. Division 80 has shown a likelihood of irreparable harm.

## III. Division 80 Requires Nationwide Relief to Stay in Business

An injunction limited to only Division 80—as the government requests—would provide no relief. It would not protect Division 80's manufacturers: 80 Percent Arms and 5D Tactical. Exhibit 35 at ¶ 7. It also would not protect the retailers across the country that purchase Division 80's products or the individual customers who buy those products from retailers. *Id.* at ¶¶ 6, 9. Under such a limited injunction, Division 80 would have no manufacturers to buy products from and no retailers to sell products to, forcing it to dissolve. Only a nationwide injunction would allow Division 80 to continue its business of engaging in the interstate sale of frame and receiver blanks and jigs and tools for making frames and receivers. *See Texas v. United States*, 809 F.3d at 188 (affirming a nationwide preliminary injunction because of "a substantial likelihood that a geographically-limited injunction would be ineffective").

## CONCLUSION

The Court should grant Division 80's request for a preliminary injunction prior to the Final Rule's effective date of August 24, 2022. The lack of clarity on the enforceability of the Final Rule is already harming Division 80, which does not know whether it should plan to stay in business after August 24, 2022. Exhibit 35 at ¶ 10.

Respectfully submitted,

Michael J. Sullivan
Massachusetts Bar No. 487210
*Admitted Pro Hac Vice*
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (703) 247-5446
Email: msullivan@ashcroftlawfirm.com

*/s/ Cory R. Liu*
Cory R. Liu
*Attorney-in-Charge*
Texas Bar No. 24098003
S.D. Texas Bar No. 3047640
ASHCROFT LAW FIRM LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
Fax: (703) 247-5446
Email: cliu@ashcroftlawfirm.com

**Certificate of Service**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on July 14, 2022.

*/s/ Cory R. Liu*
Cory R. Liu