Case 3:22-cv-00148   Document 74   Filed on 08/23/22 in TXSD   Page 1 of 18

United States District Court
Southern District of Texas
**ENTERED**
August 23, 2022
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## Galveston Division

No. 3:22-cv-148

Division 80, LLC, *Plaintiff*,

v.

Merrick Garland, et al., *Defendants*.

## MEMORANDUM OPINION AND ORDER

Jeffrey Vincent Brown, *United States District Judge*:

Division 80, LLC, located in Galveston County, began selling partially complete firearm receivers in November 2021. It now seeks a nationwide injunction to suspend a proposed rule interpreting the Gun Control Act, 18 U.S.C. §§ 921, *et seq.* ("the Act"). Dkt. 11. Because Division 80 has failed to show that it will suffer irreparable harm absent an injunction or that the balance of equities favors preliminary relief, the motion is denied.

## I.    FACTUAL BACKGROUND

In May 2021, Attorney General Merrick Garland published a new Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") proposed rule in the Federal Register. *See* Proposed Rule, Definition of "Frame or Receiver"

and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021) ("the Proposed Rule"). The Proposed Rule would, among other things, alter the Act's definition of a firearm's "frame or receiver" to include frames or receivers that have "reached a stage in manufacture where [they] may readily be completed, assembled, converted, or restored to a functional state." *Id.* at 27,729. The current rule defines "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11 (2021).

Under the Proposed Rule, partially complete frames or receivers that may be readily completed would be considered "firearms" under the Act. 86 Fed. Reg. at 27,736. It follows that they would then be subject to the Act's requirement that a firearm have a serial number engraved or cast upon it. *Id.* at 27,720–21; 18 U.S.C. § 923(i). Additionally, vendors selling partially complete frames or receivers would be required to have a federal firearms license ("FFL"). 18 U.S.C. § 922(a)(1)(A).

Division 80 began operations on November 29, 2021, about six months after the publication of the Proposed Rule. *See* Dkt. 16-3, Exhibit 3 at 2. The following April, after the Proposed Rule's notice-and-comment period had passed, the Attorney General published the final rule that would take effect

on August 24, 2022. Final Rule, Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (April 26, 2022) ("the Final Rule"). The Final Rule largely tracks the language of the Proposed Rule concerning frames or receivers that may readily be completed. *Id.* at 24,739.

## II. PROCEDURAL BACKGROUND

Division 80 asks the court to set aside the Final Rule as unlawful under the Administrative Procedure Act. Dkt. 1. A month after filing its initial complaint, Division 80 moved the court for a nationwide preliminary injunction and asked that it be issued no later than August 24, 2022—the date that the Final Rule takes effect. Dkt. 11 at 63–65. On July 12, 2022, the court granted the Government's[1] motion to conduct jurisdictional discovery. Dkt. 52. Nearly a month later, on August 9, the court convened an oral hearing on the motion for a preliminary injunction. The Government averred at that hearing that, for the time being, it does not contest subject-matter jurisdiction. Dkt. 68, Hrg. Tr. 7:1–9. Having no reason at the moment to believe it lacks subject-matter jurisdiction, the court now considers Division 80's request for injunctive relief.

---

[1] The defendants are the Attorney General, the Department of Justice, the director of the ATF, and the ATF. For simplicity, the court refers to the defendants collectively as "the Government."

## III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The analysis of the third and fourth factors merge when the federal government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV. ANALYSIS

### A. Irreparable Harm

A court's authority to issue a preliminary injunction is one of "equitable discretion." *Winter*, 555 U.S. at 32. Because injunctive relief is extraordinary and finds its roots in equity, "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

To obtain a preliminary injunction, a plaintiff must show "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "Speculative injury is not sufficient; there must be more than an

unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). The plaintiff must demonstrate that the harm is substantial, neither purely conjectural nor "merely trifling,"[2] and that any legal remedy would be inadequate.[3]

### 1. Has Division 80 met its burden?

Division 80 suggests that its irreparable harm is a simple matter of logic. *See* Dkt. 11 at 58. Its deductive reasoning goes like this: "Division 80's principal business is the distribution of frame and receiver blanks, jigs, and tools to build frames and receivers[.]" Dkt. 11-26, Exhibit 26, Padilla Decl. (First Padilla Decl.) at 2. Thus, "it will be illegal for Division 80 to continue doing business because Division 80 does not have a [FFL]." *Id.* at 3. And even if it does get an FFL, "the regulatory costs, bureaucratic red tape, and extensive recordkeeping requirements would cause a dramatic reduction in consumer demand for frame and receiver blanks." *Id.* It then "follows logically that without consumer demand, [the] manufacturers [that supply

---

[2] *Consol. Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302 (1900), *quoted in Weinberger*, 456 U.S. at 311–12.

