**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

**GALVESTON DIVISION**

DIVISION 80 LLC,

       *Plaintiff*,

   v.

MERRICK GARLAND, in his official
capacity as Attorney General of the
United States, *et al*,

       *Defendants*.

Civil Action No. 3:22-CV-00148

**DIVISION 80 LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

*Introduction* ........................................................................................... 1

FACTUAL BACKGROUND ................................................................... 2

I.   THE GCA AND ATF'S IMPLEMENTING REGULATIONS ............................... 2

II.  THE BIDEN ADMINISTRATION ANNOUNCES THAT IT "WILL NOT WAIT
     FOR CONGRESS TO ACT TO TAKE ITS OWN STEPS" ON "GHOST GUNS" ..... 4

III. THE RULEMAKING PROCESS: NOTICE AND COMMENT PERIOD ................... 5

IV.  PUBLICATION OF THE FINAL RULE ............................................... 6

LEGAL STANDARD ............................................................................... 8

A.   SUMMARY JUDGMENT ................................................................ 8

B.   APA STANDARD ....................................................................... 8

SUMMARY OF THE ARGUMENT ....................................................... 9

ARGUMENT ............................................................................................ 9

I.   THE FINAL RULE VIOLATES THE PLAIN LANGUAGE
     OF THE GCA ............................................................................. 9

     A. Congress's Definition of "Firearm" under the GCA Unequivocally
        Excluded Partially Complete, Disassembled, or Nonfunctional
        "Frames or Receivers," as Well as "Weapon Parts Kits" .................... 10

II.  *CHEVRON* DEFERENCE DOES NOT APPLY ...................................... 12

III. THE FINAL RULE VIOLATES THE CONSTITUTION AND
     DIVISION 80'S CONSTITUTIONAL RIGHTS ....................................... 14

     A. The Final Rule Is Unconstitutionally Vague in Violation of
        Due Process ........................................................................... 14

     B. The Final Rule Infringes on the Exercise of Second Amendment
        Rights .................................................................................... 17

i

C.  The Final Rule Chills Protected Speech in Violation of the
     First Amendment ........................................................................ 20

D.  The Final Rule Effectuates a Regulatory Taking of "Privately
     Made Firearms" Without Just Compensation ............................... 22

E.  The Agencies' Rulemaking Actions and Adoption of Final
     Rule Violate the Separation of Powers ........................................ 23

F.  The Final Rule Violates the Nondelegation Doctrine ........................... 24

G.  The Final Rule's Regulation on "Privately Made Firearms"
     Exceeds the Limits of the Commerce Clause ................................ 25

IV.  THE FINAL RULE VIOLATES THE APA AND MUST BE
      SET ASIDE ....................................................................................... 25

A. The Final Rule Was Not a Logical Outgrowth of the NPRM
    and Failed to Satisfy the Public Participation Requirements
    of the APA .................................................................................... 25

B. The Final Rule Is Arbitrary and Capricious ............................................ 27

*Conclusion* ........................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935) ......................................................................................... 24

*Amin v. Mayorkas*,
   24 F.4th 383 (5th Cir. 2022) ............................................................................... 8

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002) ......................................................................................... 23

*Bernstein v. U.S. Dep't of State*,
   922 F. Supp. 1426 (N.D. Cal. 1996) .................................................................. 21

*California v. ATF*,
   No. 3:20-cv-06761, 2020 WL 9849685 (N.D. Cal. Nov. 30, 2020) ............................ 13

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) ...................................................................*passim*

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................... 8

*Chamber of Commerce v. U.S. Dep't of Labor*,
   885 F.3d 360 (5th Cir. 2018) .............................................................................. 9

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ...............................................................................*passim*

*Conn. Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ......................................................................................... 10

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971) ......................................................................................... 16

*Collins v. Mnuchin*,
   938 F.3d 553 (5th Cir. 2019) ....................................................................... 11, 12

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
   45 F.4th 846 (5th Cir. 2022) ............................................................................. 30

*Decker v. Nw. Env't Def. Ctr.*,
    568 U.S. 597 (2013) ........................................................................................ 16

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) .................................................................................. 18, 20

*Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*,
    718 F.3d 488 (5th Cir. 2013) ......................................................................... 16

*FCC v. League of Women Voters of Cal.*,
    468 U.S. 364 (1984) ........................................................................................ 21

*Horne v. Dep't of Agriculture*,
    576 U.S. 351 (2015) ........................................................................................ 23

*IMS Health Inc. v. Sorrell*,
    630 F.3d 263 (2d Cir. 2010), *aff'd*, 564 U.S. 552 (2011) .............................. 21

*Johnson v. United States*,
    576 U.S. 591 (2015) ........................................................................................ 14

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) ............................................................................ 8

*Loving v. United States*,
    517 U.S. 748 (1996) ........................................................................................ 24

*Mozilla Corp. v. FCC*,
    940 F.3d 1 (D.C. Cir. 2019) ............................................................................ 27

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) .................................................................................... 22

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
    921 F.3d 1102 (D.C. Cir. 2019) ................................................................ 25, 27

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ........................................................................ 18, 19, 20

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) ........................................................................................ 24

iv

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978) ........................................................................... 22

*Penn. Coal Co. v. Mahon*,
  260 U.S. 393 (1922) ..................................................................... 22, 23

*Policy & Research, LLC v. HHS*,
  313 F. Supp. 3d 62 (D.D.C. 2018) ................................................... 30

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) ....................................................................... 15

*Staples v. United States*,
  511 U.S. 600 (1994) ........................................................................... 15

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ............................................................ 27

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) ............................................................ 27

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994) ........................................................................... 16

*United States v. Bittner*,
  19 F.4th 734 (5th Cir. 2021) ............................................................. 10

*United States v. Garcia*,
  707 F. App'x 231 (5th Cir. 2017) ..................................................... 13

*United States v. Ron Pair Enters., Inc.*,
  489 U.S. 235 (1989) ........................................................................... 10

*United States v. USPlabs, LLC*,
  338 F. Supp. 3d 547 (N.D. Tex. 2018) ......................................... 14, 16

*Utility Air Reg. Group v. EPA*,
  573 U.S. 302 (2014) ........................................................................... 23

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ........................................................................... 21

*Vizaline, L.L.C. v. Tracy*,
  949 F.3d 927 (5th Cir. 2020) ...................................................................... 22

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021) ..................................................................... 27

*Weaver v. Harris*,
  856 F. Supp. 2d 854 (S.D. Miss. 2012), *aff'd*, 486 Fed. App'x 503 (5th Cir. 2012) .... 17

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ................................................................................ 30