[3] *Weinberger*, 456 U.S. at 312 ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."); *see also Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919) (holding that an injunction should issue only when it "is essential in order effectually to protect property rights against injuries otherwise irremediable"), *quoted in Weinberger*, 456 U.S. at 312.

Division 80] will cease operations." Dkt. 11 at 58. Thus, "Division 80's business will be completely wiped out, causing irreparable harm." *Id.*

But this reasoning leaves much to be desired, including a record to support it. Division 80 may worry that "its business will be completely wiped out," but it has not shown that its demise is "likely." In a supplemental affidavit attached to Division 80's reply brief, Brandon Padilla, Division 80's sole owner, claims that after completing its first sale earlier this year, Division 80 has since had "over $200,000 in sales." Dkt. 55-1, Exhibit 35, Padilla Decl. (Second Padilla Decl.) at 3. But from there, Division 80 merely speculates that its business would be forced to close unless the court grants immediate relief. It likewise offers no evidence that its suppliers "will cease operations." These predictions are just Padilla's conjecture; the court has heard from not even one of Division 80's customers or suppliers.[4]

Division 80 has likewise failed to disprove that obtaining an FFL would save its business. Padilla attests summarily: "If the Final Rule takes effect, I will have no choice but to dissolve my business." Second Padilla Decl. at 4. But he does have a choice—he can get a license. ATF estimates that an FFL

---

[4] Division 80 relies on two manufacturers for its sales stock: 80 Percent Arms and 5D Tactical. Dkt. 55 at 15. Neither has joined the lawsuit, sought to appear as an *amicus curiae*, or submitted any evidence that it would close its doors in the absence of an injunction in this case.

would cost Division 80 $408 to initially obtain and $194 every three years to renew[5]—certainly not cost-prohibitive for a company that purports to enjoy better than $200,000 in annual sales. Padilla suggests that even if Division 80 were to get licensed, "the regulatory costs, bureaucratic red tape, and extensive recordkeeping requirements" would destroy consumer demand for its products. First Padilla Decl. at 3. But Division 80 neither presents Padilla as an expert in the market dynamics of gun-component sales nor offers any other evidence to support such a conclusion.

Instead, Division 80 points to the "Regulatory Impact Analysis" ATF conducted as part of proposing the new rule. In it, "ATF estimates it will be unlikely that a significant number of [non-FFL holders] will opt to become [FFL holders]," and non-FFL holders will instead "end up dissolving their businesses." Regulatory Impact Analysis, Dkt. 11-3, Exhibit 3 at 32. This analysis was based on comments received during the notice-and-comment period—a required step in the rulemaking process. *See id.* But this does not suggest that those without licenses could not obtain one and maintain their businesses—just that they would not wish to do so.

---

[5] Regulatory Impact Analysis, Dkt. 11-3, Exhibit 3 at 35.

Division 80 relies on two cases for the idea that the threat of severe economic harm to a business is enough to show irreparable injury. The first is *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989). In *Atwood*, Petrobras—the national oil company of Brazil—contracted with Atwood—a drilling company—to drill wells off the Brazilian coast. *Id*. at 1175. As security for the payments it would owe, "Petrobras furnished Atwood a letter of credit issued by an American bank and guaranteed by the Export Import Bank of the United States (EXIM)." *Id*. When Petrobras later balked at paying, Atwood sued it for breach of contract. *Id*. As the letter of credit and EXIM's guarantee were set to expire, Atwood sought injunctive relief "maintaining them in effect." *Id*. The district court ordered "Petrobras to extend or reinstate the letter of credit and to request EXIM to extend its guarantee." *Id*. at 1176. The Fifth Circuit held that the injunction was proper because Atwood would lose most of its financing without the letter of credit. *Id*. at 1178–79.

The second case is *Jiao v. Xu*, 28 F.4th 591 (5th Cir. 2022). In *Jiao*, four investors agreed to jointly acquire the Crowne Plaza Hotel in Houston. *Id*. at 595. One of the four, Xu, was contractually obligated to make a $3 million capital contribution for a 50.02% membership interest. *Id*. Instead, he contributed just $867,889.11. *Id*. The district court declared Xu's unit

certificates invalid and ordered the investment group to provide him "with new certificates reflecting the ownership interest derived from the amount [he] had actually paid." *Id.*

On appeal, Xu argued the district court had abused its discretion because his fellow investors had failed "to establish a substantial threat of irreparable injury." *Id.* at 598. The Fifth Circuit upheld the injunction:

> In holding that Plaintiffs faced irreparable injury, the district court found that Plaintiffs were in imminent danger of losing the hotel's IHG franchise and even the hotel itself. The district court's findings are supported by the record, including testimony of both fact and expert witnesses, and are not clearly erroneous. Accordingly, the district court did not abuse its discretion by concluding that Plaintiffs established a substantial threat they would suffer irreparable injury if an injunction was not granted.