**Statutes**

18 U.S.C. § 921 ............................................................................... *passim*

18 U.S.C. § 922 ............................................................................... 2, 13

18 U.S.C. § 923 ..................................................................................... 2

18 U.S.C. § 924 ............................................................................... 3, 13

18 U.S.C. § 926 ..................................................................................... 2

5 U.S.C. § 553 ............................................................................... 25, 26

5 U.S.C. § 706 ......................................................................... 9, 20, 27, 30

**Other Authorities**

Administrative Procedures Act ................................................................ *passim*

*Commerce in Firearms and Ammunition*, 33 Fed. Reg. 18,555 (Dec. 14, 1968) ........... 2, 3

*Definition of "Frame or Receiver" and Identification of Firearms*,
  86 Fed. Reg. 27 (May 21, 2021) .......................................................... *passim*

*Definition of "Frame or Receiver" and Identification of Firearms*,
  87 Fed. Reg. 24 (Apr. 26, 2022) .......................................................... *passim*

Federal Firearms Act of 1938 ..................................................................... 28

Gun Control Act of 1968 ...................................................................................*passim*

H.R. Rep. 90-1577 (June 21, 1968) ................................................................. 28

U.S. CONST. Art. I, § 1 ....................................................................................... 24

U.S. CONST. Art. I, § 8 ....................................................................................... 25

U.S. CONST. Art. II, § 3 ...................................................................................... 23

**Rules**

26 C.F.R. § 178.11 ................................................................................................ 3

27 C.F.R. part 447 ................................................................................................ 3

27 C.F.R. § 478.11 .......................................................................................*passim*

27 C.F.R. § 478.12 ....................................................................................... 17, 26

27 C.F.R. part 479 ......................................................................................... 3, 15

111 Cong. Rec. 5527 (March 22, 1965) ......................................................... 28

Fed. R. Civ. P. 56 .............................................................................................. 1, 8

Plaintiff Division 80 LLC ("Division 80") files this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. Division 80 seeks summary judgment against Defendants United States Attorney General Merrick Garland ("Attorney General"), United States Department of Justice ("DOJ"), Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Steven Dettelbach, ECF No. 83 (Answer) at 1 n.1, and ATF (collectively, "Agencies" or "Defendants") on all claims in Division 80's Complaint, ECF No. 1.

### *Introduction*

Division 80 challenges the flawed and far-reaching Final Rule[1] promulgated by the Agencies. The Final Rule is not a valid interpretation of federal law or use of Congressionally delegated powers. The Final Rule is instead a rushed, politicized, unconstitutional, unilateral undertaking meant only to appease the wishes of a sitting president frustrated with the legislative process of bicameralism and presentment.

Importantly, the Final Rule unlawfully expands the Agencies' regulatory reach by rewriting, *inter alia*, the federal definition of a "firearm." The Agencies' unilateral action deliberately circumvented constitutional constraints that are in place to prevent an administrative body from doing exactly what the Agencies have done with the Final Rule.

Just weeks ago, the Fifth Circuit emphasized that the responsibility to determine our nation's public policy lies with Congress, and that federal courts must apply the law as

---

[1] Issued by ATF on April 26, 2022, 2021R-05F, 87 FR 24652. Took effect on August 24, 2022. Entitled *Definition of 'Frame or Receiver' and Identification of Firearms* (codified at 27 C.F.R. pts. 447, 478, and 479). *See* Exhibit A.

Congress has written it. *Cargill v. Garland*, 57 F.4th 447, 461 (5th Cir. 2023) (*en banc*). Contrary to the principles affirmed in *Cargill*, the Final Rule impermissibly redefines and reinterprets the Gun Control Act of 1968 ("GCA"), expanding and creating new regulatory powers for ATF and broadening the threat of criminal penalties to reach activities that Congress declined to criminalize. A plain reading of the statutory language, coupled with the circumstances surrounding the promulgation of the Final Rule and the criminal liability that it creates, shows that the Final Rule defies the plain language of the GCA, and violates the Constitution and the Administrative Procedure Act ("APA"). Defendants cannot reasonably contend otherwise. This matter is therefore ready for this Court's judgment.

## FACTUAL BACKGROUND

### I.   THE GCA AND ATF'S IMPLEMENTING REGULATIONS

Congress enacted the GCA, *as amended*, 18 U.S.C. §§ 921 *et seq*., which established federal regulations for persons engaging in the business of importing, manufacturing, or dealing in "firearms." *See generally* 18 U.S.C. §§ 922–923.  Congress vested in ATF the authority to prescribe regulations "necessary to carry out the provisions of" the GCA, *id.* § 926(a), but made clear that "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms" for appropriate purposes. Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213–14.

The GCA does not include a statutory definition of a "frame or receiver," but shortly after passage of the GCA, ATF promulgated regulations which provided a one-sentence definition of "frame or receiver." Final Rule, *Commerce in Firearms and Ammunition*, 33

Fed. Reg. 18,555 (Dec. 14, 1968) (then codified at 26 C.F.R. § 178.11, and today appearing at 27 C.F.R. § 478.11). At the time ATF promulgated its 1968 Rule, the Agencies took and held the position that the GCA authorized ATF to regulate items that "may readily be converted" into a weapon that expels a projectile by the act of an explosion, but did not authorize the regulation of items that "may readily be converted" into a "frame or receiver." The Agencies maintained this distinction for five decades.

Since the 1968 enactment of the GCA and at all times prior to the effective date of the Final Rule, ATF's regulations defined a "firearm" as including the four categories of items contained in 18 U.S.C. § 921(a)(3), following (nearly verbatim) the statutory text of 27 C.F.R. § 478.11. This regulatory definition guides ATF's enforcement of a licensing regime which governs the importation, manufacture, and dealing of products that constitute firearms. Failure to follow the requirements imposed by the GCA can result in criminal liability. *See* 18 U.S.C. § 924(a)(1) (making it a crime to violate "any other provision of [the GCA]"). It is therefore essential for law-abiding citizens and businesses in the firearms industry to have clarity about what meets the definitions of a "firearm" and "frame or receiver" and what does not.

For five decades, ATF's regulations maintained adherence to and continuity with the GCA text regarding the definition of "firearm" and ATF's definition of "frame or receiver," and provided basic stability while technology evolved and the American tradition of homemade gunmaking gained popularity. Prior to the Final Rule, ATF communicated with the industry and the public in a relatively coherent and consistent manner so that licensees and the public alike had reasonable clarity as to the basic definition

of "firearm" and the parameters of ATF's regulations regarding licensure, compliance, and criminal conduct.[2] ATF issued consistent guidance through scores of classification letters, ruling that certain "partially complete or unassembled frames or receivers" (even those including parts, tools, and instructions to assist in the manufacturing process) have not "reached a stage of manufacture" to be properly classified as the "frame or receiver" of a "firearm," and thus are outside the regulatory scope of federal law. Compl. ¶ 32.