*Id.*

Division 80 relies on *Atwood* and *Jiao* for the notion that "the mere fact that economic damages may be available does not always mean that remedy at law is 'adequate.'" *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011), *quoted in Jiao*, 28 F.4th at 598. "[A]n exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood*, 875 F.2d at 1179.

But there are evident differences between *Jiao* and *Atwood* on the one hand and this case on the other. In both *Jiao* and *Atwood* the threatened economic harm was shown to be significant, tangible, and likely. Division 80,

by contrast, fears an injury that is amorphous, unsubstantiated, and speculative. Moreover, both *Atwood* and *Jiao* involved the clearly imminent collapse of momentous financial deals through the unexpected malfeasance of parties with whom the deals had been made. Here, on the other hand, Division 80 has cryptically surmised that its fledgling business model will evaporate with the implementation of a regulatory rule change that was already under proposal when the company was created.

In its reply brief, Division 80 appends an additional argument, suggesting that *any* cost it may incur by complying with the Final Rule would amount to irreparable harm. It cites *Texas v. EPA* for the idea that "complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)). And the Government has not argued that Division 80 will ever be able to recover such costs. "That's probably because federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., L.L.C. v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021).

But equating the compliance costs expected in *Texas v. EPA* to those Division 80 might experience makes little sense. In that case, the petitioners

showed that compliance with the final rule "would impose $2 billion in costs on power companies, businesses, and consumers." *Texas*, 829 F.3d at 433. It also was demonstrated that the regulated companies at issue would have to construct extensive emission controls to comply with the EPA's final rule—a process that would take years to complete, raise rates for millions of consumers, and severely impair ERCOT's reliability. *Id.* By contrast, the only quantified compliance costs we know Division 80 will face is a few hundred dollars in licensing fees.[6]

It remains that in this circuit, a "preliminary injunction is not appropriate where the potential harm to the movant is strictly financial, unless the potential economic loss is so great as to threaten the existence of the movant's business." *Andritz Sundwig GmbH v. United States*, No. CV 4:18-2061, 2018 WL 3218006, at *10 (S.D. Tex. July 2, 2018) (citing *Atwood*, 875 F.2d at 1179). Division 80 insists that it is staring just such a threat in the face. But insisting is not enough. Division 80 has neither shown that it is likely to suffer irreparable harm absent preliminary relief nor that any injury

---

[6] Of course, Division 80 has also alleged more nebulous compliance costs—"regulatory costs, bureaucratic red tape, and extensive recordkeeping requirements"—without attempting to quantify them with any specificity. First Padilla Decl. at 2.

it might endure would be so great as to compel the court to intervene before reaching a final decision on the merits.

### 2. Is Division 80's harm self-inflicted?

Division 80 was formed on November 29, 2021—a full six-months after the Proposed Rule was published in the Federal Register. *Compare* Dkt. 16-3, Exhibit 3 at 2, *with*, 86 Fed. Reg. at 27,720. It now indignantly complains that a regulation already coming down the pike before it was created—and its business model was chosen—will soon lead to its destruction. This brings to mind the old tort-law doctrine of "coming to the nuisance,"[7] though the more appropriate term is "self-inflicted harm" when speaking of injunctive relief: "[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed. Apr. 2021 update); *see also Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam) (self-inflicted injuries "do not count" as irreparable harm); *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("[S]elf-inflicted wounds are not

---

[7] Though "[t]he fact that the plaintiff in a nuisance action moved into an area affected by an existing nuisance has never been a complete defense to an action seeking to abate a nuisance[,]" Prosser and Keeton have explained that it is a "factor to consider while weighing the equities in an abatement action[.]" *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 417 n.13 (Tenn. 2013) (citing W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 88B, at 635 (5th ed.1984)).

irreparable injury."); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable.").

That said, the fatal flaw in Division 80's irreparable-harm argument is not that it came to the alleged injury on its own, but that—as set out above—it has failed to convince the court of its likelihood and substantiality.

### 3. What is the scope of the harm?

Finally, Division 80 argues that it "cannot continue operations without a *nationwide injunction*." Dkt. 11 at 62 (emphasis added). For support, it simply notes that "most of its customers are out of state." *Id.* at 61 (citing First Padilla Decl. at 2). Again, Division 80 offers no details and no substantiation. It names no customers and lists no states. Does the court really need to immediately halt the Final Rule in Hawaii to save Division 80 from going under? Even if Division 80 had shown itself entitled to an injunction, it has failed to explain why that relief must be nationwide in scope.