## II.   THE BIDEN ADMINISTRATION ANNOUNCES THAT IT "WILL NOT WAIT FOR CONGRESS TO ACT TO TAKE ITS OWN STEPS" ON "GHOST GUNS"

President Biden campaigned on a promise to "[s]top 'ghost guns,'" referring to firearms "assembl[ed] . . . on [one's] own . . . by buying a kit of disassembled gun parts." *See* Compl. ¶¶ 38–52. On April 7, 2021, the Biden Administration announced that it "will not wait for Congress to act to take its own steps" on gun control, instead instructing the Department of Justice to "within 30 days . . . issue a proposed rule to help stop the proliferation" of so-called "ghost guns." *Id.* In a press conference the following day, President Biden confirmed that he asked the Attorney General and his team to "identify [] immediate, concrete actions [the President] could take [] without having to go through the Congress," Compl. ¶ 42, because the President was having trouble getting anything passed in the Congress.[3]  On April 8, 2021, the Attorney General stated that "the proliferation of

---

[2]  The Administrative Record contains numerous classification letters and guidance that demonstrate areas of laudable consistency in ATF's generally permissible interpretation of the GCA and the application of agency rules in determinations made over the course of decades.

[3]  *Remarks by President Biden Announcing Actions to Fight Gun Crime*, THE WHITE HOUSE (Apr. 11, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/04/11/press-briefing-by-press-secretary-jen-psaki-april-11-2022/.

the so-called ghost guns" was caused by a "regulatory loophole" or "gap," Compl. ¶ 43, despite decades of ATF's carefully crafted (and legally correct) classification determinations under the GCA approving the lawful, unregulated sale of such products.

## III.   THE RULEMAKING PROCESS: NOTICE AND COMMENT PERIOD

On May 21, 2021, the Agencies published in the Federal Register a Notice of Proposed Rulemaking entitled *Definition of 'Frame or Receiver' and Identification of Firearms*, requesting comments. 86 Fed. Reg. 27,720 (May 21, 2021) ("NPRM"). *See* Exhibit B. The NPRM provided the regulatory text of the proposed rule, *id.* at 27,741–53, which explained the ATF sought to "amend[] [its] regulations to clarify the definition of 'firearm' and to provide a more comprehensive definition of 'frame or receiver' so that those definitions more accurately reflect firearm configurations not explicitly captured under the existing definitions[.]" *Id.* at 27,725. The NPRM also "propose[d] new terms and definitions." *Id.* ATF received over 290,000 public comments in response to the NPRM. Final Rule at 24,654. "There were nearly 170,550 comments opposed to the [NPRM]," which comprised nearly 60% of all comments. *Id.* at 24,667.

Specifically, ATF's NPRM proposed a new definition concerning "partially complete, disassembled, or nonfunctional frame or receiver[s]." Compl. ¶ 56. The public submitted numerous comments that expressed its collective concern that the proposed new definition was not only vague, *id.* at 24,678, but would also rewrite 18 U.S.C. § 921(a)(3) by treating receiver blanks as regulated products, contrary to ATF's longstanding legal position that such products do not fall within ATF's regulatory jurisdiction. *Id.* at 24,699. Rather than amending the NPRM or formally proposing a new definition and providing

5

adequate time to receive public comment thereon, ATF instead simply wrote a new definition of "frame or receiver" and promulgated it as a regulation in the Final Rule without any opportunity for notice and comment. The Final Rule admits as much. *Id.* at 24,693 (the Final Rule "provid[es] *new distinct definitions*" (emphasis added)).

Commenters repeatedly noted that for decades, ATF consistently stated that receiver blanks do not meet the definition of a regulated "firearm" under federal law. Nevertheless, the Final Rule expressly repudiated ATF's prior classification determinations. Compl. ¶ 58. Commenters noted ATF's reversal of its long-standing legal position seemed arbitrary and capricious on its face. *See* Final Rule at 24,689.

## IV.   PUBLICATION OF THE FINAL RULE

The Final Rule was published on April 26, 2022 and took effect on August 24, 2022.

The Final Rule amends 27 C.F.R. § 478.11 by adding a fifth category to the definition of a "firearm," which has no basis in the statutory text of the GCA, section 921(a)(3). Final Rule at 24,735. Under this new provision, a collection of parts— none of which independently constitutes a firearm—could nonetheless be characterized by the government as a firearm based on a subjective determination that the items, when grouped together, may "readily" be assembled into a firearm. *Id.* Furthermore, parts combined with tools and/or jigs and/or instructions might be deemed capable of being "readily" assembled into a firearm, thus fitting the definition of "weapon parts kit."

The Final Rule newly defines "readily" as a "process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." Final Rule at 24,735; *see also id.* at

24,747.  The Final Rule then provides a non-exclusive list of eight unranked, unweighted factors relevant to the determination of *readily*-ness, none of which is dispositive. *Id.* at 24,735. The Final Rule also replaces the clear, one-sentence definition of "firearm frame or receiver" under 27 C.F.R. § 478.11 with a convoluted, lengthy, three-paragraph definition. Final Rule at 24,735. Accordingly, the definition of a "firearm" or "frame or receiver" now turns on whether the product "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver," leaving ATF to ignore decades of legal determinations based on objective standards and make arbitrary determinations of whether an item "*may readily*" be considered having the characteristics of a potential, future frame or receiver.

ATF's abandonment of its permissible, consistent interpretation of the GCA and the limits of the regulatory definitions has little to do with adaptations to modern technological advancements, and more to do with ATF's obedience to a White House that "will not wait for Congress to act" to attain its gun control objectives. Compl. ¶ 41.

The Final Rule (unlawfully) replaced decades of classification determinations—including scores of detailed technical analyses, measurements, and images cumulatively comprising a library of publicly available guidance that was **objective**, **quantitative**, **understandable**, and **in alignment with the limitations established by the GCA**—with a series of new definitions that are *subjective*, *qualitative*, and *patently susceptible to divergent interpretations*. These phrases, when combined with the Final Rule's authorization of the ATF Director to "consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials," effectively delegate to the

7

ATF Director unbounded discretion to unilaterally determine the reach of ATF's jurisdiction over any raw materials, components, fabrication tools, and documentation utilized or involved in the firearm manufacturing process and supply chain. *Id.* at 24,739. Moreover, the Final Rule's vagueness makes it impossible for manufacturers, distributors, and customers to understand which product designs are regulated by the Final Rule and which are not, Final Rule at 24,677–79, creating profound uncertainty given the potential criminal penalties for violations and substantial waste in determining which facets of the firearms manufacturing supply chain require a federal firearms license. *Id.* at 24,677–79.

## LEGAL STANDARD

### I.   SUMMARY JUDGMENT

Summary judgment should be granted when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "APA cases are often resolved at summary judgment because whether an agency's decision is arbitrary and capricious is a legal question that the court can usually resolve on the agency record." *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just speedy and inexpensive determination of every action." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 317).

### II.  APA STANDARD

The APA requires "the reviewing court" to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B). Pursuant to the APA, federal courts therefore regularly vacate unconstitutional agency actions. *See Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 384, 388 (5th Cir. 2018).

## SUMMARY OF THE ARGUMENT

1. The Final Rule exceeds ATF's statutory authority under the plain language of the GCA.

2. Even if this Court were to determine that the GCA were ambiguous on this point (which it is not), *Chevron* deference does not apply.

3. The Final Rule is contrary to constitutional rights because it is impermissibly vague; infringes upon the lawful exercise of Second Amendment rights; chills First Amendment speech; effectuates a regulatory taking of privately made firearms without just compensation; and contravenes the separation of powers, the Nondelegation Doctrine, and the Commerce Clause.

4. The Final Rule violates the APA and must be set aside because it was not a logical outgrowth of the Notice and Comment period, and it is arbitrary and capricious.

## ARGUMENT

## I.   THE FINAL RULE VIOLATES THE PLAIN LANGUAGE OF THE GCA

A plain reading of the GCA shows that the Final Rule fails to conform to the statute. ATF's expansion of its own regulatory authority contravenes the unambiguous, expressed intent of Congress in the GCA.  The Final Rule is thus unlawful.

The Fifth Circuit has held that "[w]hen interpreting a statute, [the Court] begin[s] with the text." *United States v. Bittner*, 19 F.4th 734, 743 (5th Cir. 2021). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Courts in the Fifth Circuit evaluate Congressional intent "the old-fashioned way," *i.e.*, assessing words and phrases that are included in the text of the statute and adopting the meaning of the words and phrases from the time the statute was passed. *Cargill*, 57 F.4th at 458–60. At bottom, where a "statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (internal quotation marks omitted).

### A.   Congress's Definition of "Firearm" under the GCA Unequivocally Excluded Partially Complete, Disassembled, or Nonfunctional "Frames or Receivers," as Well as "Weapon Parts Kits"

The Final Rule goes beyond the plain language of the GCA by redefining "frame or receiver" and inserting "weapon parts kits" into the definition of "firearm."

First, in subsection (A) of 18 U.S.C § 921(a)(3), Congress expressly wrote that "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" is a firearm. 18 U.S.C. § 921(a)(3)(A). However, under subsection (B)—which concerns a "frame or receiver"—Congress chose not to include the concept of "designed to or may readily be converted" to expel a projectile. 18 U.S.C. § 921(a)(3)(A).

Here, in the face of Congress' unambiguous intent, the Final Rule injects the language from subsection (A) into subsection (B). Particularly, the Final Rule rewrote the

statutory text in subsection (B) with the following language: "includ[ing] a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit" that "may readily be completed, assembled, restored, or otherwise converted to a function as a frame or receiver." Final Rule at 24,739. This is unlawful. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021). Congress could have included language from subsection (A) in subsection (B) to expand the regulatory scope regarding a frame or receiver or nonfunctional firearm parts to include those that "may readily be converted" into a firearm, but Congress did not. Additionally, given the standard—"intentional[] or purpose[ful] . . . inclusion or exclusion"—the Agencies cannot plausibly argue that the language in subsection (A) is incorporated or linked to the language in subsection (B); to do so would effectively reverse the presumption, *supra*, and would also open the door for any administrative body to expand its own regulatory scope by making its own self-serving, politically convenient interpretation of Congressional intent. Congress's carefully crafted language must be given effect, and the Agencies are not allowed to re-write statutory language as they see fit.

Second, the plain language of 18 U.S.C. § 921(a)(3) demonstrates that "firearm" does not include "parts kit[s]." Congress, however, *did* choose to regulate "parts" that can be used to assemble or create a destructive device or silencer, *see* 18 U.S.C. § 921(a)(4)(c); 18 U.S.C. § 921(a)(25), thus indicating that the omission of "parts" from the definition of "firearm" was a deliberate decision by Congress.

11

Here, the Agencies once again unlawfully seek to expand their regulatory power by adding language to a statute despite Congress' unambiguous exclusion of such language. Specifically, the Agencies adopted a new definition of "firearm": "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *See* 27 C.F.R. § 478.11. This is an unlawful attempt to expand regulatory authority to cover an expansive range of different items and components that do not meet the GCA's definition using a term—"parts"—in a manner that Congress deliberately declined to exercise.

Again, "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins*, 141 S. Ct. at 1782. As the Fifth Circuit observed in *Cargill*, context and grammar matter and, as in that case, "Congress knew how to write a definition" that would have followed the Government's preferred reading "if it wanted to[, b]ut it did not." *Cargill*, 57 F.4th at 460. Furthermore, as in *Cargill*, "[t]he Government offers nothing to overcome this plain reading[.]" *Id.* Congress's unambiguous language must be given effect and its deliberate omissions must be respected.

## II.    *CHEVRON* DEFERENCE DOES NOT APPLY

Even if this Court disagrees with Plaintiff's plain-language arguments, *supra* Argument, Section I, *Chevron* deference does not apply for two reasons. *Chevron USA, Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837 (1984).

First, *Chevron* does not apply because the Final Rule interprets a statute that imposes criminal penalties. *Cargill*, 57 F.4th at 467 ("[t]he *Chevron* framework does not apply for a second, independent reason: the statute which the [] Rule interprets imposes criminal penalties."); *see also id.* (citing and quoting *United States v. Garcia*, 707 F. App'x 231, 234 (5th Cir. 2017) ("The Supreme Court has now resolved this uncertainty, instructing that no deference is owed to agency interpretations of criminal statutes."). Here, violations of the GCA give rise to criminal liability, including imprisonment. *See*, *e.g.*, 18 U.S.C. §§ 922, 924. This Circuit has made clear that it "must not apply *Chevron* where, as here, the Government seeks to define the scope of activities that subject the public to criminal penalties." *Cargill*, 57 F.4th at 467.

Second, *Chevron* does not apply here "because the Government has construed the same statute in two, inconsistent ways at different points in time." *Cargill*, 57 F.4th at 469; *id.* at 468 ("If we were required to defer to the Government's position, the Government could change the scope of criminal liability at any time."). In 2020 the Government asserted that "[a]s a statutory matter, Congress has legislatively defined a 'firearm' to be a weapon that may be readily converted to expel a projectile by the action of an explosive, or the frame or receiver of such weapon, but has explicitly excluded 'firearms parts' from that definition," *See* Defs.' Mot. to Dismiss at 10–11, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685 (N.D. Cal. Nov. 30, 2020). The Final Rule shows ATF now takes a substantially different position regarding Congress's statutory definition, and therefore its newly adopted interpretation is not afforded deference under *Chevron*. *See Cargill*, 57 F.4th at 469 ("Indeed, the Supreme Court has long recognized that an agency interpretation

13

that conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view. The concern is only magnified where, as here, the Government's interpretation of the underlying statute carries implications for criminal liability. As such, *Chevron* does not apply because the Government has construed the same statute in two, inconsistent ways at different points in time.").[4]

## III.   THE FINAL RULE VIOLATES THE CONSTITUTION AND DIVISION 80'S CONSTITUTIONAL RIGHTS

### A.   The Final Rule Is Unconstitutionally Vague in Violation of Due Process

Numerous public comments on the NPRM highlighted the subjective nature of what now is the Final Rule's new definitions and expressed strong concern that vagueness throughout the Final Rule makes it impossible for an ordinary citizen to know which or whether a given product or activity is subject to regulation and potential criminal penalties. Final Rule at 24,677–79.

When a criminal statute is challenged as vague, courts consider the challenge under the rubric of the Fifth Amendment's due process clause. *United States v. USPlabs, LLC*, 338 F. Supp. 3d 547, 570–71 (N.D. Tex. 2018) (citing *Johnson v. United States*, 576 U.S. 591, 595 (2015)). The government violates due process by taking away an individual's "life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Id.* (quoting *Johnson* at 591). "[T]he prohibition of vagueness in criminal

---

[4] In like manner, the rule of lenity should be applied in favor of Division 80 should this Court find that the GCA is not unambiguous. *See Cargill*, 57 F.4th at 469–71.

statutes . . . is 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law.'" *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

Importantly, the statutory definition of "firearm" is pivotal in the context of criminal enforcement and liability. *See*, *e.g.*, *Staples v. United States*, 511 U.S. 600, 609–10 (1994) (discussing whether *mens rea* element of criminal statute required that defendant "know of the particular characteristics that make his weapon a statutory firearm" and rejecting government's contention that guns are "highly dangerous devices" and therefore gunowners "should be alert to the probability of regulation").

In lieu of proactively taking the steps to clarify the unconstitutionally vague portions of the Final Rule, the Agencies instead instruct members of the public to ask for ATF's opinion "to the extent there is uncertainty about a particular item[.]" Final Rule at 24,679; *see also id*. at 24,672; 24,696 ("If persons remain unclear which specific portion of a weapon or device falls within the definitions of 'frame' or 'receiver,' then they may voluntarily submit a request to ATF").[5] The Fifth Amendment, however, requires that the

_____

[5] The following excerpt from the Final Rule underscores the existing "uncertainty":

> "Each such voluntary request or form submitted shall be executed under the penalties of perjury with a complete and accurate description of the item or kit, the name and address of the manufacturer or importer thereof, and a sample of such item or kit for examination. A firearm sample must include all accessories and attachments relevant to such classification as each classification is limited to the firearm in the configuration submitted. Each request for classification of a partially complete, disassembled, or nonfunctional item or kit must contain any associated templates, jigs, molds, equipment, or tools that are made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit, and any instructions, guides, or marketing materials if they will be made available by the seller or distributor with the item or kit."

Final Rule at 24749. The logical result of this language—which is now codified in 27 CFR § 479.102(c)—is for the public to be discouraged from even submitting a classification request in the first place out of fear of unforeseen criminal liability.

law be clearly written so that persons of ordinary intelligence can understand it, without being forced to seek dispensations or indulgences from bureaucrats.[6] *USPlabs, LLC*, at 570–71 (An ordinance is vague in all its applications where (1) "it subjects the exercise of [a] right . . . to an unascertainable standard," or (2) persons "of common intelligence must necessarily guess at its meaning." (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (citation omitted)).

The Final Rule fails to inform industry and individuals what concurrent purchases may result in a non-firearm item becoming a regulated "firearm." The Final Rule says only that a non-firearm item sold and/or purchased with a jig, or a tool, or instructions, or some combination of these, if by the same company or a company conspiring with another company, *may be* a "firearm"; however, the Agencies fail to elaborate or provide specifics as to what other "templates, [] molds, equipment, tools, instructions, guides, or marketing materials," or any of the myriad combinations thereof, may be considered a "firearm" if accompanying another item. Additionally—and only adding to the confusion—ATF sent an open letter to all FFLs on December 27, 2022, which states:

> "partially complete . . . frames, including, but not limited to, those sold within parts kits, have reached a stage of manufacture where they 'may

---

[6] Further, the vagueness of the Final Rule is consistent with the tactical ambiguity giving agencies increased enforcement flexibility—a particular concern that multiple Justices have raised. *See Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 718 F.3d 488, 493 n.6 (5th Cir. 2013) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 525 (1994) (Thomas, J., dissenting, joined by Stevens, O'Connor, and Ginsburg, JJ.) and noting that "[w]here courts defer completely to agency interpretations of their own regulations, 'the incentive is to speak vaguely and broadly, so as to retain a 'flexibility' that will enable 'clarification' with retroactive effect." (quoting *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 620 (2013) (Scalia, J., concurring in part and dissenting in part) and citing *id*. at 615 (Roberts, C.J., joined by Alito, J., concurring) (expressing agreement)).

readily be completed, assembled, restored, or otherwise converted' to a functional frame. This definition of 'readily' applies to each and every classification of a partially complete frame or receiver under this Rule, whether sold alone or as part of a kit. Therefore, even without any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials, these partially complete pistol frames are 'frames' and also 'firearms' as defined in the GCA and its implementing regulations, 18 U.S.C. § 921(a)(3)(B) and 27 CFR 478.12(a)(1), (c)." [7]

As a consequence of this incongruity, no amount of expertise or sophistication is sufficient to discern whether a given combination is a "firearm" because there is no limitation to what the ATF Director "may consider" in determining whether the combination of items results in the existence of a regulated firearm. This just one of multiple provisions in the Final Rule that are beyond the ken of a person of ordinary intelligence to determine what conduct is regulated or prohibited. *See Weaver v. Harris*, 856 F.Supp.2d 854, 858 (S.D. Miss. 2012) (argument that licensee's violations were minor or honest errors was unavailing because "the GCA does not provide a dispensation for 'minor' errors") (citation omitted), *aff'd*, 486 Fed. App'x 503 (5th Cir. 2012). The Final Rule is therefore unconstitutionally vague.

## B. The Final Rule Infringes on the Exercise of Second Amendment Rights

The Second Amendment protects "the right of the people to keep and bear Arms" and the Ninth Amendment recognizes that the people have inalienable rights not expressly enumerated in the Constitution. The Final Rule infringes on the rights of Plaintiffs to keep and bear arms, to engage in lawful self-defense, to make their own firearms, to possess

---

[7] *Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames*, ATF (Dec. 27, 2022), https://www.atf.gov/rules-and-regulations/docs/open-letter/all-ffls-dec2022-open-letter-impact-final-rule-2021-05f/download. *See* Exhibit C.

property lawfully acquired, and to earn a living by manufacturing and selling lawful goods in commerce.

In the Final Rule, ATF reports that comments were received from "[a] majority of commenters opposed to the NPRM" to the effect that ATF's "new requirements that undermine the Second Amendment are unconstitutional," and that "the NPRM failed to include relevant Second Amendment analysis." *See* Final Rule at 24,676; *see also id* at 24,677. In response, the Final Rule includes a "Second Amendment analysis" that was absent from the NPRM, but confidently asserts that "this final rule is consistent with the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008)" because "[t]here are compelling governmental interests in requiring privately made firearms to be marked and recorded whenever they are accepted into the business or collection inventories of licensees." *Id*. at 24,676.  The Agencies further contended that ATF's regulatory changes do not violate Second Amendment rights on the theory that "this rule serves the *compelling governmental interest* of preventing unserialized firearms from proliferating throughout the country" and "imposes a *minimal burden* on the possession of firearms." *Id*. at 24,677 (emphasis added); *see also id*. (relying on cases discussing whether a restriction "severely burden[s] Second Amendment-protected conduct" and is a "reasonable fit for achieving the City's objectives of "public safety and crime prevention," and upholding another restriction because "the 'burden imposed by the law does not severely limit the possession of firearms.'").

However, the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* issued June 2022 invalidated the legal grounds on which the Final Rule's Second

Amendment analysis relies. 142 S. Ct. 2111 (2022). In *Bruen*, the Supreme Court "decline[d] to adopt that two-part approach" used in the lower federal courts and relied on by ATF in the Final Rule, "decline[d] to engage in means-end scrutiny generally," and "specifically ruled out the intermediate-scrutiny test[.]" *Id.* at 2117–18. In doing so, the Court made clear that the level of severity of a "burden" on Second Amendment rights is immaterial—any "burden" will do. *Id.* at 2126 (finding step two, which looks at "the severity of the law's burden on that right," to be "one step too many"). The Court similarly rejected the ubiquitous "public-safety" talisman waved by governments to justify Second Amendment infringements." *Id.* at 2126 n.3 (citation omitted).[8] In light of *Bruen's* express holdings that "public safety" is an insufficient justification for an infringement, and that even a "minimal burden" on protected rights is still an unconstitutional infringement, the Agencies' rulemaking is marred by a fundamental defect.

Consequently, under *Bruen*, the Final Rule cannot satisfy its Constitutional burden by referencing the alleged "problem of untraceable firearms being acquired and used by violent criminals and terrorists," and lamenting that the law as it currently exists makes it "more difficult for law enforcement to trace firearms, including PMFs."[9] Final Rule at 24,688–89; *see also* Regulatory Impact Analysis at 27, 47 (justifying the Final Rule, even though "[w]hen PMFs are made for personal use, they are not required by the GCA to have

---

[8] Unfortunately for Defendants, ATF elevated "public safety" as the "primary benefit" of the Final Rule. *See* NPRM at 24,724 ("ATF reiterates that the primary benefit of the final rule is promoting public safety and restricting felons and other prohibited persons' access to firearms.")
[9] PMF refers to "privately made firearms"—another regulatory category that ATF's seeks to formalize and expand via the Final Rule.

a serial number," but "because PMFs do not bear a serial number . . . ATF has found it extremely difficult to complete [] traces on behalf of law enforcement.").

Moreover, *Bruen* makes it clear ruled that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. This is because "[t]he Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U.S. at 635. It is this balance—struck by the traditions of the American people—that demands the court's unqualified deference. *Bruen*, 142 S. Ct. at 2131.

In sum, because the Final Rule's regulatory promulgations were wholly reliant upon a legal scrutiny framework that has been rejected and rendered obsolete by the Supreme Court's controlling Second Amendment jurisprudence, the Final Rule is therefore "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

## C.   The Final Rule Chills Protected Speech in Violation of the First Amendment

By adopting the Final Rule, ATF seeks to regulate protected speech in violation of the First Amendment. In determining when a "partially complete" frame or receiver reaches a stage where it is classified as a firearm, the Final Rule indicates that "the Director may consider any available instructions, guides, templates, jigs, equipment, tools, or marketing materials." Final Rule at 24,678. Instructions, guides, templates, marketing

20

materials and other similar information all constitute speech, whether printed on a piece of paper that is included in a product box, or available in a digital format. *See IMS Health Inc. v. Sorrell*, 630 F.3d 263, 271–72 (2d Cir. 2010) ("The First Amendment protects [e]ven dry information, devoid of advocacy, political relevance, or artistic expression" and "speech in a form that is sold for profit is entitled to First Amendment protection.") (internal quotations omitted), *aff'd*, 564 U.S. 552, 566, 570 (2011) (noting "creation and dissemination of information are speech for First Amendment purposes"); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–70 (1976) (drug price information in advertisements is speech); *Bernstein v. U.S. Dep't of State*, 922 F. Supp. 1426, 1435 (N.D. Cal. 1996) ("Instructions, do-it-yourself manuals, recipes . . . are also speech.").

Notably, not all information accompanying an unfinished frame or receiver transforms an unregulated non-firearm item into a firearm pursuant to the Final Rule. Rather, speech accompanying an unfinished frame or receiver "may" be considered by the ATF Director in (unilaterally) determining whether an unfinished frame or receiver is a firearm. Final Rule at 24,678. ATF's determining which speech affects the classification of an item constitutes content-based restriction because it requires "enforcement authorities" to "examine the content of the message that is conveyed to determine whether" the speech should be restricted. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984).

As a result, the Final Rule forces Division 80 and similarly situated businesses to regulate speech by deleting instructions from their websites in order to avoid the threat of

criminal liability arising from the unlicensed sale of some combination of non-firearm items that together may constitute a "firearm." The possibility that two identical pieces of metal could be treated differently depending on whether they are associated with instructions, or where the instructions might be acquired from, chills First Amendment speech that guides lawful activity recognized by the Final Rule itself. *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 928–29 (5th Cir. 2020) ("In overturning the 'professional speech' doctrine . . . the Court rejected any theory of the First Amendment that 'gives the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement.'") (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2375 (2018)).

These and other aspects of the Final Rule impermissibly regulate the speech of Division 80 and are in direct violation of the First Amendment.

### D.    The Final Rule Effectuates a Regulatory Taking of "Privately Made Firearms" Without Just Compensation

The Final Rule imposes onerous government regulations that effectuate the appropriation of personal property by the government without just compensation, which constitutes a regulatory taking in violation of the Fifth Amendment. The Supreme Court has recognized that onerous government regulations can effectuate a regulatory taking. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (noting that the Court looks at the "economic impact of the regulation" and "the extent to which the regulation has interfered with distinct investment-backed expectations"); *see also Penn.*

*Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("[I]f regulation goes too far it will be recognized as a taking.").

The Final Rule seeks to require licensees with "privately made firearms" in their inventories to either mark them according to the Final Rule's specifications, destroy them, or "voluntarily" turn them over to a law enforcement agency. Final Rule at 24,679–80. The Final Rule places no restrictions on what the government may choose to do with "privately made firearms" that are surrendered to the government. Consequently, the Final Rule's regulations on "privately made firearms" effectuate a regulatory taking of personal property without just compensation, thus violating the Fifth Amendment's Takings Clause. *See Horne v. Dep't of Agriculture*, 576 U.S. 351, 357 (2015).

### E. The Agencies' Rulemaking Actions and Adoption of Final Rule Violate the Separation of Powers

"Under our system of government, Congress makes laws and the President, acting at times through agencies like [ATF], 'faithfully execute[s]' them." *Utility Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (quoting U.S. CONST., Art. II, § 3). While the power to execute laws "necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration . . . it does not include a power to revise clear statutory terms." *Id.*; *see*, *e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) (agency lacked authority "to develop new guidelines or to assign liability in a manner inconsistent with" an "unambiguous statute").

The Final Rule represents an attempt by an administrative agency to implement policy change and enact omnibus federal gun control legislation through bureaucratic regulation, rather than through legislation, and in so doing violates the Constitution.

### F.      The Final Rule Violates the Nondelegation Doctrine

Under Article I of the U.S. Constitution, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. Art. I, § 1. Yet, Congress can delegate some authority to the Executive Branch (or independent agencies) to engage in rulemaking without violating principles of non-delegation, even where such rulemaking may lead to criminal consequences. *See Loving v. United States*, 517 U.S. 748, 768 (1996) (documenting the Supreme Court's history of "uphold[ing] delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal").

If this Court concludes that the Final Rule is authorized by statute, then the statutory scheme unconstitutionally delegates legislative power with no intelligible principle, violating the nondelegation doctrine. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).  Further, various provisions of the Final Rule effectuate a double delegation by interpreting Congress's delegation of authority to ATF as allowing for the promulgation of a rule that in turn delegates to the ATF Director unbounded discretion to create or revise legislative standards.

**G.     The Final Rule's Regulation on "Privately Made Firearms" Exceeds the Limits of the Commerce Clause**

To the extent the Final Rule seeks to impose regulations on intrastate activities with no interstate nexus, such requirements exceed Congress's authority under the Commerce Clause. U.S. CONST. Art. I, § 8, cl. 3.

## IV.     THE FINAL RULE VIOLATES THE APA AND MUST BE SET ASIDE

**A.     The Final Rule Was Not a Logical Outgrowth of the NPRM and Failed to Satisfy the Public Participation Requirements of the APA**

Defendants' rulemaking renders the Final Rule procedurally defective because the Final Rule is not a logical outgrowth of the NPRM.

After publishing notice in the Federal Register of "the terms or substance of the proposed rule or a description of the subjects and issues involved," an agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b), (c). That opportunity must be "meaningful", which requires the final rule to be "a logical outgrowth" of the proposed rule "in the sense that the original notice must adequately frame the subjects for discussion." *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) (internal quotations omitted).

The Agencies made material changes between the proposed and final versions of the Rule to critical definitions—including "frame or receiver" and "partially complete" items—and failed to identify all of the sources they relied upon until publication of the Final Rule, depriving the public and regulated entities of adequate notice of and meaningful opportunity to participate in the rulemaking process as required under the APA. 5 U.S.C.

§ 553(c) (rulemaking requires an agency to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments" and to give "consideration of the relevant matter presented"). For example, in response the public's comments, ATF, rather than amending the NPRM or formally proposing a new definition of "frame or receiver" and seeking public comment thereon, simply wrote a new definition of "frame or receiver" and promulgated it as a regulation in the Final Rule without any opportunity for notice and comment.[10] Final Rule at 24,693 (the Final Rule "provid[es] *new distinct definitions*" (emphasis added)).

The public could not have anticipated—and should not be expected to possess such prescience—the introduction and adoption of new terms in the Final Rule that do not correspond with the Agencies' definitions in the NPRM. The reality is that the Defendants introduced definitions that evolved after the NPRM without providing notice to the public or opportunity for meaningful comment.[11] Accordingly, because Defendants failed to provide fair notice and give the public opportunity to meaningfully comment on the noted definitions in the Final Rule, these provisions are not the "logical outgrowth" of the NPRM,

---

[10] The NPRM revised the definition of "frame or receiver" into four sub-categories, each with a discrete definition. NPRM at 27,741–46. In the Final Rule, however, the Agencies did not include any definition of "frame or receiver," instead amending 27 C.F.R. § 478.11 to say that "[t]he term 'frame or receiver' shall have the same meaning as in § 478.12." Final Rule at 24,735.  But the newly minted 27 C.F.R. § 478.12 skips past providing any baseline, starting-point definition of "frame or receiver" and instead provides an expanded list of sub-categories, each with its own definitions. Final Rule at 24,735–41.

[11] For instance, "privately owned firearms marked by nonlicensees" appears nowhere in the NPRM, but is defined in the Final Rule, *id*. at 24,743, and appears to comprise yet another subcategory of "firearms" that has no recognizable link to the GCA, but over which ATF intends to assert enforcement power by a newly-expanded definition of *gunsmith* that is responsible for marking privately owned firearms. *Compare* NPRM at 27,742 *with* Final Rule at 24,734.

in violation of the APA. *See Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021) ("Final rules under the APA notice-and-comment rulemaking must be the 'logical outgrowth' of the proposed rule."); *Nat'l Lifeline*, 921 F.3d at 1116 (final rule not a logical outgrowth where particular definition of "rural" lands was not mentioned in NPRM).

### B.    The Final Rule Is Arbitrary and Capricious

The Final Rule is in violation of the APA because it is arbitrary and capricious. It must therefore be set aside.

The APA directs courts to set aside agency action that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). A court must set aside agency action if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). A rule may be found arbitrary and capricious if the agency failed to "examine the relevant data and articulate a satisfactory explanation for its action", *id.* (internal quotation marks omitted), or failed to "respond to relevant and significant public comments in a reasoned way." *Mozilla Corp. v. FCC*, 940 F.3d 1, 69–70 (D.C. Cir. 2019) (*per curiam*) (quotation marks omitted). Further, a rule is arbitrary and capricious if it changes a prior policy which has "engendered serious reliance interests" but which the agency has failed to properly consider in its rulemaking. *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1139 (5th Cir. 2021).

The text and background of the GCA reflect a deliberate decision by Congress to not regulate each and every part of a "firearm."[12] For the next five decades, ATF issued classification determinations in accordance with the GCA that provided law-abiding citizens and businesses in the firearms industry with guidance about what is considered a firearm and what is not. *See supra* at 3–4. It is therefore unquestionable that the Agencies began the rulemaking process (leading to the Final Rule) with the clear recognition that the GCA reflects Congress's intent to *not* regulate all parts of a firearm. *See* NPRM at 27,720 ("Congress recognized that regulation of all firearm parts was impractical.").

The Final Rule introduces the novel term "weapon parts kit" which directly conflicts with the definition of "firearm" under 27 C.F.R. § 478.11; *see also supra* Argument, Section I(A). The Agencies provided no explanation for the contradiction between this term in the Final Rule which expressly regulates weapon *parts* and ATF's admission, NPRM at 27,720, that the GCA does not regulate weapon parts. *See* 18 U.S.C § 921(a)(3) (the GCA does not include in its definition of "firearm" the regulation over items that could be constructed into a firearm, only regulation of a "weapon" or the "frame or receiver of any such weapon"); *see also supra* Argument, Section I(A).

---

[12] In repealing the Federal Firearms Act of 1938 and replacing it with the GCA in 1968, Congress determined that regulating all component parts of a firearm was impractical and crafted a statutory definition of "firearm" that included (in subsection (B)) the "frame or receiver"—but no other parts—of a firearm. *See* 111 Cong. Rec. 5527 (March 22, 1965) ("The present definition of this term includes 'any part or parts' of a firearm. It has been impractical to treat each small part of a firearm as if it were a weapon. The revised definition substitutes the words 'frame or receiver' for the words 'any part or parts.'"); *see also* H.R. Rep. 90-1577, at 4416 (June 21, 1968) ("Under former definitions of 'firearm,' any part or parts of such a weapon were included. It was found impractical to have controls over each small part of a firearm. Thus, this definition includes only the major parts of the firearm, that is, the frame or receiver.").

Despite its awareness and admission, and in the face of public comments to the NPRM, the Agencies simply "disagree[d] with commenters' suggestion" that the Agencies could not use the "concepts of 'readily' and 'converted'" in the definition of "frame or receiver." Final Rule at 24,685. Citing no legal authority for the change, the Agencies simply offer the conclusory assertion that their position in the Final Rule is "appropriate" because the act of manufacturing is also the act of converting. *Id.* Defendants' self-serving stance does not adequately explain or identify any authority to support their new position.

Defendants likewise do not adequately explain the NPRM and Final Rule's suggestions that a firearm can have multiple frames or receivers.  Despite the absence of any ambiguity in the GCA's provision that a "firearm" can have only one "frame or receiver," the NPRM originally proposed the "possibility a firearm may have more than one frame or receiver . . . ." NPRM at 27,734. ATF conceded that its NPRM assertion was untenable, stating that it "agrees with comment[e]rs that the definition of 'firearm' in 18 U.S.C. Section 921(a)(3)(B) is best read to mean a single part of a weapon or device as being 'the' frame or receiver." Despite this admission, the Final Rule simply says that ATF "disagrees" that the statute "*must* be read to mean that a firearm may not have more than one frame or receiver," and asserts that "it is *possible* that the term 'frame,' for example, could be referring to multiple frames within a handgun, or both a frame and a receiver in a split handgun design." *Id*. at 24,683 (emphasis added).

In reality, the Final Rule admits the NPRM was wrong on the central definition in the GCA, but hedges its position by leaving the door open for future interpretations that may best serve ATF. This position cannot be reconciled with the text of the GCA or ATF's

positions in the Final Rule—demonstrating the kind of arbitrary and capricious rulemaking that is not permitted under the APA. *See Policy & Research, LLC v. HHS*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) ("[A]n agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute."). Worse, such arbitrary-and-capricious rulemaking exposes individuals and businesses to potential criminal liability because the Final Rule fails to provide clarity on what is or is not a firearm.

Defendants' arbitrary-and-capricious rulemaking is on full display in the Final Rule, which defies Congressional intent and exposes law-abiding citizens and businesses to potential criminal liability. Defendants have failed to acknowledge and/or adequately explain numerous, specific concerns raised in response to the Final Rule. Therefore, the Final Rule must be set aside under the APA.

### *Conclusion*

The Final Rule defies the plain language of the GCA, and violates the Constitution and the APA. Accordingly, Division 80 is entitled to summary judgment on the issues raised in its Complaint, and, consequently, vacatur of the Final Rule.[13]

---

[13] Vacatur is authorized by 5 U.S.C. § 706, which requires the Court to decide "all relevant questions of law [and] interpret constitutional and statutory provisions" and "hold unlawful and set aside" agency action "not in accordance with law," "in excess of statutory jurisdiction," or "short of statutory right." Because "under our Constitution, the people's elected representatives in Congress are the decisionmakers here—and they have not clearly granted the agency the authority it claims for itself," the Final Rule is unlawful. *West Virginia v. EPA*, 142 S. Ct. 2587, 2626 (2022) (Gorsuch, J., concurring); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) ("the ordinary practice is to vacate unlawful agency action").

Respectfully submitted,


/s/ *Michael J. Sullivan*
Michael J. Sullivan (Lead Attorney)
*Pro Hac Vice*, MA Bar No. 487210
J. Christopher Amrhein, Jr.
*Pro Hac Vice*, MA Bar No. 703170
ASHCROFT LAW FIRM LLC
200 State Street, 7th Floor
Boston, MA 02109
Phone: (617) 573-9400
Fax: (617) 933-7607
msullivan@ashcroftlawfirm.com
camrhein@ashcroftlawfirm.com

*Counsel for Plaintiff Division 80 LLC*

## **CERTIFICATE OF SERVICE**

I certify that on February 24 2023, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the registered CM/ECF users in this action.

/s/ *Michael J. Sullivan*
Michael J. Sullivan