### B. Balance of Equities

Division 80 spends very little of its briefing—just three short paragraphs—addressing the balance of the equities. It suggests that, so long as the court determines that Division 80 is likely to succeed on the merits,

the court need not consider the broader public interest because the Government has "no legitimate interest in implementing an unlawful rule." Dkt. 11 at 63. But showing both that the balance of equities tips in the movant's favor and that an injunction is in the public interest remain essential requirements for obtaining injunctive relief. The Supreme Court has criticized lower courts for "address[ing] these considerations in only a cursory fashion." *Winter*, 555 U.S. at 26. A preliminary injunction "does not issue as of course." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 542 (1987). Rather, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.*

Division 80 relies on two cases for the idea that the court need not truly balance the equities to issue an injunction: *BST Holdings, L.L.C. v. Occupational Safety & Health Administration*, 17 F.4th 604 (5th Cir. 2021), and *New York Progress & Protection PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013). But both are distinguishable from this case for the same reason—they both involved concrete violations of individual constitutional rights. In *BST Holdings*, the Fifth Circuit vindicated individuals' liberty interests, including the right to free religious exercise, when it stayed the OSHA rule mandating that employers require their employees to either get vaccinated against

COVID-19 or test on a regular basis. 17 F.4th at 609–10, 618 n.21, 618–19. Likewise, the Second Circuit held in *Walsh* that core First Amendment rights were at stake when the state of New York imposed limits on political contributions. 733 F.3d at 485–89.

Here, on the other hand, Division 80 has not shown that individual constitutional liberty interests are at stake. It does not argue that the Final Rule would amount to a violation of the Second Amendment. Instead, it maintains that the Government's interpretation runs afoul of the Act's plain language—a statutory argument, not a constitutional one.

Division 80 briefly raises two constitutional issues with the Final Rule, but neither implicates a concrete individual liberty interest. One is a void-for-vagueness challenge to the Final Rule. Dkt. 11 at 33–37. The other concerns the nondelegation doctrine: a challenge to the "delegation of open-ended legislative authority to rewrite federal statutory definitions without an intelligible principle." *Id.* at 37. But these are not the type of constitutional violations that would compel the court to skip any equity-balancing analysis. *See Aposhian v. Barr*, 958 F.3d 969, 990–91 (10th Cir. 2020).[8]

---

[8] The *Aposhian* court held that because the plaintiff did not allege a violation of an "*individual* constitutional right[,]" the equities weighed in favor of the government. 958 F.3d at 991. *Aposhian* concerned ATF's banning of bump stocks by including them in the statutory definition of a "machinegun." *Id.* at 976–77. The

Unlike Division 80, the Government makes a case for balancing the equities in its favor. In the Proposed Rule itself, the Attorney General explains that it is "difficult for law enforcement to determine where, by whom, or when [unserialized weapons] were manufactured, and to whom they were sold or otherwise disposed." 86 Fed. Reg. at 27,722. Non-FFL holders can use unserialized gun parts to create their own unserialized firearms. *Id.* Many privately made firearms are recovered at crime scenes, often leaving law-enforcement officials unable to prosecute criminals when they cannot trace a firearm to its owner. *Id.* at 27,722–23. Advances in technology have made it easier to construct operable firearms from component parts. *Id.* at 27,722. "Prohibited persons," including convicted felons, are able to easily obtain partially complete frames or receivers that can be readily converted into functional weapons that "are nearly impossible to trace." *Id.* at 27,729 (citing examples).

The Government contends the implementation of the Final Rule will decrease the number of untraceable firearms in circulation, thus facilitating law enforcement's efforts to keep guns out of the hands of criminals. Division

---

court held that the plaintiff had no irreparable harm to weigh against the government's interests because its "cases finding that a violation of a constitutional right alone constitutes irreparable harm are limited to cases involving individual rights, not the allocation of powers among the branches of government." *Id.* at 990.

80 makes little attempt to dispute this point or to explain why it is outweighed by equities favoring itself and similarly situated entities.

The court finds that the balance of the equities weighs against issuing the requested relief.

## V. CONCLUSION

Injunctive relief is meant to be extraordinary relief. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must establish all four of those requirements, not just one or two. In this case, Division 80 seems convinced it has made a good case for its likelihood to succeed on the merits, and that that should be enough. But a court is not justified in exercising its equitable power without a showing of likely irreparable harm, that the equities favor the plaintiff, and that the injunction will serve the public interest. Because Division 80 failed to establish those elements, the court need not address its likelihood of success on the merits.

\* \* \*

The court denies Division 80's motion for a preliminary injunction (Dkt. 11).

Signed on Galveston Island this 23rd day of August, 2022.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE